1  Randolph Gaw (S.B. #223718)
   rgaw@gawpoe.com
2  Mark Poe (S.B. #223714)
   mpoe@gawpoe.com
3  Victor Meng (S.B. #254102)
   vmeng@gawpoe.com
4  Samuel Song (S.B. #245007)
   ssong@gawpoe.com
5  GAW | POE LLP
   4 Embarcadero, Suite 1400
6  San Francisco, CA 94111
   Telephone: (415) 766-7451
7  Facsimile: (415) 737-0642

8  Attorneys for Plaintiff AdTrader, Inc.

9

10

11  **UNITED STATES DISTRICT COURT**

12  **NORTHERN DISTRICT OF CALIFORNIA**

13

14  ADTRADER, INC.                          Case No. 17-7082

15              Plaintiff,                   **CLASS ACTION COMPLAINT**

16      v.                                   DEMAND FOR JURY TRIAL

17  GOOGLE LLC.

18              Defendant.

19

20      Plaintiff AdTrader, Inc. ("AdTrader") hereby makes the following allegations against

21  defendant Google LLC ("Google"):

22      1.      This is an individual action brought against Google for its failure to honor its

23  commitment to pay AdTrader for the ad revenue that Google received from placing its ads on

24  AdTrader's publishers' websites through the DoubleClick Ad Exchange ("AdX").

25      2.      This is also a class action brought against Google for its fraudulent promises that it

26  would refund or credit advertisers in the event that any ad impressions for advertisements served

27  through AdX were determined by Google to be invalid in some way.  The falsity of Google's

28  prior representations was exposed by the Wall Street Journal in an article dated August 25, 2017,

and exactly one week later, Google made sweeping changes to its contract terms with some of those advertisers (in fact, the tens or hundreds of thousands of advertisers that use Google AdWords) in an attempt to prevent them from filing any lawsuits against Google for such fraud.

3.      For years, Google has claimed to aggrieved AdX publishers that it was not contractually obligated to pay out their accrued ad revenues, regardless of whether Google's reasons for withholding such payment were justified, because Google had automatically refunded such revenues back to its advertisers.

4.      Google's representations, however, have turned out to be untrue from the very beginning.  Many of its advertisers never got any refunds (or even credits) when their advertisements were run on websites that Google later claimed to have fraudulent or invalid activity.  Instead, Google kept for itself all of those funds, as it refused to pay out anything to the AdX publishers that ran the websites displaying such ads with the supposedly invalid activity.

5.      In the August 25, 2017 Wall Street Journal article, advertisers revealed that, at most, Google only offers to refund 7-10% of the amount the advertisers had spent on what turned out to be invalid user traffic, and Google claimed that "this was appropriate because it doesn't control the rest of the money spent."  This is not a true statement, as in most situations, Google does control everything about how the money is spent.  Most of the advertisers referenced in the Wall Street Journal article had their advertisements displayed on the websites of AdX and AdSense publishers, and thus for those advertisers, Google had complete control over how much of their advertising spend was remitted to publishers and how much was retained by Google itself.  And for those advertisers that had their ads displayed on the websites of AdX and AdSense publishers with supposedly invalid traffic, Google actually kept all of these funds for itself rather than refund them back to advertisers.

6.      The falsity of Google's representations is best evidenced by the unfortunate experience of AdTrader.  AdTrader is a company that helps website publishers monetize their content through on-line advertising platforms, including AdX.  In May 2017, Google abruptly disabled AdTrader's AdX account without providing a coherent reason, and withheld close to

$500,000 in accrued AdX earnings from AdTrader.  When AdTrader pressed for the payments owed to it and its clients, Google responded the same way it has to hundreds of thousands of publishers for many years – that it could not and would not make any payments to AdTrader because it had already refunded the withheld earnings back to the advertisers whose advertisements were displayed on the websites of AdTrader's publishers.

7.      What Google apparently forgot, however, was that AdTrader also helps companies place on-line advertisements on various advertising platforms.  And so Google did not know that AdTrader and its advertising clients, using a Google product called DoubleClick Bid Manager ("DBM"), had placed some of the AdX advertisements that ran on the websites of AdTrader's publishers.  Thus, Google's explanation that it had refunded all of AdTrader's withheld earnings back to Google's advertisers rang false, **because neither AdTrader nor its advertising clients received any refunds**.

8.      Google's false explanation caused AdTrader to investigate, and its records showed that for the several years it and its advertising clients had advertisements on AdX, **they had never received a single cent as a refund (or credit) from Google**.  They had never received any refunds even though, every single month, Google withheld a small amount (usually between 0.15% and 0.2%) of accrued earnings from AdTrader on its publishing activities for what it deemed to be invalid activity and claimed to have refunded the withheld amounts to its advertisers.  During these months, however, some of the advertisements that AdTrader and its advertising clients placed through DBM were displayed on the websites of AdTrader's publishers.  Thus, if Google's explanation was true, then AdTrader and its advertising clients necessarily would have received some refunds or credits almost every month.

9.      AdTrader also inquired with other DBM and Google AdWords advertisers that placed ads through AdX to see if they had ever received a refund or credit on their ads.  None of them had.  This is statistically impossible, because Google always determines that a certain percentage of impressions (between 1% to 3% on average) on any particular advertisement every month is invalid for one reason or another.  Google did not pay anything out to its AdX publishers

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

for those supposedly invalid impressions, but also did not refund the advertisers for the monies they had paid to Google for these supposedly invalid impressions.  Instead, Google confiscated the money for itself.

10.     Thus, on behalf of all advertisers that had their advertisements displayed on the websites of AdX publishers, AdTrader also brings this action to recover all monies that Google withheld from paying those AdX publishers, but did not refund to those advertisers that had their advertisements featured on those publishers' websites.  Back in 2014, a leading adtech company had estimated that AdX collectively generated $1 million per hour in revenue for all of its publishers, which would mean that Google has been unjustly enriched by tens of millions of dollars to hundreds of millions of dollars, each year, by retaining instead of refunding amounts spent by advertisers on AdX on what Google claimed to be invalid impressions.

11.     AdTrader also brings this action on behalf of itself to recover the amounts that it had earned for displaying AdX advertisements, but that Google ultimately did not pay.  Under the contract between Google and its AdX publishers, Google can withhold payment of an AdX publisher's accrued earnings only if (i) such earnings were the product of invalid activity **and** (ii) the withheld amounts are refunded to the advertisers.  Evidence uncovered by AdTrader, however, reveals that when Google decides that ad impressions generated on an AdX publisher's website were invalid and withholds that publisher's accrued earnings as a result, Google is **not** refunding that withheld amount back to advertisers.  Instead, Google keeps those funds for itself in violation of its contractual obligations with AdTrader.

12.     In the end, the monies in question belong either to AdTrader, or they belong to the advertisers.  It is not equitable for Google to keep this money for itself, and this lawsuit is intended to force it to disgorge its ill-gotten gains and change its unjust practices.

## PARTIES

13.     Plaintiff AdTrader, Inc. is a Nevada corporation that has its principal place of business in New Jersey.  AdTrader, Inc. was formerly known as AdTradr Corporation, and had contracted with Google under that name.

14.     Defendant Google LLC. is a Delaware limited liability company that has its principal place of business in California.  Google LLC was formerly known as Google, Inc. at the time the parties first contracted with each other, but was subsequently converted to its current business form.

## JURISDICTIONAL STATEMENT

15.     The Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because there is a complete diversity of citizenship, and the amount in controversy exceeds $75,000.

16.     The Court has personal jurisdiction over Google because it transacts business in California and because in the Google DoubleClick AdX Service Agreement, it expressly consents to personal jurisdiction in this Court.

17.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Google resides and regularly conducts business in this district, and because the contracts with Google at issue in this lawsuit have forum selection clauses requiring that litigation of all disputes is handled in the state or federal courts of Santa Clara County, California.

## INTRADISTRICT ASSIGNMENT

18.     Google's headquarters is located in Mountain View, California, and therefore assignment to the San Jose division of this Court is appropriate.

## FACTUAL ALLEGATIONS

### *Background on DoubleClick Ad Exchange (AdX)*

19.     Google is the largest online marketing/advertising business in the world.  The AdWords Advertising Program ("AdWords") is Google's primary advertising program. AdWords advertisements are displayed in a variety of formats such as text and/or images, alongside or above search results, on webpages, in e-mails, on blogs, and/or in videos.

20.     The Google AdSense Content program enables online publishers of websites to partner with Google to earn revenue from AdWords advertisements displayed on websites under their ownership, license, registration and/or other control.  Google tracks each time Internet users click on advertisements displayed on AdSense publishers' websites and charges advertisers for

COMPLAINT
CASE NO. 17-7082

each click.  Google pays the AdSense publishers a portion of the amount paid by advertisers for the clicks, while retaining the remaining portion for itself.

21.     Like AdSense, DoubleClick Ad Exchange also allows website publishers to display advertisements in exchange for a share of the advertising revenue paid to Google by the advertiser for each "impression" (i.e., each time a unique user views the publisher's website displaying an advertisement served to that website through AdX).

22.     AdX differs from AdSense in that it is a programmatic, real-time bidding exchange that allows publishers and advertisers to exercise far more granular control over what advertisements are displayed and how much is paid by the advertiser to display those advertisements.  It also allows advertisers from outside of the Google Display Network to buy inventory from the publisher, thus significantly increasing the demand.

23.     Advertisers can buy ad space on AdX through DoubleClick Ad Exchange Buyer ("AdX Buyer"), as well as DBM (which is Google's demand-side platform).  AdX is an ad exchange, which means that it consolidates advertising demand from AdWords and other ad networks, exchanges, and demand-side platforms (such as DBM) to participating AdX publishers. Thus, for example, DBM and AdWords advertisers can end up buying ad space on the website of an AdX publisher.

24.     In layman's terms, advertisers have advertisements that they wish to display on websites and publishers have "inventory" (i.e., ad spaces on their websites) that can accommodate the display of those advertisements.  AdX facilitates these two groups transacting together for their mutual benefit.

25.     Put differently, AdX is viewed by industry participants as a more sophisticated ad placement service compared to AdSense, and attracts more experienced and/or larger publishers.

26.     Google offers a suite of DoubleClick products to assist publishers and advertisers in utilizing AdX.  Some of these products include DoubleClick for Publishers and DoubleClick Bid Manager, among others.  DoubleClick for Publishers is primarily used as an ad server to help publishers monetize their inventory.  DoubleClick Bid Manager is the largest demand-side-

platform in the world and is used to run ad campaigns for advertisers.  A demand-side-platform provides media buyers (such as advertisers, agencies, trading desks, etc.) with centralized access to multiple ad exchanges and networks where they can bid for their desired inventory.  DBM consolidates inventory from AdX, AdSense, and other ad exchanges.  In other words, an advertiser can use DBM to buy inventory on both AdX and also on non-Google controlled ad exchanges.  Most transactions end up consummated on a Google platform because Google controls a large share of the online advertising market.

