1  Randolph Gaw (S.B. #223718)
   rgaw@gawpoe.com
2  Mark Poe (S.B. #223714)
   mpoe@gawpoe.com
3  Victor Meng (S.B. #254102)
   vmeng@gawpoe.com
4  Samuel Song (S.B. #245007)
   ssong@gawpoe.com
5  GAW | POE LLP
   4 Embarcadero, Suite 1400
6  San Francisco, CA 94111
   Telephone: (415) 766-7451
7  Facsimile: (415) 737-0642

8  Attorneys for Plaintiffs AdTrader, Inc., Classic and
   Food EOOD, LML CONSULT Ltd., Ad Crunch
9  Ltd., Fresh Break Ltd., and Specialized Collections
   Bureau, Inc.

10

11              **UNITED STATES DISTRICT COURT**

12             **NORTHERN DISTRICT OF CALIFORNIA**

13                    **SAN JOSE DIVISION**

14

15  ADTRADER, INC., CLASSIC AND          Case No. 5:17-CV-7082-BLF
    FOOD EOOD, LML CONSULT LTD.,
16  AD CRUNCH LTD., FRESH BREAK          **AMENDED CLASS ACTION**
    LTD., AND SPECIALIZED               **COMPLAINT**
17  COLLECTIONS BUREAU, INC.
                                        DEMAND FOR JURY TRIAL
18              Plaintiffs,

19       v.

20  GOOGLE LLC.

21              Defendant.

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

PARTIES ............................................................................................................... 4

JURISDICTIONAL STATEMENT ...................................................................... 4

INTRADISTRICT ASSIGNMENT ...................................................................... 5

FACTUAL ALLEGATIONS ................................................................................ 5

    *Background on DoubleClick Ad Exchange (AdX)* ........................................ 5

    *Background on Plaintiffs* ............................................................................ 10

    *Google Tries to Destroy AdTrader's Business* .......................................... 14

    *Google Lies About Refunding Its Advertisers* .......................................... 19

CLASS ACTION ALLEGATIONS .................................................................... 29

CLAIMS FOR RELIEF ...................................................................................... 31

    FIRST CAUSE OF ACTION: Breach of Contract (Google Services Agreement) by AdTrader Against Google (Individual Claim) ........................................................... 31

    SECOND CAUSE OF ACTION: Breach of the Implied Covenant of Good Faith and Fair Dealing (Google Services Agreement) by AdTrader against Google (Individual Claim) ........ 34

    THIRD CAUSE OF ACTION: Breach of the Implied Duty to Perform with Reasonable Care (Google Services Agreement) by AdTrader against Google (Individual Claim) ..................... 38

    FOURTH CAUSE OF ACTION: Intentional Interference with Contract by AdTrader against Google (Individual Claim) .............................................................................. 39

    FIFTH CAUSE OF ACTION: Intentional Interference with Prospective Economic Advantage by AdTrader against Google (Individual Claim) ......................................................... 42

    SIXTH CAUSE OF ACTION: Declaratory Relief by AdTrader against Google (Individual Claim) ....................................................................................................... 45

    SEVENTH CAUSE OF ACTION: Fraud by Plaintiffs against Google (Class Action Claim). 46

    EIGHTH CAUSE OF ACTION: Negligent Misrepresentation by Plaintiffs against Google (Class Action Claim) .......................................................................................... 51

    NINTH CAUSE OF ACTION: California Penal Code § 496(c) by Plaintiffs against Google (Class Action Claim) .......................................................................................... 56

    TENTH CAUSE OF ACTION: Breach of Contract (DoubleClick Ad Exchange Agreement, DoubleClick Advertising Agreement, and AdWords Agreement) by Plaintiffs against Google (Class Action Claim) .......................................................................................... 57

ELEVENTH CAUSE OF ACTION: Breach of the Implied Covenant of Good Faith and Fair Dealing (DoubleClick Ad Exchange Agreement, DoubleClick Advertising Agreement, and AdWords Agreement) by Plaintiffs against Google (Class Action Claim) ............................... 60

TWELFTH CAUSE OF ACTION: Breach of Implied Duty to Perform with Reasonable Care (DoubleClick Ad Exchange Agreement and AdWords Agreement) by Plaintiffs against Google (Class Action Claim) ................................................................................................ 62

THIRTEENTH CAUSE OF ACTION: Unjust Enrichment by Plaintiffs against Google (Class Action Claim) ................................................................................................ 65

FOURTEENTH CAUSE OF ACTION: Unfair Competition Law by Plaintiffs against Google (Class Action Claim) ................................................................................................ 67

FIFTEENTH CAUSE OF ACTION: Violation of the New York General Business Law § 349 by AdTrader against Google (Class Action Claim) ................................................... 69

PRAYER ..................................................................................................................... 71

JURY DEMAND ......................................................................................................... 72

Plaintiffs AdTrader, Inc. ("AdTrader"), Classic and Food EOOD ("Classic"), LML CONSULT Ltd. ("LML"), Ad Crunch Ltd. ("Ad Crunch"), Fresh Break Ltd. ("Fresh Break"), and Specialized Collections Bureau, Inc. ("SCB") (collectively, "Plaintiffs") hereby make the following allegations against defendant Google LLC ("Google"):

## INTRODUCTION

1.    This is an individual action brought by AdTrader against Google for its failure to honor its commitment to pay AdTrader its share of the ad revenue that Google received for placing ads on AdTrader's publishers' websites through the DoubleClick Ad Exchange ("AdX").

2.    This is also a class action brought by Plaintiffs on behalf of advertisers against Google for its fraudulent promises that it would issue refunds or credits to advertisers for invalid activity on their advertisements served through AdX.

3.    For years, Google has refused to pay AdX publishers their accrued revenues, claiming that it would return that money to advertisers because of some purported violation of Google policy by those publishers.  As it turns out, Google never returned that money to many of those advertisers.  Instead, Google simply pocketed the money, bilking both the advertisers who paid Google to deliver their ads and the AdX publishers who displayed those ads.

4.    Google's fraudulent practice is best evidenced by the unfortunate experience of AdTrader.  AdTrader is a company that helps website publishers display ads on their websites through on-line advertising platforms, including AdX.  After using AdX for years without issue, in May 2017, Google abruptly disabled AdTrader's AdX account without providing a coherent reason, and withheld close to $500,000 in accrued AdX earnings from AdTrader.  When AdTrader pressed for the payments owed to it and its clients, Google responded the same way it has to hundreds of thousands of publishers for many years – that it could not and would not make any payments to AdTrader because it had already made the decision to refund all of AdTrader's withheld earnings back to the advertisers whose advertisements were displayed on the websites of AdTrader's clients.

5.    What Google apparently forgot, however, was that AdTrader also helps companies place on-line advertisements on various advertising platforms, including AdX.  And so Google

did not know that AdTrader and its advertising clients, using a Google product called DoubleClick Bid Manager ("DBM"), had placed some of the AdX advertisements that ran on the websites of AdTrader's publishers.  DBM is the largest demand-side platform in the world and is used to run ad campaigns for advertisers.  A demand-side platform provides media buyers (such as advertisers, agencies, trading desks, etc.) with centralized access to multiple ad exchanges and networks where they can bid for their desired inventory.  Thus, Google's explanation that it had refunded all of AdTrader's withheld earnings back to Google's advertisers rang false, **because neither AdTrader nor its advertising clients received any refunds from Google**.

6.      Google's false explanation caused AdTrader to investigate, and its records showed that for the several years it had advertisements on AdX, **it had never received a single cent as a refund (or credit) from Google when using DBM**.  AdTrader had never received any refunds even though, as it turns out, Google always withheld a small amount of accrued earnings from all of its AdX publishers for what Google claimed to be invalid activity – amounts that Google also claimed to have refunded back to its advertisers.  If Google truly was providing its advertisers with refunds or credits of the amounts it withheld from its publishers on the purported grounds of invalid activity, then AdTrader necessarily would have received some refunds or credits every month when using DBM.

7.      AdTrader also inquired with other advertisers that used DBM to place ads through AdX to see if they had ever received a refund or credit on their ads.  None of them had.  Google did not pay anything out to its AdX publishers for those amounts it withheld from them for supposedly invalid impressions, but also did not refund those amounts back to advertisers.  Instead, Google confiscated the money for itself.

8.      The falsity of Google's prior representations was publicly exposed by the Wall Street Journal in an article dated August 25, 2017.  In that article, advertisers that used DBM revealed that Google did not refund the full cost they paid for ads served to invalid traffic (and was withheld from publishers).  Instead, Google offered to refund only a fraction of that cost—a mere 7 to 10 percent of what advertisers had paid Google.  Google claimed that "this was appropriate because it doesn't control the rest of the money spent."  This is not a true statement,

as in most situations, Google does control everything about how the money is spent.  Most of the advertisers referenced in the Wall Street Journal article had their advertisements displayed on the websites of AdX and AdSense publishers, and thus for those advertisers, Google had complete control over how much of their advertising spend was remitted to publishers and how much was retained by Google itself.  And for those advertisers that had their ads displayed on the websites of AdX and AdSense publishers with supposedly invalid traffic, Google actually kept all of these funds for itself rather than refund them back to advertisers.

9.      Exactly one week after the Wall Street Journal article was published, Google made sweeping changes to its contract terms with some of those advertisers (in fact, the millions of advertisers that use Google AdWords) in an attempt to prevent them from filing any lawsuits against Google for its fraud.

10.      Thus, on behalf of all advertisers who had their advertisements displayed on the websites of AdX publishers, Plaintiffs bring this action to recover all monies that Google withheld from those AdX publishers for displaying the ads, but did not refund to those advertisers.  Back in 2014, a leading adtech company had estimated that AdX collectively generated $1 million per hour in revenue for all of its publishers, which would mean that Google has been unjustly enriched by tens of millions of dollars to hundreds of millions of dollars, each year, by retaining instead of refunding amounts spent by advertisers on AdX on what Google claimed to be invalid impressions.

11.      AdTrader also brings this action on behalf of itself to recover the amounts that it had earned for displaying AdX advertisements, but that Google ultimately did not pay.  Under the contract between Google and its AdX publishers, Google can withhold payment of an AdX publisher's accrued earnings only if (i) such earnings were the product of invalid activity **and** (ii) the withheld amounts are refunded to the advertisers.  Evidence uncovered by AdTrader, however, reveals that when Google decides that ad impressions generated on an AdX publisher's website were invalid and withholds that publisher's accrued earnings as a result, Google is **not** refunding that withheld amount back to advertisers.  Instead, Google keeps those funds for itself in violation of its contractual obligations with AdTrader.

12.     In the end, Google's wrongful actions mean that the monies in question belong to both AdTrader (as a publisher) and to all the advertisers.  Google has an obligation to provide refunds to advertisers for any ad impressions that Google deems to have been invalid, and Google did not do this.  Google also has an obligation to pay AdTrader for any accrued AdX earnings that Google did not refund back to advertisers, and Google did not do this either.  Thus, this lawsuit is intended to force Google to disgorge its ill-gotten gains and change its unjust practices.

**PARTIES**

13.     Plaintiff AdTrader, Inc. is a Nevada corporation that has its principal place of business in New Jersey.  AdTrader, Inc. was formerly known as AdTradr Corporation, and had contracted with Google under that name.

14.     Plaintiff Classic and Food EOOD is a Bulgarian company that has its principal place of business in Bulgaria.

15.     Plaintiff LML CONSULT Ltd. is a Bulgarian company that has its principal place of business in Bulgaria.

16.     Plaintiff Ad Crunch Ltd. is a Bulgarian company that has its principal place of business in Bulgaria.

17.     Plaintiff Fresh Break Ltd. is a Bulgarian company that has its principal place of business in Bulgaria.

18.     Plaintiff Specialized Collections Bureau, Inc. is a California corporation that has its principal place of business in Los Angeles, California.

19.     Defendant Google LLC is a Delaware limited liability company that has its principal place of business in California.  Google LLC was formerly known as Google, Inc. at the time the parties first contracted with each other, but was subsequently converted to its current business form.

**JURISDICTIONAL STATEMENT**

20.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2).  If a class is certified in this action, the amount in controversy will exceed $5,000,000.00, exclusive

1  of interest and costs, and this is a class action in which at least one member of the class is a

2  citizen of a state different from any defendant.

3       21.     The Court has personal jurisdiction over Google because it transacts business in

4  California and because in the Google Services Agreement, it expressly consents to personal

5  jurisdiction in this Court.

6       22.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Google

7  resides and regularly conducts business in this district, and because the contracts with Google at

8  issue in this lawsuit have forum selection clauses requiring that litigation of all disputes is

9  handled in the state or federal courts of Santa Clara County, California.

10                             **INTRADISTRICT ASSIGNMENT**

11      23.     Google's headquarters is located in Mountain View, California, and therefore

12  assignment to the San Jose division of this Court is appropriate.

13                              **FACTUAL ALLEGATIONS**

14                    ***Background on DoubleClick Ad Exchange (AdX)***

15      24.     Google is the largest online marketing/advertising business in the world.  The

16  AdWords Advertising Program ("AdWords") is Google's primary advertising program.

17  AdWords advertisements are displayed in a variety of formats such as text and/or images,

18  alongside or above search results, on webpages, in e-mails, on blogs, and/or in videos.

19      25.     The Google AdSense Content program enables online publishers of websites to

20  partner with Google to earn revenue from AdWords advertisements displayed on websites under

21  their ownership, license, registration and/or other control.  Google tracks each time Internet users

22  click on advertisements displayed on AdSense publishers' websites and charges advertisers for

23  each click.  Google pays the AdSense publishers a portion of the amount paid by advertisers for

24  the clicks, while retaining the remaining portion for itself.

25      26.     Like AdSense, DoubleClick Ad Exchange also allows website publishers to

26  display advertisements in exchange for a share of the advertising revenue paid to Google by the

27  advertiser for each "impression" (i.e., each time a unique user views the publisher's website

28  displaying an advertisement served to that website through AdX).

AMENDED COMPLAINT
CASE NO. 5:17-CV-7082-BLF

27.     AdX differs from AdSense in that it is a programmatic, real-time bidding exchange that allows publishers and advertisers to exercise far more granular control over what advertisements are displayed and how much is paid by the advertiser to display those advertisements.  It also allows advertisers from outside of the Google Display Network to buy inventory from the publisher, thus significantly increasing the demand.

28.     Advertisers can buy ad space on AdX through DoubleClick Ad Exchange Buyer ("AdX Buyer"), as well as DBM (which is Google's demand-side platform).  AdX is an ad exchange, which means that it consolidates advertising demand from AdWords and other ad networks, exchanges, and demand-side platforms (such as DBM) to participating AdX publishers.  Thus, for example, DBM and AdWords advertisers can end up buying ad space on the website of an AdX publisher.

29.     Advertisers can also end up buying space on AdX even without their knowledge.  The default setting for an advertiser's AdWords campaign is to have the advertiser participate in the Google Display Network.  When this setting is left alone, Google's algorithms will automatically display an AdWords advertiser's advertisements on an AdX publisher's website, when the price offered by those publishers meets certain pre-determined criteria set in advance by that AdWords advertiser.

30.     In layman's terms, advertisers have advertisements that they wish to display on websites and publishers have "inventory" (i.e., ad spaces on their websites) that can accommodate the display of those advertisements.  AdX facilitates these two groups transacting together for their mutual benefit.

31.     AdX is viewed by industry participants as a more sophisticated ad placement service compared to AdSense, and therefore attracts more experienced and/or larger publishers.

32.     Google offers a suite of DoubleClick products to assist publishers and advertisers in utilizing AdX.  Some of these products include DoubleClick for Publishers and DBM, among others.  DoubleClick for Publishers is primarily used as an ad server to help publishers monetize their inventory.  DBM is the largest demand-side platform in the world and is used to run ad campaigns for advertisers.  As previously alleged, a demand-side platform provides media buyers

AMENDED COMPLAINT
CASE NO. 5:17-CV-7082-BLF

(such as advertisers, agencies, trading desks, etc.) with centralized access to multiple ad exchanges and networks where they can bid for their desired inventory.  DBM consolidates inventory from AdX, AdSense, and other ad exchanges.  In other words, an advertiser can use DBM to buy inventory on both AdX and also on non-Google controlled ad exchanges.  Most transactions end up consummated on a Google platform because Google controls a large share of the online advertising market.

33.     Though advertisers have the option of buying ad space on AdX through either AdX Buyer or DBM, the vast majority of ad space is bought through DBM, because of its flexibility compared to AdX Buyer.

34.     Another feature of AdX is that Google allows businesses to participate on the publishing side even if they do not have their own website, but as managers of websites belonging to others.  Google calls such entities Network Partner Managers ("NPM").  Essentially, NPMs help Google manage smaller publishers and penetrate in new markets.  NPMs also help Google gain additional market share with its existing clients.  AdTrader was an NPM.

35.     Due to the sophisticated features offered by AdX, website content creators often engage NPMs to focus on optimizing the revenue earned from Google advertisements placed on their websites (usually by selling ad space at the highest possible price), while those website content creators focus instead on content creation.

36.     These websites will accordingly be registered in the AdX program under the AdX account belonging to the NPM, but may also be simultaneously registered in the AdX program under their own AdX account (or may also be registered in the AdSense program under their own account there).

37.     Similarly, Google allows businesses to participate in AdX on the advertising side even if they do not have any advertisements of their own to place, but as managers of advertisers seeking to place advertisements through DBM.  This is because much like AdX is a more sophisticated product than AdSense, DBM is a more sophisticated product than AdWords.  DBM provides more granular control and access to more inventory compared to AdWords.  It is also more difficult to manage and also requires a high minimum monthly ad spend to access the

platform.  Thus, smaller and mid-size advertisers typically work with business entities familiar with DBM rather than navigate the platform on their own, especially since their individual advertising budgets are not large enough to meet the minimum monthly ad spend requirement for DBM.

