# EXHIBIT 1



# GOOGLE SERVICES AGREEMENT

Google Internal Contract ID: 232669

| COMPANY INFORMATION | |
|---|---|
| **COMPANY NAME:** | **AdTradr Corporation** |
| | **BUSINESS CONTACT** |
| **Name:** | Dobromir Kamburov |
| **Title:** | CEO |
| **Address, City, State, Postal Code:** | 95 Model Avenue<br>New Jersey<br>08525 |
| **Phone:** | 609 937 0277 |
| **Fax:** | |
| **Email:** | kamburov@adtradr.com |
| | **LEGAL CONTACT** |
| **Name:** | Dobromir Kamburov |
| **Title:** | CEO |
| **Address, City, State, Postal Code:** | 95 Model Avenue<br>New Jersey<br>08525 |
| **Phone:** | 609 937 0277 |
| **Fax:** | |
| **Email:** | kamburov@adtradr.com |
| | **TECHNICAL CONTACT** |
| **Name:** | Dobromir Kamburov |
| **Title:** | CEO |
| **Address, City, State, Postal Code:** | 95 Model Avenue<br>New Jersey<br>08525 |

| Phone: | 609 937 0277 |
|---|---|
| Fax: | |
| Email: | kamburov@adtradr.com |

| **TERM** |
|---|
| **TERM:** Starting on the first day of the calendar month in which this Agreement is fully executed ("**Effective Date**") and continuing for twelve months through the last day of the twelfth calendar month (inclusive) |

| **GOOGLE DOUBLECLICK AdX SERVICE** | **Revenue Share Percentage** | **Transaction Fee for Client-Managed Buyers** |
|---|---|---|
| Sites for AdX: See Section 1.21 | General Pricing:     80%<br>Google-Managed: 90%<br>Preferred:              90% | 5% of Client-Managed Revenues (as defined below) |

This Google Services Agreement ("**Agreement**") is entered into by Google Inc. ("**Google**") and the company listed on the first page ("**Company**") and is effective as of the Effective Date.

**1.     Definitions**.  In this Agreement:

**1.1.** "**Ad**" means an individual advertisement provided through the Services.

**1.2.** "**Ad Revenues**" means, for any period during the Term and for each AdX transaction type, the sum of the AdX Transaction Prices in that period.  Ad Revenues do not include Client-Managed Revenues.

**1.3.** "**Ad Set**" means a set of one or more Ads.

**1.4.** "**AdX**" or "**Services**" means Google DoubleClick AdX Service, or any successor service.

**1.5.** "**AdX Guidelines**" means the guidelines applicable to AdX and located at the following URL: https://www.google.com/adxseller/adx/static/en_US/guidelines.html (or a different URL Google may provide to Company from time to time).

**1.6.** "**AdX Transaction Price**" means, in an AdX transaction, the final price for the provision of the Ad.

**1.7.** "**Affiliate**" of a party means any corporate entity that directly or indirectly

controls, is controlled by or is under common control with that party.

**1.8.** "**Brand Features**" means each party's trade names, trademarks, logos and other distinctive brand features.

**1.9.** "**Client**" means Company.

**1.10.** "**Client-Managed Accounts**" means Company's accounts with Client-Managed Buyers that are related to the Services.

**1.11.** "**Client-Managed Buyer**" means a purchaser of advertising inventory on the Sites (i) from whom Company is responsible for collection of payment and (ii) with whom Company has a separate contractual relationship, as indicated by Company through the AdX user interface (including, if applicable, Google acting as purchaser, for example via an AdSense service).

**1.12.** "**Client-Managed Revenues**" means, for any period during the Term, the total amount payable to Company by Client-Managed Buyers for the sale of advertising inventory on the Sites, as calculated by Google from data retrieved from Client-Managed Accounts in that period.

**1.13.** "**Company Content**" means any content served to End Users that is not provided by Google.

**1.14.** "**Company Partner**" means for Sites participating in AdX, (i) the owner (if not Company) of those Sites, (ii) the third party co-branding the Sites with Company, or (iii) the third party for whom Company is white labeling the Sites.