27.     Another feature of AdX is that Google allows businesses to participate on the publishing side even if they do not have their own website, but as managers of websites belonging to others.  Google calls such entities Network Partner Managers ("NPM").  Essentially, NPMs help Google manage smaller publishers and penetrate in new markets.  NPMs also help Google gain additional share with its existing clients.  AdTrader was an NPM.

28.     Due to the sophisticated features offered by AdX, website content creators often engage NPM partners to focus on optimizing the revenue earned from Google advertisements placed on their websites (usually by selling ad space at the highest possible price), while those website content creators focus instead on content creation.

29.     These websites will accordingly be registered in the AdX program under the AdX account belonging to the NPMs, but may also be simultaneously registered in the AdX program under their own AdX account (or may also be registered in the AdSense program under their own account there).

30.     Similarly, Google allows businesses to participate in AdX on the advertising side even if they do not have any advertisements of their own to place, but as managers of advertisers seeking to place advertisements through DBM.  This is because much like AdX is a more sophisticated product than AdSense, DBM is a more sophisticated product than AdWords.  DBM provides more granular control and access to more inventory compared to AdWords.  It is also more difficult to manage and also requires a high minimum monthly ad spend to access the

platform.  Thus, smaller and mid-size advertisers typically work with business entities familiar with DBM rather than navigate the platform on their own.

31.    Google calls such entities advertising agencies, or advertising networks.  AdTrader was also classified by Google as an advertising agency, and then subsequently re-classified as an advertising network.  Thus, AdTrader would buy ad space on publisher websites on behalf of its advertising clients, and Google would charge AdTrader for ad impressions on those websites. AdTrader would advance those costs on behalf of its advertising clients and then get reimbursed for them by those clients.

32.    Most of AdTrader's advertising clients, however, would also have their own Google advertising accounts (such as AdWords).  That way, they could and would directly arrange for their advertisements to be displayed on the website of an AdX publisher.

33.    The Google Services Agreement, which AdTrader entered into, governs the relationship between AdX publishers and Google.  A true and correct copy of this contract is attached hereto as Exhibit 1.  The primary obligations of a publisher are set forth in Section 2.3 of the agreement, which requires that an AdX publisher adhere to Google's published AdX Guidelines and Google's technical protocols.

34.    The Google Services agreement also provides the following policies and procedures for Google's payments to AdX web publishers:

**Section 8.2: Google Payments**

(a)  For the Services, Google will pay Company an amount equal to the Revenue Share Percentage (listed on the front page of this Agreement) of Ad Revenues attributable to a calendar month.  This payment will be made in the month following the calendar month in which the applicable Ads were displayed provided that the amount owed to Company in a given month is above the minimum set forth in the AdX Guidelines.

(b)  Google's payments for the Services under this Agreement will be based on Google's accounting which may be filtered to exclude (i) invalid queries, impressions, conversions, or clicks, and (ii) any amounts refunded to advertisers in connection with Company's failure to comply with this Agreement, as reasonably determined by Google.

35.    Moreover, the Google Services Agreement lays out specific grounds for Google to terminate an AdX publisher's account.  The entirety of these grounds are as follows:

**Section 13.2: Termination**

(a)  Either party may terminate this Agreement with notice if the other party is in material breach of this Agreement:

    (i)  where the breach is incapable of remedy;

    (ii)  where the breach is capable of remedy and the party in breach fails to remedy that breach within 30 days after receiving notice from the other party; or

    (iii)  more than twice even if the previous breaches were remedied.

(b)  Either party may terminate this Agreement for any or no reason upon 30 days prior notice to the other party.

(c)  Google reserves the right to suspend or terminate Company's use of any Services that are alleged or reasonably believed by Google to infringe or violate a third party right.  If any suspension of a Service under this subsection 13.2(c) continues for more than 6 months, Company may immediately terminate this Agreement upon notice to Google.

(d)  Google may terminate this Agreement immediately with notice if pornographic content that is illegal under U.S. law is displayed on any Site.

36.     The Google Ad Exchange Master Service Agreement, which AdTrader entered into, is the primary contract that governs the relationship between advertisers using AdX Buyer and Google, as executing this agreement is a prerequisite to buy on AdX through DBM.  A true and correct copy of this contract is attached hereto as Exhibit 2.

37.     AdTrader, like some other advertisers using AdX Buyer, also entered into the DoubleClick Advertising Platform Agreement in order to utilize certain specific DoubleClick products.  A true and correct copy of this contract is attached hereto as Exhibit 3.

38.     Finally, the Google Inc. Advertising Program Terms, which AdTrader entered into, is the contract that governs the relationship between Google and advertisers using AdWords.  A true and correct copy of this contract is attached hereto as Exhibit 4.

### Background on AdTrader

39.     Plaintiff AdTrader is a company that manages on-line advertising for both advertisers and web publishers.  It delivers advanced programmatic and real-time bidding solutions that help advertisers and publishers execute media deals more effectively.

40.     Programmatic ad buying typically refers to the use of software to purchase digital advertising, as opposed to the traditional process that involves requests for proposals, human

negotiations, and manual insertion orders.  AdTrader is one of few companies offering solutions that address both sides of the market - the buy (advertisers) and sell (publishers).

41.     In return for a fee, AdTrader helps advertisers plan, execute, analyze, and optimize their ad campaigns to meet targets.  AdTrader places advertising bids on the Double Click Ad Exchange through DBM on behalf of these firms, handles implementation of their advertisements, and monitors advertising campaigns to ensure they are reaching their intended targets at the intended prices.

42.     Similarly, AdTrader uses its technology to help web publishers maximize the revenues they can earn from displaying advertisements on their websites by helping them expose their inventory to optimal demand.  AdX is AdTrader's biggest demand partner. Through AdX, AdTrader offered publishers access to the world's largest demand pool.

43.     AdTrader also ensures that web publishers are complying with the requirements of the online advertising exchanges they participate in (including AdX), ranging from actions such as making sure that advertisements are placed in the proper positions on the websites to vetting out objectionable content from those websites.

44.     AdTrader has worked extensively with Google for the last three years as an NPM and in its capacity as an advertising agency / advertising network.  In these roles, AdTrader has heavily utilized the various DoubleClick products and its employees are extremely knowledgeable about how to use them properly in accordance with Google's guidelines. AdTrader performed its obligations under the Google Services Agreement, and ensured that its publisher clients performed their obligations under the Google Services Agreement.  AdTrader and its publisher clients properly displayed Google's advertisements in conformity with Google's policies, did not display any impermissible content on their websites, and otherwise performed all of their required contractual duties.

45.     Similarly, AdTrader and its advertising partners always performed their obligations under the Google Ad Exchange Master Service Agreement, the DoubleClick Advertising Platform Agreement, and the Google Inc. Advertising Program Terms.  The primary

contractual responsibilities of advertisers under these agreements were to (i) pay Google (ii) not offer advertisements that violated Google's content guidelines, and (iii) not embed malware in those advertisements.  AdTrader and its advertising partners had no problems carrying out these contractual duties.

46.     AdTrader was also one of the larger NPM publisher accounts participating in AdX. As such, over the course of this multi-year relationship, Google account managers would regularly keep track of AdTrader's month-over-month growth, challenges, goals, and future plans through quarterly reports.

47.     Google account managers would also communicate with AdTrader employees (in phone calls, e-mails, on-line chats, and live meetings) about how to properly utilize the various DoubleClick products.  In these discussions, Google would reassure AdTrader that AdTrader and its publishers were complying with all of Google's policies, and would continue to be in compliance if they followed the implementation and optimization measures suggested by those employees.  (Meaning that Google employees would recommend to AdTrader to implement new layouts, such as ad units or ad formats, or advertisement placement strategies for their publisher websites that would be more effective at generating revenue from those advertisements.)

48.     For example, for much of 2016 and 2017, AdTrader's assigned account manager was a Google employee named Balint Torok.  Mr. Torok spoke to AdTrader employees on a regular basis, and reassured them that AdTrader's publishers' websites had high quality traffic. In fact, Mr. Torok would sometimes tell AdTrader employees the percentage of invalid impressions that AdTrader's publishers had for each billing period, and based on those representations, it appeared that only 0.15% - 0.2% of AdTrader's estimated revenue for the average billing period was the product of invalid activity (and accordingly deducted).  Mr. Torok said that this was an exceptionally low number compared to the vast majority of other AdX publishers, as the average amount of invalid activity on an AdX publisher website was usually several percentage points.

49.     Also, in February 2017, AdTrader employees were invited by Google to attend the Mobile World Congress in Barcelona.  During this event, AdTrader employees spoke to Google employees Anthony Nakache (the Director of Online Partnerships) and Rachad Saddi (a Channel Partner Manager).  Both said that they were very impressed with AdTrader and its growth, and hoped that AdTrader's AdX revenues would grow ten times larger.  At no point during this meeting did anyone from Google raise any concerns that AdTrader or its publisher clients had failed to comply with Google's AdX policies in any way, or that any of their user traffic was invalid in any way.

50.     AdTrader and its employees had another meeting with Google's AdX publisher team in April 2017, this time in Dublin, Ireland.  The two sides discussed in detail the publishers in AdTrader's account and the future plans it had for growing its AdX account.  At no point during this meeting did anyone from Google raise any concerns that AdTrader or its publisher clients had failed to comply with Google's AdX policies in any way, or that any of their user traffic was invalid in any way.

51.     By early 2017, AdTrader managed on-line advertising for hundreds of advertisers and web publishers.  The majority of publisher inventory was monetized through AdX, and the majority of the advertising campaigns were run through DBM and, because of Google's preference for directing advertisers to AdX, most of those ads were placed on AdX.  Most of AdTrader's publishing and/or advertising clients also had their own individual AdX, AdSense, and/or AdWords accounts as well.

### *Google Tries to Destroy AdTrader's Business*

52.     In early 2017, AdTrader began a contractual relationship with DingIt.tv ("DingIt") in its capacity as an NPM.  DingIt, and its parent company Level Up Media, is one of the leading video hosting services for e-sports.  AdTrader and DingIt had a contractual relationship.  AdTrader helped DingIt optimize the monetization of its content, including the bidding and placement of advertisements on DingIt web properties through AdX.

53.     DingIt was pleased with the quality of AdTrader's work.  On April 26, 2017, DingIt executives had a call with AdTrader's executives, and DingIt offered an exclusive partnership to AdTrader worth millions of dollars in added annual revenue.  AdTrader accepted.