38.     Google calls such managing entities "advertising agencies," or "advertising networks."  An advertising agency / network would have one or more "seats" of its own on DBM. A small or mid-size advertiser would pay the advertising agency / network to use the latter's "seat" on DBM to place ads on various publishers' websites (usually an AdX publisher).  These small or mid-size advertisers would not have any contracts with Google, but only with the advertising agency / network.

39.     AdTrader was also classified by Google as an advertising agency, and then subsequently re-classified as an advertising network.  Thus, AdTrader (using DBM) would buy ad space on publisher websites on behalf of its advertising clients, and Google would charge AdTrader for ad impressions on those websites.  AdTrader would advance those costs on behalf of its advertising clients and then get reimbursed for them by those clients.  On many occasions, however, AdTrader was not reimbursed by a client or was not reimbursed in full.  Thus, to the extent that Google ever overcharged its advertisers, AdTrader sometimes bore the brunt of those overcharges and had to eat those costs itself.

40.     The Google Services Agreement, which AdTrader entered into, governs the relationship between AdX publishers and Google.  A true and correct copy of this contract is attached hereto as Exhibit 1.  The primary obligations of a publisher are set forth in Section 2.3 of the agreement, which requires that an AdX publisher adhere to Google's published AdX Guidelines and Google's technical protocols.

41.     The Google Services Agreement also provides the following policies and procedures for Google's payments to AdX web publishers:

**Section 8.2: Google Payments**

(a)  For the Services, Google will pay Company an amount equal to the Revenue Share Percentage (listed on the front page of this Agreement) of Ad Revenues attributable to a calendar month.  This payment will be made in the month following the calendar month in

which the applicable Ads were displayed provided that the amount owed to Company in a given month is above the minimum set forth in the AdX Guidelines.

(b)  Google's payments for the Services under this Agreement will be based on Google's accounting which may be filtered to exclude (i) invalid queries, impressions, conversions, or clicks, and (ii) any amounts refunded to advertisers in connection with Company's failure to comply with this Agreement, as reasonably determined by Google.

42.     Moreover, the Google Services Agreement lays out specific grounds for Google to terminate an AdX publisher's account.  The entirety of these grounds are as follows:

**Section 13.2: Termination**

(a)  Either party may terminate this Agreement with notice if the other party is in material breach of this Agreement:

(i)  where the breach is incapable of remedy;

(ii)  where the breach is capable of remedy and the party in breach fails to remedy that breach within 30 days after receiving notice from the other party; or

(iii)  more than twice even if the previous breaches were remedied.

(b)  Either party may terminate this Agreement for any or no reason upon 30 days prior notice to the other party.

(c)  Google reserves the right to suspend or terminate Company's use of any Services that are alleged or reasonably believed by Google to infringe or violate a third party right.  If any suspension of a Service under this subsection 13.2(c) continues for more than 6 months, Company may immediately terminate this Agreement upon notice to Google.

(d)  Google may terminate this Agreement immediately with notice if pornographic content that is illegal under U.S. law is displayed on any Site.

43.     The DoubleClick Ad Exchange Master Service Agreement ("DoubleClick Ad Exchange Agreement"), which AdTrader entered into on or around June 19, 2014, is the primary contract that governs the relationship between advertisers using AdX Buyer and Google, as executing this agreement is a prerequisite to buy on AdX through DBM.  A true and correct copy of this contract is attached hereto as Exhibit 2.

44.     AdTrader, like some other advertisers using AdX Buyer, also entered into the DoubleClick Advertising Platform Agreement ("DoubleClick Advertising Agreement") on March 1, 2016 in order to utilize certain specific DoubleClick products.  A true and correct copy of this contract is attached hereto as Exhibit 3.

AMENDED COMPLAINT
CASE NO. 5:17-CV-7082-BLF

45.     Finally, the Google Inc. Advertising Program Terms ("AdWords Agreement"), which AdTrader entered into on February 21, 2013, is the contract that governs the relationship between Google and advertisers using AdWords.  A true and correct copy of this contract is attached hereto as Exhibit 4.

### *Background on Plaintiffs*

46.     Plaintiff AdTrader is a company that manages on-line advertising for both advertisers and web publishers.  It delivers advanced programmatic and real-time bidding solutions that help advertisers and publishers execute media deals more effectively.

47.     Programmatic ad buying typically refers to the use of software to purchase digital advertising, as opposed to the traditional process that involves requests for proposals, human negotiations, and manual insertion orders.  AdTrader is one of few companies offering solutions that address both sides of the market – the buy (advertisers) and sell (publishers).

48.     In return for a fee, AdTrader helps advertisers plan, execute, analyze, and optimize their ad campaigns to meet targets.  AdTrader places advertising bids on AdX through DBM on behalf of these firms, handles implementation of their advertisements, and monitors advertising campaigns to ensure they are reaching their intended targets at the intended prices.

49.     Similarly, AdTrader uses its technology to help web publishers maximize the revenues they can earn from displaying advertisements on their websites by helping them expose their inventory to optimal demand.  AdX is AdTrader's biggest demand partner. Through AdX, AdTrader offered publishers access to the world's largest demand pool.

50.     AdTrader also ensures that web publishers are complying with the requirements of the online advertising exchanges they participate in (including AdX), ranging from actions such as making sure that advertisements are placed in the proper positions on the websites to vetting out objectionable content from those websites.

51.     AdTrader has worked extensively with Google for the last three years as an NPM and in its capacity as an advertising agency / advertising network.  In these roles, AdTrader has heavily utilized the various DoubleClick products and its employees are extremely knowledgeable about how to use them properly in accordance with Google's guidelines.

1    AdTrader performed its obligations under the Google Services Agreement, and ensured that its

2    publisher clients performed their obligations under the Google Services Agreement.  AdTrader

3    and its publisher clients properly displayed Google's advertisements in conformity with Google's

4    policies, did not display any impermissible content on their websites, and otherwise performed all

5    of their required contractual duties.

6           52.     Similarly, AdTrader and its advertising partners always performed their

7    obligations under the DoubleClick Ad Exchange Agreement, the DoubleClick Advertising

8    Agreement, and the AdWords Agreement.  The primary contractual responsibilities of advertisers

9    under these agreements were to (i) pay Google (ii) not offer advertisements that violated Google's

10   content guidelines, and (iii) not embed malware in those advertisements.  AdTrader and its

11   advertising partners had no problems carrying out these contractual duties.

12          53.     AdTrader was also one of the larger NPM publisher accounts participating in AdX.

13   As such, over the course of this multi-year relationship, Google account managers would

14   regularly keep track of AdTrader's month-over-month growth, challenges, goals, and future plans

15   through quarterly reports.

16          54.     Google account managers would also communicate with AdTrader employees (in

17   phone calls, e-mails, on-line chats, and live meetings) about how to properly utilize the various

18   DoubleClick products.  In these discussions, Google would reassure AdTrader that AdTrader and

19   its publishers were complying with all of Google's policies, and would continue to be in

20   compliance if they followed the implementation and optimization measures suggested by those

21   employees.  (Meaning that Google employees would recommend to AdTrader to implement new

22   layouts, such as ad units or ad formats, or advertisement placement strategies for their publisher

23   websites that would be more effective at generating revenue from those advertisements.)  Google

24   employees also considered AdTrader to be such a well-managed account that they would refer

25   other AdX publishers to AdTrader for help and advice.

26          55.     For example, for much of 2016 and 2017, AdTrader's assigned account manager

27   was a Google employee named Balint Torok.  Mr. Torok spoke to AdTrader employees on a

28   regular basis, and reassured them that AdTrader's publishers' websites had high quality traffic.

1    Trying to be helpful, Mr. Torok would also sometimes tell AdTrader employees the percentage of

2    invalid impressions that AdTrader's publishers had for each billing period, and based on those

3    representations, it appeared that only 0.15% - 0.2% of AdTrader's estimated revenue for the

4    average billing period was the product of invalid activity (and accordingly deducted).  Mr. Torok

5    said that this was an exceptionally low number compared to the vast majority of other AdX

6    publishers, as the average amount of invalid activity on an AdX publisher website was usually

7    several percentage points.

8          56.    Also, in February 2017, AdTrader employees were invited by Google to attend the

9    Mobile World Congress in Barcelona.  During this event, AdTrader employees spoke to Google

10   employees Anthony Nakache (the Director of Online Partnerships) and Rachad Saddi (a Channel

11   Partner Manager).  Both said that they were very impressed with AdTrader and its growth.  At no

12   point during this meeting did anyone from Google raise any concerns that AdTrader or its

13   publisher clients had failed to comply with Google's AdX policies in any way, or that any of their

14   user traffic was invalid in any way.  Instead, Google's employees clearly implied that AdTrader

15   was a model exemplar for AdX publishers.

16         57.    AdTrader and its employees had another meeting with Google's AdX publisher

17   team in April 2017, this time in Dublin, Ireland.  The two sides discussed in detail the publishers

18   in AdTrader's account and the future plans it had for growing its AdX account.  At no point

19   during this meeting did anyone from Google raise any concerns that AdTrader or its publisher

20   clients had failed to comply with Google's AdX policies in any way, or that any of their user

21   traffic was invalid in any way.  Instead, Google's employees clearly implied that AdTrader was a

22   model exemplar for AdX publishers.

23         58.    By early 2017, AdTrader managed on-line advertising for hundreds of web

24   publishers.  The majority of publisher inventory was monetized through AdX.  Most of

25   AdTrader's publishing clients also had their own individual AdX or AdSense accounts as well.

26         59.    By early 2017, AdTrader managed on-line advertising for dozens of advertisers.

27   The majority of the advertising campaigns were run through DBM and, because of Google's

28

AMENDED COMPLAINT
CASE NO. 5:17-CV-7082-BLF

1    preference for directing advertisers to AdX, most of those ads were placed on AdX.  Most of

2    these advertisers did not have their own DBM or AdWords account.

3          60.    AdTrader also paid to engage in online advertising of its own services.  AdTrader

4    used DBM and AdWords to display its own advertisements on the websites of AdX publishers.

5          61.    Plaintiff Classic runs a restaurant.  Classic engaged AdTrader to use DBM to

6    advertise its business on the Internet, with the majority of all ad impressions coming from AdX

7    publisher websites.  Any advertising expenditures charged by Google for such ad impressions

8    were passed on by AdTrader to Classic and paid in full by Classic.  Any refunds or credits given

9    by Google for such advertising expenditures would have also been passed on by AdTrader to

10   Classic.

11         62.    Plaintiff LML runs a restaurant.  LML engaged AdTrader to use DBM to advertise

12   its business on the Internet, with the majority of all ad impressions coming from AdX publisher

13   websites.  Any advertising expenditures charged by Google for such ad impressions were passed

14   on by AdTrader to LML and paid in full by LML.  Any refunds or credits given by Google for

15   such advertising expenditures would have also been passed on by AdTrader to LML.

16         63.    Plaintiff Ad Crunch formerly operated a digital advertising agency.  Ad Crunch

17   engaged AdTrader to use DBM to advertise its business on the Internet, with the majority of all

18   ad impressions coming from AdX publisher websites.  Any advertising expenditures charged by

19   Google for such ad impressions were passed on by AdTrader to Ad Crunch and paid in full by Ad

20   Crunch.  Any refunds or credits given by Google for such advertising expenditures would have

21   also been passed on by AdTrader to Ad Crunch.

22         64.    Plaintiff Fresh Break runs a restaurant.  Fresh Break engaged AdTrader to use

23   DBM to advertise its business on the Internet, with the majority of all ad impressions coming

24   from AdX publisher websites.  Any advertising expenditures charged by Google for such ad

25   impressions were passed on by AdTrader to Fresh Break and paid in full by Fresh Break.  Any

26   refunds or credits given by Google for such advertising expenditures would have also been passed

27   on by AdTrader to Fresh Break.

28

AMENDED COMPLAINT
CASE NO. 5:17-CV-7082-BLF

65.     Plaintiff SCB is a collections agency.  It used AdWords to advertise its business on the Internet.  As SCB did not opt out of the Google Display Network, some of its ad impressions came from AdX publisher websites.

### *Google Tries to Destroy AdTrader's Business*

66.     In early 2017, AdTrader began a contractual relationship with DingIt.tv ("DingIt") in its capacity as an NPM.  DingIt, and its parent company Level Up Media, is one of the leading video hosting services for e-sports.  AdTrader and DingIt had a contractual relationship. AdTrader helped DingIt optimize the monetization of its content, including the bidding and placement of advertisements on DingIt web properties through AdX.

67.     DingIt was pleased with the quality of AdTrader's work.  On April 26, 2017, DingIt executives had a call with AdTrader's executives, and DingIt offered an exclusive partnership to AdTrader worth millions of dollars in added annual revenue.  AdTrader accepted.

68.     AdTrader's employees repeatedly made Google aware of the existence of the AdTrader-DingIt relationship.  As an NPM, AdTrader needed Google's approval to add any new publisher to its stable, and DingIt was no exception.  Furthermore, in March and April 2017, AdTrader employees had specific discussions with Google employees Pavel Pimshin (the then-current account manager assigned to AdTrader) and Mr. Torok about AdTrader working with DingIt.  And on May 12, 2017, Mr. Pimshin e-mailed AdTrader to ask it to have DingIt directly contact Google and, even more unusually, to see AdTrader's contract with DingIt.

69.     On May 15, 2017, AdTrader introduced Mr. Pimshin and other Google employees to Adam Simmons, an executive of Level Up Media, as requested by Google.  Mr. Simmons then directly communicated with those Google employees by e-mail.

70.     AdTrader also gave Mr. Pimshim a copy of its contract with DingIt.  As a result, Google became fully knowledgeable about the terms of AdTrader's supply-side agreements, including when and how AdTrader remitted funds received from Google to its publisher clients.

71.     On May 19, 2017, a few days before Google was due to pay AdTrader its accrued AdX earnings (and only four days after DingIt contacted Google directly), without any warning, AdTrader received a form e-mail from Google stating, in part:

Hello,

This e-mail is to alert you that your DoubleClick Ad Exchange account was found to be non-compliant with our Ad Exchange program policies and as a result, your **Ad Exchange account has been disabled.**

**Current account status:** Disabled

**Action required:** None

**Violation explanation**

As stated in our program policies, sites displaying Google ads should provide substantial and useful information to the user.  Users should be able to easily navigate through the site to find what products, goods, or services are promised.  Examples of misguided navigation include, but are not limited to:

False claims of downloadable or streaming content

Linking to content that does not exist

Redirecting users to irrelevant and/or misleading webpages

Text on a page unrelated to the topic and/or business model of the website.

**Payment**

As your account has been permanently disabled, we will withhold payment of your account balance.  As stated in the terms governing your Ad Exchange account, Google reserves the right to withhold from its payments to publishers any amounts refunded to advertisers in connection with the publisher's failure to comply with their Ad Exchange agreement, as reasonably determined by Google.  Please note that this step was taken in an effort to maintain the quality of the Ad Exchange program and to protect the interests of our advertisers.  The earnings on your account will be returned to the affected advertisers.

**No further accounts**

Please note that publishers disabled for invalid activity on Ad Exchange are not allowed any further participation in Ad Exchange, AdSense or our other ad monetization products.

72.     AdTrader's employees were utterly baffled by this e-mail.  None of the websites monetized by AdTrader performed the kind of hypothetical, prohibited activities listed by Google, and Google employees had repeatedly confirmed that AdTrader's websites were in compliance with Google's policies.

73.     AdTrader's employees reached out to Google's employees for clarification, but did not receive any insight.  After ignoring or brushing off AdTrader for six days, finally Google employees would say only that AdTrader's account was disabled because it was found to be in violation of some unspecified AdX guidelines.  This was in line with Google's policy that it

refuses to provide publishers whose accounts are disabled "any information about their account activity, including any web pages, users, or third-party services that might have been involved." Google's statement is found on one of its DoubleClick Ad Exchange Seller Help webpages, a true and correct copy of which is attached as Exhibit 5.  Thus, AdTrader had no effective way of contesting Google's decision.

74.    AdTrader submitted an internal appeal to Google, pursuant to its contractual right to appeal.  Google has expressly recognized the existence of this contractual right, as it expressly stated, "Publishers whose accounts we've disabled have the right to appeal their case."  Google's acknowledgment is found on one of its Google Ads Traffic Quality webpages, a true and correct copy of which is attached as Exhibit 6.

75.    Google's appeal form, however, is nothing more than a pro forma document, and only asks very general, standardized questions without permitting the user to elaborate on the reasons why Google's reasons for terminating the user's AdX account and withholding the accrued earnings were erroneous.  In particular, because Google's notice of violation did not actually inform AdTrader of what it did wrong, AdTrader had no way of knowing what facts to provide to Google to get it to reconsider its decision.  This was especially egregious in light of Google's representation on that same webpage that it "review[s] every appeal that **supplies enough information to investigate**[.]"

76.    Google summarily rejected AdTrader's internal appeal by means of an auto-generated e-mail that was sent a short time later.  On information and belief, nobody at Google closely reviewed AdTrader's appeal, as the appeal form was designed to convey minimal information to Google and give publishers the illusion that Google might reconsider its decision.

77.    AdTrader's employees again asked Google representatives to provide further information as to what policy AdTrader had supposedly violated, and explained that AdTrader could not effectively appeal Google's decision if it did not know what it did that was wrong. Google's employees were unmoved and did not provide any additional information.

AMENDED COMPLAINT
CASE NO. 5:17-CV-7082-BLF

78.     In any event, Google prevented AdTrader from receiving the benefit of a meaningful appeal of its decision to terminate its AdX account and withhold its accrued AdX earnings, as Google refused to tell AdTrader the reason Google had terminated its account.

79.     AdTrader employees were 100% certain that none of its publisher websites had violated any Google policies.  But nevertheless, they pointed out to Google employees that, even if, hypothetically, one or two publisher websites were not in compliance with Google's rules, AdTrader's remaining websites (as it had over two hundred active publishers for that earnings period) would still be in compliance and it would not be fair to withhold the earnings generated from those compliant websites.  Google's employees remained unmoved.