**1.15.** "**Confidential Information**" means information that one party (or an Affiliate) discloses to the other party under this Agreement, and that is marked as confidential or would normally be considered confidential information under the circumstances. It does not include information that the recipient already knew, that becomes public through no fault of the recipient, that was independently developed by the recipient, or that was lawfully given to the recipient by a third party.

**1.16.** "**End Users**" means individual human end users of a Site.

**1.17.** "**Intellectual Property Rights**" means all copyrights, moral rights, patent rights, trademarks, rights in or relating to Confidential Information and any other intellectual property or similar rights (registered or unregistered) throughout the world.

**1.18.** "**Results**" means Ad Sets or Ads.

**1.19.** "**Results Page**" means any Site page that contains any Results.

**1.20.** "**Request**" means a request from Company to Google for an Ad Set.

**1.21.** "**Sites**" means the Web site(s) or other property(ies) registered with

Google in writing or through the AdX user interface, together with the additional property(ies) registered with Google from time to time under subsection 5.3(a) of the Agreement.

**2. Implementation and Maintenance of Services.**

**2.1.** For the remainder of the Term, Google will make available and Company may implement and maintain the Services on each of the Sites. For purposes of clarity, Company may not implement the Services on a property that is not a Site.

**2.2.** Company will ensure that Company, or Company Partner:

(a) is the technical and editorial decision maker in relation to each page, including Results Pages, on which the Services are implemented; and

(b) has control over the way in which the Services are implemented on each of those pages.

**2.3.** Company will ensure that the Services are implemented and maintained in accordance with:

(a) the AdX Guidelines; and

(b) Google technical protocols (if any) and any other technical requirements and specifications applicable to the Services that are provided to Company by Google from time to time.

**2.4.** Google will, upon receiving a Request sent in compliance with this Agreement, provide an Ad Set when available. Company will then display the Ad Set on the applicable Site.

**2.5.** Company will ensure that at all times during the applicable Term, Company or Company Partner:

(a) has a clearly labeled and easily accessible privacy policy in place relating to the Site(s); and

(b) provides the End User with clear and comprehensive information about cookies and other information stored or accessed on the End User's device in connection with the Services, including information about End Users' options for cookie management.

**2.6.** Company will use commercially reasonable efforts to ensure that an End User gives consent to the storing and accessing of cookies and other information on the End User's device in connection with the Services where such consent is required by law.

**2.7.** In each case solely for the purpose of providing AdX, Company authorizes Google to access, manage, retrieve data from, and analyze data from:

(a)   Client-Managed Accounts (including by automated means); and

(b)   Company's AdX account.

**2.8**   If this box is checked by Company, the following will be added as Section 2.8:

**Please check this box to add Section 2.8.**

If Company receives any products and services provided by DoubleClick, a division of Google ("**DoubleClick**," and such products and services, "**DoubleClick Services**"), then notwithstanding anything to the contrary in any agreement between DoubleClick and Company for DoubleClick Services ("**DoubleClick Agreement**"):

(a)   Company authorizes Google to (i) access and manage Company's accounts for DoubleClick Services and (ii) review and analyze the data derived from Company's use of DoubleClick Services on its own behalf or on behalf of any Company Partners ("**DoubleClick Data**"), for the purpose of optimizing Company's use of the Services and the DoubleClick Services.

(b)   Google may use DoubleClick Data to provide its services, but except as set forth in this Agreement or any DoubleClick Agreement, neither DoubleClick nor Google may use or disclose to any third party DoubleClick Data or any of the analyses of DoubleClick Data without Company's written consent. For purposes of clarification, the authority provided by Company to Google in this Section 2.8 will be deemed in addition to all other rights and obligations set forth in this Agreement and any DoubleClick Agreement.

(c)   The parties acknowledge and agree that the reviews and analyses of DoubleClick Data may include the matching of DoubleClick Data with data derived from the services provided by Google to Company.