54.     AdTrader's employees repeatedly made Google aware of the existence of the AdTrader-DingIt relationship.  In particular, in March and April 2017, AdTrader employees informed Google employees Pavel Pimshin (the then-current account manager assigned to AdTrader) and Mr. Torok that AdTrader was working with DingIt.  And on May 12, 2017, Mr. Pimshin e-mailed AdTrader to ask it to have DingIt directly contact Google and, even more unusually, to see AdTrader's contract with DingIt.

55.     On May 15, 2017, AdTrader introduced Mr. Pimshin and other Google employees to Adam Simmons, an executive of Level Up Media, as requested by Google.  Mr. Simmons then directly communicated with those Google employees by e-mail.

56.     AdTrader also gave Mr. Pimshim a copy of its contract with DingIt.  As a result, Google became fully knowledgeable about the terms of AdTrader's supply-side agreements, including when and how AdTrader remitted funds received from Google to its publisher clients.

57.     On May 19, 2017, a few days before Google was due to pay AdTrader its accrued AdX earnings (and only four days after DingIt contacted Google directly), without any warning, AdTrader received a form e-mail from Google stating, in part:

> Hello,
>
> This e-mail is to alert you that your DoubleClick Ad Exchange account was found to be non-compliant with our Ad Exchange program policies and as a result, your **Ad Exchange account has been disabled.**
>
> **Current account status:** Disabled
>
> **Action required:** None
>
> **Violation explanation**
>
> As stated in our program policies, sites displaying Google ads should provide substantial and useful information to the user.  Users should be able to easily navigate through the site to find what products, goods, or services are promised.  Examples of misguided navigation include, but are not limited to:
>
> False claims of downloadable or streaming content

Linking to content that does not exist

Redirecting users to irrelevant and/or misleading webpages

Text on a page unrelated to the topic and/or business model of the website.

**Payment**

As your account has been permanently disabled, we will withhold payment of your account balance.  As stated in the terms governing your Ad Exchange account, Google reserves the right to withhold from its payments to publishers any amounts refunded to advertisers in connection with the publisher's failure to comply with their Ad Exchange agreement, as reasonably determined by Google.  Please note that this step was taken in an effort to maintain the quality of the Ad Exchange program and to protect the interests of our advertisers.  The earnings on your account will be returned to the affected advertisers.

**No further accounts**

Please note that publishers disabled for invalid activity on Ad Exchange are not allowed any further participation in Ad Exchange, AdSense or our other ad monetization products.

58.     AdTrader's employees were utterly baffled by this e-mail.  None of websites monetized by AdTrader performed the kind of prohibited activities listed by Google, and Google employees had repeatedly confirmed that AdTrader's websites were in compliance with Google's policies.

59.     AdTrader's employees reached out to Google's employees for clarification, but did not receive any insight.  After ignoring or brushing off AdTrader for six days, finally Google employees would say only that AdTrader's account was disabled because it was found to be in violation of some unspecified AdX guidelines.

60.     AdTrader submitted an internal appeal to Google.  Google's appeal form is nothing more than a pro forma document, and only asks very general, standardized questions without permitting the user to elaborate on the reasons why Google's reasons for terminating the user's AdX account and withholding the accrued earnings were erroneous.  In particular, because Google's notice of violation did not actually inform AdTrader of what it did wrong, AdTrader had no way of knowing what facts to provide to Google to get it to reconsider its decision.

61.     Google summarily rejected AdTrader's internal appeal by means of an auto-generated e-mail that was sent a short time later.  On information and belief, nobody at Google

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

closely reviewed AdTrader's appeal, as the appeal form was designed to convey minimal information to Google and give publishers the illusion that Google might reconsider its decision.

62.     AdTrader's employees again asked Google representatives to provide further information as to what policy AdTrader had supposedly violated, and explained that AdTrader could not effectively appeal Google's decision if it did not know what it did that was wrong. Google's employees were unmoved and did not provide any additional information.

63.     In any event, Google prevented AdTrader from receiving the benefit of a meaningful appeal of its decision to terminate its AdX account and withhold its accrued AdX earnings, as Google refused to tell AdTrader the reason Google had terminated its account.

64.     AdTrader employees were 100% certain that none of its publisher websites had violated any Google policies.  But nevertheless, they pointed out to Google employees that, even if, hypothetically, one or two publisher websites were not in compliance with Google's rules, AdTrader's remaining websites (as it had over two hundred active publishers for that earnings period) would still be in compliance and it would not be fair to withhold the earnings generated from those compliant websites.  Google's employees remained unmoved.

65.     AdTrader's employees were also baffled by Google's decision to withhold payment of AdTrader's accrued AdX earnings, which totaled $476,622.69 as of May 19, 2017, for other reasons.  Per the express terms of the Google Service Agreement, Google could withhold AdTrader's accrued AdX earnings only if two grounds were met.  Under the first ground, it could withhold a publisher's AdX earnings for "invalid queries, impressions, conversions, or clicks[.]"  But Google's May 19, 2017 notice of violation did not even accuse AdTrader of having invalid queries, impressions, conversions, or clicks.

66.     Furthermore, AdTrader never received any prior notice from Google of a breach of the Google Services Agreement.  Indeed, the only contractual grounds for Google to immediately terminate that contract is if a web publisher displays pornographic content on its website, and AdTrader has never had any of its website publishers display any pornographic content.

67.     Most telling, however, is the fact that to this day, to the best of AdTrader's knowledge, none of its publisher clients have had their individual AdX or AdSense accounts suspended by Google, and continue to monetize their content through AdSense or AdX.  This was the case despite the fact that Google's termination e-mail clearly stated that "publishers disabled for invalid activity on Ad Exchange are not allowed any further participation in Ad Exchange, AdSense or our other ads monetization products."  Therefore, if AdTrader had, in fact, violated an AdX policy, then at least some of its publisher clients necessarily would also have had their individual accounts disabled, because AdTrader (as a NPM) only worked on the websites of its publisher clients.  The fact that none of AdTrader's publisher clients suffered a similar fate is proof that AdTrader did not, in fact, violate any Google policies.

68.     Google's employees certainly had a motive to gin up a pretextual reason to terminate AdTrader's AdX account.  Google typically has a direct relationship with major website publishers such as DingIt and helps those publishers monetize their properties on AdX (i.e., the same types of services that managers like AdTrader provide).  Google thus had financial incentives to cause DingIt to directly turn to Google for AdX services (or to a preferred AdX partner that is typically owned by ex-Google employees).

69.     Indeed, Mr. Torok had previously (and privately) warned AdTrader employees that in his observation, NPMs would mysteriously start getting into trouble with Google once they reached an annual revenue run rate of $4-5 million.  AdTrader employees noted to themselves that at that revenue level, the NPM's publisher clients were likely generating enough revenue that Google would want to directly work with those publishers.

70.     On information and belief, a few days after Google terminated AdTrader's account on May 19, 2017, Google directly contacted DingIt to begin a direct relationship.  If true, then AdTrader's termination was not a coincidence.

71.     Undoubtedly, Google will rely on a contractual Limitations of Liability provision in an attempt to minimize its liability to AdTrader for such wrongful conduct.  This provision,

however, is substantively and procedurally unconscionable, and AdTrader seeks a declaration on behalf of itself and other AdX publishers that this provision is unenforceable.

72.     Incidentally, rather than force its publisher clients to absorb losses because Google refused to pay its accrued AdX earnings, AdTrader paid out of its own cash reserves what it could, to what those publishers were owed.  Until the filing of this lawsuit, those publisher clients never knew the truth, even though it would have been easier for AdTrader to simply point out to its clients what Google did and not pay out any monies.  AdTrader thus spent the majority of its own remaining funds to essentially protect Google's reputation.

### *Google Lies About Refunding Its Advertisers*

73.     The second ground under the Google Services Agreement for Google to withhold a publisher's accrued AdX earnings is if it refunds "any amounts… to advertisers in connection with [a publisher's] failure to comply with this Agreement, as reasonably determined by Google."

74.     It appeared to AdTrader that Google was primarily relying upon the second ground to withhold payment from AdTrader, even though the Google Services Agreement allows Google to withhold accrued AdX earnings only if both grounds are satisfied.  On a May 24, 2017 recorded telephone call, Mr. Nakache represented to AdTrader's employees that:

AdTrader:  All of the money is going to be refunded to advertisers?

Nakache:  Yes.

AdTrader:  Does that mean that every single impression and every single click for all of our publishers has been…

Nakache:  Exactly.  Everything in the account, the account is in violation of our policy, advertisers have been impacted, and as a result we have made the decision to refund all the advertisers and all the revshare from Google.

\*\*\*

AdTrader:  So, every single advertisers [sic] who has bought a single impression for the past two months from any of our publishers will get their money back?  Is that correct?

Nakache:  Yes.

\*\*\*

AdTrader:  I see.  OK, so we are not going to receive anything unless the appeal is successful we will not be paid anything.

Nakache: No, the money is going to be paid back to the advertisers.

AdTrader: So, whether the appeal is successful or not, we will still not receive the payment, is that correct?

Nakache: Yes.[1]

75.     Mr. Nakache lied.  Google did not, in fact, refund its advertisers that had advertised on AdTrader's publisher's websites.

76.     As an advertising agency / advertising network, AdTrader also handled the accounts of numerous advertisers that bought inventory on AdX and AdSense using AdWords and DBM.  During the last pay period prior to AdTrader's account termination, AdTrader had a number of its advertising clients run advertisements on the websites of AdTrader's publishers.  AdTrader also knew that a number of its advertising clients ran advertisements on those same websites through their own individual DBM and AdWords accounts.

77.     AdTrader never got any refunds or credits from Google for running these advertisements, despite Mr. Nakache's emphatic statements to the contrary.  Nor did AdTrader's advertising clients on their individual accounts.

78.     Alerted to this inconsistency, AdTrader reviewed its records to see whether it had ever received a refund or credit from Google for running advertisements on websites that had invalid activity.  It had not, nor had any of AdTrader's advertising clients when AdTrader was handling their accounts.  Google gave no refunds or credits even though, every single month, Google withheld a small amount of accrued earnings from AdTrader on its publishing activities for what it deemed to be invalid activity and claimed to have refunded the withheld amounts to its advertisers.  During these same months, however, AdTrader and its advertising clients had bought traffic from some of those same websites through DBM, so if Google's explanation was true, then AdTrader and its advertising clients should have received some refunds or credits almost every month.

---

[1] Mr. Nakache is located in Ireland and AdTrader's employee was also located out of the United States at the time.  Therefore, California's two-party consent law does not apply.