80.     AdTrader's employees were also baffled by Google's decision to withhold payment of AdTrader's accrued AdX earnings, which totaled $476,622.69 as of May 19, 2017, for other reasons.  Per the express terms of the Google Service Agreement, Google could withhold AdTrader's accrued AdX earnings only if two condition precedents were present.  Under the first condition precedent, Google must show that a publisher's withheld AdX earnings was due to "invalid queries, impressions, conversions, or clicks[.]"  But Google's May 19, 2017 notice of violation did not even accuse AdTrader of having invalid queries, impressions, conversions, or clicks.

81.     Furthermore, AdTrader never received any prior notice from Google of a breach of the Google Services Agreement.  Indeed, the only contractual grounds for Google to immediately terminate that contract is if a web publisher displays pornographic content on its website, and AdTrader has never had any of its website publishers display any pornographic content.

82.     Most telling, however, is the fact that to this day, none of its publisher clients have had their individual AdX or AdSense accounts suspended by Google.  Indeed, Google maintains several publicly available files that identify the active participants in AdX, and as of the filing of this pleading, these files show that multiple AdTrader publisher clients such as dubizzle.com, IGN, ytn.co.kr, OLX, mydotcomrade.com, seoul.com.kr., dir.bg, standartnews.com, khan.co.kr all continue to monetize their content through AdX.  This was the case despite the fact that Google's termination e-mail clearly stated that "publishers disabled for invalid activity on Ad Exchange are

AMENDED COMPLAINT
CASE NO. 5:17-CV-7082-BLF

1    not allowed any further participation in Ad Exchange, AdSense or our other ads monetization

2    products."  Therefore, if AdTrader had, in fact, violated an AdX policy, then at least some of its

3    publisher clients necessarily would also have had their individual accounts disabled, because

4    AdTrader (as an NPM) only worked on the websites of its publisher clients.  The fact that none of

5    AdTrader's publisher clients suffered a similar fate is proof that AdTrader did not, in fact, violate

6    any Google policies.  And as even further evidence, Google did not report any policy violations

7    on the "Policy Violations" page of AdTrader's DoubleClick for Publisher's account (which was

8    tied to its AdX account).

9            83.    Google's employees certainly had a motive to gin up a pretextual reason to

10   terminate AdTrader's AdX account.  Google typically has a direct relationship with major

11   website publishers and helps those publishers monetize their properties on AdX (i.e., the same

12   types of services that managers like AdTrader provide).  Google thus had financial incentives to

13   cause DingIt to directly turn to Google for AdX services (or to a preferred AdX partner that is

14   typically owned by ex-Google employees).

15           84.    Indeed, Mr. Torok had previously (and privately) warned AdTrader employees

16   that in his observation, NPMs would mysteriously start getting into trouble with Google once

17   they reached an annual revenue run rate of $4-5 million.  AdTrader employees noted to

18   themselves that at that revenue level, the NPM's publisher clients were likely generating enough

19   revenue that Google would want to directly work with those publishers.  As such, AdTrader's

20   executives were concerned when Google first requested an introduction to DingIt and the details

21   of AdTrader's contract with it.  AdTrader ultimately complied with Google's request, however,

22   because it had no choice in the matter and did not want to risk antagonizing Google.

23           85.    On information and belief, a few days after Google terminated AdTrader's account

24   on May 19, 2017, Google directly contacted DingIt to begin a direct relationship.  If true, then

25   AdTrader's termination was not a coincidence.

26           86.    Undoubtedly, Google will rely on a contractual Limitations of Liability provision

27   in an attempt to minimize its liability to AdTrader for such wrongful conduct.  This provision,

28

1    however, is substantively and procedurally unconscionable, and AdTrader seeks a declaration on

2    behalf of itself and other AdX publishers that this provision is unenforceable.

3          87.     Rather than force its publisher clients to absorb losses because Google refused to

4    pay its accrued AdX earnings, AdTrader paid out of its own cash reserves what it could, to what

5    those publishers were owed.  Until the filing of this lawsuit, those publisher clients never knew

6    the truth, even though it would have been easier for AdTrader to simply point out to its clients

7    what Google did and not pay out any monies.  AdTrader thus spent the majority of its own

8    remaining funds to essentially protect Google's reputation.

9                              *Google Lies About Refunding Its Advertisers*

10         88.     The second condition precedent under the Google Services Agreement for Google

11   to withhold a publisher's accrued AdX earnings is if it refunds "any amounts… to advertisers in

12   connection with [a publisher's] failure to comply with this Agreement, as reasonably determined

13   by Google."

14         89.     It appeared to AdTrader that Google was primarily relying upon this second

15   condition precedent (irrespective of whether it satisfied the first condition precedent) to withhold

16   payment from AdTrader, even though the Google Services Agreement allows Google to withhold

17   accrued AdX earnings only if both grounds are satisfied.  On a May 24, 2017 recorded telephone

18   call, Mr. Nakache represented to AdTrader's employees that:

19         AdTrader:  All of the money is going to be refunded to advertisers?

20         Nakache:  Yes.

21         AdTrader:  Does that mean that every single impression and every single click for all of
22         our publishers has been…

23         Nakache:  Exactly.  Everything in the account, the account is in violation of our policy,
           advertisers have been impacted, and as a result we have made the decision to refund all
24         the advertisers and all the revshare from Google.

25         ***

26         AdTrader:  So, every single advertisers [sic] who has bought a single impression for the
           past two months from any of our publishers will get their money back?  Is that correct?

27         Nakache:  Yes.

28         ***

AdTrader:  I see. OK, so we are not going to receive anything unless the appeal is successful we will not be paid anything.

Nakache: No, the money is going to be paid back to the advertisers.

AdTrader: So, whether the appeal is successful or not, we will still not receive the payment, is that correct?

Nakache: Yes.[1]

90.     Mr. Nakache lied.  Google did not, in fact, refund its advertisers that had advertised on AdTrader's publisher's websites.

91.     As an advertising agency / advertising network, AdTrader also handled the accounts of numerous advertisers that bought inventory on AdX publisher websites using DBM. And during the last earnings period prior to AdTrader's account termination, AdTrader used DBM to have a number of its advertising clients run advertisements on the websites of AdTrader's publishers.  A small sampling of such examples includes:

        a.     Citroen, Daza, Ivet.bg, Mackeeper, Mytime.mk, Refan, and Tehnomix advertised on the website of an AdTrader publisher named athletic.net.

        b.     Allianz.bg, Gosport.bg, Mytime.mk and VIP Watches advertised on the website of an AdTrader publisher named bgbasket.com.

        c.     Citroen, Daza, Delimano, Diamonds Club, Dormeo, Gosport.bg, Happy Bulgaria, Ivet.bg, MaistorPlus, Markiiza, Max Credit, Nestle, Sportex, Topcho, and VIP Watches advertised on the website of an AdTrader publisher named blitz.bg.  (AdTrader also put up its own advertisements on that website as well.)

        d.     Allianz.bg, Citroen, Daza, Diamonds Club, Dormeo, Gosport.bg, Happy Bulgaria, Ivet.bg, Mackeeper, Refan, Tehnomix, and VIP Watches advertised on the website of an AdTrader publisher named cheezburger.com.  (AdTrader also put up its own advertisements on that website as well.)

---

[1] Mr. Nakache is located in Ireland and AdTrader's employee was also located out of the United States at the time.  Therefore, California's two-party consent law does not apply.

AMENDED COMPLAINT
CASE NO. 5:17-CV-7082-BLF

e.     Citroen, Daza, Delimano, Diamonds Club, Dormeo, Gosport.bg, Happy
Bulgaria, Ivet.bg, Max Credit, Nestle, Refan, Sportex, Tehnomix, and VIP
Watches advertised on the website of an AdTrader publisher named dir.bg.
(AdTrader also put up its own advertisements on that website as well.)

f.     Citroen, Daza, Dormeo, Gosport.bg, Happy Bulgaria, Ivet.bg, Mackeeper,
Nestle, Refan, Sportex, Tehnomix, and VIP Watches advertised on various
websites published by the International Business Times, which was also an
AdTrader publisher.  (AdTrader also put up its own advertisements on
these websites as well.)

g.     Citroen, Daza, Delimano, Diamonds Club, Dormeo, Gosport.bg, Happy
Bulgaria, Ivet.bg, Mackeeper, Max Credit, Nestle, Refan, Tehnomix, and
VIP Watches advertised on the popular video-gaming website IGN, which
was also an AdTrader publisher.  (AdTrader also put up its own
advertisements on that website as well.)

h.     Citroen, Mytime.mk, Sportex, and VIP Watches advertised on the website
of an AdTrader publisher named investor.bg.

92.     AdTrader never got any refunds or credits from Google through DBM despite
having run those aforementioned advertisements, notwithstanding Mr. Nakache's emphatic
statements to the contrary.  And for AdTrader's advertising clients that also run advertisements on
AdTrader's publisher's websites using their individual AdWords accounts, none of them received
any refunds or credits on their individual accounts for these specific advertisements.

93.     Alerted to this inconsistency, AdTrader reviewed its records to see whether it had
ever received a refund or credit from Google for ad buys made through DBM.  (Google gives
separate monthly invoices for ad buys made through DBM and for advertising done via
AdWords.)  Google gave no refunds or credits even though, every single month, Google withheld
a small amount of accrued earnings from AdTrader on its publishing activities for what it deemed
to be invalid activity and apparently claimed to have refunded the withheld amounts to its
advertisers.  During some of these same months, however, AdTrader and its advertising clients

AMENDED COMPLAINT
CASE NO. 5:17-CV-7082-BLF

1    had bought traffic from some of those same websites through DBM, so if Google's explanation

2    was true, then AdTrader and its advertising clients should have received some refunds or credits

3    almost every month.

4          94.    AdTrader also checked the records for its AdWords account.  That account did

5    reflect some credits from Google over the years, but always in miniscule amounts and,

6    furthermore, Google does not provide any detail as to why those refunds are being provided.  For

7    example, an AdWords advertiser has no way of knowing whether a refund or credit is coming for

8    an ad impression placed on an AdX publisher's website, or a Youtube video, or an AdSense

9    publisher's website, or from Google Search.  Only Google knows that information and it does not

10   share such information with any AdWords advertisers.

11         95.    The vast majority of ad buys made by AdTrader (both for itself, and on behalf of

12   its advertising clients) are through DBM.  But, just to be sure, AdTrader checked its AdWords

13   invoices to see if the refunds Mr. Nakache claimed Google had made could have been reflected

14   there instead of a DBM invoice.  Those AdWords invoices, however, showed that Google had not

15   issued Mr. Nakache's claimed refunds.

16         96.    AdTrader employees subsequently corresponded with employees of one of its

17   channel partners, a well-known DoubleClick certified marketing partner.  That channel partner

18   handled many of AdTrader's ad buys through DBM, and confirmed that AdTrader had not

19   received any refunds from Google for advertising it had made through DBM on AdX publisher

20   websites.

21         97.    Moreover, following the filing of this lawsuit, representatives from Criteo – a

22   publicly traded marketing company that engages in substantial amounts of online advertising –

23   contacted employees of AdTrader.  Criteo's representatives claimed that the company's records

24   also did not show any evidence of it having received refunds from Google for advertising

25   expenditures it made through DBM on AdX publisher websites.

26         98.    In early December 2017 – around the time AdTrader filed this lawsuit –AdTrader

27   finally received a DBM invoice from Google reflecting refunds for advertising on sites with

28   invalid traffic.  In that invoice, Google gave AdTrader total refunds of about $2 against total

AMENDED COMPLAINT
CASE NO. 5:17-CV-7082-BLF

charges of $7,837.55. As the invoice specifically identifies which advertisers were getting

refunds from Google, AdTrader could tell that none of this $2 in refunds had anything to do with

the events that led Google to terminate AdTrader's NPM account. The additional fact that this

invoice came eight months after Google confiscated AdTrader's accrued AdX earnings further

dispelled any linkage between the refunds and that confiscation.

99.    These revelations are especially problematic for Google, because it is contractually

obligated to refund its advertisers for advertising funds spent by them on invalid impressions or

clicks. Google represented to AdTrader, as it does to all advertisers, that it performs something

called "offline analysis" of its advertising networks to ascertain whether any impressions or clicks

on an advertisement are invalid.

100.   Google further represented that "offline analysis" was supposed to be only one of

three different methods that Google used to detect invalid ad impressions. As Google explained,

"offline analysis" was a detection scheme based upon automated algorithms and manual analysis

that affected all Google sites and even those in other networks. Google explained that "offline

analysis" would take place after a different process called "proactive filters," which involved

automated algorithms that filtered and discarded out invalid impressions in real time, before those

impressions were charged to an advertiser's account. Finally, Google represented that the final

process it used to detect invalid ad impressions came about through "reactive investigations" –

which was essentially a review performed in response to an advertiser inquiry about invalid

clicks.

101.   Google's representations are found on its Google Ads Traffic Quality Resource

Center webpage, and a true and correct copy of this webpage is attached as Exhibit 7. Despite the

iterations of that webpage over the years, Google keeps making essentially the same

representation over and over. Google representatives also expressly refer advertisers and

potential advertisers (during in-person conversations, telephone calls, e-mails, message board

responses, and Internet chats) to review the Google Ads Traffic Quality Resource Center

webpage whenever they have specific questions about invalid activity and advertising fraud.

Indeed, Google prominently states on its own webpage

AMENDED COMPLAINT
CASE NO. 5:17-CV-7082-BLF

1  (https://adwords.googleblog.com/2007/08/introducing-ad-traffic-quality-resource.html) that the

2  Ad Traffic Quality Resource Center "serve[s] as the single source for all click fraud and ad traffic

3  quality related information."

4  102.  More importantly, Google also represented on that Ad Traffic Quality Resource

5  Center webpage that "When invalid activity is found through offline analysis and reactive

6  investigation, we mark those clicks as invalid and issue credits to any advertisers affected by this

7  activity."  The issuance of refunds or credits after the fact was an important way for Google to

8  distinguish "offline analysis" and "reactive investigation" from "proactive filtering," as the latter

9  prevented invalid ad impressions from being charged to the advertiser in the first place.

10  103.  Google repeats its representation that it would provide refunds or credits to

11  advertisers for invalid ad impressions on multiple webpages that it tells its advertisers to review.

12  For example, in an AdWords Help article, Google states that, with respect to "invalid activity,"

13  that it "prohibit[s] this kind of bad behavior.  And that's why you don't have to pay for these

14  unfair clicks and impressions."  A true and correct copy of this webpage is attached as Exhibit 8.

15  104.  As another example, Google stated on another Ad Traffic Quality webpage that:

16  "When we find something wrong, we try to make it right as soon as possible.  We suspend or

17  disable invalid accounts, and may withhold payments to the publisher.  When appropriate and

18  possible, that money is credited back to the advertisers – not only for the month where we found

19  the invalid activity, but often for the previous month, as well."  A true and correct copy of this

20  webpage is attached as Exhibit 6.

21  105.  In still yet another example, Google stated on its Inside AdWords blog that "our

22  team proactively identifies invalid activity that may not have been automatically filtered and

23  credits advertisers accordingly…. In the interest of transparency, all credits, past and future, for

24  future invalid click activity are now labeled 'Adjustment – Click Quality.'"  A true and correct

25  copy of this webpage is attached as Exhibit 9.

26  106.  All of these representations were made by Google to Plaintiffs and all other

27  advertising agencies, advertising networks, and advertisers when they first enter into the

28  DoubleClick Ad Exchange Agreement, the DoubleClick Advertising Agreement, and/or the

AdWords Agreement.  Google then continually affirms these representations by repeatedly re-directing existing clients to its previously referenced webpages whenever they have any questions about Google's advertising programs.

107.   All of the aforementioned representations were reviewed by AdTrader employees on or shortly before it entered into the AdWords Agreement on February 21, 2013.  AdTrader, just like other advertising agencies, advertising networks, and advertisers, decided to sign that contract in large measure because of these representations, as Google's statements provided reassurance that it had ad fraud detection in the specific form of its "offline analysis" in addition to the two other forms of ad fraud detection described by Google, and also that AdTrader and its advertisers would not have to pay for any ad impressions that Google determined to be invalid.

108.   All of the aforementioned representations were re-reviewed by AdTrader employees on or shortly before it entered into the DoubleClick Ad Exchange Agreement on or around June 19, 2014.  AdTrader, just like other advertising agencies, advertising networks, and advertisers, decided to sign that contract in large measure because of these representations, as Google's statements reaffirmed that it had ad fraud detection in the specific form of its "offline analysis" in addition to the two other forms of ad fraud detection described by Google, and also that AdTrader and its advertisers would not have to pay for any ad impressions that Google determined to be invalid.  Furthermore, Google's reaffirmations led AdTrader, just like other advertising agencies, advertising networks, and advertisers, to make advertising expenditures on AdX publisher websites instead of competing ad platforms.

109.   All of the aforementioned representations were re-reviewed by AdTrader employees on or shortly before it entered into the DoubleClick Advertising Agreement on March 1, 2016.  AdTrader, just like other advertising agencies, advertising networks, and advertisers, decided to sign that contract in large measure because of these representations, as Google's statements reaffirmed that it had ad fraud detection in the specific form of its "offline analysis" in addition to the two other forms of ad fraud detection described by Google, and also that AdTrader and its advertisers would not have to pay for any ad impressions that Google determined to be invalid.  Furthermore, Google's reaffirmations led AdTrader, just like other advertising agencies,

advertising networks, and advertisers, to decide to maintain or increase its advertising expenditures on AdX publisher websites instead of competing ad platforms.

110.    All of the aforementioned representations were reviewed by SCB owners on or shortly before it entered into the AdWords Agreement during the spring of 2015.  SCB, like all other advertisers, decided to sign that contract in large measure because of these representations, as Google's statements provided reassurance that it had ad fraud detection in the specific form of its "offline analysis" in addition to the two other forms of ad fraud detection described by Google, and also that SCB would not have to pay for any ad impressions that Google determined to be invalid.