**3.   Policy and Compliance Obligations.**

3.1   **Policy Obligations.**   Company will not, and will not knowingly or negligently allow any third party to:

(a)   modify, obscure or prevent the display of all, or any part of, any Results;

(b)   implement any click tracking or other monitoring of Results;

(c)   display any Results in pop-ups, pop-unders or other similar methods;

(d)   interfere with the display of or frame any Results Page or any page accessed by clicking on any Results;

(e)   display any content between any Results and any page accessed by clicking on those Results;

(f) directly or indirectly, (i) offer incentives to End Users to generate impressions, Requests or clicks on Results, (ii) fraudulently generate impressions, Requests or clicks on Results or (iii) modify impressions, Requests or clicks on Results;

(g) "crawl", "spider", index or in any non-transitory manner store or cache information obtained from the Services (including Results); or

(h) display on any Site, any content that violates or encourages conduct that would violate the AdX Guidelines, Google technical protocols and any other technical requirements and specifications applicable to the Services that are provided to Company by Google from time to time.

3.2 **Compliance Obligations.**  Company will not knowingly or negligently allow any use of or access to the Services through any Site that is not in compliance with the terms of this Agreement.  Company will use commercially reasonable efforts to monitor for any such access or use and will, if any such access or use is detected, take all reasonable steps requested by Google to disable this access or use.  If Company is not in compliance with this Agreement at any time, Google may suspend provision of all (or any part of) the Services.

**4. Company Partners.**  Company is responsible for any use of, or access to, the Services, including Results, by any Company Partner.  Company will not provide Company Partner or any other third party with access to the AdX user interface.  If the conduct of a Company Partner would be a breach of this Agreement had the conduct been performed by Company, this Company Partner conduct will be treated as Company's breach of this Agreement.  If a Company Partner or Company Partner Site is in violation (or if Google reasonably suspects a violation) of this Agreement, then Google may immediately suspend or deactivate that Company Partner Site.

**5. Changes and Modifications.**

**5.1. By Google.**  If Google modifies the AdX Guidelines, or the Google technical protocols and the modification requires action by Company, Company will take the necessary action no later than 30 days from receipt of notice from Google.  Any modifications to the AdX Guidelines will be generally applied to Google's similarly situated customers in the same region who are using the specific Service impacted by the modification.

**5.2. By Company.**  Company will provide Google with at least 15 days prior notice of any change in code or serving technology that could reasonably be expected to affect the delivery or display of any Results.

**5.3. Site List Changes.**

(a) Company may notify Google from time to time that it wishes to add or remove property(ies) to or from those comprising the Site(s) by either sending notice to Google or adding or removing the property(ies) through the AdX user interface.

(b)   If there is a change in control of any Site (such that the conditions set out in Section 2.2(a) or (b) are not met):

(i)   Company will provide notice to Google at least 30 days before the change; and
(ii)   unless the entire Agreement is assigned to the third party controlling the Site in compliance with Section 14.3 below, from the date of that change in control of the Site, that Site will be treated as removed from this Agreement. Company will ensure that from that date, the Services are no longer implemented on that Site.

**6.   Intellectual Property.**

Except to the extent expressly stated otherwise in this Agreement, neither party will acquire any right, title or interest in any Intellectual Property Rights belonging to the other party, or to the other party's licensors.

**7.   Brand Features.**

Google may include Company's Brand Features in customer lists with Company's prior consent.  Approval will not be required for subsequent uses of a previously approved Brand Feature.

**8.   Payment.**

**8.1. Company Payments.**

(a)   Company will pay Google (i) the Transaction Fee for Client-Managed Buyers (listed on the front page of this Agreement) and (ii) any fees for additional services agreed to by Company through the AdX user interface (together, "**AdX Service Fees**").

(b)   Google may offset the AdX Service Fees payable by Company under this Agreement against Google's payment obligations to Company under this Agreement.

(c)   Even if the AdX Service Fees are offset as described in subsection 8.1(b), Google will invoice (or send a statement of financial activity to) Company for AdX Service Fees in the month after the AdX Service Fees are incurred.  Company will pay the invoice amount, if any, to Google within 30 days of the date of invoice.

**8.2. Google Payments.**

(a)   For the Services, Google will pay Company an amount equal to the Revenue Share Percentage (listed on the front page of this Agreement) of Ad Revenues attributable to a calendar month.  This payment will be made in the month following the calendar month in which the applicable Ads were displayed provided that the amount owed to Company in a given month is above the minimum set forth in the AdX Guidelines.