79.     AdTrader also inquired with a large New York agency, and several European agencies, whose identities are not being disclosed to avoid retaliation from Google, whether they or their clients had ever received a refund or credit for advertising funds spent on websites with invalid activity.  None of them had, even though multiple AdX and AdSense publishers have publicly stated or privately confirmed that Google always determines that a certain percentage of their clicks or impressions for any particular advertisement every month is invalid for one reason or another.

80.     These revelations are especially problematic for Google, because it is contractually obligated to refund its advertisers for advertising funds spent by them on invalid impressions or clicks.  Google represented to AdTrader, as it does to all advertisers, that it performs "offline analysis" of its advertising networks to ascertain whether any impressions or clicks on an advertisement are invalid.  More importantly, Google represented that "When invalid activity is found through offline analysis and reactive investigation, we mark those clicks as invalid and issue credits to any advertisers affected by this activity."

81.     Google's representation is found on its Google Ads Traffic Quality Resource Center webpage, and a true and correct copy of this webpage is attached as Exhibit 5.  Despite the iterations of that webpage over the years, Google keeps making essentially the same representation over and over.  Google representatives also expressly refer advertisers and potential advertisers (during in-person conversations, telephone calls, e-mails, message board responses, and Internet chats) to review the Google Ads Traffic Quality Resource Center webpage whenever they have specific questions about invalid activity and advertising fraud.  Indeed, Google prominently states on its own webpage (https://adwords.googleblog.com/2007/08/introducing-ad-traffic-quality-resource.html) that the Ad Traffic Quality Resource Center "serve[s] as the single source for all click fraud and ad traffic quality related information."

82.     Google repeats its representation on multiple webpages that it tells its advertisers to review.  For example, in an AdWords Help article, Google states that, with respect to "invalid

activity," that it "prohibit[s] this kind of bad behavior.  And that's why you don't have to pay for these unfair clicks and impressions."  A true and correct copy of this webpage is attached as Exhibit 6.

83.     As another example, Google stated on another Ad Traffic Quality webpage that: "When we find something wrong, we try to make it right as soon as possible.  We suspend or disable invalid accounts, and may withhold payments to the publisher.  When appropriate and possible, that money is credited back to the advertisers – not only for the month where we found the invalid activity, but often for the previous month, as well."  A true and correct copy of this webpage is attached as Exhibit 7.

84.     In still yet another example, Google stated on its Inside AdWords blog that "our team proactively identifies invalid activity that may not have been automatically filtered and credits advertisers accordingly…. In the interest of transparency, all credits, past and future, for future invalid click activity are now labeled 'Adjustment – Click Quality.'"  A true and correct copy of this webpage is attached as Exhibit 8.

85.     Google's representations were made to AdTrader and all other advertising agencies, advertising networks, and advertisers when they first entered into the DoubleClick Advertising Platform Agreement, the DoubleClick Ad Exchange Master Service Agreement, and/or the Google Inc. Advertising Program Terms.  Google then continually affirms this representation by repeatedly re-directing existing clients to its previously referenced webpages.

86.     As it turned out, Google's representations were false.  During an Internet chat with AdTrader employees held on June 2, 2017, Google employee Paschal Pradeep confirmed that in DoubleClick Bid Manager (again, the largest demand-side-platform in the world and which is used to run ad campaigns for advertisers) there was actually no way for Google or anyone else to check on invalid impressions and clicks (i.e., there is no "offline analysis" mentioned in Google's representation).

87.     Mr. Pradeep explained that this was because DoubleClick Bid Manager only does real-time filtering of invalid impressions and clicks.  In other words, when an advertiser is

checking its DoubleClick Bid Manager account, the results it sees already reflect that Google has excluded invalid impressions and clicks from the final metrics.

88.     Plaintiff AdTrader, of course, never saw any indication in DoubleClick Bid Manager (or any other Google product) that any of its advertisements were being displayed on websites with invalid impressions and clicks.  Incredulous that in the context of AdTrader's account termination, Google would essentially fabricate a claim that it had somehow subsequently detected invalid activity coming from AdTrader's publisher websites (since the real-time, filtered data showed no such invalid activity), AdTrader's employees repeated their questions to Mr. Pradeep to see if there was any misunderstanding.  There was not.  Mr. Pradeep explained that there was no end-of-the-month adjustment for invalid activity, or that such an adjustment took longer than a month to finalize.  Instead, he stated, "[i]t is automatic and it will happen instantly."

89.     And, of course, Google's representation is false for the added reason that it does not, in fact, issue credits to advertisers affected by invalid activity.  AdTrader and its advertisers are the obvious case in point.

90.     Additional confirmation came by way of an August 25, 2017 article published in the Wall Street Journal.  The article explained that Google had detected a surge of ad fraud during the second quarter of 2017 on DoubleClick Bid Manager.  But rather than offer full refunds or credits to those advertisers, as it had continually represented in its Ad Traffic Quality Resource Center webpage, Google was offering only a modest reimbursement – about 7-10% of the total amounts spent by those advertisers (with some advertisers apparently getting much less).  Not surprisingly, many advertisers were unhappy with this development.

91.     Also in this article, Google said that the refunds it was offering were appropriate "because it doesn't control the rest of the money spent."  This statement is untrue, as the vast majority of advertisements served through DoubleClick Bid Manager go to AdX publisher websites, and Google routinely deducts or withholds payments to those publishers (like it did for

AdTrader) on the grounds that some or all of the clicks or impressions generated on that website were somehow invalid.

92.     Apparently, some executive at Google read this August 25, 2017 article and realized that it publicly exposed that Google was not giving full refunds or credits as contractually obligated.  On or around September 1, 2017, Google suddenly changed the terms of the contract governing its relationship with AdWords advertisers – the Google Inc. Advertising Program Terms.  The primary change it effected to this agreement was that AdWords advertisers were now required to arbitrate their disputes with Google and were precluded from bringing any class actions against Google.  It is plainly obvious that Google made such changes directly in response to the August 25, 2017 Wall Street Journal article to prevent advertisers (especially smaller advertisers) from suing Google and obtaining redress.

93.     This sudden change to the contract terms was particularly egregious because it purported to require advertisers to arbitrate any claim they had against Google arising prior to the date of the contract modification.  But in all prior iterations of the Google Inc. Advertising Program Terms, Google specifically represented to everyone that any "changes to the Terms **will not apply retroactively**[.]"  AdTrader, and all other advertisers using AdWords, relied on this express contractual representation by Google in deciding to sign up for, and continue using AdWords, because Google had promised it would not try to retroactively change contract terms.

94.     AdTrader did not agree to the modified AdWords contract, and is not bound by its terms.  Many other advertisers are also similarly not bound, as they either declined to accept the modified contract or specifically opted out of the new arbitration requirement.  But nevertheless, AdTrader seeks a declaration, on behalf of itself and all AdWords advertisers, that this new arbitration clause is substantively and procedurally unconscionable, and therefore cannot be enforced to the extent that it purports to require advertisers to arbitrate any disputes with Google arising prior to the effective date of this arbitration clause.

### *Class Action Allegations*

95.     AdTrader brings this action on behalf of itself and an Advertiser Class, defined as:

All businesses and Google-recognized advertising agencies and advertising networks that, at any time during the applicable limitations period, paid Google to display their advertisements on the website of a third-party publisher participating in the DoubleClick Ad Exchange or on AdSense, and did not receive refunds or credits for advertising expenditures spent by them on that publisher website after Google withheld any amount of payment to that publisher for what Google claimed to be invalid activity or non-compliance with a Google policy.

96.     AdTrader additionally brings this action on behalf of itself and an AdWords Advertisers Sub-Class, defined as:

All businesses and Google-recognized advertising agencies and advertising networks that had an active AdWords account as of September 1, 2017.

97.     Through the process of seeking and obtaining class certification, AdTrader reserves the right to amend the definitions of the proposed classes, as appropriate.

98.     Excluded from the Classes and the Sub-Class are the officers, directors, and employees of Google, any judicial officer presiding over this action, and the members of his or her immediate family and judicial staff.

99.     This action is brought and may properly be maintained as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3).

100.     The Classes and the Sub-Class are so numerous that joinder of all members is impracticable.  There are tens of thousands, if not hundreds of thousands, of businesses that have done online advertising on an AdX publisher website.  The precise number and identity of the members of the Classes and the Sub-Class can be obtained from the records of Google.

101.     There are numerous questions of law and fact common to the members of the Classes and Sub-Class which predominate over any questions affecting only individual members including: (i) whether Google defrauded its DBM and AdWords advertising clients by falsely representing to them that Google refunded or credited advertisers when it discovers that their advertising funds had been spent on fraudulent or invalid clicks, (ii) whether Google had negligently misrepresented to its DBM and AdWords advertising clients that Google refunded or credited advertisers when it discovers that their advertising funds had been spent on fraudulent or invalid clicks, (iii) whether Google is in violation of California Penal Code § 496(c) for defrauding its DBM and AdWords advertising clients by falsely representing to them that Google

refunded or credited advertisers when it discovers that their advertising funds had been spent on fraudulent or invalid clicks, (iv) whether Google had breached its contracts with its DBM and AdWords advertising clients by failing to provide them refunds or credits for their advertising funds had been spent on fraudulent or invalid clicks, (v) whether Google had unjustly enriched itself at the expense of its DBM and AdWords advertising clients by failing to provide them refunds or credits for their advertising funds had been spent on fraudulent or invalid clicks, (vi) whether Google had violated California's unfair competition law by misrepresenting to its DoubleClick and AdWords advertising clients that Google refunded or credited advertisers when it discovers that their advertising funds had been spent on fraudulent or invalid clicks and/or by withholding accrued earnings to publishers participating in the DoubleClick Ad Exchange on the grounds that Google had determined such funds were associated with invalid activity and refunded back to advertisers when, in reality, Google was keeping those funds for itself, and (xii) whether AdTrader and the members of the Classes and the Sub-Class are entitled to damages, restitution, and injunctive relief for Google's conduct.

### FIRST CAUSE OF ACTION
#### (Breach of Contract – AdX Publisher Contract)
#### (Individual Claim)

102.    AdTrader hereby re-incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

103.    AdTrader entered into the Google Services Agreement with Google.

104.    As previously alleged in greater detail, AdTrader substantially performed all of its obligations under the Google Services Agreement.  AdTrader ensured that its web publisher clients only displayed content that adhered to Google's policies on their websites.  AdTrader ensured that its web publisher clients adhered to Google's guidelines when displaying advertisements through AdX on their websites.  Furthermore, Google employees confirmed on multiple occasions to AdTrader employees (in-person, by phone calls, by Internet chat, and by e-mail) that AdTrader's publisher websites were in compliance with Google's policies.