111.    Also, on a monthly or quarterly basis in 2014-2017, AdTrader employees would re-review all of Google's written communications about its advertising programs, including but not limited to the aforementioned representations, on their own accord in response to any questions they had about Google's advertising programs or simply to make sure they were up to date on everything related to Google's advertising programs.  Google's reaffirmations led AdTrader, just like other advertising agencies, advertising networks, and advertisers, to decide to maintain or increase its advertising expenditures on AdX publisher websites instead of competing ad platforms.

112.    As it turned out, Google's aforementioned representations were false.  During an Internet chat with AdTrader employees held on June 2, 2017, Google employee Paschal Pradeep (who was some kind of account or customer service representative for DBM) confirmed that in DBM (again, the largest demand-side-platform in the world and which is used to run ad campaigns for the majority of advertisers using AdX) there was actually no way for Google (or any advertiser) to check on whether advertisements were receiving invalid impressions and clicks (i.e., there is no "offline analysis" as Google has claimed).

113.    Mr. Pradeep explained that this was because DBM only does real-time filtering of invalid impressions and clicks.  In other words, when an advertiser is checking its DBM account, the results it sees already reflect that Google has excluded invalid impressions and clicks from the

final metrics.  "Offline analysis" apparently did not exist, as the only method of fraud detection that existed was "proactive filtering."

114.    AdTrader, of course, never saw any indication in DBM (or any other Google product) that any of its advertisements were being displayed on websites with invalid impressions and clicks.  Incredulous that in the context of AdTrader's account termination, Google would essentially fabricate a claim that it had somehow subsequently detected invalid activity coming from AdTrader's publisher websites (since the real-time, filtered data showed no such invalid activity), AdTrader's employees repeated their questions to Mr. Pradeep to see if there was any misunderstanding.  There was not.  Mr. Pradeep explained that there was no end-of-the-month adjustment for invalid activity, or that such an adjustment took longer than a month to finalize.  Instead, he stated, "[i]t is automatic and it will happen instantly."

115.    And, of course, Google's representation is false for the added reason that it does not, in fact, issue credits to advertisers affected by invalid activity.  AdTrader and its advertisers, are the obvious case in point.

116.    Additional confirmation came by way of an August 25, 2017 article published in the Wall Street Journal.  The article explained that Google had detected a surge of ad fraud during the second quarter of 2017 for DBM users.  But rather than offer full refunds or credits to those advertisers, as it had continually represented in its Ad Traffic Quality Resource Center webpage, Google was offering only a modest reimbursement – about 7-10% of the total amounts spent by those advertisers (with some advertisers apparently getting much less).  These amounts represent only the "platform fee" that advertisers pay to Google as opposed to the expenditures spent on the advertisements themselves.  Not surprisingly, many advertisers were unhappy with this development.

117.    Also in this article, Google said that the refunds it was offering were appropriate "because it doesn't control the rest of the money spent."  This statement is untrue, as the vast majority of advertisements served through DBM go to AdX publisher websites, and Google routinely deducts or withholds payments to those publishers (like it did for AdTrader) on the

1  grounds that some or all of the clicks or impressions generated on that website were somehow

2  invalid

3      118.    For example, using analytics data provided by Google itself, AdTrader determined

4  that for all of 2017, over 70% of all of its advertising clients' ad impressions acquired through

5  DBM had originated through AdX as opposed to other advertising exchanges.

6      119.    Google's analytics data (which AdTrader has access to) also showed that, with

7  respect to the world-wide usage of DBM as of March 2018, 32.79% of all unique cookies with

8  impressions for advertisers had originated through AdX – or 3½ times more than the next largest

9  source – AppNexus.

10      120.    Indeed, it is well known throughout the advertising industry that Google uses

11  DBM to funnel advertisers to AdX instead of other advertising exchanges, and it is a topic that is

12  openly discussed between executives of major advertisers, advertising agencies, advertising

13  networks, and other advertising exchanges.  For example, in a November 9, 2017 interview with a

14  media publication, AppNexus's CEO commented that most DBM buyers that spoke to AppNexus

15  confirmed that more than half of their advertising spend goes to AdX when they used DBM.

16      121.    Apparently, some executive at Google read the August 25, 2017 Wall Street

17  Journal article and realized that it publicly exposed that Google was not giving full refunds or

18  credits as contractually obligated.  On or around September 1, 2017, Google suddenly changed

19  the terms of the contract governing its relationship with AdWords advertisers – the AdWords

20  Agreement.  The primary change it effected to this agreement was that AdWords advertisers were

21  now required to arbitrate their disputes with Google and were precluded from bringing any class

22  actions against Google.  It is plainly obvious that Google made such changes directly in response

23  to the August 25, 2017 Wall Street Journal article to prevent advertisers (especially smaller

24  advertisers) from suing Google and obtaining redress.

25      122.    This sudden change to the contract terms was particularly egregious because it

26  purported to require advertisers to arbitrate any claim they had against Google arising prior to the

27  date of the contract modification.  But in all prior iterations of the AdWords Agreement, Google

28  specifically represented to everyone that any future "changes to the Terms **will not apply**

AMENDED COMPLAINT
CASE NO. 5:17-CV-7082-BLF

1    **retroactively**[.]"  Plaintiffs and all other advertisers using AdWords, relied on this express

2    contractual representation by Google in deciding to sign up for, and continue using AdWords,

3    because Google had promised it would not try to retroactively change contract terms.

4         123.    Plaintiffs did not agree to the modified AdWords contract, and are not bound by its

5    terms.  Many other advertisers are also similarly not bound, as they either declined to accept the

6    modified contract or specifically opted out of the new arbitration requirement.

7         124.    AdTrader filed this lawsuit on December 13, 2017, and its filing received media

8    coverage across the world.  That same day, in response to the allegations raised in this lawsuit, a

9    Google representative informed a United Kingdom publication that "Google has a **longstanding**

10   **policy** of refunding advertisers for invalid traffic" but also admitted that this policy was

11   "**currently being expanded** to include ads purchased via DoubleClick Bid Manager."  In other

12   words, Google admitted to the world that (1) it had a contractual obligation to refund its

13   advertisers for invalid traffic, and (2) until recently, it did not provide refunds to advertisers that

14   used DBM to buy ad space on an AdX publisher's website.

15                        **CLASS ACTION ALLEGATIONS**

16        125.    Plaintiffs brings this action on behalf of themselves and an Advertiser Class,

17   defined as:

18            All businesses and Google-recognized advertising agencies and advertising
             networks that, at any time during the applicable limitations period, paid Google to
19           display their advertisements on the website of a third-party publisher participating
             in the DoubleClick Ad Exchange, and did not receive refunds or credits for
20           advertising expenditures spent by them on that publisher website after Google
             withheld any amount of payment to that publisher for what Google claimed to be
21           invalid activity or non-compliance with a Google policy.

22        126.    AdTrader additionally brings this action on behalf of itself and a DoubleClick

23   Advertising Agreement Sub-Class, defined as:

24            All businesses and Google-recognized advertising agencies and advertising
             networks that executed the DoubleClick Advertising Platform Agreement and that,
25           at any time during the applicable limitations period, paid Google to display their
             advertisements on the website of a third-party publisher participating in the
26           DoubleClick Ad Exchange, and did not receive refunds or credits for advertising
             expenditures spent by them on that publisher website after Google withheld any
27           amount of payment to that publisher for what Google claimed to be invalid activity
             or non-compliance with a Google policy.

28

127.    Through the process of seeking and obtaining class certification, Plaintiffs reserve the right to amend the definitions of the proposed classes, as appropriate.

128.    Excluded from the Class and the Sub-Class are the officers, directors, and employees of Google, any judicial officer presiding over this action, and the members of his or her immediate family and judicial staff.

129.    This action is brought and may properly be maintained as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3).

130.    The Class and the Sub-Class are so numerous that joinder of all members is impracticable.  There are tens of thousands, if not hundreds of thousands, of businesses that have done online advertising on an AdX publisher website.  The precise number and identity of the members of the Class and the Sub-Class can be obtained from the records of Google.

131.    There are numerous questions of law and fact common to the members of the Class and Sub-Class which predominate over any questions affecting only individual members including: (i) whether Google defrauded its DBM and AdWords advertising clients by falsely representing to them that Google refunded or credited advertisers when it discovers that their advertising funds had been spent on fraudulent or invalid clicks, (ii) whether Google had negligently misrepresented to its DBM and AdWords advertising clients that Google refunded or credited advertisers when it discovers that their advertising funds had been spent on fraudulent or invalid clicks, (iii) whether Google is in violation of California Penal Code § 496(c) for defrauding its DBM and AdWords advertising clients by falsely representing to them that Google refunded or credited advertisers when it discovers that their advertising funds had been spent on fraudulent or invalid clicks, (iv) whether Google had breached its contracts with its DBM and AdWords advertising clients by failing to provide them refunds or credits for their advertising funds that had been spent on fraudulent or invalid clicks, (v) whether Google had breached the implied covenant of good faith and fair dealing to its DBM and AdWords advertising clients by failing to provide them refunds or credits for their advertising funds that had been spent on fraudulent or invalid clicks, (vi) whether Google breached the implied duty to perform with reasonable care to its DBM and AdWords advertising clients by failing to provide them refunds

or credits for their advertising funds that had been spent on fraudulent or invalid clicks, (vii) whether Google had unjustly enriched itself at the expense of its DBM and AdWords advertising clients by failing to provide them refunds or credits for their advertising funds that had been spent on fraudulent or invalid clicks, (vii) whether Google had violated California's unfair competition law by misrepresenting to its DoubleClick and AdWords advertising clients that Google refunded or credited advertisers when it discovers that their advertising funds had been spent on fraudulent or invalid clicks and/or by withholding accrued earnings to publishers participating in the DoubleClick Ad Exchange on the grounds that Google had determined such funds were associated with invalid activity and refunded back to advertisers when, in reality, Google was keeping those funds for itself, and (xii) whether Plaintiffs and the members of the Class and the Sub-Class are entitled to damages, restitution, and injunctive relief for Google's conduct.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION:
**Breach of Contract (Google Services Agreement)
by AdTrader Against Google
(Individual Claim)**

132.    Plaintiffs hereby re-incorporate and re-allege all the preceding paragraphs as if fully set forth herein.

133.    AdTrader entered into the Google Services Agreement with Google.

134.    As previously alleged in greater detail, AdTrader substantially performed all of its obligations under the Google Services Agreement.  AdTrader and its web publisher clients published advertisements on their websites served to them by Google, and thereby generated earnings for Google.  AdTrader ensured that its web publisher clients only displayed content that adhered to Google's policies on their websites.  AdTrader ensured that its web publisher clients adhered to Google's guidelines when displaying advertisements through AdX on their websites. Furthermore, Google employees confirmed on multiple occasions to AdTrader employees (in-person, by phone calls, by Internet chat, and by e-mail) that AdTrader's publisher websites were in compliance with Google's policies.

135.    As previously alleged in greater detail, AdTrader's substantial performance is also evidenced by the fact that most or all of its web publisher clients that monetized their traffic through AdTrader's NPM AdX account are still in good standing with Google with their own individual AdX and AdSense accounts (and Google continues to serve ads to those individual accounts to this very day).  If AdTrader were truly in violation of some Google policy, then its individual web publishers would also be in violation of Google policies since both the websites and policies in question are identical.  But since all of their individual web publisher accounts are in good standing, that means Google has found that none of them have violated any Google policies.  And if none of those individual web publisher accounts had violated any Google policies, then AdTrader could not have violated any Google policy either.

136.    As previously alleged in greater detail, AdTrader's substantial performance is also evidenced by the fact that it never received any prior notice from Google of a breach of the Google Services Agreement.  The only contractual grounds for Google to immediately terminate the contract is if a web publisher displays pornographic content on its website, and AdTrader has never had any of its website publishers display any pornographic content.

137.    As previously alleged in greater detail, AdTrader's substantial performance is also evidenced by the fact that neither AdTrader, nor its advertising clients, have ever received a refund from Google for their advertisements placed through AdX on the websites owned by AdTrader's web publisher clients.

138.    In breach of the Google Services Agreement, Google failed to pay AdTrader for the number of valid impressions of advertisements displayed on those websites, and/or other valid events performed in connection with the display of advertisements on those websites using Google's AdX program.

139.    Per the express terms of the Google Services Agreement, Google could withhold AdTrader's accrued AdX earnings only for "(i) invalid queries, impressions, conversions, or clicks, **and** (ii) any amounts refunded to advertisers in connection with Company's failure to comply with this Agreement, as reasonably determined by Google."  Google's notice of violation

1    did not even accuse AdTrader of having invalid queries, impressions, conversions, or clicks.  And

2    Google also did not refund to advertisers the amounts it withheld from AdTrader.

3        140.    As a proximate result of Google's breach of contract, AdTrader has been damaged

4    by $476,622.69 – the amount of the accrued AdX earnings that Google withheld from AdTrader.

5        141.    In addition, Google's breach of contract has resulted in lost profits to AdTrader's

6    business as a whole.  AdTrader's monetization operation for publishers has disintegrated, and

7    AdTrader has thus lost out on all future business from its clients.  AdTrader has also lost out on

8    future business from other publishing clients that had reached out to the company for its products

9    and services.

10        142.    Google was fully aware that its breach of contract could result in lost future profits

11    for AdTrader.  The AdX program specifically contemplates that participants would include

12    businesses that manage monetization of on-line advertising for web publishers.  It therefore is

13    foreseeable that a failure by Google to pay an NPM the amounts owed to it under the AdX

14    program would result in a loss of future business to that NPM.

15        143.    AdTrader also brings a breach of contract claim because Google has withheld all

16    of its accrued earnings as an improper forfeiture.

17        144.    Per the Google Service Agreement, Google could withhold only those accrued

18    earnings that were the product of invalid activity, and could not penalize an AdX publisher by

19    withholding all of its accrued earnings merely because some of those earnings were the result of

20    invalid activity.  Google's actions necessarily meant that it failed to reasonably determine how

21    much to withhold in accrued earnings from AdTrader, even assuming all of Google's other

22    actions were valid.  Google simply decided to withhold the entire amount of the accrued earnings

23    regardless of the fact that the vast majority of those earnings could not have stemmed from any

24    invalid activity, for the reasons previously alleged in greater detail.  Furthermore, Google refused

25    to provide to AdTrader any substantive information about AdTrader's purported violations in

26    order to prevent AdTrader from raising a meaningful challenge about the reasonableness of

27    Google's actions.

28

AMENDED COMPLAINT
CASE NO. 5:17-CV-7082-BLF

1    145.   In addition, if Mr. Nakache was telling the truth during his May 24, 2017 phone

2    call Google would not pay out AdTrader's withheld earnings regardless of the outcome of its

3    internal appeal with Google, then those actions also breach the Google Services Agreement

4    because it demonstrates that Google failed to reasonably determine how much to withhold in

5    accrued earnings from AdTrader.

6    146.   Indeed, by contrast, Google's contract with its AdSense publishers (called the

7    AdSense Terms of Service) state the exact opposite.  For example, in that contract, Google

8    expressly reserved the right to "withhold unpaid amounts" in the event it terminates that

9    agreement due to a publisher engaging in invalid activity.

10    147.   As a proximate result of Google's breach of contract, AdTrader has been damaged

11    in the amount of the accrued AdX earnings that Google withheld from it that were not related to

12    any invalid activity on its publishers' websites.

13                        **SECOND CAUSE OF ACTION:**
                **Breach of the Implied Covenant of Good Faith and Fair Dealing**
14                          **(Google Services Agreement)**
                          **by AdTrader against Google**
15                             **(Individual Claim)**

16    148.   Plaintiffs hereby re-incorporate and re-allege all the preceding paragraphs as if

17    fully set forth herein.

18    149.   As previously alleged in greater detail, AdTrader and Google entered into the

19    Google Services Agreement, and AdTrader substantially performed under that contract.

20    150.   There exists in every contract, including Google's Services Agreement with

21    AdTrader, an implied covenant of good faith and fair dealing, requiring that each party not do

22    anything to unfairly interfere with the right of the other party to receive the benefits of the

23    contract.

24    151.   As previously alleged in greater detail, in breach of the implied covenant, Google

25    unfairly frustrated AdTrader's right to receive its accrued revenue by arbitrarily and capriciously

26    withholding AdTrader's AdX earnings for alleged policy violations, while simultaneously finding

27    that AdTrader's publisher clients were (and still are) in full compliance with Google's policies

28    despite displaying the exact same content and advertising layouts.  If AdTrader had, in fact,

1    violated an AdX policy, then at least some of its publisher clients necessarily would also have had

2    their individual accounts disabled, because AdTrader (as a NPM) only worked on the websites of

3    its publisher clients.  The fact that none of AdTrader's publisher clients suffered a similar fate is

4    proof that AdTrader did not, in fact, violate any Google policies and that Google withheld its

5    earnings in bad faith.

6          152.   As previously alleged in greater detail, in breach of the implied covenant, Google

7    unfairly frustrated AdTrader's right to receive its accrued revenue by refusing to provide the

8    specific reasons for withholding its revenue, ceasing all communications with AdTrader, and

9    refusing to provide any meaningful opportunity to appeal Google's decision.  In particular,

10   Google's violation notice to AdTrader was exceedingly vague, and as a matter of policy, Google

11   refused to provide AdTrader with any information about its account activity after its account was

12   disabled.  Google also as a matter of policy, ceased all communications with AdTrader after

13   Google had disabled AdTrader's account and withheld its earnings.  Google has publicly admitted

14   that publishers have a right to appeal their cases, but because Google refused to inform AdTrader

15   of exactly what it did wrong, AdTrader was deprived of any meaningful opportunity to appeal its

16   case.  Moreover, Google's standardized, pro forma appeal form did not permit AdTrader to

17   elaborate on why Google's termination and withholding decision was erroneous, which in all

18   events, was summarily rejected by Google by means of an auto-generated email, without a good

19   faith review.