(b)   Google's payments for the Services under this Agreement will be based on Google's accounting which may be filtered to exclude (i) invalid queries, impressions, conversions, or clicks, and (ii) any amounts refunded to advertisers in connection with Company's failure to comply with this Agreement, as reasonably determined by Google.

**8.3.  Additional Payment Terms.**

(a)   As between Google and Company, Google is responsible for all taxes (if any) associated with the transactions between Google and advertisers in connection with Ads displayed on the Sites.  Company is responsible for all taxes (if any) associated with the Services, other than taxes based on Google's net income.  All payments to Company from Google in relation to the Services will be treated as inclusive of tax (if applicable) and will not be adjusted.  If Google is obligated to withhold any taxes from its payments to Company, Google will notify Company of this and will make the payments net of the withheld amounts.  Google will provide Company with original or certified copies of tax payments (or other sufficient evidence of tax payments) if any of these payments are made by Google.

(b)   All payments due to Company will be in the currency and form of payment selected by Company from the options provided by Google.  Company will be responsible for any bank charges assessed by Company's bank.

(c)   In addition to other rights and remedies Google may have, Google may offset any undisputed, past due payment obligations to Company that Google may incur under this Agreement against any product or service fees owed to Google by Company under this Agreement or any other agreement between Company and Google.  Google may also withhold and offset against its payment obligations under this Agreement, or require Company to pay to Google within 30 days of any invoice, any amounts Google may have overpaid to Company in prior periods.

**9.   Warranties; Disclaimers.**

**9.1.  Warranties.**  Each party warrants that (a) it has full power and authority to enter into this Agreement; and (b) entering into or performing under this Agreement will not violate any agreement it has with a third party.

**9.2.  Disclaimers.**  Except as expressly provided for in this Agreement and to the maximum extent permitted by applicable law, NEITHER PARTY MAKES ANY WARRANTY OF ANY KIND, WHETHER IMPLIED, STATUTORY, OR OTHERWISE AND DISCLAIMS, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR USE, AND NONINFRINGEMENT.

**10.  Indemnification.**

**10.1.     By Company.**  Company will indemnify, defend, and hold harmless Google from and against all liabilities, damages, and costs (including settlement costs) arising out of a third party claim: (a) arising from any Company Content,

Sites or Company Brand Features; (b) arising from Company's breach of this Agreement; (c) relating to any use of, or access to, the Services, including Results, by any Company Partner; or (d) brought by any Company Partner against Google relating to the implementation or display of Ads on a Company Partner Site.

**10.2.     By Google.**  Google will indemnify, defend, and hold harmless Company from and against all liabilities, damages, and costs (including settlement costs) arising out of a third party claim: (a) that authorized use of Google's technology used to provide the Service infringes or misappropriates any copyright, trade secret, trademark or patent of that third party; or (b) arising from Google's breach of this Agreement.  For purposes of clarity, Google will not have any obligations or liability under this Section 10 to the extent arising from any (i) use of the Services in a modified form or in combination with services or software not furnished by Google, (ii) content, information or data provided to Google by Company, End Users or any other third parties, (iii) actions by Company Partner or (iv) Ads, content appearing in Ads, or content to which Ads link.

**10.3.     General**.  The party seeking indemnification will promptly notify the other party of the claim and cooperate with the other party in defending the claim.  The indemnifying party has full control and authority over the defense, except that any settlement requiring the party seeking indemnification to admit liability or to pay any money will require that party's prior written consent, such consent not to be unreasonably withheld or delayed.  The other party may join in the defense with its own counsel at its own expense.  THE INDEMNITIES IN SUBSECTIONS 10.1(a) and 10.2(a) ARE THE ONLY REMEDY UNDER THIS AGREEMENT FOR VIOLATION OF A THIRD PARTY'S INTELLECTUAL PROPERTY RIGHTS.