105.     As previously alleged in greater detail, AdTrader's substantial performance is also evidenced by the fact that most or all of its web publisher clients that monetized their traffic through AdTrader's NPM AdX account are still in good standing with Google with their own individual AdX and AdSense accounts (and Google continues to serve ads to those individual accounts to this very day).  If AdTrader were truly in violation of some Google policy, then its individual web publishers would also be in violation of Google policies since both the websites and policies in question are identical.  But since all of their individual web publisher accounts are in good standing, that means Google has found that none of them have violated any Google policies.  And if none of those individual web publisher accounts had violated any Google policies, then AdTrader could not have violated any Google policy either.

106.     As previously alleged in greater detail, AdTrader's substantial performance is also evidenced by the fact that it never received any prior notice from Google of a breach of the Google Services Agreement.  The only contractual grounds for Google to immediately terminate the contract is if a web publisher displays pornographic content on its website, and AdTrader has never had any of its website publishers display any pornographic content.

107.     As previously alleged in greater detail, AdTrader's substantial performance is also evidenced by the fact that neither AdTrader, nor its advertising clients, have ever received a refund from Google for their advertisements placed through AdX on the websites owned by AdTrader's web publisher clients.

108.     In breach of the Google Services Agreement, Google failed to pay AdTrader for the number of valid impressions of advertisements displayed on those websites, and/or other valid events performed in connection with the display of advertisements on those websites using Google's AdX program.

109.     Per the express terms of the Google Service Agreement, Google could withhold AdTrader's accrued AdX earnings only for "(i) invalid queries, impressions, conversions, or clicks, and (ii) any amounts refunded to advertisers in connection with Company's failure to comply with this Agreement, as reasonably determined by Google."  Google's notice of violation

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

did not even accuse AdTrader of having invalid queries, impressions, conversions, or clicks.  And Google did not refund to advertisers the amounts it withheld from AdTrader.

110.     As a proximate result of Google's breach of contract, AdTrader has been damaged by $476,622.69 – the amount of the accrued AdX earnings that Google withheld from AdTrader.

111.     In addition, Google's breach of contract has resulted in lost profits to AdTrader's business as a whole.  AdTrader's monetization operation for publishers has disintegrated, and AdTrader has thus lost out on all future business from its clients.  AdTrader has also lost out on future business from other publishing clients that had reached out to the company for its products and services.

112.     Google was fully aware that its breach of contract could result in lost future profits for AdTrader.  The AdX program specifically contemplates that participants would include businesses that manage monetization of on-line advertising for web publishers.  It therefore is foreseeable that a failure by Google to pay NPMs the amounts owed to them under the AdX program would result in a loss of future business to those NPMs.

113.     AdTrader also brings a breach of contract claim because Google has withheld all of its accrued earnings as an improper forfeiture.

114.     Per the Google Service Agreement, Google could withhold only those accrued earnings that were the product of invalid activity, and could not penalize an AdX publisher by withholding all of its accrued earnings merely because some of those earnings were the result of invalid activity.

115.     Indeed, by contrast, Google's contract with its AdSense publishers (called the AdSense Terms of Service) state the exact opposite.  For example, in that contract, Google expressly reserved the right to "withhold unpaid amounts" in the event it terminates that agreement due to a publisher engaging in invalid activity.

116.     In breach of the Google Services Agreement, Google withheld all accrued AdX earnings from AdTrader for purported invalid activity rather than only those accrued earnings that were the product of invalid activity.

117.     As a proximate result of Google's breach of contract, AdTrader has been damaged in the amount of the accrued AdX earnings that Google withheld from it that were not related to any invalid activity on its publishers' websites.

## SECOND CAUSE OF ACTION
**(Breach of the Implied Covenant of Good Faith and Fair Dealing
– AdX Publisher Contract)**
**(Individual Claim)**

118.     AdTrader hereby re-incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

119.     Google has a duty under California law to act in good faith and deal fairly with AdTrader in connection with the Google Services Agreement, as well as Google's obligations in administering the AdX advertising program.

120.     As previously alleged in greater detail, Google breached its duty of good faith and fair dealing by arbitrarily and capriciously withholding AdTrader's AdX earnings for alleged policy violations, while simultaneously finding that AdTrader's web publishers were (and still are) in full compliance with Google's policies despite displaying the exact same content and advertising layouts.

121.     As previously alleged in greater detail, Google breached its duty of good faith and fair dealing by refusing to provide a meaningful review of AdTrader's internal appeal to Google over their purported AdX policy violations.  Forcing AdTrader to use a limited appeal form is *per se* unreasonable.  It is also unreasonable because Google's violation notice to AdTrader was exceedingly vague, yet AdTrader was expected to submit an appeal based off of this extremely limited information.  In fact, AdTrader requested that Google provide more detail about AdTrader's supposed policy violation so that AdTrader could provide detailed facts in support of its appeal, but Google refused to provide any further information.

122.     As previously alleged in greater detail, Google breached its duty of good faith and fair dealing because it summarily rejected AdTrader's appeal and used an auto-generated response to do so.  Such actions are evidence that Google did not even seriously consider AdTrader's appeal.

123.    As previously alleged in greater detail, Google breached its duty of good faith and fair dealing because it affirmatively misrepresented to AdTrader that it could not pay out any of AdTrader's withheld earnings because those withheld earnings had supposedly been refunded to Google's advertisers.

124.    In addition, AdTrader also pleads a breach of the implied covenant claim in the alternative in the event that it is determined that Google did not breach its contractual obligations to AdTrader when it withheld all of their accrued AdX earnings instead of just those earnings that were the result of invalid activity.  Instead of withholding only those accrued AdX earnings attributable to invalid activity, Google withholds all accrued AdX earnings as a matter of uniform policy.  Such actions violate the implied covenant of good faith and fair dealing towards AdTrader because Google is willfully withholding accrued AdX earnings that were obtained honestly and legitimately by AdTrader.

125.    Google also violated the implied covenant of good faith and fair dealing towards AdTrader because when Google withholds the entirety of an AdX publisher's accrued earnings, it always makes this announcement on or around the day those earnings were supposed to be paid out instead of the date Google has determined that the publisher had violated a Google policy. AdTrader knows this for a fact because other such publishers have reached out to AdTrader's representatives with similar stories of their mistreatment by Google.

126.    Google deliberately forces AdTrader to expend resources and time on continuing to display AdX advertisements and acquiring traffic to its websites when Google had already internally decided it would not pay out any AdX revenue to AdTrader under any circumstances. Google does this because when it confiscates the funds from a publisher and refunds them back to the advertiser (assuming that Google does, in fact, provide such refunds), it effectively and substantially lowers that advertiser's cost of advertising, **at the publisher's, not Google's** expense.  That is, the advertiser still received the impression or click from the person who was browsing the publisher's website, but did not have to pay for it.  Through this process, Google earns substantial goodwill from its advertiser customer base, and obtains a competitive advantage

vis-à-vis its competitors in the online advertising business who do not confiscate their publishers' accrued earnings and kick them back to the advertiser.

127.    Google additionally violated the implied covenant of good faith and fair dealing towards AdTrader because when Google makes the determination that it will withhold the entirety of an AdX publisher's accrued earnings, as a matter of policy, there is nothing that publisher can do to get its money.  During the May 24, 2017 phone call, Mr. Nakache expressly told AdTrader that regardless of the outcome of its internal appeal with Google, Google would not pay out AdTrader's withheld earnings.  In other words, Google could concede that it had unjustly suspended/terminated AdTrader's account (the account suspension/termination being the only reason why the entirety of AdTrader's accrued earnings would be withheld), but Google would nonetheless refuse to pay AdTrader publisher what it was owed.

128.    As a proximate result of Google's breach of the implied covenant, AdTrader has been damaged by approximately $476,622.69 – the amount of the accrued AdX earnings that Google withheld from AdTrader.

129.    In addition, Google's breach of the implied covenant has resulted in lost profits to AdTrader's business as a whole.  AdTrader's monetization operation for publishers has disintegrated, and AdTrader has thus lost out on all future business from its clients.  AdTrader has also lost out on future business from other publishing clients that had reached out to the company for its products and services.

130.    Google was fully aware that its breach of the implied covenant could result in lost future profits for AdTrader.  The AdX program specifically contemplates that participants would include businesses that manage monetization of on-line advertising for web publishers.  It therefore is foreseeable that a failure by Google to pay NPMs the amounts owed to them under the AdX program would result in a loss of future business to those NPMs.

**THIRD CAUSE OF ACTION**
**(Intentional Interference with Contract)**
**(Individual Claim)**

131.    AdTrader hereby re-incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

132.    As previously alleged in greater detail, AdTrader and DingIt had a contractual relationship.  AdTrader helped DingIt optimize the monetization of its content through AdX.

133.    As previously alleged in greater detail, Google knew of the existence of AdTrader's contract with DingIt.  AdTrader employees, on several occasions, informed Google about the existence of this relationship and even directly introduced DingIt's Vice President of Content & Marketing to AdTrader's AdX account manager on May 15, 2017 after Google forced them to.  In addition, DingIt informed Google on May 17, 2017 of the existence of the contractual relationship and DingIt's intent to exclusively use AdTrader's services to monetize its traffic through AdX going forward.

134.    AdTrader also had contractual relationships with over 200 other web publishers during the period of April 1, 2017 through May 31, 2017, including but not limited to Dubizzle.com, olx.co.za, olx.com.eg., olx.qa., interez.sk, dir.bg, investor.bg, and classifiedny.com (collectively, the "Web Publishers").  Google was aware of each of these contractual relationships, because it previously required AdTrader to disclose their existence as part of its obligations as an NPM.  AdTrader also helped the Web Publishers optimize the monetization of their content through AdX.

135.    Google's termination of AdTrader's AdX account, and its decision to withhold AdTrader's accrued AdX earnings, made AdTrader's further performance under its contractual relationship with DingIt impossible, or at least extremely difficult.  DingIt declined to further use AdTrader afterwards.  AdTrader experienced similar difficulties with the Web Publishers.

136.    Google knew that its actions would disrupt AdTrader's performance under its contracts.  Google had extensively worked with AdTrader for nearly four years by that point in time and knew that terminating its AdX account, or withholding any accrued AdX earnings

(which Google knew would be remitted to AdTrader's web publisher clients) would prevent AdTrader from fulfilling its contractual duties to any of its Web Publisher clients, let alone DingIt.  Furthermore, Google has extensively worked with NPM managers similar to AdTrader for years, and was familiar enough with the business model of these companies to know that terminating the AdX accounts, or withholding accrued earnings, would cripple these businesses.