20         153.   As previously alleged in greater detail, Google breached its duty of good faith and

21   fair dealing because it affirmatively misrepresented to AdTrader that it could not pay out any of

22   AdTrader's withheld earnings because those withheld earnings had supposedly been refunded to

23   Google's advertisers.

24         154.   In addition, AdTrader also pleads a breach of the implied covenant claim in the

25   alternative in the event that it is determined that Google did not breach its express contractual

26   obligations to AdTrader when it withheld all of AdTrader's accrued AdX earnings instead of just

27   those earnings that were the result of supposedly invalid activity.  Instead of withholding only

28   those accrued AdX earnings supposedly attributable to invalid activity, Google withholds all

AMENDED COMPLAINT
CASE NO. 5:17-CV-7082-BLF

1   accrued AdX earnings as a matter of uniform policy.  Such actions violate the implied covenant

2   of good faith and fair dealing towards AdTrader because Google is willfully withholding accrued

3   AdX earnings that were obtained honestly and legitimately by AdTrader.

4         155.   Continuing to plead in the alternative, Google additionally violated the implied

5   covenant of good faith and fair dealing towards AdTrader because when Google makes the

6   determination that it will withhold the entirety of an AdX publisher's accrued earnings, as a

7   matter of policy, there is nothing that publisher can do to get its money.  During the May 24, 2017

8   phone call, Mr. Nakache expressly told AdTrader that regardless of the outcome of its internal

9   appeal with Google, Google would not pay out AdTrader's withheld earnings.  In other words,

10   Google could concede that it had unjustly suspended/terminated AdTrader's account (the account

11   suspension/termination being the only reason why the entirety of AdTrader's accrued earnings

12   would be withheld), but Google would nonetheless refuse to pay AdTrader what it was owed.

13   Thus, even if AdTrader had exclusively, or at least some, valid activity associated with its

14   account for a particular earnings period, there was nothing it could do to get its accrued revenue

15   for that valid activity from Google.

16         156.   Google also violated the implied covenant of good faith and fair dealing towards

17   AdTrader because when Google withholds the entirety of an AdX publisher's accrued earnings, it

18   always makes this announcement on or around the day those earnings were supposed to be paid

19   out instead of the date Google has determined that the publisher had violated a Google policy.

20   For example, Google announced to another AdX publisher named Bulletin Marketing LLC that it

21   was withholding the entirety of Bulletin Marketing's accrued earnings on or around the day those

22   earnings were supposed to be paid out.  Google has also demonstrated similar conduct to its

23   AdSense publishers, as detailed in the pending matter of *Free Range Content v. Google*, No.

24   5:14-CV-02329-BLF (N.D. Cal.), and as experienced by other AdSense publishers such as

25   Pubshare, Super Cray, eOnline, and others.

26         157.   Moreover, Google could and did detect any such invalid activity prior to the date

27   earnings were due to be paid.  In fact, Google itself claims in its Google Ads Traffic Quality

28   webpage (Exhibit 6) that it detects "the vast majority of invalid traffic in real time or soon

1    after[.]"  Google also claims that in its Google Ads Ad Traffic Quality Resource Center webpage

2    (Exhibit 7) that it engages in "proactive monitoring of both advertiser and publisher networks,"

3    and "carefully monitors all clicks and impressions on ads."  Mr. Pradeep had also confirmed that

4    Google only detected invalid activity in real-time (i.e., "proactive filtering).

5          158.    Google deliberately forced AdTrader to expend resources and time on continuing

6    to display AdX advertisements and acquiring traffic to its websites when Google had already

7    internally decided it would not pay out any AdX revenue to AdTrader under any circumstances.

8    Google does this because when it confiscates the funds from a publisher and refunds them back to

9    the advertiser (assuming that Google does, in fact, provide such refunds), it effectively and

10   substantially lowers that advertiser's cost of advertising, **at the publisher's, not Google's**

11   expense.  That is, the advertiser still received the impression or click from the person who was

12   browsing the publisher's website, but did not have to pay for it.  Through this process, Google

13   earns substantial goodwill from its advertiser customer base, and obtains a competitive advantage

14   vis-à-vis its competitors in the online advertising business who do not confiscate their publishers'

15   accrued earnings and kick them back to the advertiser.

16         159.    As a proximate result of Google's breach of the implied covenant, AdTrader has

17   been damaged by approximately $476,622.69 – the amount of the accrued AdX earnings that

18   Google withheld from AdTrader.

19         160.    In addition, Google's breach of the implied covenant has resulted in lost profits to

20   AdTrader's business as a whole.  AdTrader's monetization operation for publishers has

21   disintegrated, and AdTrader has thus lost out on all future business from its clients.  AdTrader has

22   also lost out on future business from other publishing clients that had reached out to the company

23   for its products and services.

24         161.    Google was fully aware that its breach of the implied covenant could result in lost

25   future profits for AdTrader.  The AdX program specifically contemplates that participants would

26   include businesses that manage monetization of on-line advertising for web publishers.  It

27   therefore is foreseeable that a failure by Google to pay NPMs the amounts owed to them under

28   the AdX program would result in a loss of future business to those NPMs.

1

**THIRD CAUSE OF ACTION:**
**Breach of the Implied Duty to Perform with Reasonable Care**
**(Google Services Agreement)**
**by AdTrader against Google**
**(Individual Claim)**

2

3

4        162.    Plaintiffs hereby re-incorporate and re-allege all the preceding paragraphs as if

5   fully set forth herein.

6        163.    AdTrader brings this claim for breach of implied duty to perform with reasonable

7   care, in the alternative should the Court find that the Google Services Agreement does not impose

8   an express contractual obligation on Google to "reasonably determine" how much of AdTrader's

9   accrued earnings it could withhold on the basis of "invalid queries, impressions, conversions, or

10  clicks."  And even if the Court finds that the contract does impose such an express contractual

11  obligation upon Google, then AdTrader brings this claim in the alternative so that it can elect

12  between contract and tort remedies against Google.

13       164.    As previously alleged in greater detail, AdTrader entered into the Google Services

14  Agreement and substantially performed under that contract.

15       165.    Google had a contractual obligation to pay AdTrader its accrued earnings and

16  could withhold only payments for "invalid queries, impressions, conversions, or clicks" and

17  "amounts refunded to advertisers in connection with [AdTrader's purported] failure to comply

18  with [the Google Services Agreement], as reasonably determined by Google."   This obligation

19  arises from the language of Section 8.2(b) of the Google Services Agreement.

20       166.     Under California law, Google was required to perform its contractual obligations

21  competently and with reasonable care.  Google breached these duties by withholding all of

22  AdTrader's accrued AdX earnings, instead of only those earnings attributable to any invalid

23  queries, impressions, conversions, or clicks on AdTrader's publisher's websites and amounts

24  refunded to advertisers.

25       167.    Had Google used reasonable care in performing its obligations, it would have not

26  withheld the entirety of AdTrader's accrued AdX earnings, but only those earnings attributable to

27  any invalid queries, impressions, conversions, or clicks on AdTrader's publisher's websites and

28  amounts refunded to advertisers.  Google could easily do this, because its software tracks – with

granular detail – all impressions and clicks on every single publisher webpage and thus Google knows exactly which impressions and clicks on a particular webpage are invalid, and which impressions and clicks are valid.  Instead, as a matter of company policy, Google did a blanket withholding of all AdTrader's accrued AdX publisher earnings.

168.    As a proximate result of Google's breach of contract, AdTrader has been damaged in the amount of the accrued AdX earnings that Google withheld from it that were not related to any invalid activity on its publishers' websites.

**FOURTH CAUSE OF ACTION:**
**Intentional Interference with Contract**
**by AdTrader against Google**
**(Individual Claim)**

169.    Plaintiffs hereby re-incorporate and re-allege all the preceding paragraphs as if fully set forth herein.

170.    As previously alleged in greater detail, AdTrader and DingIt had a contractual relationship.  AdTrader helped DingIt optimize the monetization of its content through AdX.  Furthermore, that contract was solely for the provision of AdX-related services.  DingIt did not ask AdTrader to assist with monetizing its content on any other advertising platforms or exchanges.

171.    As previously alleged in greater detail, Google knew of the existence of AdTrader's contract with DingIt.  AdTrader employees, on several occasions, informed Google about the existence of this relationship and even directly introduced DingIt's Vice President of Content & Marketing to AdTrader's AdX account manager on May 15, 2017 after Google forced them to.  In addition, DingIt informed Google on May 17, 2017 of the existence of the contractual relationship and DingIt's intent to exclusively use AdTrader's services to monetize its traffic through AdX going forward.

172.    AdTrader also had contractual relationships with over 200 other web publishers during the period of April 1, 2017 through May 31, 2017.  These publishers included: 6okolad.com; 9kefa.com; 19min.bg; Advertisea.com; Allthatboots.com; Ambito.com; Asiatoday.co.kr; Astrohoroscope.info; Athletic.net; Az-jenata.bg; Babskeveci.sk; Baomoi.com;

1    Bbms.bg; Bet-portal.net; Bgathletic.com; Bgbasket.com; Bgflash.com; Bgfootball.com;

2    Bgmaps.com; Bgnes.com; Bgswim.info; Bgvest.info; Bgvolleyball.com; Blitz.bg; Blog.bg;

3    BollywoodGaram.com; Bonapeti.bg; Booksbg.org; Briag.bg; Briagnews.bg; Building.bg;

4    Bultimes.com; Businessnews.bg; Businessrays.com; Calculator.bg; Cheezburger.com; Chefs.bg;

5    Chirpstory.com; Choiceorlife.com; Classifiedny.com; Cram.com; Cz.ign.com;

6    Designsponge.com; Dieti.info; Dinnerism.com; Dir.bg; Dnes.bg; Dnesbg.net; Dubizzle.com;

7    Ebaumsworld.com; Englobing.com; Filmon.com; Football24.bg; Front.bg; Ghanasoccernet.com;

8    Gledavalnik.com; Gol.bg; Gravitytales.com; Gwarnet.com; Huvle.com; Ibtimes.co.in;

9    Ibtimes.co.uk; Ibtimes.com; Idigitaltimes.com; Ign.com; Igraigo.com; Ikonomist.bg; Ina-

10   online.net; Infojobs.com.br; Informiran365.net; Infostock.co.kr; Interez.sk; Investor.bg; Jenata-

11   vchas.net; Juventusmania1897.com; Kangarooclassifieds.com; Kmib.co.kr; Kpd.bg;

12   Lavoz.com.ar; Lekuvai.bg; Lifebg.net; Ludsport.net; M.incheonilbo.com; Medicaldaily.com;

13   Mediapen.com; Mediatoday.co.kr; Mignews.info; Minterfootball.heraldcorp.com;

14   Minutouno.com; Moneyfeedsme.com; Mosen.mt.co.kr; Msportalkorea.mt.co.kr;

15   Mydotcomrade.com; Myhealthy.tips; Mytime.bg; Nedvijim.com; Newsnbuzz.com;

16   Newsweek.com; Nzfreeads.com; Ok.de; Olx.bg; Olca.co.uk; Olx.co.ke; Olx.co.za; Olx.com.bh;

17   Olx.com.eg; Olx.com.gh; Olx.com.pk; Olx.com.kw; Olx.com.ng; Olx.com.om; Olx.com.pk;

18   Olx.qa; Olx.sa.com; Olxliban.com; Onlinevideocollectionz.com; Op.gg; Ovguide.com; Petel.bg;

19   Pitanka.net; Plovdivderby.com; Politikata.net; Postshare.co.id; Prochetime.com; Puls.bg;

20   Rabota.bg; Realniistorii.com; Roditel.bg; Rhymeswithsnitch.com; Saveti.info; Sedaily.com;

21   Scoresinlive.com; Segye.com; Skafeto.com; Snimka.bg; Sportmedia.tv; Sportsseoul.com;

22   Standartnews.com; Star.mt.co.kr; Stars.bg; Start.bg; Steep.tv; Struma.co; Struma.com;

23   Strumarelax.com; Studymode.com; Tennis24.bg; Termo.bg; Tf.co.kr; Thatsnotfood.com;

24   Thecelebbuzz.com; Thecongressing.com; Thejama.com; Themainline.bg; Thetop.tv; Tia.bg;

25   Todayshealth.buzz; Topgear.bg; Trend-guru.com; Variance.tv; Vchas.net; Viasport.bg;

26   Videoclip.bg; Vijaytamil.net; Voinata.com; Yahoo.com; Zapernik.com; Zdrava.bg;

27   Zemedelski.com; and Zevzeci.net (collectively, the "Web Publishers").

28

173.    All of the Web Publishers had signed an identical contract with AdTrader.  A true and correct copy of the AdTrader Ad Supply Agreement template used for each of these Web Publishers is attached hereto as Exhibit 10.

174.    Google was aware of each contractual relationship between AdTrader and each of the Web Publishers, because it previously required AdTrader to register each Web Publisher in AdX as part of AdTrader's obligations as an NPM to register each of its publisher partners.  AdTrader also helped the Web Publishers optimize the monetization of their content through AdX.

175.    Google's decision to withhold AdTrader's accrued AdX earnings made AdTrader's further performance under its contractual relationship with DingIt impossible, or at least extremely difficult, as DingIt stopped using AdTrader any further when AdTrader was unable to remit the full amount of earnings owed to DingIt.

176.    AdTrader experienced similar difficulties with the Web Publishers.  Google's decision to withhold AdTrader's accrued AdX earnings, made AdTrader's further performance under its contractual relationship with the Web Publishers impossible, or at least extremely difficult, because now depleted of funds, AdTrader was unable to operate in the same capacity and deliver the same results to the Web Publishers.  The Web Publishers declined to further use AdTrader afterwards.

177.    Google knew that its actions would disrupt AdTrader's performance under its contracts.  Google had extensively worked with AdTrader for nearly four years by that point in time and knew that withholding any accrued AdX earnings would prevent AdTrader from fulfilling its contractual duties to any of its Web Publisher clients, let alone DingIt.  Furthermore, Google has extensively worked with NPM managers similar to AdTrader for years, and was familiar enough with the business model of these companies to know that withholding accrued earnings would cripple these businesses.

178.    On information and belief, Google intended to disrupt AdTrader's relationship with DingIt and with the Web Publishers.  In particular, DingIt, and its parent company Level Up Media, is one of the leading video hosting services for e-sports.  Google typically has a direct

AMENDED COMPLAINT
CASE NO. 5:17-CV-7082-BLF

1    relationship with major website publishers and helps those publishers monetize their properties on

2    AdX (i.e., the same types of services that NPMs like AdTrader provide).  Google thus had

3    financial incentives to cause DingIt to directly turn to Google for AdX services (or to a preferred

4    AdX partner that is typically owned by ex-Google employees), and it is not a coincidence that

5    Google terminated AdTrader's account on May 19, 2017, only a few days after Google's direct

6    interactions with DingIt.

7         179.    AdTrader was harmed as a result of Google's interference.  Google's actions

8    caused AdTrader to lose the DingIt account and the Web Publishers accounts, and the millions of

9    dollars in revenue that these accounts represented.  Indeed, just prior to AdTrader's account

10   termination, DingIt informed it that it was going to utilize AdTrader's services that would have

11   generated an estimated $6 million in revenue for AdTrader through the rest of 2017 by itself.

12   And just continuing this relationship would have been worth tens of millions of dollars in annual

13   revenue for AdTrader.  AdTrader also had an annual revenue run rate of several million dollars

14   with the Web Publishers.

15        180.    Google's actions towards AdTrader reflects that it acted with malice, oppression,

16   or fraud toward AdTrader.

17                              **FIFTH CAUSE OF ACTION:**
                     **Intentional Interference with Prospective Economic Advantage**
18                              **by AdTrader against Google**
                                    **(Individual Claim)**
19
         181.    Plaintiffs hereby re-incorporate and re-allege all the preceding paragraphs as if
20
     fully set forth herein.  Plaintiffs plead these allegations in the alternative in the event it is
21
     determined that AdTrader did not have a contractual relationship with DingIt or any of the Web
22
     Publishers.
23
         182.    As previously alleged in greater detail, AdTrader and DingIt had an economic
24
     relationship.  AdTrader helped DingIt optimize the monetization of its content through AdX.
25
     Similarly, AdTrader and the Web Publishers had an economic relationship.  AdTrader helped the
26
     Web Publishers optimize the monetization of their content through AdX.
27

28

                                                                            AMENDED COMPLAINT
                                      - 42 -                                 CASE NO. 5:17-CV-7082-BLF

183.    As previously alleged in greater detail, Google knew of the existence of AdTrader's economic relationship with DingIt, and also with the Web Publishers.  AdTrader employees, on several occasions, informed Google about the existence of this relationship and even directly introduced DingIt's Vice President of Content & Marketing to AdTrader's AdX account manager on May 15, 2017.  In addition, DingIt informed Google on May 17, 2017 of the existence of the economic relationship and DingIt's intent to exclusively use AdTrader's services for monetization via AdX going forward.  As for the Web Publishers, AdTrader had previously disclosed their existence and economic relationship to Google, as it was required to do as an NPM.

184.    Google's decision to withhold AdTrader's accrued AdX earnings disrupted the economic relationship between AdTrader and DingIt, as DingIt stopped using AdTrader any further when AdTrader was unable to remit the full amount of earnings owed to DingIt.

185.    This action also disrupted the economic relationship between AdTrader and the Web Publishers, because now depleted of funds, AdTrader was unable to operate in the same capacity and deliver the same results to the Web Publishers.  The Web Publishers declined to further use AdTrader afterwards.

186.    Google knew that its actions would disrupt AdTrader's relationship with DingIt and with the Web Publishers.  Google had extensively worked with AdTrader for nearly four years by that point in time and knew that withholding any accrued AdX earnings would prevent AdTrader from being able to fulfill any future contractual duties to any of its Web Publisher clients, let alone DingIt.  Furthermore, Google has extensively worked with NPM managers similar to AdTrader for years, and was familiar enough with the business model of these companies to know that withholding accrued earnings would cripple these businesses.

187.    On information and belief, Google intended to disrupt AdTrader's relationship with DingIt and with the Web Publishers.  In particular, DingIt, and its parent company Level Up Media, is one of the leading video hosting services for e-sports.  Google typically has a direct relationship with major website publishers and helps those publishers monetize their properties on AdX (i.e., the same types of services that managers like AdTrader provide).  Google thus had

1    financial incentives to cause DingIt to directly turn to Google for AdX services (or to a preferred

2    AdX partner that is typically owned by ex-Google employees), and it is not a coincidence that

3    Google terminated AdTrader's account on May 19, 2017, only a few days after Google's direct

4    interactions with DingIt.