**11.  Limitation of Liability.**

**11.1.     Limitation.**

(a)   NEITHER PARTY WILL BE LIABLE UNDER THIS AGREEMENT FOR LOST REVENUES OR INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, OR PUNITIVE DAMAGES, EVEN IF THE PARTY KNEW OR SHOULD HAVE KNOWN THAT SUCH DAMAGES WERE POSSIBLE AND EVEN IF DIRECT DAMAGES DO NOT SATISFY A REMEDY.

(b)    NEITHER PARTY WILL BE LIABLE UNDER THIS AGREEMENT FOR MORE THAN THE NET AMOUNT THAT PARTY HAS RECEIVED AND RETAINED UNDER THIS AGREEMENT DURING THE 12 MONTHS BEFORE THE CLAIM ARISES.

**11.2 Exceptions to Limitation.**  These limitations of liability do not apply to breaches of confidentiality obligations contained in this Agreement, violations of a party's Intellectual Property Rights by the other party, or indemnification obligations contained in this Agreement (except for patent indemnification obligations).

**12.  Confidentiality.**

**12.1.     Confidentiality.**  The recipient of any Confidential Information will not

disclose that Confidential Information, except to Affiliates, employees, agents or professional advisors who need to know it and who have agreed in writing (or in the case of professional advisors are otherwise bound) to keep it confidential.  The recipient will ensure that those people and entities use Confidential Information only to exercise rights and fulfill obligations under this Agreement, while using reasonable care to keep the Confidential Information confidential.  The recipient may also disclose Confidential Information when required by law after giving reasonable notice to the discloser, if permitted by law.

**12.2.     Exceptions.**

(a)   Notwithstanding Section 12.1, and subject to Company's anonymity preferences selected in the AdX user interface, Google may (a) inform advertisers of Company's participation in AdX; and (b) share with advertisers Site-specific statistics, the Site URL, and related information collected by Google through its provision of the Services to Company.  Disclosure of information by Google under this subsection 12.2(a) will be subject to the terms of the Google Privacy Policy located at the following URL: http://www.google.com/privacypolicy.html (or a different URL Google may provide to Company from time to time).

(b)   Notwithstanding Section 12.1, Company may disclose to Company Partners, or to any other third parties, the AdX reports provided by Google to Company.  But, Company will not disclose to any Company Partners, or to any other third parties, the Revenue Share Percentage or any data that would allow a Company Partner or third party to back into the Revenue Share Percentage.

**12.3.     Publicity.**  Neither party may make any public statement regarding this Agreement without the other's written approval.

**13.  Term and Termination.**

**13.1.     Term.**  The term of this Agreement is the Term stated on the front pages of this Agreement, unless earlier terminated as provided in this Agreement.  At the end of the Term, this Agreement will automatically renew for additional one year terms (each, a "**Renewal Term**") unless either party notifies the other of its intent not to renew this Agreement at least 30 days prior to the end of the Term or then-current Renewal Term.

**13.2.     Termination.**

(a)   Either party may terminate this Agreement with notice if the other party is in material breach of this Agreement:

   (i)   where the breach is incapable of remedy;

   (ii)  where the breach is capable of remedy and the party in breach fails to remedy that breach within 30 days after receiving notice from the other party; or

(iii)   more than twice even if the previous breaches were remedied.

(b)   Either party may terminate this Agreement for any or no reason upon 30 days prior notice to the other party.

(c)   Google reserves the right to suspend or terminate Company's use of any Services that are alleged or reasonably believed by Google to infringe or violate a third party right.  If any suspension of a Service under this subsection 13.2(c) continues for more than 6 months, Company may immediately terminate this Agreement upon notice to Google.

(d)   Google may terminate this Agreement immediately with notice if pornographic content that is illegal under U.S. law is displayed on any Site.

(e)   Upon the expiration or termination of this Agreement for any reason:

(i)   all rights and licenses granted by each party will cease immediately; and

(ii)   if requested, each party will use commercially reasonable efforts to promptly return to the other party, or destroy and certify the destruction of, all Confidential Information disclosed to it by the other party.

**14.   Miscellaneous.**

**14.1.       Compliance with Laws.**  Each party will comply with all applicable laws, rules, and regulations in fulfilling its obligations under this Agreement.