137.    On information and belief, Google intended to disrupt AdTrader's relationship with DingIt and with the Web Publishers.  In particular, DingIt, and its parent company Level Up Media, is one of the leading video hosting services for e-sports.  Google typically has a direct relationship with major website publishers and helps those publishers monetize their properties on AdX (i.e., the same types of services that NPMs like AdTrader provide).  Google thus had financial incentives to cause DingIt to directly turn to Google for AdX services (or to a preferred AdX partner that is typically owned by ex-Google employees), and it is not a coincidence that Google terminated AdTrader's account on May 19, 2017, only a few days after Google's direct interactions with DingIt.

138.    AdTrader was harmed as a result of Google's interference.  Google's actions caused AdTrader to lose the DingIt account and the Web Publishers accounts, and the millions of dollars in revenue that these accounts represented.  Indeed, just prior to AdTrader's account termination, DingIt informed it that it was going to utilize AdTrader's services that would have generated an estimated $6 million in revenue for AdTrader through the rest of 2017 by itself.  And just continuing this relationship would have been worth tens of millions of dollars in annual revenue for AdTrader.

## FOURTH CAUSE OF ACTION
### (Intentional Interference with Prospective Economic Advantage)
### (Individual Claim)

139.    AdTrader hereby re-incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.  AdTrader pleads these allegations in the alternative in the event it is determined that AdTrader did not have a contractual relationship with DingIt or any of the Web Publishers.

COMPLAINT
CASE NO. 17-7082

140.     As previously alleged in greater detail, AdTrader and DingIt had an economic relationship.  AdTrader helped DingIt optimize the monetization of its content through AdX.  Similarly, AdTrader and the Web Publishers had an economic relationship.  AdTrader helped the Web Publishers optimize the monetization of their content through AdX.

141.     As previously alleged in greater detail, Google knew of the existence of AdTrader's economic relationship with DingIt, and also with the Web Publishers.  AdTrader employees, on several occasions, informed Google about the existence of this relationship and even directly introduced DingIt's Vice President of Content & Marketing to AdTrader's AdX account manager on May 15, 2017.  In addition, DingIt informed Google on May 17, 2017 of the existence of the economic relationship and DingIt's intent to exclusively use AdTrader's services going forward.  As for the Web Publishers, AdTrader had previously disclosed their existence and economic relationship to Google, as it was required to do as an NPM.

142.     Google's termination of AdTrader's AdX account, and its decision to withhold AdTrader's accrued AdX earnings, disrupted the economic relationship between AdTrader and DingIt.  DingIt declined to further use AdTrader afterwards.  This action also disrupted the economic relationship between AdTrader and the Web Publishers, and they also declined to use AdTrader afterwards.

143.     Google knew that its actions would disrupt AdTrader's relationship with DingIt and with the Web Publishers.  Google had extensively worked with AdTrader for nearly four years by that point in time and knew that terminating its AdX account, or withholding any accrued AdX earnings (which Google knew would be remitted to AdTrader's web publisher clients) would prevent AdTrader from being able to fulfill any future contractual duties to any of its Web Publisher clients, let alone DingIt.  Furthermore, Google has extensively worked with NPM managers similar to AdTrader for years, and was familiar enough with the business model of these companies to know that terminating the AdX accounts, or withholding accrued earnings, would cripple these businesses.

144. On information and belief, Google intended to disrupt AdTrader's relationship with DingIt and with the Web Publishers. In particular, DingIt, and its parent company Level Up Media, is one of the leading video hosting services for e-sports. Google typically has a direct relationship with major website publishers and helps those publishers monetize their properties on AdX (i.e., the same types of services that managers like AdTrader provide). Google thus had financial incentives to cause DingIt to directly turn to Google for AdX services (or to a preferred AdX partner that is typically owned by ex-Google employees), and it is not a coincidence that Google terminated AdTrader's account on May 19, 2017, only a few days after Google's direct interactions with DingIt.

145. Google engaged in independently wrongful conduct in disrupting AdTrader's relationship with DingIt and with the Web Publishers. As previously alleged in greater detail, Google breached its implied covenant of good faith and fair dealing in terminating AdTrader's AdX account and withholding its accrued AdX earnings. Google also deliberately provided false reasons to AdTrader for terminating its AdX account and withholding its accrued earnings, including the demonstrably false statement that all of AdTrader's accrued AdX earnings had already been refunded to Google's advertisers. Google's conduct in disrupting AdTrader's relationship with DingIt and with the Web Publishers also constitutes a violation of California's unfair competition law, as further alleged herein.

146. AdTrader was harmed as a result of Google's interference. Google's actions caused AdTrader to lose the DingIt account and the Web Publishers accounts, and the millions of dollars in revenue that these accounts represented. Indeed, just prior to AdTrader's account termination, DingIt informed it that it was going to utilize AdTrader's services that would have generated an estimated $6 million in revenue for AdTrader through the rest of 2017 by itself. And just continuing this relationship would have been worth tens of millions of dollars in annual revenue for AdTrader.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**FIFTH CAUSE OF ACTION**
**(Declaratory Relief)**
**(Individual and Class Action Claims)**

147.    AdTrader hereby re-incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

*Individual Claim – Limitation of Liability provision*

148.    The Google Service Agreement includes a Limitation of Liability provision that exempts Google from liability for any "lost revenues or indirect, special, incidental, consequential, exemplary, or punitive damages[.]"  The Limitation of Liability also states that liability is limited to no more "than the net amount that [Google] has received and retained under this Agreement during the 12 months before the claim arises."

149.    Google has invoked this Limitation of Liability clause in other lawsuits brought by AdSense or AdX publishers to argue that it owes no liability to those publishers.  It is expected that Google will invoke that provision in this lawsuit as well.

150.    AdTrader seek a declaration that this Limitation of Liability clause is substantively and procedurally unconscionable and therefore unenforceable under principles of California contract law.

151.    The Limitation of Liability clause is substantively unconscionable because it is transparently one-sided in favor of Google.  There are no instances in which an AdX publisher could engage in conduct that could cause "consequential, special, indirect, exemplary or punitive" damages to Google.  These terms therefore operate only for Google's benefit and to the detriment of AdX publishers.

152.    If there were any means by which an AdX publisher's conduct could conceivably cause more-than-compensatory damages to Google, Google has expressly exempted such examples from the Limitation of Liability clause.  For example, the Google Services Agreement explicitly excludes from the Limitations of Liability clause "breaches of confidentiality obligations contained in this Agreement, violations of a party's Intellectual Property Rights by the other party, or indemnification obligations contained in this Agreement[.]"  Each of the examples

inures solely to the benefit of Google.  No publisher could possibly disclose confidential information to Google (as their entire business model is to publish content on the Internet), whereas Google regards even their most banal internal e-mails to be confidential (as evidenced by the fact that in every lawsuit it is involved in, Google marks almost all of its internal documents to be "Confidential" or "Attorney's Eyes Only" regardless of the actual content of those documents).  Similarly, Google is not in any conceivable position to violate any intellectual property rights held by a publisher whereas the various AdX platforms and their interfaces are considered by Google to be their proprietary intellectual property.  The examples of indemnification provided in the agreement also make it clear that there is no likely scenario where a publisher could require Google to provide indemnification from a third-party lawsuit.  Thus, the Limitations of Liability are authored to give off the illusion of bilateralism, but in substance operate solely to prevent publishers from recovering their damages due to Google's wrongful conduct.

153.    The Limitation of Liability clause is procedurally unconscionable for many reasons, including that it is presented as a take-it-or-leave it provision to AdX publishers.  And given that Google has a virtual monopoly in the field of on-line advertising, anyone who wishes to monetize their websites through advertising has to use AdX (or AdSense, which has a virtually identical Limitation of Liability clause).

### *Class Action Claim – AdWords Advertisers Sub-Class – Arbitration Agreement*

154.    AdTrader also seeks declaratory relief on behalf of the AdWords Advertisers Sub-Class.

155.    As previously alleged in greater detail, on or around September 1, 2017, Google suddenly changed the terms of the contract governing its relationship with AdWords advertisers – the Google Inc. Advertising Program Terms.  The primary change it effected to this agreement was that AdWords advertisers were now required to arbitrate their disputes with Google and were precluded from bringing any class actions against Google.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

156.     Google made such changes directly in response to the August 25, 2017 Wall Street Journal article exposing that Google only refunded to its advertisers a fraction of the fees it collected from ad traffic run through DBM that Google had internally determined to be fraudulent or otherwise invalid.  Google's practice was at odds with its repeated representations to publishers that all accrued ad revenues that Google withheld from payment had already been refunded back to its advertisers, and with Google's repeated representations to advertisers that it issues credits to them for clicks later determined by Google to be invalid.

157.     AdTrader seeks a declaration, on behalf of all members of the AdWords Advertisers Sub-Class, that this new arbitration clause is substantively and procedurally unconscionable.  To the extent this clause requires the AdWords Advertisers Sub-Class to arbitrate any disputes with Google arising prior to the effective date of this arbitration clause, it is unenforceable under principles of California contract law.  Importantly, AdTrader does not seek to invalidate the arbitration clause with respect to prospective claims by the AdWords Advertisers Sub-Class, only to retrospective claims.

158.     The new arbitration clause is substantively unconscionable because it is transparently one-sided in favor of Google.  As stated earlier, Google immediately pushed through this revision directly in response to the public exposure of its fraudulent practices in order to prevent its aggrieved advertisers from taking legal action.  Moreover, the average member of the AdWords Advertisers Sub-Class would not have enough in the value of their individual claims to justify the costs of hiring an attorney to pursue those claims (especially since there is no attorney fee shifting provision in the Google Inc. Advertising Program Terms), and thus the class action waiver transparently operates to deprive them of their ability to get meaningful redress.

159.     The new arbitration clause is also substantively unconscionable because it applies retrospectively to all claims possessed by a member of the AdWords Advertisers Sub-Class even though those other claims were governed under a different iteration of the Google Inc. Advertising Program Terms.

COMPLAINT
CASE NO. 17-7082

160.     The new arbitration clause is procedurally unconscionable for many reasons, not least of which it is presented as a take-it-or-leave it provision to the members of the AdWords Advertisers Sub-Class.  In particular, Google told sub-class members that if they chose not to accept the new terms and conditions, Google would suspend all of their advertisements on Google's advertising platforms.  These sub-class members had spent years and countless funds on utilizing and acclimating to Google's platforms, yet all of that work and money would have been rendered pointless unless they agreed to surrender their rights to seek legal redress against Google.