5            188.    Google engaged in independently wrongful conduct in disrupting AdTrader's

6    relationship with DingIt and with the Web Publishers.  As previously alleged in greater detail,

7    Google breached its implied covenant of good faith and fair dealing, and also its implied duty to

8    perform with reasonable care, in terminating AdTrader's AdX account and withholding its

9    accrued AdX earnings.  Google also deliberately provided false reasons to AdTrader for

10   terminating its AdX account and withholding its accrued earnings, including the demonstrably

11   false statement that all of AdTrader's accrued AdX earnings had already been refunded to

12   Google's advertisers.  Google's conduct in disrupting AdTrader's relationship with DingIt and

13   with the Web Publishers also constitutes a violation of California's unfair competition law, as

14   further alleged herein.

15           189.    AdTrader was harmed as a result of Google's interference.  Google's actions

16   caused AdTrader to lose the DingIt account and the Web Publishers accounts, and the millions of

17   dollars in revenue that these accounts represented.  Indeed, just prior to AdTrader's account

18   termination, DingIt informed it that it was going to utilize AdTrader's services that would have

19   generated an estimated $6 million in revenue for AdTrader through the rest of 2017 by itself.

20   And just continuing this relationship would have been worth tens of millions of dollars in annual

21   revenue for AdTrader.  AdTrader also had an annual revenue run rate of several million dollars

22   with the Web Publishers.

23           190.    Google's actions towards AdTrader reflects that it acted with malice, oppression,

24   or fraud toward AdTrader.

25

26

27

28

1

**SIXTH CAUSE OF ACTION:**
**Declaratory Relief**
**by AdTrader against Google**
**(Individual Claim)**

2

3          191.    Plaintiffs hereby re-incorporate and re-allege all the preceding paragraphs as if

4    fully set forth herein.

5          192.    The Google Service Agreement includes a Limitation of Liability provision that

6    exempts Google from liability for any "lost revenues or indirect, special, incidental,

7    consequential, exemplary, or punitive damages[.]"  The Limitation of Liability also states that

8    liability is limited to no more "than the net amount that [Google] has received and retained under

9    this Agreement during the 12 months before the claim arises."

10         193.    Google has invoked this Limitation of Liability clause in other lawsuits brought by

11   AdSense or AdX publishers to argue that it owes no liability to those publishers.  It is expected

12   that Google will invoke that provision in this lawsuit as well.

13         194.    AdTrader seeks a declaration that this Limitation of Liability clause is

14   substantively and procedurally unconscionable and therefore unenforceable under principles of

15   California contract law.

16         195.    The Limitation of Liability clause is substantively unconscionable because it is

17   transparently one-sided in favor of Google.  There are no instances in which an AdX publisher

18   could engage in conduct that could cause "consequential, special, indirect, exemplary or punitive"

19   damages to Google.  Indeed, Google has never even brought a claim or lawsuit against an AdX

20   publisher that could have resulted in consequential, special, indirect, exemplary or punitive

21   damages.  Nor has Google ever experienced a material loss in revenue from advertisers as a result

22   of an ad running on a publisher webpage that contained material thought by some to be

23   inappropriate or offensive.  These terms therefore operate only for Google's benefit and to the

24   detriment of AdX publishers.

25         196.    If there were any means by which an AdX publisher's conduct could conceivably

26   cause more-than-compensatory damages to Google, Google has expressly exempted such

27   examples from the Limitation of Liability clause.  For example, the Google Services Agreement

28   explicitly excludes from the Limitations of Liability clause "breaches of confidentiality

- 45 -

1    obligations contained in this Agreement, violations of a party's Intellectual Property Rights by the

2    other party, or indemnification obligations contained in this Agreement[.]"  Each of the examples

3    inures solely to the benefit of Google.  No publisher could possibly disclose confidential

4    information to Google (as their entire business model is to publish content on the Internet),

5    whereas Google regards even their most banal internal e-mails to be confidential (as evidenced by

6    the fact that in every lawsuit it is involved in, Google marks almost all of its internal documents

7    to be "Confidential" or "Attorney's Eyes Only" regardless of the actual content of those

8    documents).  Similarly, Google is not in any conceivable position to violate any intellectual

9    property rights held by a publisher whereas the various AdX platforms and their interfaces are

10   considered by Google to be their proprietary intellectual property.

11          197.    The examples of indemnification provided in the agreement also make it clear that

12   there is no likely scenario where a publisher could require Google to provide indemnification

13   from a third-party lawsuit.  Thus, the Limitations of Liability are authored to give off the illusion

14   of bilateralism, but in substance operate solely to prevent publishers from recovering their

15   damages due to Google's wrongful conduct.

16          198.    The Limitation of Liability clause is procedurally unconscionable for many

17   reasons, including that it is presented as a take-it-or-leave it provision to AdX publishers.  And

18   given that Google has a virtual monopoly in the field of on-line advertising, anyone who wishes

19   to monetize their websites through advertising has to use AdX (or AdSense, which has a virtually

20   identical Limitation of Liability clause).

21                          **SEVENTH CAUSE OF ACTION:**
                                      **Fraud**
22                          **by Plaintiffs against Google**
                                **(Class Action Claim)**
23

24          199.    Plaintiffs hereby re-incorporate and re-allege all the preceding paragraphs as if

25   fully set forth herein.

26          200.    Plaintiffs brings this claim of fraud on behalf of themselves and all members of the

27   Advertiser Class.

28

201.    As previously alleged in greater detail, Google represented to Plaintiffs, and all other members of the Advertiser Class, that it performed "offline analysis" of its advertising networks to ascertain whether any clicks on an advertisement was invalid."  Google also represented to Plaintiffs, and all other members of the Advertiser Class, that it would refund or give credits to them for invalid impressions and clicks.

202.    As previously alleged in greater detail, Google's representations were made to Plaintiffs, and all other members of the Advertiser Class when they first entered into the DoubleClick Advertising Platform Agreement, the DoubleClick Ad Exchange Master Service Agreement, and/or the Google Inc. Advertising Program Terms, and were continually reaffirmed by Google afterwards.

203.    As an advertising agency / advertising network, Google knew that AdTrader served as the agent for numerous advertisers such as Classic, LML, Ad Crunch, and Fresh Break. Indeed, Google knows exactly who all of AdTrader's advertising clients are, because AdTrader is required to separately register them in DBM.  When Google issues DBM invoices, each of AdTrader's advertising clients are identified by name and by a unique id number.  Thus, Google knew that any representations it made to AdTrader would be as if it had made those representations directly to those advertisers.

204.    As previously alleged in greater detail, Google's representations were false when made.  As Google employee Paschal Pradeep confirmed to AdTrader on June 2, 2017, in DBM, there was actually no way for Google or anyone else to check on invalid impressions and clicks (i.e., the "offline analysis" mentioned in Google's representation) because DBM (the product that handles the vast majority of ad buys on AdX) only does real-time filtering of invalid impressions and clicks, and it apparently has always been that way.  In other words, from the very beginning, Google never had the ability to do "offline analysis" – or, at least, never had the ability to do "offline analysis" for advertisers using DBM to buy ad space with AdX publishers.

205.    As previously alleged in greater detail, Google's representations were also false when made because Google apparently has never provided any credits or refunds to advertisers for impressions or clicks that Google has represented to its publishers as having been fraudulent

AMENDED COMPLAINT
CASE NO. 5:17-CV-7082-BLF

or otherwise invalid.  For example, AdTrader, Classic, LML, Ad Crunch, and Fresh Break have never received any credits or refunds for invalid clicks or impressions even though (i) Google disabled AdTrader's NPM publisher account and withheld $476,622.69 in accrued earnings for supposedly invalid activity and (ii) every month, Google would adjust AdTrader's accrued earnings (or the earnings of AdTrader's publisher clients accrued on their individual AdX or AdSense accounts) by a small amount to reflect deductions for supposedly invalid activity.

206.    Moreover, the contemporaneous falsity of Google's representations is also evidenced by its December 13, 2017 statement to the news media, where it admitted that its policy of providing refunds to advertisers for invalid traffic was only now "**currently being expanded to include ads purchased via DoubleClick Bid Manager.**"  Clearly, at least for ads bought via DBM (which is where the majority of ad buys for AdX take place), Google was acknowledging that it previously never provided refunds for such ads.

207.    And as revealed in the August 25, 2017 Wall Street Journal article, Google is refunding to its advertisers only 7-10% of the amounts they paid to Google for advertisements that were served to invalid traffic (i.e., the platform fee) rather than the entire amount.  In fact, even Google's stated reason for limiting refunds to 7-10% of the total amount paid for invalid traffic – that Google "doesn't control the rest of the money spent" – is itself false, as Google confiscated all of the accrued earnings of AdTrader, as well as other AdX publishers, whenever it accuses them of having invalid activity on their websites.  Moreover, as previously alleged in greater detail, a majority of all advertising expenditures made through DBM is directed by Google to AdX.  So while Google is claiming to publishers that it cannot pay out the entirety of their accrued earnings because such amounts have already been refunded to advertisers, it is simultaneously claiming to advertisers that it is able to refund them only a fraction of that amount.  Google appears to be keeping the difference for itself.

208.    On information and belief, SCB has never received full refunds for any advertisements that they placed on an AdX publisher's website that was internally marked by Google as having invalid impressions or clicks.  As previously alleged in greater detail, Google provides no transparency when it gives refunds or credits to its AdWords advertisers.  And based

1    on all the evidence uncovered so far, it is likely that SCB did not receive at least full refunds or

2    credits for any ad impressions or clicks it had on an AdX publisher's website that was internally

3    marked by Google as having invalid impressions or clicks.

4         209.   Google knew that its representations were false when made, or at the very least,

5    made those representations recklessly and without regard for their truth.  Having developed and

6    operated the DBM, AdX, and AdWords software, Google obviously was well aware at all times

7    that (i) they do not perform any "offline analysis" of invalid activity and (ii) Google's practice

8    was to keep all, or almost all, of the confiscated earnings from its AdX and AdSense publishers.

9    To this very day, Google continues to make the same misrepresentations on its webpages.

10        210.   Moreover, Google's awareness that its representations were false when made is

11   also evidenced by its December 13, 2017 admission to the news media that it had never before

12   provided refunds for DBM users.

13        211.   Google's awareness that its representations were false when made is also

14   demonstrated by its conduct after the August 25, 2017 Wall Street Journal article was published.

15   Within days, Google attempted to unilaterally impose sweeping changes to the AdWords

16   Agreement to (1) bar its advertisers from filing any class actions against it and (2) impose an

17   arbitration agreement that had a retroactive effect, despite Google's prior contractual promise that

18   any changes to its contractual terms would only apply prospectively.

19        212.   Further reflecting on its inherent corporate mentality, Google was also recently

20   given a record fine (€2.42 billion) by the European Commission for manipulating its Google

21   Shopping results, and there is an ongoing European Commission investigation over its

22   manipulation of results for its AdSense for Search program.  Similarly, in 2014, Google agreed to

23   a settlement with the Federal Trade Commission where it would pay at least $19 million to

24   reimburse parents who were forced to pay large bills following unauthorized in-app purchases by

25   their children.  As this FTC proceeding revealed, Google employees had jocularly referred

26   amongst themselves to this practice as "friendly fraud" or "family fraud."

27        213.   Google intended to have Plaintiffs and the members of the Advertiser Class rely on

28   its representations.  As stated already, Google representatives repeatedly refer customers and

1   potential customers to its webpages whenever those customers have questions about how Google

2   is ensuring that their advertising spend is not being wasted on fraudulent or invalid traffic.  In

3   particular, referring existing advertisers to these webpages is meant to assuage their concerns

4   about invalid clicks so that they continue to participate in AdX or AdWords and continue to pay

5   Google for on-line advertising.  Furthermore, as Google knew that AdTrader served as the agent

6   for numerous advertisers, it also knew that AdTrader was relying on such representations both in

7   its own capacity and also on behalf of its advertising clients.

8          214.    As previously alleged in greater detail, Plaintiffs and the members of the

9   Advertiser Class relied upon Google's representations in deciding to enter the various advertising

10   contracts with Google, and in deciding to maintain or increase their advertising expenditures

11   through AdX.

12          215.    Plaintiffs and the members of the Advertiser Class reasonably relied upon

13   Google's representations.  It is obvious that Google has superior knowledge of its DBM, AdX and

14   AdWords software compared to anyone else, and thus its statements about that technology were

15   viewed by everyone as authoritative and truthful.  Moreover, it was not until August 25, 2017 that

16   it became public knowledge that Google did not give complete refunds or credits to its advertisers

17   for payments that were triggered by what it had determined to be invalid activity.

18          216.    For their part, Plaintiffs had no inside information allowing them to know what

19   was going on prior to August 25, 2017, and Google's lack of transparency kept Plaintiffs in the

20   dark about how the internal mechanics of AdX worked.  For example, the percentage of invalid

21   traffic on AdTrader's publisher's websites was so miniscule every month, that it did not occur to

22   anyone to scrutinize the monthly AdWords or DBM invoices to see if Google was offering any

23   refunds or credits.  For that matter, AdTrader's employees did not even know how refunds or

24   credits were supposed to be reflected on any of Google's DBM invoices and it was not until they

25   received Google's DBM invoice in early December 2017 did AdTrader understand that refunds

26   would be reflected as a separate line item, rather than as an adjustment to a charge.  As for

27   Classic, LML, Ad Crunch, Fresh Break, and SCB none of them had any idea as to how credits or

28   refunds were handled by Google.

217.     Plaintiffs and the members of the Advertiser Class were damaged by Google's fraudulent conduct.  They spent advertising funds on user traffic that Google claims (to its publishers anyway) to have been invalid and therefore derived no benefit from those expenditures, yet Google did not refund or credit those funds back to the advertisers as Google had promised.  Instead, Google kept such funds for itself.  Also, as an advertising agency, AdTrader was additionally damaged because it was not always reimbursed in full by its clients for its advertising expenditures made on their behalf, and receiving refunds from Google would have mitigated those losses.  Furthermore, AdTrader's reputation as an advertising agency was damaged by not receiving refunds from Google for invalid traffic, because some of its clients associate the inability to obtain such refunds as a failing on AdTrader's part, not Google's part, and those clients choose to reduce or take away their business with AdTrader.

218.     Plaintiffs and the other members of the Advertiser Class's reliance on Google's representation was a substantial factor in causing their harm.  All of them would have chosen to not buy ad space through Google platforms, or would have at least spent less money on those platforms and increased their expenditures on competing platforms, had they known that Google would keep for itself all of their expenditures on user traffic that were fraudulent or otherwise invalid.

**EIGHTH CAUSE OF ACTION:**
**Negligent Misrepresentation**
**by Plaintiffs against Google**
**(Class Action Claim)**

219.     Plaintiffs hereby re-incorporate and re-allege all the preceding paragraphs as if fully set forth herein.

220.     Plaintiffs brings this claim of negligent misrepresentation on behalf of themselves and all members of the Advertiser Class.

221.     As previously alleged in greater detail, Google represented to Plaintiffs, and all other members of the Advertiser Class, that it performed "offline analysis" of its advertising networks to ascertain whether clicks on an advertisement were invalid.  Google also represented

to AdTrader, and all other members of the Advertiser Class, that it would refund or give credits to them for invalid impressions and clicks.

222.    As previously alleged in greater detail, Google's representations were made to AdTrader, and all other members of the Advertiser Class when they first entered into the DoubleClick Advertising Platform Agreement, the DoubleClick Ad Exchange Master Service Agreement, and/or the Google Inc. Advertising Program Terms, and were continually reaffirmed by Google afterwards.

223.    As an advertising agency / advertising network, Google knew that AdTrader served as the agent for numerous advertisers such as Classic, LML, Ad Crunch, and Fresh Break. Indeed, Google knows exactly who all of AdTrader's advertising clients are, because AdTrader is required to separately register them in DBM.  When Google issues DBM invoices, each of AdTrader's advertising clients are identified by name and by a unique id number.  Thus, Google knew that any representations it made to AdTrader would be as if it had made those representations directly to those advertisers.

224.    As previously alleged in greater detail, Google's representations were false when made.  As Google employee Paschal Pradeep confirmed to AdTrader on June 2, 2017, in DBM, there was actually no way for Google or anyone else to check on invalid impressions and clicks (i.e., the "offline analysis" mentioned in Google's representation) because DBM only does real-time filtering of invalid impressions and clicks, and it apparently has always been that way.  In other words, from the very beginning, Google never had the ability to do "offline analysis" – or, at least, never had the ability to do "offline analysis" for advertisers using DBM to buy ad space with AdX publishers.

225.    As previously alleged in greater detail, Google's representations were also false when made because it does not provide any credits or refunds to advertisers for impressions or clicks that Google has represented to its publishers as having been fraudulent or otherwise invalid.  For example, AdTrader, Classic, LML, Ad Crunch, and Fresh Break have never received any credits or refunds for invalid clicks or impressions through DBM from Google even though (i) Google disabled AdTrader's NPM publisher account and withheld $476,622.69 in accrued

1    earnings for supposedly invalid activity and (ii) every month, Google would adjust AdTrader's

2    accrued earnings (or the earnings of AdTrader's publisher clients accrued on their individual AdX

3    or AdSense accounts) by a small amount to reflect deductions for supposedly invalid activity.

4        226.    Moreover, the contemporaneous falsity of Google's representations is also

5    evidenced by its December 13, 2017 statement to the news media, where it admitted that its

6    policy of providing refunds to advertisers for invalid traffic was only now "**currently being**

7    **expanded to include ads purchased via DoubleClick Bid Manager.**"  Clearly, at least for ads

8    bought via DBM (which is where the majority of ad buys for AdX take place), Google was

9    acknowledging that it previously never provided refunds for such ads.