**14.2.       Notices.**  All notices of termination or breach must be in writing and addressed to the attention of the other party's Legal Department and primary point of contact.  The email address for notices being sent to Google's Legal Department is legal-notices@google.com.  All other notices must be in English , in writing and addressed to the other party's primary contact.  Notice will be treated as given on receipt, as verified by written or automated receipt or electronic logs (as applicable).

**14.3.       Assignment.**  Neither party may assign any part of this Agreement without the written consent of the other, except to an Affiliate where (a) the assignee has agreed in writing to be bound by the terms of this Agreement; (b) the assigning party remains liable for obligations under the Agreement if the assignee defaults on them; and (c) the assigning party has notified the other party of the assignment.  Any other attempt to transfer or assign is void.

**14.4.       Change of Control.**  Upon the earlier of (a) entering into an agreement providing for a change of control (for example, through a stock purchase or sale, merger, asset sale, liquidation or other similar form of corporate transaction), (b) the board of directors of a party recommending its shareholders approve a change of control, or (c) the occurrence of a change of control (each, a "**Change of Control Event**"), the party experiencing the Change of Control Event will provide notice to the other party promptly, but no later than 3 days, after the occurrence of

the Change of Control Event.  The other party may terminate this Agreement by sending notice to the party experiencing the Change of Control Event and the termination will be effective upon the earlier of delivery of the termination notice or 3 days after the occurrence of the Change of Control Event.

**14.5.      Governing Law.**  ALL CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE SERVICES WILL BE GOVERNED BY CALIFORNIA LAW, EXCLUDING CALIFORNIA'S CONFLICT OF LAW RULES, AND WILL BE LITIGATED EXCLUSIVELY IN THE FEDERAL OR STATE COURTS OF SANTA CLARA COUNTY, CALIFORNIA, USA.  THE PARTIES CONSENT TO PERSONAL JURISDICTION IN THOSE COURTS.

**14.6.      Equitable Relief**.  Nothing in this Agreement will limit either party's ability to seek equitable relief; except that Company will not seek, in a proceeding filed during the Term or for one year after the Term, an injunction or exclusion order of any of the Services or any portion of the Services based on patent infringement.

**14.7.      Entire Agreement; Amendments.**  This Agreement sets out all terms agreed between the parties and supersedes any other agreements between the parties relating to its subject matter.  In entering into this Agreement, neither party has relied on, and neither party will have any right or remedy based on, any statement, representation or warranty (whether made negligently or innocently), except those expressly set out on this Agreement.  Any amendment must be in writing signed (including by electronic signature) by both parties and expressly state that it is amending this Agreement.

**14.8.      No Waiver.**  Neither party will be treated as having waived any rights by not exercising (or delaying exercise of) any rights under this Agreement.

**14.9.      Severability.**  If any term (or part of a term) of this Agreement is invalid, illegal or unenforceable, the rest of the Agreement will remain in effect.

**14.10.     Survival.**  The following sections of this Agreement will survive any expiration or termination of this Agreement: 6 (Intellectual Property), 10 (Indemnification), 11 (Limitation of Liability), 12 (Confidentiality; Publicity) and 14 (Miscellaneous).

**14.11.     No Agency.**  This Agreement does not create an agency, partnership, or joint venture between the parties.

**14.12.     No Third Party Beneficiaries.**  This Agreement does not confer any benefits on any third party unless it expressly states that it does.

**14.13.     Force Majeure.**  Neither party will be liable for failure or delay in performance to the extent caused by circumstances beyond its reasonable control.

**14.14.     Counterparts.**  The parties may execute this Agreement in counterparts, including facsimile, PDF or other electronic copies, which taken together will constitute one instrument.

Signed:

**Company: AdTradr Corporation**

**By:** *Dobromir Kamburov*
Dobromir Kamburov (Jun 19, 2014)

**Name:** Dobromir Kamburov
**Title:** CEO
**Date:** Jun 19, 2014


**Google Inc.:**

**By:**

**Name:** Nikesh Arora
**Title:** President, Global Sales and Business Dev
**Date:** Jun 19, 2014