161.     Finally, AdTrader additionally seeks a declaration that Google's new arbitration clause is invalid, to the extent it requires arbitration of retrospective claims against Google, on grounds of breach of contract, breach of the implied covenant of good faith and fair dealing, and fraud.  As previously alleged in greater detail, in all prior iterations of the Google Inc. Advertising Program Terms, Google specifically represented to everyone that any "changes to the Terms **will not apply retroactively**[.]"  AdTrader, and all other members of the AdWords Advertisers Sub-Class, relied on this express contractual representation by Google in deciding to sign up for, and continue using AdWords, because Google had promised it would not retroactively change the terms of its contract.

## SIXTH CAUSE OF ACTION
### (Fraud)
### (Class Action Claim)

162.     AdTrader hereby re-incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

163.     AdTrader brings this claim of fraud on behalf of itself and all members of the Advertiser Class.

164.     As previously alleged in greater detail, Google represented to AdTrader, and all other members of the Advertiser Class, that it performed "offline analysis" of its advertising networks to ascertain whether any clicks on an advertisement was invalid."  Google also

represented to AdTrader, and all other members of the Advertiser Class, that it would refund or give credits to them for invalid impressions and clicks.

165.    As previously alleged in greater detail, Google's representations were made to AdTrader, and all other members of the Advertiser Class when they first entered into the DoubleClick Advertising Platform Agreement, the DoubleClick Ad Exchange Master Service Agreement, and/or the Google Inc. Advertising Program Terms, and was continually reaffirmed by Google afterwards.

166.    As previously alleged in greater detail, Google's representations were false.  As Google employee Paschal Pradeep confirmed to AdTrader on June 2, 2017, in DBM, there was actually no way for Google or anyone else to check on invalid impressions and clicks (i.e., the "offline analysis" mentioned in Google's representation) because DBM only does real-time filtering of invalid impressions and clicks.

167.    As previously alleged in greater detail, Google's representations were also false because it does not provide any credits or refunds to advertisers for impressions or clicks that Google has represented to its publishers as having been fraudulent or otherwise invalid. AdTrader and its advertising partners have never received any credits or refunds for invalid clicks or impressions even though (i) Google disabled AdTrader's NPM publisher account and withheld $476,622.69 in accrued earnings for supposedly invalid activity and (ii) every month, Google would adjust AdTrader's accrued earnings (or the earnings of AdTrader's publisher clients accrued on their individual AdX or AdSense accounts) by a small amount to reflect deductions for supposedly invalid activity.

168.    And as revealed in the August 25, 2017 Wall Street Journal article, Google is refunding to its advertisers only 7-10% of the amounts they paid to Google for advertisements that were served to invalid traffic rather than the entire amount.  In fact, even Google's stated reason for limiting refunds to 7-10% of the total amount paid for invalid traffic – that Google "doesn't control the rest of the money spent" – is itself false, as Google confiscated all of the accrued earnings of AdTrader, as well as other AdX publishers, whenever it accuses them of

having invalid activity on their websites.  So while Google is claiming to publishers that it cannot pay out the entirety of their accrued earnings because such amounts have already been refunded to advertisers, it is simultaneously claiming to advertisers that it is able to refund them only a fraction of that amount.  Google appears to be keeping the difference for itself.

169.    Google knew that its representations were false when made, or at the very least, made those representations recklessly and without regard for their truth.  Having developed and operated the DBM and AdWords software, Google obviously was well aware at all times that (i) it does not perform any "offline analysis" of invalid activity and (ii) Google's practice was to keep all, or almost all, of the confiscated earnings from its AdX and AdSense publishers.  To this very day, Google continues to make the same misrepresentations on its webpages.

170.    Further reflecting on its inherent corporate mentality, Google was also recently given a record fine (€2.42 billion) by the European Commission for manipulating its Google Shopping results, and there is an ongoing European Commission investigation over its manipulation of results for its AdSense for Search program.

171.    Google intended to have AdTrader and the members of the Advertiser Class rely on its representations.  As stated already, Google representatives repeatedly refer customers and potential customers to its webpages whenever those customers have questions about how Google is ensuring that their advertising spend is not being wasted on fraudulent or invalid traffic.  In particular, referring existing advertisers to these webpages is meant to assuage their concerns about invalid clicks so that they continue to participate in AdX or AdWords and continue to pay Google for on-line advertising.

172.    AdTrader and the members of the Advertiser Class reasonably relied upon Google's representations.  It is obvious that Google has superior knowledge of its DBM and AdWords software compared to anyone else, and thus its statements about that technology were viewed by everyone as authoritative and truthful.  Moreover, it was not until August 25, 2017 that it became public knowledge that Google did not give complete refunds or credits to its advertisers for payments that were triggered by what it had determined to be invalid activity.

173.    AdTrader and the members of the Advertiser Class were damaged by Google's fraudulent conduct.  They spent advertising funds on user traffic that Google claims (to its publishers anyway) to have been invalid and therefore derived no benefit from those expenditures, yet Google did not refund or credit those funds back to the advertisers as Google had promised.  Instead, Google kept such funds for itself.

174.    AdTrader and the other members of the Advertiser Class's reliance on Google's representation was a substantial factor in causing their harm.  All of them would have chosen to not buy ad space through Google platforms, or would have at least spent less money on those platforms and increased their expenditures on competing platforms, had they known that Google would keep for itself all of their expenditures on user traffic that were fraudulent or otherwise invalid.

### SEVENTH CAUSE OF ACTION
**(Negligent Misrepresentation)**
**(Class Action Claim)**

175.    AdTrader hereby re-incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

176.    AdTrader brings this claim of negligent misrepresentation on behalf of itself and all members of the Advertiser Class.

177.    As previously alleged in greater detail, Google represented to AdTrader, and all other members of the Advertiser Class, that it performed "offline analysis" of its advertising networks to ascertain whether clicks on an advertisement were invalid.  Google also represented to AdTrader, and all other members of the Advertiser Class, that it would refund or give credits to them for invalid impressions and clicks.

178.    As previously alleged in greater detail, Google's representations were made to AdTrader, and all other members of the Advertiser Class when they first entered into the DoubleClick Advertising Platform Agreement, the DoubleClick Ad Exchange Master Service Agreement, and/or the Google Inc. Advertising Program Terms, and were continually reaffirmed by Google afterwards.

179.    As previously alleged in greater detail, Google's representations were false.  As Google employee Paschal Pradeep confirmed to AdTrader on June 2, 2017, in DBM, there was actually no way for Google or anyone else to check on invalid impressions and clicks (i.e., the "offline analysis" mentioned in Google's representation) because DBM only does real-time filtering of invalid impressions and clicks.

180.    As previously alleged in greater detail, Google's representations were also false because it does not provide any credits or refunds to advertisers for impressions or clicks that Google has represented to its publishers as having been fraudulent or otherwise invalid. AdTrader and its advertising partners have never received any credits or refunds for invalid clicks or impressions even though (i) Google disabled AdTrader's NPM publisher account and withheld $476,622.69 in accrued earnings for supposedly invalid activity and (ii) every month, Google would adjust AdTrader's accrued earnings (or the earnings of AdTrader's publisher clients accrued on their individual AdX or AdSense accounts) by a small amount to reflect deductions for supposedly invalid activity.

181.    And as revealed in the August 25, 2017 Wall Street Journal article, Google is refunding to its advertisers only 7-10% of the amounts they paid to Google for advertisements that were served to invalid traffic rather than the entire amount.  In fact, even Google's stated reason for limiting refunds to 7-10% of the total amount spent – that Google "doesn't control the rest of the money spent" – is itself false, as Google confiscates all of the accrued earnings of AdTrader, as well as other AdX publishers, whenever it accuses them of having invalid activity on their websites.  So while Google is claiming to publishers that it cannot pay out the entirety of their accrued earnings because such amounts have already been refunded to advertisers, it simultaneously claiming to advertisers that it is able to refund them only a fraction of that amount.  Google appears to be keeping the difference for itself.

182.    Google knew that it had no reasonable grounds for believing its representations were true when it made those representations.  Having developed and operated the DBM and AdWords software, Google obviously was well aware at all times that (i) it does not perform any

"offline analysis" of invalid activity and (ii) Google's practice was to keep all, or almost all, of the confiscated earnings from its AdX and AdSense publishers.  To this very day, Google continues to make the same misrepresentations on its webpages.

183.    Google was also recently given a record fine (€2.42 billion) by the European Commission for manipulating its Google Shopping results, and there is an ongoing European Commission investigation over its manipulation of results for its AdSense for Search program.

184.    Google intended to have AdTrader and the members of the Advertiser Class rely on its representations.  As stated already, Google representatives repeatedly refer customers and potential customers to its webpages whenever those customers have questions about how Google is ensuring that their advertising spend is not being wasted on fraudulent or invalid traffic.  In particular, referring existing advertisers to these webpages is meant to assuage their concerns about invalid clicks so that they continue to participate in AdX or AdWords and continue to pay Google for on-line advertising.

185.    AdTrader and the members of the Advertiser Class reasonably relied upon Google's representations.  It is obvious that Google has superior knowledge of its DBM and AdWords software compared to anyone else, and thus its statements about that technology were viewed by everyone as authoritative and truthful.  Moreover, it was not until August 25, 2017 that it became public knowledge that Google did not give complete refunds or credits to its advertisers for payments that were triggered by what it had determined to be invalid activity.

186.    AdTrader and the members of the Advertiser Class were damaged by Google's fraudulent conduct.  They spent advertising funds on user traffic that Google claims (to its publishers anyway) to be invalid and therefore derived no benefit from those expenditures, yet Google did not refund or credit those funds back to them as Google had promised.  Instead, Google kept such funds for itself.

187.    AdTrader and the other members of the Advertiser Class's reliance on Google's representation was a substantial factor in causing their harm.  All of them would have chosen to not buy ad space through Google platforms, or would have at least spent less money on those

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

platforms and increased their expenditures on competing platforms, had they known that Google would keep for itself all of their expenditures on user traffic that was fraudulent or otherwise invalid.

**EIGHTH CAUSE OF ACTION**
**(California Penal Code § 496(c))**
**(Class Action Claim)**

188.    AdTrader hereby re-incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

189.    Under California law, a party may bring a private right of action against a defendant that fraudulently obtains that party's property (including money) by means of deception.  AdTrader hereby brings such a claim on behalf of itself and the other members of the Advertiser Class.

190.    As previously alleged in greater detail, Google's actions in inducing AdTrader, and the other members of the Advertiser Class, into spending advertising funds on the DBM and AdWords platforms constitute theft by deception under California law.

191.    As previously alleged in greater detail, AdTrader, and the other members of the Advertiser Class, have been damaged as a result of Google's deception.  Accordingly, they are entitled to treble damages and attorney's fees as a result.