10        227.    And as revealed in the August 25, 2017 Wall Street Journal article, Google is

11    refunding to its advertisers only 7-10% of the amounts they paid to Google for advertisements

12    that were served to invalid traffic rather than the entire amount.  In fact, even Google's stated

13    reason for limiting refunds to 7-10% of the total amount spent – that Google "doesn't control the

14    rest of the money spent" – is itself false, as Google confiscates all of the accrued earnings of

15    AdTrader, as well as other AdX publishers, whenever it accuses them of having invalid activity

16    on their websites.  Moreover, as previously alleged in greater detail, a majority of all advertising

17    expenditures made through DBM is directed by Google to AdX.  So while Google is claiming to

18    publishers that it cannot pay out the entirety of their accrued earnings because such amounts have

19    already been refunded to advertisers, it is simultaneously claiming to advertisers that it is able to

20    refund them only a fraction of that amount.  Google appears to be keeping the difference for

21    itself.

22        228.    On information and belief, SCB has never received full refunds or credits for any

23    advertisements that it placed on an AdX publisher's website through AdWords that was internally

24    marked by Google as having invalid impressions or clicks.  As previously alleged in greater

25    detail, Google provides no transparency when it gives refunds or credits to its AdWords

26    advertisers.  And based on all the evidence uncovered so far, it is likely that SCB did not receive

27    at least full refunds or credits for any ad impressions or clicks it had on an AdX publisher's

28    website that was internally marked by Google as having invalid impressions or clicks.

229.    Google knew that it had no reasonable grounds for believing its representations were true when it made those representations.  Having developed and operated the DBM, AdX and AdWords software, Google obviously was well aware at all times that (i) they do not perform any "offline analysis" of invalid activity and (ii) Google's practice was to keep all, or almost all, of the confiscated earnings from its AdX and AdSense publishers.  To this very day, Google continues to make the same misrepresentations on its webpages.

230.    Moreover, Google's awareness that its representations were false when made is also evidenced by its December 13, 2017 admission to the news media that it had never before provided refunds for DBM users.

231.    Google's awareness that its representations were false when made is also demonstrated by its conduct after the August 25, 2017 Wall Street Journal article was published.  Within days, Google attempted to unilaterally impose sweeping changes to the AdWords Agreement to (1) bar its advertisers from filing any class actions against it and (2) impose an arbitration agreement that had a retroactive effect, despite Google's prior contractual promise that any changes to its contractual terms would only apply prospectively.

232.    Further reflecting on its inherent corporate mentality, Google was also recently given a record fine (€2.42 billion) by the European Commission for manipulating its Google Shopping results, and there is an ongoing European Commission investigation over its manipulation of results for its AdSense for Search program.  Similarly, in 2014, Google agreed to a settlement with the Federal Trade Commission where it would pay at least $19 million to reimburse parents who were forced to pay large bills following unauthorized in-app purchases by their children.  As this FTC proceeding revealed, Google employees had jocularly referred amongst themselves to this practice as "friendly fraud" or "family fraud."

233.    Google intended to have Plaintiffs and the members of the Advertiser Class rely on its representations.  As stated already, Google representatives repeatedly refer customers and potential customers to its webpages whenever those customers have questions about how Google is ensuring that their advertising spend is not being wasted on fraudulent or invalid traffic.  In particular, referring existing advertisers to these webpages is meant to assuage their concerns

1    about invalid clicks so that they continue to participate in AdX or AdWords and continue to pay

2    Google for on-line advertising.  Furthermore, as Google knew that AdTrader served as the agent

3    for numerous advertisers, it also knew that AdTrader was relying on such representations both in

4    its own capacity and also on behalf of its advertising clients.

5          234.    As previously alleged in greater detail, Plaintiffs and the members of the

6    Advertiser Class relied upon Google's representations in deciding to enter the various advertising

7    contracts with Google, and in deciding to maintain or increase their advertising expenditures

8    through AdX.

9          235.    Plaintiffs and the members of the Advertiser Class reasonably relied upon

10   Google's representations.  It is obvious that Google has superior knowledge of its DBM, AdX and

11   AdWords software compared to anyone else, and thus its statements about that technology were

12   viewed by everyone as authoritative and truthful.  Moreover, it was not until August 25, 2017 that

13   it became public knowledge that Google did not give complete refunds or credits to its advertisers

14   for payments that were triggered by what it had determined to be invalid activity.

15         236.    For their part, Plaintiffs had no inside information allowing them to know what

16   was going on prior to August 25, 2017, and Google's lack of transparency kept Plaintiffs in the

17   dark about how the internal mechanics of AdX worked.  For example, the percentage of invalid

18   traffic on AdTrader's publisher's websites was so miniscule every month, that it did not occur to

19   anyone to scrutinize the monthly AdWords or DBM invoices to see if Google was offering any

20   refunds or credits.  For that matter, AdTrader's employees did not even know how refunds or

21   credits were supposed to be reflected on any of Google's DBM invoices and it was not until they

22   received Google's DBM invoice in early December 2017 did AdTrader understand that refunds

23   would be reflected as a separate line item, rather than as an adjustment to a charge.  As for

24   Classic, LML, Ad Crunch, Fresh Break, and SCB none of them had any idea as to how credits or

25   refunds were handled by Google.

26         237.    Plaintiffs and the members of the Advertiser Class were damaged by Google's

27   false representations.  They spent advertising funds on user traffic that Google claims (to its

28   publishers anyway) to be invalid and therefore derived no benefit from those expenditures, yet

1  Google did not refund or credit those funds back to them as Google had promised.  Instead,

2  Google kept such funds for itself.  Also, as an advertising agency, AdTrader was additionally

3  damaged because it was not always reimbursed in full by its clients for its advertising

4  expenditures made on their behalf, and receiving refunds from Google would have mitigated

5  those losses.  Furthermore, AdTrader's reputation as an advertising agency was damaged by not

6  receiving refunds from Google for invalid traffic, because some of its clients associate the

7  inability to obtain such refunds as a failing on AdTrader's part, not Google's part, and those

8  clients choose to reduce or take away their business with AdTrader.

9      238.    Plaintiffs and the other members of the Advertiser Class's reliance on Google's

10  representation was a substantial factor in causing their harm.  All of them would have chosen to

11  not buy ad space through Google platforms, or would have at least spent less money on those

12  platforms and increased their expenditures on competing platforms, had they known that Google

13  would keep for itself all of their expenditures on user traffic that was fraudulent or otherwise

14  invalid.

15                        **NINTH CAUSE OF ACTION:**
                          **California Penal Code § 496(c)**
16                        **by Plaintiffs against Google**
                          **(Class Action Claim)**
17

18      239.    Plaintiffs hereby re-incorporate and re-allege all the preceding paragraphs as if

19  fully set forth herein.

20      240.    Under California law, a party may bring a private right of action against a

21  defendant that fraudulently obtains that party's property (including money) by means of

22  deception.  Plaintiffs hereby bring such a claim on behalf of themselves and the other members of

23  the Advertiser Class.

24      241.    As previously alleged in greater detail, Google's actions in inducing Plaintiffs, and

25  the other members of the Advertiser Class, into spending advertising funds on the DBM, AdX,

26  and AdWords platforms constitute theft by deception under California law.

27

28

242.   As previously alleged in greater detail, Plaintiffs, and the other members of the Advertiser Class, have been damaged as a result of Google's deception.  Accordingly, they are entitled to treble damages and attorney's fees as a result.

### TENTH CAUSE OF ACTION:
**Breach of Contract (DoubleClick Ad Exchange Agreement,
DoubleClick Advertising Agreement, and AdWords Agreement)
by Plaintiffs against Google
(Class Action Claim)**

243.   Plaintiffs hereby re-incorporate and re-allege all the preceding paragraphs as if fully set forth herein.

244.   Plaintiffs bring this claim of breach of the DoubleClick Ad Exchange Agreement, breach of the DoubleClick Advertising Agreement, and breach of the AdWords Agreement, on behalf of themselves and all members of the Advertiser Class.

245.   AdTrader and the other members of the Advertiser Class, had entered into the DoubleClick Ad Exchange Agreement, the DoubleClick Advertising Agreement, and/or the AdWords Agreement.

246.   SCB had entered into the AdWords Agreement.

247.   Classic, LML, Ad Crunch, and Fresh Break were third-party beneficiaries of the DoubleClick Ad Exchange Agreement, the DoubleClick Advertising Agreement, and the AdWords Agreement.  As previously alleged in greater detail, Google is aware that advertising agencies and advertising networks like AdTrader buy ad space on behalf of their advertising clients.  Furthermore, Google knows exactly who all of AdTrader's advertising clients are, because AdTrader is required to separately register them in DBM.  When Google issues DBM invoices, each of AdTrader's advertising clients are identified by name and by a unique ID number.

248.   Plaintiffs, and the other members of the Advertiser Class, had substantially performed under the DoubleClick Ad Exchange Agreement, the DoubleClick Advertising Agreement, and/or the AdWords Agreement.  The key requirements of those contracts were that Plaintiffs, and the other members of the Advertiser Class, (i) provided advertisements that complied with Google's policies and regulations and (ii) paid Google in timely fashion after

1    Google invoiced them for its services.  Plaintiffs, and the other members of the Advertiser Class,

2    met both of these obligations at all times.

3        249.    As previously alleged in greater detail, Google represented to Plaintiffs, and all

4    other members of the Advertiser Class, that it performed "offline analysis" of its advertising

5    networks to ascertain whether any clicks on an advertisement were invalid.  Google also

6    represented to Plaintiffs, and all other members of the Advertiser Class, that it would refund or

7    give credits to them for invalid impressions or clicks.

8        250.    As previously alleged in greater detail, Google's representations were made to

9    Plaintiffs, and all other members of the Advertiser Class when they first entered into the

10   DoubleClick Ad Exchange Agreement, the DoubleClick Advertising Agreement, and/or the

11   AdWords Agreement, and were continually reaffirmed by Google afterwards.

12       251.    Google has also informed every single AdX publisher from whom it confiscates

13   their accrued earnings that those confiscated funds were supposedly "refunded" or "returned"

14   back to advertisers.  Furthermore, the words "refund" or "return," as opposed to "credit," is

15   specifically chosen by Google, as it is emphasizing to the disaffected publisher that the money is

16   already gone and is irretrievable.

17       252.    Google also admitted in a statement to the media after the filing of this lawsuit that

18   it has a "longstanding policy of refunding advertisers for invalid traffic."

19       253.    The DoubleClick Advertising Agreement does not have any express language

20   relating to the parties' obligations when Google discovers that its advertisers had spent money on

21   websites Google determined to have had fraudulent or invalid traffic.  Accordingly, Google's

22   promise that it would refund or provide credits to advertisers in such circumstances (which was

23   repeated after the parties entered into this contract), as well as its frequent statements to the public

24   that it does indeed provide such refunds, is extrinsic evidence demonstrating that the parties

25   understand that Google has an obligation under that contract to provide refunds to advertisers for

26   invalid impressions or clicks.  In the alternative, Google's actions reveal that the obligation to

27   provide such refunds is either an implied term of the contract, or is a modification of the contract

28   as a result of Google's subsequent conduct.

254.    The DoubleClick Ad Exchange Agreement has express language addressing the parties' obligations specifically for (i) click fraud (ii) that is detected through a reactive investigation.  This agreement also requires that Google exercise "reasonable discretion" in issuing advertising credits.  There is no express language regarding the parties' obligations when Google discovers through its "offline" investigations that its advertisers have spent money on invalid traffic (that did not constitute click fraud).  Accordingly, Google's promise that it would refund or provide credits to advertisers in such circumstances (which was repeated after the parties entered into this contract), as well as its frequent statements to the public that it does indeed provide such refunds, is extrinsic evidence demonstrating that the parties understand that Google has an obligation under that contract to provide refunds to advertisers for invalid impressions or clicks.  In the alternative, Google's actions reveal that the obligation to provide such refunds is either an implied term of the contract, or is a modification of the contract as a result of Google's subsequent conduct.  Moreover, Google's repeated promises have also resulted in a modification of the contract with respect to the parties' obligations specifically for (i) invalid traffic (ii) that is detected through offline analysis.

255.    The AdWords Agreement has express language addressing the parties' obligations specifically for (i) click fraud (ii) that is detected through a reactive investigation.  This agreement also requires that Google exercise "reasonable discretion" in issuing advertising credits.  There is no express language regarding the parties' obligations when Google discovers through its "offline" investigations that its advertisers had spent money on invalid traffic (that did not constitute click fraud).  Accordingly, Google's promise that it would refund or provide credits to advertisers in such circumstances (which was repeated after the parties entered into this contract), as well as its frequent statements to the public that it does indeed provides such refunds, is extrinsic evidence demonstrating that the parties understand that Google has an obligation under that contract to provide refunds to advertisers for invalid impressions or clicks.  In the alternative, Google's actions reveal that the obligation to provide such refunds is either an implied term of the contract, or is a modification of the contract as a result of Google's subsequent conduct. Moreover, Google's repeated promises have also resulted in a modification of the

1    contract with respect to the parties' obligations specifically for (i) invalid traffic (ii) that is

2    detected through offline analysis.

3        256.    As previously alleged in greater detail, Google breached all of these contracts

4    because it does not provide full credits or refunds to advertisers for impressions or clicks that

5    Google has represented to its publishers as having been fraudulent or otherwise invalid.  Further,

6    where "reasonable discretion" to issue advertising credits is given under the contracts to Google,

7    Google breached these contracts by exercising that discretion in an objectively unreasonable

8    manner.

9        257.    And as revealed in the August 25, 2017 Wall Street Journal article, Google is

10   refunding to its advertisers only 7-10% of the amounts they paid to Google for advertisements

11   that were served to invalid traffic rather than the entire amount.  In fact, even Google's stated

12   reason for limiting refunds to 7-10% of the total amount spent – that Google "doesn't control the

13   rest of the money spent" – is itself false, as Google confiscated all of the accrued earnings of

14   AdTrader, as well as other AdX publishers, whenever it accuses them of having invalid activity

15   on their websites.  Moreover, as previously alleged in greater detail, a majority of all advertising

16   expenditures made through DBM is directed by Google to AdX.

17       258.    As a proximate result of Google's breaches of the contracts, Plaintiffs, and the

18   other members of the Advertiser Class, have been damaged by not receiving the refunds or credits

19   owed to them by Google.

20   **ELEVENTH CAUSE OF ACTION:**
**Breach of the Implied Covenant of Good Faith and Fair Dealing (DoubleClick Ad Exchange**
21   **Agreement, DoubleClick Advertising Agreement, and AdWords Agreement)**
**by Plaintiffs against Google**
22   **(Class Action Claim)**

23       259.    Plaintiffs hereby re-incorporate and re-allege all the preceding paragraphs as if

24   fully set forth herein.

25       260.    Plaintiffs bring this claim for breach of the implied covenant of good faith and fair

26   dealing, on behalf of themselves and all members of the Advertiser Class, in the alternative

27   should the Court find that the DoubleClick Ad Exchange Agreement, the DoubleClick

28

1   Advertising Agreement, or the AdWords Agreement do not impose an express contractual

2   obligation by Google to give refunds or credits to its advertisers for invalid clicks.

3       261.    As previously alleged in great detail, Plaintiffs, and the other members of the

4   Advertiser Class, entered into the DoubleClick Ad Exchange Agreement, the DoubleClick

5   Advertising Agreement, and/or the AdWords Agreement (or were third-party beneficiaries of

6   those contracts), and substantially performed under these contracts.

7       262.    There exists in every contract, including Google's contracts with AdTrader and

8   other members of the Advertiser Class, an implied covenant of good faith and fair dealing,

9   requiring that each party not do anything to unfairly interfere with the right of the other party to

10  receive the benefits of the contract.

11      263.    Google breached the implied covenant of good faith and fair dealing by unfairly

12  interfering with Plaintiffs and the other members of the Advertiser Class's right to receive the

13  benefits of the contracts at issue.

14      264.    As previously alleged in greater detail, Google does not provide full credits or

15  refunds to advertisers for impressions or clicks that Google has represented to its publishers as

16  having been fraudulent or otherwise invalid.

17      265.    And as revealed in the August 25, 2017 Wall Street Journal article, Google is

18  refunding to its advertisers only 7-10% of the amounts they paid to Google for advertisements

19  that were served to invalid traffic rather than the entire amount.  In fact, even Google's stated

20  reason for limiting refunds to 7-10% of the total amount spent – that Google "doesn't control the

21  rest of the money spent" – is itself false, as Google confiscated all of the accrued earnings of

22  AdTrader, as well as other AdX publishers, whenever it accuses them of having invalid activity

23  on their websites.  Moreover, as previously alleged in greater detail, a majority of all advertising

24  expenditures made through DBM is directed by Google to AdX.

25      266.    Where discretion is given under the contracts to Google, it violated the implied

26  covenant by exercising that discretion to issue credits to Plaintiffs and other members of the

27  Advertiser Class in an arbitrary and unfair manner.  For example, after disabling AdTrader's

28  NPM publisher account and withholding $476,622.69 in accrued earnings for supposedly invalid

AMENDED COMPLAINT
CASE NO. 5:17-CV-7082-BLF

activity, AdTrader and its advertising partners never received any credits or refunds through DBM from Google for invalid clicks or impressions even though they had advertised on AdTrader's publisher's websites during that same period of time.  Similarly, on information and belief, SCB never received full refunds or credits through AdWords either.  And as revealed in the August 25, 2017 Wall Street Journal article, Google is refunding to advertisers only 7-10% of the amounts they paid to Google for advertisements that were served to invalid traffic, rather than the entire amount.  Moreover, as recounted by various advertising agencies to AdTrader, none of them had ever received a refund or credit for invalid activity on ad buys made through DBM even though Google withheld millions of dollars every earnings period from those same AdX publishers for supposedly invalid activity.  The implied covenant of good faith and fair dealing must be implied with respect to Google's discretion, because if the provisions were read literally, Google's bad faith refusal to provide credits to advertisers for invalid clicks on their advertisements would frustrate the actual benefits of the contracts and render them illusory.