**NINTH CAUSE OF ACTION**
**(Breach of Contract – AdX and AdWords Advertiser Contracts)**
**(Class Action Claim)**

192.    AdTrader hereby re-incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

193.    AdTrader brings this claim of breach of the DoubleClick Advertising Platform Agreement, breach of the DoubleClick Ad Exchange Master Service Agreement, and breach of the Google Inc. Advertising Program Terms, on behalf of itself and all members of the Advertiser Class.

194.    AdTrader, and the other members of the Advertiser Class, had entered into the DoubleClick Advertising Platform Agreement, the DoubleClick Ad Exchange Master Service Agreement, and/or the Google Inc. Advertising Program Terms.

195.    AdTrader, and the other members of the Advertiser Class, had substantially performed under the DoubleClick Advertising Platform Agreement, the DoubleClick Ad Exchange Master Service Agreement, and/or the Google Inc. Advertising Program Terms.  The key requirements of those contracts were that AdTrader, and the other members of the Advertiser Class, (i) provided advertisements that complied with Google's policies and regulations and (ii) paid Google in timely fashion after Google invoiced them for its services.  AdTrader, and the other members of the Advertiser Class, met both of these obligations at all times.

196.    As previously alleged in greater detail, Google represented to AdTrader, and all other members of the Advertiser Class, that it performed "offline analysis" of its advertising networks to ascertain whether any clicks on an advertisement were invalid.  Google also represented to AdTrader, and all other members of the Advertiser Class, that it would refund or give credits to them for invalid impressions and clicks.

197.    As previously alleged in greater detail, Google's representations were made to AdTrader, and all other members of the Advertiser Class when they first entered into the DoubleClick Advertising Platform Agreement, the DoubleClick Ad Exchange Master Service Agreement, and/or the Google Inc. Advertising Program Terms, and were continually reaffirmed by Google afterwards.

198.    The DoubleClick Advertising Platform Agreement does not have any language whatsoever relating to the parties' obligations when Google discovers that its advertisers had spent money on websites Google determined to have had fraudulent or invalid traffic. Accordingly, Google's promise that it would refund or provide credits to advertisers in such circumstances (which was repeated after the parties entered into this contract) is either an implied term of the contract, or is a modification of the contract as a result of Google's subsequent conduct.

199.    Furthermore, the DoubleClick Advertising Platform Agreement is governed by New York law according to its terms.  Under New York law, all contracts as a matter of law have implied terms mandating good faith and a promise that each party will use reasonable efforts to allow the other to realize the benefits of the contract.  As previously alleged in greater detail, Google has breached these implied terms by not providing refunds or credits to AdTrader and the other members of the Advertiser Class.

200.    The DoubleClick Ad Exchange Master Service Agreement has language addressing the parties' obligations specifically for (i) click fraud (ii) that is detected through a reactive investigation.  There is no language regarding the parties' obligations when Google discovers through its "offline" investigations that its advertisers have spent money on invalid traffic (that did not constitute click fraud).  Accordingly, Google's promise that it would refund or provide credits to advertisers in such circumstances (which was repeated after the parties entered into this contract) is either an implied term of the contract, or is a modification of the contract as a result of Google's subsequent conduct.  Moreover, Google's repeated promises has also resulted in a modification of the contract with respect to the parties' obligations specifically for (i) click fraud (ii) that is detected through a reactive investigation.

201.    The Google Inc. Advertising Program Terms has language addressing the parties' obligations specifically for (i) click fraud (ii) that is detected through a reactive investigation. There is no language regarding the parties' obligations when Google discovers through its "offline" investigations that its advertisers had spent money on invalid traffic (that did not constitute click fraud).  Accordingly, Google's promise that it would refund or provide credits to advertisers in such circumstances (which was repeated after the parties entered into this contract) is either an implied term of the contract, or is a modification of the contract as a result of Google's subsequent conduct.  Moreover, Google's repeated promises have also resulted in a modification of the contract with respect to the parties' obligations specifically for (i) click fraud (ii) that is detected through a reactive investigation.

202.     As previously alleged in greater detail, Google breached all of these contracts because it does not provide any credits or refunds to advertisers for clicks that Google has represented to its publishers as having been fraudulent or otherwise invalid.  AdTrader and its advertising partners have never received any credits or refunds for invalid clicks or impressions (whether those ads were placed through DBM or AdWords), even though (i) Google disabled AdTrader's NPM publisher account and withheld $476,622.69 in accrued earnings for supposedly invalid activity and (ii) every month, Google would adjust AdTrader's accrued earnings (or the earnings of AdTrader's publisher clients accrued on their individual AdX or AdSense accounts) by a small amount to reflect deductions for supposedly invalid activity.

203.     And as revealed in the August 25, 2017 Wall Street Journal article, Google is refunding to its advertisers only 7-10% of the amounts they paid to Google for advertisements that were served to invalid traffic rather than the entire amount.  In fact, even Google's stated reason for limiting refunds to 7-10% of the total amount spent – that Google "doesn't control the rest of the money spent" – is itself false, as Google confiscates all of the accrued earnings of AdTrader, as well as other AdX publishers, whenever it accuses them of having invalid activity on their websites.  Moreover, it was not until August 25, 2017 that it became public knowledge that Google did not give complete refunds or credits to its advertisers for payments that were triggered by what it had determined to be invalid activity.

204.     As a proximate result of Google's breaches of the contracts, AdTrader, and the other members of the Advertiser Class, have been damaged by not receiving the refunds or credits owed to them by Google.

**TENTH CAUSE OF ACTION**
**(Unjust Enrichment)**
**(Class Action Claim)**

205.     AdTrader hereby re-incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

206.     AdTrader brings this claim of unjust enrichment, on behalf of itself and all members of the Advertiser Class, in the alternative should the Court find that the DoubleClick

Advertising Platform Agreement, the DoubleClick Ad Exchange Master Service Agreement, or the Google Inc. Advertising Program Terms do not impose a contractual obligation by Google to give refunds or credits to its advertisers for invalid clicks.

207.    As previously alleged in greater detail, Google represented to AdTrader, and all other members of the Advertiser Class, that it performed "offline analysis" of its advertising networks to ascertain whether any clicks on an advertisement were invalid.  Google also represented to AdTrader, and all other members of the Advertiser Class, that it would refund or give credits to them for invalid impressions and clicks.

208.    As previously alleged in greater detail, Google's representations were made to AdTrader, and all other members of the Advertiser Class when they first entered into the DoubleClick Advertising Platform Agreement, the DoubleClick Ad Exchange Master Service Agreement, and/or the Google Inc. Advertising Program Terms, and was continually reaffirmed by Google afterwards.

209.    As previously alleged in greater detail, Google's representation was false because it does not provide any credits or refunds to advertisers for clicks that Google has represented to its publishers as having been fraudulent or otherwise invalid.  AdTrader and its advertising partners have never received any credits or refunds for invalid clicks or impressions (whether those ads were placed through DBM or AdWords), even though (i) Google disabled AdTrader's NPM publisher account and withheld $476,622.69 in accrued earnings for supposedly invalid activity and (ii) every month, Google would adjust AdTrader's accrued earnings (or the earnings of AdTrader's publisher clients accrued on their individual AdX or AdSense accounts) by a small amount to reflect deductions for supposedly invalid activity.

210.    And as revealed in the August 25, 2017 Wall Street Journal article, Google is refunding to its advertisers only 7-10% of the amounts they paid to Google for advertisements that were served to invalid traffic rather than the entire amount.  In fact, even Google's stated reason for limiting refunds to 7-10% of the total amount spent – that Google "doesn't control the rest of the money spent" – is itself false, as Google confiscates all of the accrued earnings of

AdTrader, as well as other AdX publishers, whenever it accuses them of having invalid activity on their websites.  So while Google is claiming to publishers that it cannot pay out the entirety of their accrued earnings because such amounts have already been refunded to advertisers, it is simultaneously claiming to advertisers that it is able to refund them only a fraction of that amount.  Google appears to be keeping the difference for itself.

211.    Google has been unjustly enriched by keeping for itself all advertising funds that were spent on invalid traffic instead of refunding those amounts back to AdTrader and the other members of the Advertiser Class.

212.    AdTrader and the other members of the Advertiser Class are accordingly entitled to restitution equal to the amount of funds that Google refused to pay out to its AdX and AdSense publishers, but that Google kept for itself instead of refunding back to AdTrader and the other members of the Advertiser Class.

### ELEVENTH CAUSE OF ACTION
**(Unfair Competition Law)**
**(Class Action Claim)**

213.    AdTrader hereby re-incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

214.    AdTrader brings this claim under California Business & Professions Code §§ 17200, et seq. on behalf of itself and all members of the Advertiser Class.

215.    As previously alleged in greater detail, Google's actions and systematic conduct towards AdTrader and the other members of the Advertiser Classes constitute unlawful business practices towards them within the meaning of California Business & Professions Code § 17200.

216.    As previously alleged in greater detail, Google's actions and systematic conduct towards AdTrader and the other members of the Advertiser Class constitute unfair business practices towards them within the meaning of California Business & Professions Code § 17200.

217.    As previously alleged in greater detail, Google's actions and systematic conduct towards AdTrader and the other members of the Advertiser Class constitute fraudulent business practices towards them within the meaning of California Business & Professions Code § 17200.

218.    As previously alleged in greater detail, Google's actions and systematic conduct towards AdTrader and the other members of the Advertiser Class constitute "unfair, deceptive, untrue, or misleading advertising" towards them within the meaning of California Business & Professions Code § 17200.  Google's webpages constitute a form of advertising within the meaning of that law, as the webpages consist of statements made by Google in connection with the offering of its services.

219.    AdTrader, and the members of the Advertiser Class are accordingly entitled to restitution and injunctive relief as a remedy for Google's violations of the unfair competition law.

## PRAYER

**WHEREFORE**, Plaintiff AdTrader, Inc. prays for judgment as follows:

1.    For judgment against defendant Google, LLC;

2.    For compensatory and special damages;

3.    For treble damages;

4.    For punitive damages;

5.    For declaratory relief;

6.    For restitution;

7.    For a permanent injunction;

8.    For pre-judgment interest;

9.    For attorney's fees and costs; and

10.    For such other and further relief as the Court deems just and proper.

Dated:  December 13, 2017                    GAW | POE LLP

By: _____
Randolph Gaw
Attorneys for Plaintiff AdTrader, Inc.

- 49 -

COMPLAINT
CASE NO. 17-7082

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JURY DEMAND**

     Plaintiff AdTrader, Inc. hereby demands a jury trial for its claims against defendant Google, LLC.

     Dated:  December 13, 2017          GAW | POE LLP

                                  By: _____
                                     Randolph Gaw
                                   Attorneys for Plaintiff AdTrader, Inc.