267.   As a proximate result of Google's breaches of the implied covenant, Plaintiffs, and the other members of the Advertiser Class, have been damaged by not receiving the refunds or credits owed to them by Google.

**TWELFTH CAUSE OF ACTION:**
**Breach of Implied Duty to Perform with Reasonable Care (DoubleClick Ad Exchange Agreement and AdWords Agreement)**
**by Plaintiffs against Google**
**(Class Action Claim)**

268.   Plaintiffs hereby re-incorporate and re-allege all the preceding paragraphs as if fully set forth herein.

269.   Plaintiffs bring this claim for breach of implied duty to perform with reasonable care, on behalf of themselves and all members of the Advertiser Class, in the alternative should the Court find that the DoubleClick Ad Exchange Agreement or the AdWords Agreement do not impose an express contractual obligation by Google to give refunds or credits to its advertisers for invalid clicks or impressions.  Plaintiffs also bring this claim in the alternative should it turn out that, in fact, Google does have "a longstanding policy of refunding advertisers for invalid traffic"

1     as it publicly stated in response to this lawsuit.  And even if the Court finds that the contract does

2     impose the aforementioned express contractual obligations upon Google, then Plaintiffs bring this

3     claim in the alternative so that they can elect between contract and tort remedies against Google.

4          270.    As previously alleged in greater detail, Plaintiffs and the other members of the

5     Advertiser Class entered into the DoubleClick Ad Exchange Agreement, and/or the AdWords

6     Agreement (or were third-party beneficiaries to those contracts), and substantially performed

7     under these contracts.

8          271.    Google's obligations to Plaintiffs and other members of the Advertiser Class can

9     be determined by reference not only to Google's various contracts with advertisers, but also to

10    various webpages created by Google, including:  an article titled "Google's Protection against

11    Invalid Clicks" posted in Google's "Ad Traffic Quality Resource Center" (Exhibit 7); an article

12    titled "Understanding credits and adjustments to your account" posted on Google's "Search

13    AdWords Help" site (Exhibit 8); an article titled "How does Google prevent invalid activity?"

14    posted on Google's "Traffic Quality" site (Exhibit 6); and an article titled "Invalid click credits"

15    posted on Google's "Inside AdWords," which Google describes as its "official blog for news, tips

16    and information on AdWords."  (Exhibit 9.)

17         272.    Google's obligations to Plaintiffs and other members of the Advertiser Class can

18    also be determined by reference to its course of dealing with the Advertiser Class.  Assuming the

19    truth of its statement that it has a "a longstanding policy of refunding advertisers for invalid

20    traffic," then Google has been providing refunds (or credits) to at least some advertisers during

21    the applicable Class Period, even if those refunds/credits are not as complete as they should have

22    been.

23         273.    Google had an obligation to proactively monitor for and identify invalid clicks and

24    impressions on advertisements purchased by Plaintiffs and other members of the Advertiser

25    Class, and to provide refunds or credits to the Advertiser Class for such invalid activity.  These

26    obligations are implied by language in Google's contracts with advertisers referencing the fact

27    that Google monitored clicks and impressions on advertisements and based its charges to the

28    Advertiser Class on those clicks and impressions.  In addition, Google's Ad Traffic Quality

1   Resource Center—which "serve[s] as the single source for all click fraud and ad traffic quality

2   related information"—states that Google undertakes "**proactive monitoring of both advertiser**

3   **and publisher networks**"; that it "**carefully monitors all clicks and impressions on ads**"; and

4   that "**[w]hen invalid activity is found through offline analysis and reactive investigation, we**

5   **mark those clicks as invalid and issue credits to any advertisers affected by this activity**."

6   (Exhibit 7 (emphasis added).)  Further, in an AdWords Help article, Google states regarding

7   "invalid activity" that it "prohibit[s] this kind of bad behavior.  And **that's why you don't have**

8   **to pay for these unfair clicks and impressions**."  (Exhibit 8 (emphasis added).)  Google states

9   on another Ad Traffic Quality webpage that: "When we find something wrong, we try to make it

10   right as soon as possible.  We suspend or disable invalid accounts, and may withhold payments to

11   the publisher.  When appropriate and possible, **that money is credited back to the advertisers** –

12   not only for the month where we found the invalid activity, but often for the previous month, as

13   well." (Ex. 6 (emphasis added).)  Reiterating these obligations, Google's Inside AdWords blog

14   states that "our team **proactively identifies invalid activity that may not have been**

15   **automatically filtered and credits advertisers accordingly**."  (Ex. 9 (emphasis added).)

16   Moreover, after this lawsuit was filed, a Google representative admitted to a United Kingdom

17   publication that "Google has a longstanding policy of refunding advertisers for invalid traffic."

18        274.    Under California law, Google was required to perform its contractual obligations

19   competently and with reasonable care.  Google breached these duties by failing to accurately

20   monitor for and identify invalid impressions or clicks and by refusing to provide credits for

21   invalid clicks to Plaintiffs and other members of the Advertising Class.  As previously alleged in

22   greater detail, Google does not provide full credits or refunds to advertisers for clicks that Google

23   has represented to its publishers as having been fraudulent or otherwise invalid.  And as revealed

24   in the August 25, 2017 Wall Street Journal article, Google belatedly discovered a surge of ad

25   fraud during the second quarter of 2017 on DBM for which it had charged advertisers, but rather

26   than offer full refunds or credits to those advertisers, offered to reimburse only about 7-10% or

27   less paid by those advertisers.  Moreover, as recounted by various advertising agencies to

28   AdTrader, none of them had ever received a refund or credit for invalid activity from ad buys

1   made through DBM even though Google withheld millions of dollars every earnings period from

2   those same AdX publishers for supposedly invalid activity.

3       275.    Had Google used reasonable care in performing its obligations, it would have not

4   charged the Advertiser Class for these invalid clicks and impressions, or at the very least, would

5   have provided full refunds or credits for those invalid clicks and impressions.

6       276.    As a proximate result of Google's breaches of its obligations, Plaintiffs, and the

7   other members of the Advertiser Class, have been damaged by not receiving the refunds or credits

8   owed to them by Google.

9                          **THIRTEENTH CAUSE OF ACTION:**
                                 **Unjust Enrichment**
10                          **by Plaintiffs against Google**
                                **(Class Action Claim)**
11

12      277.    Plaintiffs hereby re-incorporate and re-allege all the preceding paragraphs as if

13   fully set forth herein.

14      278.    Plaintiffs bring this claim of unjust enrichment, on behalf of themselves and all

15   members of the Advertiser Class, in the alternative should the Court find that the DoubleClick Ad

16   Exchange Agreement, the DoubleClick Advertising Agreement, or the AdWords Agreement do

17   not impose a contractual obligation by Google to give refunds or credits to its advertisers for

18   invalid clicks.

19      279.    As previously alleged in greater detail, Google represented to Plaintiffs, and all

20   other members of the Advertiser Class, that it performed "offline analysis" of its advertising

21   networks to ascertain whether any clicks on an advertisement were invalid.  Google also

22   represented to AdTrader, and all other members of the Advertiser Class, that it would refund or

23   give credits to them for invalid impressions and clicks.

24      280.    As previously alleged in greater detail, Google's representations were made to

25   Plaintiffs, and all other members of the Advertiser Class when they first entered into the

26   DoubleClick Ad Exchange Agreement, the DoubleClick Advertising Agreement, and/or the

27   AdWords Agreement, and was continually reaffirmed by Google afterwards.

28

AMENDED COMPLAINT
CASE NO. 5:17-CV-7082-BLF

281.   As previously alleged in greater detail, Google's representation was false because it does not provide full credits or refunds to advertisers for clicks that Google has represented to its publishers as having been fraudulent or otherwise invalid.  AdTrader and its advertising clients have never received any credits or refunds for invalid clicks or impressions for ads placed through DBM, even though (i) Google disabled AdTrader's NPM publisher account and withheld $476,622.69 in accrued earnings for supposedly invalid activity and (ii) every month, Google would adjust AdTrader's accrued earnings (or the earnings of AdTrader's publisher clients accrued on their individual AdX or AdSense accounts) by a small amount to reflect deductions for supposedly invalid activity.

282.   And as revealed in the August 25, 2017 Wall Street Journal article, Google is refunding to its advertisers only 7-10% of the amounts they paid to Google for advertisements that were served to invalid traffic rather than the entire amount.  In fact, even Google's stated reason for limiting refunds to 7-10% of the total amount spent – that Google "doesn't control the rest of the money spent" – is itself false, as Google confiscates all of the accrued earnings of AdTrader, as well as other AdX publishers, whenever it accuses them of having invalid activity on their websites.  So while Google is claiming to publishers that it cannot pay out the entirety of their accrued earnings because such amounts have already been refunded to advertisers, it is simultaneously claiming to advertisers that it is able to refund them only a fraction of that amount.  Google appears to be keeping the difference for itself.

283.   Google has been unjustly enriched by keeping for itself all advertising funds that were spent on invalid traffic instead of refunding those amounts back to Plaintiffs and the other members of the Advertiser Class.

284.   Plaintiffs and the other members of the Advertiser Class are accordingly entitled to restitution equal to the amount of funds that Google refused to pay out to its AdX and AdSense publishers, but that Google kept for itself instead of refunding back to AdTrader and the other members of the Advertiser Class.

285.   Furthermore, should it be determined that advertising agencies or advertising networks globally lack standing to bring any claims against Google, then their advertising clients

such as Classic, LML, Ad Crunch, and Fresh Break still have an unjust enrichment claim against Google.  This is because these advertising clients did not have their own contracts with Google, their funds were paid to Google to display advertisements on AdX publisher websites, and it is unjust for Google to retain any such funds when Google had internally flagged those particular websites as having invalid traffic of any kind and withheld the accrued earnings of those AdX publishers.

**FOURTEENTH CAUSE OF ACTION:**
**Unfair Competition Law**
**by Plaintiffs against Google**
**(Class Action Claim)**

286.    Plaintiffs hereby re-incorporate and re-allege all the preceding paragraphs as if fully set forth herein.

287.    Plaintiffs bring this claim under California's Unfair Competition Law ("UCL"), California Business & Professions Code §§ 17200, et seq., on behalf of themselves and all members of the Advertiser Class.  This claim, however, is not related in any way to the DoubleClick Advertising Agreement.

288.    Google has engaged, in and continues to engage in, unlawful, fraudulent, and unfair business acts and practices prohibited by the UCL.  As previously alleged in greater detail, despite promising to do so, Google repeatedly and systematically refused to provide full credits or refunds to advertisers for invalid impressions or clicks on their ads, while simultaneously withholding payments to the publishers who displayed those ads.  Google instead simply pocketed the money.

289.    Google's acts and practices implicate the public in general and individual consumers in that they were based on representations that were distributed widely on the Internet and directed at thousands of individuals and businesses of all types and sizes looking to engage in online advertising, and misled these consumers as to the value of advertisements they purchased through Google.  In addition, Google's acts and practices have deprived its advertisers of money or credits – totaling hundreds of millions, or even billions, of dollars – that they would have spent on ads targeting end consumers interested in their products or services.  Thus, the interests of

individual consumers are also implicated because end consumers and Internet users were deprived of ads that cater to their interests.  The decrease in advertising expenditures also, in turn, leads to a decrease in the number of publishers offering free content for consumers on the Internet.

290.    Google's actions and systematic conduct towards Plaintiffs and the other members of the Advertiser Classes constitute unlawful business practices towards them within the meaning of California Business & Professions Code § 17200.  As previously alleged in greater detail, Google's acts and conduct constitute fraud, negligent misrepresentation, theft by deception under California Penal Code § 496(c), breach of contract, breach of the implied covenant of good faith and fair dealing, breach of the implied duty to perform with reasonable care, and/or unjust enrichment.

291.    Google's actions and systematic conduct towards Plaintiffs and the other members of the Advertiser Class constitute unfair business practices towards them within the meaning of California Business & Professions Code § 17200.  As previously alleged in greater detail, despite promising to do so, Google repeatedly and systematically refuses to provide credits or refunds to advertisers for invalid impressions or clicks on their ads, while simultaneously withholding payments to the publishers who displayed those ads.  Google instead simply pockets the money.  Such practices are deemed unfair under the UCL.  In addition, Google's conduct is immoral, unethical, oppressive, and unscrupulous in that Google wrongfully confiscates money that it promised to return to advertisers.  Google's conduct is also substantially injurious to consumers, as previously alleged in greater detail.

292.    Google's actions and systematic conduct towards Plaintiffs and the other members of the Advertiser Class constitute fraudulent business practices towards them within the meaning of California Business & Professions Code § 17200.  As previously alleged in greater detail, Google repeatedly and fraudulently represented that it would issue full refunds or credits to advertisers for impressions or clicks on their ads that were determined to be fraudulent or invalid.  Google's representations were likely to deceive a reasonable consumer.  In addition, as previously alleged in greater detail, Plaintiffs actually relied on Google's misrepresentations, as those

misrepresentations were an immediate cause of their decision to maintain or increase their advertising expenditures on AdX publisher websites.

293.    Plaintiffs, and the members of the Advertiser Class are accordingly entitled to restitution and injunctive relief as a remedy for Google's violations of the unfair competition law.

### FIFTEENTH CAUSE OF ACTION:
**Violation of the New York General Business Law § 349
by AdTrader against Google
(Class Action Claim)**

294.    Plaintiffs hereby re-incorporate and re-allege all the preceding paragraphs as if fully set forth herein.

295.    AdTrader brings this claim on behalf of itself and all members of the DoubleClick Advertising Agreement Sub-Class under New York General Business Law § 349, which provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

296.    The DoubleClick Advertising Agreement was executed by an authorized signatory of Google's DoubleClick division, which is located in New York.

297.    As previously alleged in greater detail, Google engaged in deceptive acts and practices by representing to AdTrader and all other members of the DoubleClick Advertising Agreement Sub-Class that it performed "offline analysis" of its advertising networks to ascertain whether any clicks on an advertisement were invalid, and that it would refund or give credits to them for invalid impressions and clicks.  Google's deceptive acts and practices occurred in part in New York because its DoubleClick Bid Manager service is provided through its DoubleClick division located in New York; the DoubleClick Advertising Agreement which governs advertisers' use of the DBM service contains a New York choice-of-law provision; and, on information and belief, Google's misrepresentations were made in or ratified by DoubleClick executives in New York to the extent they relate to DBM.

298.    Google's deceptive acts and practices were consumer-oriented in that they were based on representations that were distributed widely on the Internet and directed at thousands of individuals and small businesses looking to engage in online advertising, including members of

the DoubleClick Advertising Agreement Sub-Class located in New York, and misled these individuals and businesses as to the value of advertisements they purchased through Google.  In addition, Google's acts and practices have deprived its advertisers of money or credits – totaling hundreds of millions, or even billions, of dollars – that they would have spent on ads targeting end consumers interested in their products or services.  Thus, the interests of individual consumers are also implicated because end consumers and Internet users were deprived of ads that cater to their interests.  The decrease in advertising expenditures also, in turn, leads to a decrease in the number of publishers offering free content for consumers on the Internet.

299.    Google's deceptive acts and practices were misleading in a material way because, when Google represented that it performed "offline analysis" for invalid clicks and that it would issue refunds or credits for invalid clicks, a reasonable consumer or small business would reasonably be misled into believing that Google would do what it said it would do.

300.    AdTrader and the other members of the DoubleClick Advertising Agreement Sub-Class suffered injury as a result of Google's deceptive acts and practices.  They lost money by having to pay Google for invalid clicks and impressions on their ads, and would not have paid for those advertisements, or as much as they did, had they known that Google would not issue them refunds or credits for those invalids clicks and impressions.  As a result of Google's deceptive acts and practices, AdTrader and the other members of the DoubleClick Advertising Agreement Sub-Class did not obtain the value of the products or services for which they paid; were induced to pay more for products or services than they otherwise would have paid; and lost the ability to make informed and reasoned purchasing decisions.

301.    AdTrader and the other members of the DoubleClick Advertising Agreement Sub-Class seek relief under N.Y. Gen. Bus. Law § 349(h), including but not limited to actual damages (to be proven at trial), treble damages, statutory damages, injunctive relief, and/or attorney's fees and costs.

1

## **PRAYER**

2    **WHEREFORE**, Plaintiffs AdTrader, Inc., Classic and Food EOOD, LML CONSULT

3  Ltd., Ad Crunch Ltd., Fresh Break Ltd., and Specialized Collections Bureau, Inc. pray for

4  judgment as follows:

5       1.     For judgment against defendant Google, LLC;

6       2.     For compensatory and special damages;

7       3.     For treble damages;

8       4.     For punitive damages;

9       5.     For declaratory relief;

10      6.     For restitution;

11      7.     For a permanent injunction;

12      8.     For pre-judgment interest;

13      9.     For attorney's fees and costs; and

14      10.    For such other and further relief as the Court deems just and proper.

15

16    Dated:  March 20, 2018         GAW | POE LLP

17

18                       By:

19                          Randolph Gaw

20                          Attorneys for Plaintiffs AdTrader, Inc., Classic and Food EOOD, LML CONSULT Ltd., Ad Crunch Ltd., Fresh

21                          Break Ltd., and Specialized Collections Bureau, Inc.

22

23

24

25

26

27

28

AMENDED COMPLAINT
CASE NO. 5:17-CV-7082-BLF

1

## **JURY DEMAND**

2      Plaintiffs AdTrader, Inc., Classic and Food EOOD, LML CONSULT Ltd., Ad Crunch

3   Ltd., Fresh Break Ltd., and Specialized Collections Bureau, Inc. hereby demand a jury trial for

4   their claims against defendant Google, LLC.

5

6      Dated:  March 20, 2018                  GAW | POE LLP

7

8                                          By:

9                                             Randolph Gaw
                                             Attorneys for Plaintiffs AdTrader, Inc.,
10                                            Classic and Food EOOD, LML
                                             CONSULT Ltd., Ad Crunch Ltd., Fresh
11                                            Break Ltd., and Specialized Collections
                                             Bureau, Inc.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED COMPLAINT
CASE NO. 5:17-CV-7082-BLF