RANDOLPH GAW (S.B. #223718)
rgaw@gawpoe.com
MARK POE (S.B. #223714)
mpoe@gawpoe.com
SAMUEL SONG (S.B. #245007)
ssong@gawpoe.com
VICTOR MENG (S.B. #254102)
vmeng@gawpoe.com
GAW | POE LLP
4 Embarcadero, Suite 1400
San Francisco, CA 94111
Telephone: (415) 766-7451
Facsimile: (415) 737-0642

Attorneys for Plaintiffs AdTrader, Inc., Classic and
Food EOOD, LML CONSULT Ltd., Ad Crunch
Ltd., Fresh Break Ltd., and Specialized Collections
Bureau, Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| ADTRADER, INC., <br><br> Plaintiff, <br><br> v. <br><br> GOOGLE LLC. <br><br> Defendant. | Case No. 5:17-CV-07082-BLF <br><br> **PLAINTIFFS' OPPOSITION TO GOOGLE'S MOTION TO DISMISS CERTAIN CLAIMS IN AMENDED CLASS ACTION COMPLAINT** <br><br> Judge: Hon. Beth L. Freeman <br> Hearing Date: June 21, 2018 <br> Time: 9:00 am <br> Courtroom: 3 |

1

## **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS ................................................................................................ 1

ARGUMENT ..................................................................................................................... 6

I.    ADTRADER STATES ITS INDIVIDUAL CLAIMS AGAINST GOOGLE. ................. 6

    A.    AdTrader States a Claim for Breach of the Implied Covenant (Count II). ............. 6

    B.    AdTrader States a Claim for Breach of the Implied Duty of Care (Count III). ....... 8

    C.    AdTrader States an Intentional Interference with Contract Claim (Count IV). ....... 9

    D.    AdTrader States a Claim for Intentional Interference with Prospective Economic Advantage (Count V). ......................................................................................... 10

    E.    AdTrader States a Claim for Declaratory Relief (Count VI). ............................... 10

II.    PLAINTIFFS STATE THEIR CLASS CLAIMS AGAINST GOOGLE. ........................ 12

    A.    Plaintiffs State a Claim for Fraud (Count VII). .................................................... 12

        1.    Plaintiffs adequately alleged the falsity of Google's statements. ............... 12

        2.    Google's statements were false when made. ............................................... 13

        3.    Plaintiffs adequately allege reliance. ......................................................... 15

    B.    Plaintiffs State a Claim for Negligent Misrepresentation (Count VIII). ................ 17

    C.    Plaintiffs State a Claim Under Cal. Penal Code § 496(c) (Count IX). ................... 17

    D.    Plaintiffs State a Claim for Breach of Contract (Count X). .................................. 17

        1.    Google has breached the implied terms of its contracts. ............................ 17

        2.    In the alternative, Google modified and breached its contracts. ................. 20

    E.    Plaintiffs State a Claim for Breach of the Implied Covenant (Count XI). ............. 21

    F.    Plaintiffs State a Claim for Breach of the Implied Duty of Care (Count XII). ....... 22

    G.    Plaintiffs State a Claim for Unjust Enrichment (Count XIII). ............................... 23

    H.    Plaintiffs State a Claim Under the UCL (Count XIV). ......................................... 24

    I.    Plaintiffs State a Claim Under N.Y. GBL § 349 (Count XV). .............................. 25

CONCLUSION ................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arce v. Kaiser Foundation Health Plan*,
  181 Cal. App. 4th 471 (2010) ...................................................24

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).......................................................................6, 9

*Blakemore v. Superior Court*,
  129 Cal. App. 4th 36 (2005) ...................................................24

*Blue Cross and Blue Shield of N.J., Inc. v. Philip Morris USA Inc.*,
  3 N.Y.3d 200 (2004) .......................................................................25

*Broomfield v. Craft Brew All., Inc.*,
  No. 17-CV-01027-BLF, 2017 WL 3838453 (N.D. Cal. Sept. 1, 2017)...................12

*Carma Developers (Cal.), Inc. v. Marathon Dev. California, Inc.*,
  2 Cal. 4th 342 (1992) .......................................................................24

*Celador Int'l Ltd. v. Walt Disney Co.*,
  347 F. Supp. 2d 846 (C.D. Cal. 2004) ...........................................7

*Chavarria v. Ralphs Grocery Co.*,
  733 F.3d 916 (9th Cir. 2013)......................................................11

*Circle Click Media LLC v. Regus Management Group LLC*,
  No. 3:12-CV-04000-SC, 2015 WL 6638929 (N.D. Cal. 2015) ...............24

*City of New York v. Smokes-Spirits.com, Inc.*,
  541 F.3d 425 (2d Cir. 2008)...........................................................25

*City Solutions, Inc. v. Clear Channel Communications*,
  365 F.3d 835 (9th Cir. 2004)...........................................................15

*Croskrey v. Ocwen Loan Servicing LLC*,
  No. SA CV 14-1318-DOC 2015 WL 12684341 (C.D. Cal. May 22, 2015)...............7

*Darnaa, LLC v. Google, Inc.*,
  No. 15-CV-3221-RMW, 2015 WL 7753406 (N.D. Cal. Dec. 2, 2015)...................10

*English & Sons, Inc. v. Straw Hat Restaurants, Inc.*,
  176 F. Supp. 3d 904 (N.D. Cal. 2016) ..........................................19

*Ewert v. eBay, Inc.*,
  Nos. C-07-02198 RMW, C-07-04487 RMW, 2010 WL 4269259 (N.D. Cal.
  Oct. 25, 2010) ........................................................................................................24

*First Fin. Sec. Inc. v. Freedom Equity Grp. LLC*,
  No. 15-CV-01893-HRL, 2016 WL 1323104 (N.D. Cal. Apr. 5, 2016) ....................................6

*Foad Consulting Group v. Musil Govan Azzalino*,
  270 F.3d 821 (9th Cir. 2001) ....................................................................................18

*Frances Kenny Family Tr. v. World Savs. Bank FSB*,
  No. 04-3724, 2005 WL 106792 (N.D. Cal. Jan. 19, 2005) ........................................13

*Frank Lloyd Wright Found. v. Kroeter*,
  697 F. Supp. 2d 1118 (D. Ariz. 2010) ........................................................................16

*Frankel v. Board of Dental Examiners*,
  46 Cal. App. 4th 534 (1996) ....................................................................................18

*Free Range Content, Inc. v. Google Inc.*,
  No. 5:14-CV-02329-BLF, 2016 WL 2902332 (N.D. Cal. May 13, 2016) ...................... *passim*

*Glen Holly Entertainment, Inc. v. Tektronix, Inc.*,
  352 F.3d 367 (9th Cir. 2003) ....................................................................................15

*Global Crossing Bandwidth, Inc. v. Locus Telecommunication, Inc.*,
  632 F. Supp. 2d 224 (W.D.N.Y. 2009) ........................................................................20

*Gospel Missions of America v. City of Los Angeles*,
  328 F.3d 548 (9th Cir. 2003) ....................................................................................15

*Hadden v. Consolidated Edison Co. of New York, Inc.*,
  45 N.Y.2d 466 (1978) ..............................................................................................21

*Haddock v. Board of Dental Examiners of California*,
  777 F.2d 462 (9th Cir. 1985) ....................................................................................6

*Harper v. Ultimo*,
  113 Cal. App. 4th 1402 (2003) ..................................................................................12

*Heredia v. Intuitive Surgical, Inc.*,
  No. 5:15-CV-02662-EJD, 2016 WL 6947590 (N.D. Cal. Nov. 28, 2016) ........................14

*Hickox-Huffman v. US Airways, Inc.*,
  No. 10-CV-05193-HRL, 2017 WL 4842021 (N.D. Cal. Oct. 26, 2017) ..........................8

*Holguin v. DISH Network LLC*,
  229 Cal. App. 4th 1310 (2014) ..............................................................................8, 22

*Image Online Design, Inc. v. Internet Corp. for Assigned Names &*
  *Numbers*, No. CV 12-08968 DDP, 2013 WL 489899 (C.D. Cal. Feb. 7, 2013) ........................9

*Impala Partners v. Bloom*,
  133 A.D.3d 498 (N.Y. App. 2015)...........................................................................18

*In re Ins. Installment Fee Cases*,
  211 Cal. App. 4th 1395 (2012) ...............................................................................20

*Kuitems v. Covell*,
  104 Cal. App. 2d 482 (1951)....................................................................................23

*Lacey v. Maricopa County*,
  693 F.3d 896 (9th Cir. 2012)......................................................................................9

*Ladd v. Warner Bros. Entm't*,
  184 Cal. App. 4th 1298 (2010) ...........................................................................7, 21

*Lennar Mare Island, LLC v. Steadfast Ins. Co.*,
  176 F. Supp. 3d 949 (E.D. Cal. 2016)................................................................18, 19

*Letizia v. Facebook Inc.*,
  267 F. Supp. 3d 1235 (2017) ............................................................................ *passim*

*Love v. Fire Ins. Exch.*,
  221 Cal. App. 3d 1136 (1990)....................................................................................7

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
  519 F.3d 1025 (9th Cir. 2008)....................................................................................6

*Marsu, B.V. v. Walt Disney Co.*,
  185 F.3d 932 (9th Cir. 1999)....................................................................................21

*MicroTechnologies, LLC v. Autonomy, Inc.*,
  No. 15-CV-02220-JCS, 2017 WL 1848470 (N.D. Cal. May 8, 2017) ......................20

*N. Am. Chem. Co. v. Superior Court*,
  59 Cal. App. 4th 764 (1997) ......................................................................................8

*Nagelberg v. Meli*,
  __ F. Supp. 3d __, 2017 WL 5201446 (S.D.N.Y. Oct. 27, 2017)............................15

*name.space, Inc. v. Internet Corp. for Assigned Names &*
  *Numbers*, No. CV 12-8676 PA, 2013 WL 2151478 (C.D. Cal. Mar. 4, 2013)..........9

*Navigant Consulting, Inc. v. Kostakis*,
  No. CV-07-2302 CPS JMA, 2007 WL 2907330 (E.D.N.Y. Oct. 4, 2007)..............20

*Neubronner v. Milken*,
  6 F.3d 666 (9th Cir. 1993).........................................................................................13

*Nordstrom v. Ryan*,
    762 F.3d 903 (9th Cir. 2014)....................................................................14

*Patel v. New York Life Ins. Co.*,
    No. 11 CIV. 4895 JPO, 2012 WL 1883529 (S.D.N.Y. May 21, 2012) ....................................21

*Peregrine Pharm., Inc. v. Clinical Supplies Mgmt., Inc.*,
    No. 12-CV-1608, 2015 WL 13309286 (C.D. Cal. June 22, 2015) ............................................8

*ProSolutions Software, Inc. v. DemandForce, Inc.*,
    No. CV 12-8342-MFW, 2013 WL 12139357 (C.D. Cal. June 4, 2013)...............................9

*Ramos v. Citimortgage, Inc.*,
    No. CIV 08-02250 WBS, 2009 WL 86744 (E.D. Cal. Jan. 8, 2009)........................................10

*In re Read-Rite Corp.*,
    335 F.3d 843 (9th Cir. 2003).......................................................................14

*Richbell Info. Servs. v. Jupiter Partners*,
    309 A.D.2d 288 (N.Y. App. 2003)................................................................22

*Rosado v. eBay Inc.*,
    53 F. Supp. 3d 1256 (N.D. Cal. 2014) .........................................................23

*Salehi v. Surfside III Condominium Owners' Assn.*,
    200 Cal. App. 4th 1146 (2011) ...................................................................18

*Sangster v. Paetkau*,
    68 Cal. App. 4th 151 (1998) .......................................................................15

*Schaffer v. SunTrust Mortg., Inc.*,
    No. 4:16-CV-518, 2017 WL 3033398 (E.D. Tex. July 18, 2017) ............................................16

*Securitron Magnalock Corp. v. Schnabolk*,
    65 F.3d 256 (2d Cir. 1995).........................................................................25

*Silicon Valley Self Direct, LLC v. Paychex, Inc.*,
    No. 5:15-CV-01055-EJD, 2015 WL 4452373 (N.D. Cal. July 20, 2015) ...............................11

*Simulados Software, Ltd. v. Photon Infotech Private, Ltd.*,
    40 F. Supp. 3d 1191 (N.D. Cal. 2014) .........................................................11

*Solis v. Webb*,
    931 F. Supp. 2d 936 (N.D. Cal. 2012) .........................................................13

*Starr v. Baca*,
    652 F.3d 1202 (9th Cir. 2011)..................................................................6, 14

*Stationary Engineers Local 39 Health & Welfare Tr. Fund v. Philip Morris, Inc.*,
    No. C-97-01519 DLJ, 1998 WL 476265 (N.D. Cal. Apr. 30, 1998) ........................................16

*Storek & Storek, Inc. v. Citicorp Real Estate, Inc.*,
   100 Cal. App. 4th 44 (2002) ....................................................................................21

*Sustainable Ranching Partners, Inc. v. Bering Pac. Ranches Ltd.*,
   No. 17-CV-02323-JST, 2018 WL 1696805 (N.D. Cal. Apr. 6, 2018)....................................16

*Tesoro Refining & Marketing Co. LLC v. Pacific Gas and Electric Co.*,
   146 F. Supp. 3d 1170 (N.D. Cal. 2015) ...................................................................18

*Ting v. AT&T*,
   319 F.3d 1126 (9th Cir. 2003)................................................................................11

*Topps Co., Inc. v. Cadbury Stani S.A.I.C.*,
   526 F.3d 63 (2d Cir. 2008)....................................................................................18

*Tropical Sails Corp. v. Yext, Inc.*,
   No. 14 Civ. 7582, 2017 WL 1048086 (S.D.N.Y. March 17, 2017)........................................15

*U.S. Fire Ins. Co. v. Gen. Reinsurance Corp.*,
   949 F.2d 569 (2d Cir. 1991)..................................................................................19

*UMB Bank, Nat'l Ass'n v. Airplanes Ltd.*,
   260 F. Supp. 3d 384 (S.D.N.Y. 2017).......................................................................20

*Valenzuela v. ADT Sec. Servs., Inc.*,
   820 F. Supp. 2d 1061 (C.D. Cal. 2010) .....................................................................8

*Verizon Directories Corp. v. Yellow Book USA, Inc.*,
   338 F. Supp. 2d 422 (E.D.N.Y. 2004) ......................................................................25

*Vertex Const. Corp. v. T.F.J. Fitness L.L.C.*,
   No. 10-CV-683 (CBA)(ALC), 2011 WL 5884209 (E.D.N.Y. Nov. 23, 2011) .......................23

*Wang v. Asset Acceptance, LLC*,
   681 F. Supp. 2d 1143 (N.D. Cal. 2010) .....................................................................6

*Welgus v. TriNet Grp., Inc.*,
   No. 15-CV-03625-BLF, 2017 WL 6466264 (N.D. Cal. Dec. 18, 2017) ...............................15

*Wind Dancer Prod. Grp. v. Walt Disney Pictures*,
   10 Cal. App. 5th 56 (2017) ...................................................................................20

*Wool v. Tandem Computers Inc.*,
   818 F.2d 1433 (9th Cir. 1987).................................................................................13

*Xcellence, Inc. v. Arkin Kaplan Rice LLP*,
   No. 10 Civ. 3304 (HB), 2011 WL 1002419 (S.D.N.Y. Mar. 15, 2011) .................................16

*In re Yahoo! Inc. Customer Data Security Breach Litigation*,
   No. 16-MD-02752-LHK, 2018 WL 1243332 (N.D. Cal. Mar. 9, 2018) ................................11

1

2

*In re Yahoo! Litig.*,
    251 F.R.D. 459 (C.D. Cal. 2008) ............................................................................24

3

**Statutes**

4

Cal. Civ. Code § 1654 ............................................................................................................19

5

Cal. Civ. Code § 1670.5(b) ....................................................................................................10

6

Cal. Penal Code § 496(c) .......................................................................................................17

7

**Other Authorities**

8

Fed. R. Civ. P. 8(a) ................................................................................................................25

9

Fed. R. Civ. P. 9(b) ................................................................................................................13

10

Fed. R. Civ. P. 12(b)(6) ...........................................................................................................6

11

Fed. R. Evid. 201 ...................................................................................................................13

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**INTRODUCTION**

2   For years, Google repeatedly assured advertisers that they "don't have to pay" for

3 fraudulent or invalid activity on their ads, and that it would "issue credits to any advertisers

4 affected by this activity."  Google also touted its ability to detect ad fraud and invalid traffic to

5 reassure advertisers that their money would be spent only on valid traffic.  As it turns out,

6 Google's representations—which it continues to make today—were untrue all along:  Google

7 does not provide its promised refunds or credits, and its software does not work as promised.

8   Despite these facts—which must be assumed true on this motion—Google contends that

9 all of its advertising clients are barred from any relief whatsoever, whether under theories of

10 contract, tort, or restitution.  According to Google, Plaintiffs and all other Google advertisers

11 "agreed to bear th[e] risk" that Google was deceiving them from the very beginning.  Thus, in

12 Google's view, it gets to keep the hundreds of millions of dollars (or more) that it withheld from

13 publishers on its DoubleClick Ad Exchange ("AdX") service and failed to return to advertisers.

14   Google's arguments lack merit, and the Court should reject its attempt to escape liability

15 at the pleading stage.  The Court should also deny Google's attempt to dismiss most of plaintiff

16 AdTrader, Inc.'s ("AdTrader") individual claims seeking to recover the ad revenues it earned by

17 displaying ads through AdX, but Google wrongfully withheld.  Google's actions not only

18 breached its contractual duties, but also tortiously destroyed AdTrader's economic relationships

19 with its clients.  AdTrader's claims are more than adequately pled, and for these and other

20 reasons, Google's motion to dismiss should be denied in its entirety.

21

**STATEMENT OF FACTS**

22   Google is the largest online advertising business in the world.  Am. Class Action Compl.

23 ("AC"), ECF 29 ¶ 24.  It provides services allowing advertisers to buy online ad space, and

24 website publishers to display ads for a share of the money advertisers pay Google.  *Id.* ¶¶ 26, 28.

25   ***Google's Relevant Publisher Service—DoubleClick AdExchange***

26   AdX is similar to Google's AdSense program, which this Court addressed in *Free Range*

27 *Content v. Google*, No. 5:14-CV-02329-BLF, except that AdX allows website publishers to

28 exercise greater control over ad placement and price and allows advertisers from outside of the

Google Display Network to buy ad space from AdX publishers.  AC ¶¶ 26-27.  Google allows smaller publishers to participate in AdX through "Network Partner Managers" ("NPMs"), who manage those publishers' ad space through AdX accounts belonging to the NPMs.  *Id.* ¶¶ 34-36.

The Google Services Agreement ("Services Agreement") governs the relationship between Google and AdX publishers.  *Id.* ¶ 40 & Ex. 1 (ECF No. 29-1).  It states that "Google will pay [AdX publishers] an amount equal to the Revenue Share Percentage … of Ad Revenues attributable to a calendar month."  Ex. 1 § 8.2(a).  It also states the conditions under which Google may withhold that revenue:

> Google's payments for the Services under this Agreement will be based on Google's accounting which may be filtered to exclude (i) invalid queries, impressions, conversions, or clicks, and (ii) any amounts refunded to advertisers in connection with Company's failure to comply with this Agreement, as reasonably determined by Google.

Ex. 1 § 8.2(b).  The agreement permits Google to suspend a publisher's use of AdX if that publisher "is not in compliance with this Agreement," (Ex. 1 § 3.2), or to suspend or terminate a publisher's use of AdX services "that are alleged or reasonably believed by Google to infringe or violate a third party right."  Ex. 1 § 13.2(c).  Nowhere does it permit Google to withhold payments solely because Google suspended or terminated that publisher's use of AdX.  Ex. 1.

### Google's Relevant Advertiser Services

Advertisers can buy ad space offered through AdX using various Google services: (1) the AdWords Advertising Program ("AdWords"), which offers ad space from the Google Display Network (*e.g.*, AdSense) and displays ads on AdX publishers' websites (AC ¶¶ 24, 28-29); (2) DoubleClick Ad Exchange Buyer ("AdX Buyer"), which offers ad space from AdX and other ad networks, exchanges, and platforms (*id.* ¶ 28); and (3) DoubleClick Bid Manager ("DBM"), which offers ad space from AdX, AdSense, and other ad exchanges.  *Id.* ¶ 32.  The vast majority of ad space on AdX is bought through DBM.  *Id.* ¶ 33.  Google permits smaller advertisers to buy ad space on AdX through "advertising agencies" or "advertising networks," who purchase ads for advertisers using the advertising agency/network's "seat" on DBM.  *Id.* ¶¶ 37-38.

These various services are governed by form agreements: (1) for AdWords, the Google Inc. Advertising Program Terms ("AdWords Agreement"), governed by California law, *id.* ¶ 45

& Ex. 4 (ECF No. 29-4) § 12(a); (2) for AdX Buyer, the DoubleClick Ad Exchange Master Service Agreement ("AdX Buyer Agreement"), governed by California law, *id.* ¶ 43 & Ex. 2 (ECF No. 29-2) § 12(a); and (3) for DBM, the DoubleClick Advertising Platform Agreement ("DBM Agreement"), governed by New York law.  *Id.* ¶ 44 & Ex. 3 (ECF No. 29-3) § 10(a).

Google also promised advertisers that they "don't have to pay" for invalid activity, that it "carefully monitors all clicks and impressions on ads" for invalid activity, and that it would "issue credits to any advertisers affected by this activity."  *Id.* ¶¶ 99-106, 157.

### Background on Plaintiffs

AdTrader is both an NPM and an advertising agency/network.  *Id.* ¶¶ 46, 51.  As an NPM, it helped publishers display ads on their websites using its AdX account.  *Id.* ¶¶ 36, 49.  As an advertising agency/network, AdTrader bought ad space on AdX through DBM for its advertiser clients.  *Id.* ¶¶ 48, 52.  AdTrader signed each of the above agreements, *id.* ¶¶ 40, 43-45, performed its obligations under those agreements, and ensured that its clients did, too.  *Id.* ¶¶ 50-57.  AdTrader also used DBM and AdWords to display its own ads on AdX sites.  *Id.* ¶ 60.

Classic, LML, Ad Crunch, and Fresh Break engaged AdTrader to use DBM to buy ad space, with the majority of impressions on their ads coming from AdX sites.  *Id.* ¶¶ 61-64.

SCB used AdWords to place ads on the Internet, and some of the impressions on its ads came from AdX sites.  *Id.* ¶¶ 29, 65.

### Google Suddenly Disables AdTrader's AdX Account and Withholds Its Earnings.

AdTrader served as an NPM for DingIt.tv ("DingIt"), a leading video hosting service for e-sports.  *Id.* ¶ 66.  In April 2017, DingIt agreed to work exclusively with AdTrader to sell ad space through AdX—an agreement worth millions of dollars.  *Id.* ¶ 67.  Aware of AdTrader's relationship with DingIt, on May 12, 2017, Google asked AdTrader to see AdTrader's contract with DingIt and to directly connect with DingIt.  *Id.* ¶ 68.  These requests were concerning, as major publishers like DingIt typically worked directly with Google rather than NPMs like AdTrader.  *Id.* ¶ 83.  But with little choice in the matter, AdTrader gave Google a copy of its contract with DingIt and introduced Google to DingIt on May 15, 2017.  *Id.* ¶¶ 69-70, 84.

On May 19, 2017—four days after AdTrader introduced Google to DingIt and just a few

1    days before Google was due to pay AdTrader its accrued AdX earnings—Google informed

2    AdTrader that it had disabled AdTrader's AdX account and would withhold all of AdTrader's

3    accrued earnings, totaling $476,622.69.  *Id.* ¶¶ 71, 80.  AdTrader was baffled by this notice.  *Id.*

4    ¶ 72.  It vaguely claimed that AdTrader's account was "non-compliant" with Google's "program

5    policies" because "sites displaying Google ads should provide substantial and useful information

6    to the user" and "[u]sers should be able to easily navigate through the site to find what products,

7    goods, or services are promised."  *Id.* ¶ 71.  Google's notice did not state which sites AdTrader

8    managed had committed such violations (or how they did so), and none of them had, as Google

9    had previously confirmed.  *Id.* ¶¶ 71-72, 79.  To this day, none of AdTrader's publisher clients

10   have had their AdX (or AdSense) accounts disabled, even though Google disabled AdTrader's

11   account ostensibly because its clients' websites violated Google's policies.  *Id.* ¶¶ 58, 82.

12       Equally baffling was Google's decision to withhold AdTrader's accrued earnings.  Google

13   could withhold earnings only for "(i) invalid queries, impressions, conversions, or clicks, and (ii)

14   any amounts refunded to advertisers in connection with Company's failure to comply with this

15   Agreement[.]"  Ex. 1 § 8.2(b).  But Google did not even accuse AdTrader of any invalid activity.

16   AC ¶ 71.  Nor were the amounts withheld from AdTrader "refunded to advertisers," as discussed

17   below.  Further, Google had never previously given AdTrader notice of a breach, and AdTrader's

18   publisher clients did not display any illegal "pornographic content"—the only basis for immediate

19   termination of the Services Agreement.  *Id.* § 81 & Ex. 1 § 13.2(d).

20       AdTrader reached out to Google for clarification.  *Id.* ¶ 73.  But Google's employees

21   refused to provide any substantive information, in line with Google's policy of refusing to

22   provide publishers whose accounts are disabled with "any information about their account

23   activity."  *Id.* ¶ 73 & Ex. 5 (ECF No. 29-5).  AdTrader submitted an internal appeal to Google,

24   which has publicly admitted that "'Publishers whose accounts we've disabled have the right to

25   appeal their case.'"  *Id.* ¶ 74 & Ex. 6 (ECF No. 29-6).  But Google's appeal form is a pro forma

26   document that does not permit users to elaborate on why Google's decision was erroneous (*id.*

27   ¶ 75), and without "any information about [its] account activity," AdTrader had no way of

28   knowing what to appeal.  *Id.* ¶ 73.  Google summarily rejected AdTrader's appeal by use of an

auto-generated email without anyone at Google having closely reviewed the appeal. *Id.* ¶ 76.

The futility of AdTrader's appeal was confirmed in a telephone recording between AdTrader and Google executive, Anthony Nakache. *Id.* ¶ 89. In that call, Mr. Nakache represented that "[a]ll of the money" that Google withheld from AdTrader "is going to be refunded to advertisers," and that "whether [AdTrader's] appeal is successful or not, [AdTrader] will still not receive the payment." *Id.*

### AdTrader Discovers That Google Does Not Refund Accrued Earnings It Withholds.

Despite Google's representations that it was refunding all of the amounts it withheld from AdTrader to advertisers, *id.* ¶¶ 71, 89, 100-105, Google never did. During the earnings period in which Google withheld the entirety of AdTrader's accrued AdX earnings, AdTrader (as an advertising agency/network) had used DBM to place a number of its advertising clients' ads on AdX publisher websites that AdTrader managed as an NPM. *Id.* ¶ 91. Thus, if it were true that Google refunded "all of the money" it withheld from AdTrader to advertisers (*id.* ¶ 89), then at least some of AdTrader's advertising clients should have received refunds or credits for ads displayed on AdTrader's publisher websites. But, to this day, neither AdTrader nor its advertising clients have received any such refunds or credits. *Id.* ¶¶ 92, 95. In fact, neither AdTrader nor its advertising clients had ever received such refunds or credits for ad buys through DBM *at any time*, even though Google had withheld some of their accrued earnings during each earnings period. *Id.* ¶ 93. Other advertising agencies shared the same experience. *Id.* ¶¶ 96-97.

To learn more about why no advertisers got any refunds or credits, AdTrader employees held an Internet chat with Google employee Paschal Pradeep on June 2, 2017. *Id.* ¶ 112. Mr. Pradeep admitted that Google had no way to check on invalid impressions in DBM, because DBM only did real-time filtering of invalid impressions. *Id.* ¶¶ 112-113. Mr. Pradeep also admitted that Google did not perform any end-of-the-month adjustments for invalid activity, but that any adjustments for invalid activity happened automatically and instantaneously. *Id.* ¶ 114.

The falsity of Google's promises was further revealed by an August 25, 2017 Wall Street Journal article (the "WSJ Article"). *Id.* ¶ 116. That article revealed that Google did not refund or credit advertisers using DBM the amounts they paid for invalid activity on their ads, but instead

1    refunded only a tiny fraction of that amount.  *Id.*  Days later, Google amended the AdWords

2    Agreement to impose a retroactive arbitration agreement and class action waiver.  *Id.* ¶¶ 121-22.

3        Further, on the same day that AdTrader filed this action on December 13, 2017, a Google

4    representative publicly stated that "Google has a longstanding policy of refunding advertisers for

5    invalid traffic," but admitted that this policy was only "***currently being expanded*** to include ads

6    purchased via [DBM]."  AC ¶ 124 (emphasis added).  In other words, Google never previously

7    intended to issue such refunds, despite its promises to the contrary.

8                                    **ARGUMENT**

9        In reviewing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must "accept

10   factual allegations in the complaint as true and construe the pleadings in the light most favorable

11   to the non-moving party."  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031

12   (9th Cir. 2008).  The non-moving party must show only that the complaint "contain[s] sufficient

13   factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"  *Ashcroft*

14   *v. Iqbal*, 556 U.S. 662, 678 (2009).  "If there are two alternative explanations, one advanced by

15   defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint

16   survives….  Plaintiff's complaint may be dismissed only when defendant's plausible alternative

17   explanation is so convincing that plaintiff's explanation is ***im***plausible."  *Starr v. Baca*, 652 F.3d

18   1202, 1216 (9th Cir. 2011) (emphasis in original).  "[A] complaint should not be dismissed if it

19   states a claim under any legal theory, even if the plaintiff erroneously relied on a different legal

20   theory."  *Haddock v. Board of Dental Examiners of California*, 777 F.2d 462, 464 (9th Cir.

21   1985); *Wang v. Asset Acceptance, LLC*, 681 F. Supp. 2d 1143, 1145 (N.D. Cal. 2010).

22   **I.    ADTRADER STATES ITS INDIVIDUAL CLAIMS AGAINST GOOGLE.**

23       **A.    AdTrader States a Claim for Breach of the Implied Covenant (Count II).**

24       AdTrader has adequately alleged that Google breached the implied covenant in six ways:

25       First, Google disabled AdTrader's AdX account and withheld its earnings for policy

26   violations but never disabled its clients' AdX or AdSense accounts for any such violations.  AC

27   ¶¶ 82, 151.  Google's "selective enforcement" argument from the *Free Range* case fails (Mot. at

28   7), because here, the ***only way*** AdTrader (as an NPM) could have violated an AdX policy was if

its publisher clients had done so, as AdTrader only monetized its clients' websites.  AC ¶¶ 50-51, 82, 151.  AdTrader's well-pled facts show that its clients were in "full compliance" with Google's policies and never terminated, *id.* ¶¶ 50-57, 82, while AdTrader was, showing bad faith.

Second, Google (i) refused to provide the specific reasons for withholding its revenue, (ii) ceased all communications, and (iii) refused to provide any meaningful opportunity to appeal Google's decision.  AC ¶¶ 71-81, 152.  Google challenges only the third claim on the basis that there is no contractual "right to appeal."  Mot. at 7.  But the claim is that these actions frustrated AdTrader's "right to receive its accrued revenue" by concealing Google's unilateral and arbitrary withholding decision and making it unreviewable.  AC ¶ 152; *Love v. Fire Ins. Exch.*, 221 Cal. App. 3d 1136, 1153 (1990); *Ladd v. Warner Bros. Entm't*, 184 Cal. App. 4th 1298, 1306-07 (2010).  Google promising and providing a means to appeal (AC ¶¶ 74-76), confirms that the parties contemplated added measures were needed to protect an AdX publisher's right to receive payment.  *Id.* ¶ 41; *Letizia v. Facebook Inc.*, 267 F. Supp. 3d 1235, 1251 (2017).  Under the implied covenant, that appeal had to be meaningful, not arbitrary, as it was here.  AC ¶¶ 75-76.

Third, Google lied that it could not pay AdTrader's earnings because they were being refunded.  AC ¶¶ 71, 89-92, 153.  It was Google's ***affirmative misrepresentations*** that evince bad faith—not just the fact that Google never issued the refunds.  *Croskrey v. Ocwen Loan Servicing LLC*, No. SA CV 14-1318-DOC 2015 WL 12684341, at *14 (C.D. Cal. May 22, 2015) (implied covenant claim based on misrepresentations stated claim).  Google does not address this point.

Fourth, Google wrongfully withheld all of AdTrader's accrued earnings, rather than just those earnings resulting from invalid activity.  AC ¶ 154.  This claim is expressly and appropriately pled in the alternative.  *Celador Int'l Ltd. v. Walt Disney Co.*, 347 F. Supp. 2d 846, 853 (C.D. Cal. 2004).  Until a jury finds a breach of contract, the implied covenant claim is not duplicative.  This claim is also unlike *Free Range* because AdTrader is not claiming that Google used bad faith to determine that all of its ad serves were invalid, but that it determined that most of its ad serves were valid yet withheld all of its earnings anyway.  AC ¶ 154.

Fifth, Google waited until the end of AdTrader's two-month earnings period to announce that it would withhold all of AdTrader's earnings for that period, rather than when Google earlier

1   detected AdTrader's supposed violations.  AC ¶ 156.  Contrary to Google's argument, AdTrader

2   supports this allegation by pointing to its own experience and the experiences of other publishers.

3   *Id.* ¶¶ 71, 89, 156.  AdTrader also relies on Google's representations that it detects publisher

4   violations "in real time or soon after."  *Id.* ¶ 157.  It is wholly *im*plausible that in every example

5   provided by AdTrader, every purported violation occurred at the end of the two-month period.

6       Sixth, Google refused to reconsider its decision to withhold all of AdTrader's accrued

7   earnings no matter what.  AC ¶ 155.  This claim is not based on a "hypothetical"—AdTrader

8   complied with Google's policies, *id.* ¶¶ 51-52, 134, but Google withheld all its earnings and said

9   that "***whether [AdTrader's] appeal is successful or not***, [it] will still not receive the payment[.]"

10   *Id.* ¶ 89 (emphasis added).  That refusal was, by definition, arbitrary.

11       **B.**    **AdTrader States a Claim for Breach of the Implied Duty of Care (Count III).**

12       Google's arguments that this claim is duplicative of the breach of contract claim and

13   improperly "transmute[s]" that claim to a tort, Mot. at 9-10, necessarily fail because California

14   law expressly recognizes that breach of the implied duty is a tort claim.  *Letizia*, 267 F. Supp. 3d

15   at 1248-49; *Holguin v. DISH Network LLC*, 229 Cal. App. 4th 1310, 1324 (2014); *N. Am. Chem.*

16   *Co. v. Superior Court*, 59 Cal. App. 4th 764, 774 (1997).  Moreover, Google's authority explains

17   that the Ninth Circuit holds that a duplicative claim "'***is not a grounds for dismissal***.'"  *Hickcox-*

18   *Huffman v. US Airways, Inc.*, No. 10-CV-05193-HRL, 2017 WL 4842021, at *4 (N.D. Cal. Oct.

19   26, 2017) (quoting *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015)).  In all

20   events, AdTrader does more than merely restate its contract claim, because the implied duty claim

21   is broader in scope.  AdTrader also alleges that Google intentionally breached the contract to

22   interfere with AdTrader's economic relationship with DingIt, AC ¶¶ 66-71, 83-85, 178-79, 187-

23   89, and "deliberately" forced AdTrader to expend resources on AdX without compensation for

24   Google's advantage.  *Id.* ¶ 158.  Google's cases recognize that such conduct gives rise to tortious

25   breaches.  *Peregrine Pharm., Inc. v. Clinical Supplies Mgmt., Inc.*, No. 12-CV-1608, 2015 WL

26   13309286, at *10 (C.D. Cal. June 22, 2015) ("where intentional conduct is involved, merely

27   enforcing the benefit of the bargain is not sufficient"); *Valenzuela v. ADT Sec. Servs., Inc.*, 820 F.

28   Supp. 2d 1061, 1071-72 (C.D. Cal. 2010) (describing "tortious breach[es] of contract").

**C.    AdTrader States an Intentional Interference with Contract Claim (Count IV).**

Google does not seek to dismiss this claim as it pertains to DingIt, but argues that AdTrader has not alleged "specific facts" showing a "particular" breach or disruption as to the "Web Publishers." Mot. at 11. AdTrader, however, (i) identified 170 Web Publishers with whom it had contractual relationships between April and May 2017 (AC ¶ 172); (ii) attached the contract they signed (*id.* ¶ 173 & Ex. 10 (ECF No. 29-10)); and (iii) alleged that Google's decision to disable AdTrader's AdX account and withhold its earnings made its performance impossible or extremely difficult because, as a result, it "was unable to operate in the same capacity and deliver the same results to the Web Publishers," who "declined to further use AdTrader afterwards." *Id.* ¶ 176. Nothing more is required at this stage. *Lacey v. Maricopa County*, 693 F.3d 896, 924 (9th Cir. 2012) (*Iqbal* "demands more of plaintiffs than bare notice pleading, but it does not require us to flyspeck complaints looking for any gap in the facts."). Google's cases do not hold to the contrary. The plaintiff in *Image Online Design, Inc. v. Internet Corp. for Assigned Names & Numbers*, No. CV 12-08968 DDP, 2013 WL 489899, at *9 (C.D. Cal. Feb. 7, 2013), did not identify the customers or any particular contract, and merely alleged "interfere[nce] with its business model[.]" And *name.space, Inc. v. Internet Corp. for Assigned Names & Numbers*, No. CV 12-8676 PA, 2013 WL 2151478, at *8 (C.D. Cal. Mar. 4, 2013), simply cited *Image Online* in rejecting similarly conclusory allegations.

Google also argues that AdTrader does not allege "'particular facts'" showing damages or "the size of the respective contracts." Mot. at 11 (quoting *First Fin. Sec. Inc. v. Freedom Equity Grp. LLC*, No. 15-CV-01893-HRL, 2016 WL 1323104, at *2 (N.D. Cal. Apr. 5, 2016)). But the plaintiff in that case "simply state[d] that the damages exceed the jurisdictional minimum" without alleging any facts. *Id.* Here, AdTrader alleges that it had "an annual run rate of several million dollars with the Web Publishers," and that Google's actions caused it to lose "the millions of dollars in revenue" that those accounts represented. AC ¶ 179. That is enough. *Cf. ProSolutions Software, Inc. v. DemandForce, Inc.*, No. CV 12-8342-MFW, 2013 WL 12139357, at *1 (C.D. Cal. June 4, 2013) (interference claim sufficient where plaintiff alleged lost licensing fees without alleging specific dollar amount).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### D.    AdTrader States a Claim for Intentional Interference with Prospective Economic Advantage (Count V).

Google does not challenge this claim as to DingIt.  Mot. at 11:23.  As to the Web Publishers, Google argues that AdTrader has not adequately alleged their economic relationships.  *Id.* at 12.  As shown above, however, it has.  AC ¶¶ 172-73, 182.  And by contrast, the plaintiffs in Google's cited cases did not identify any specific contracts with customers.  Mot. at 12.

Google also argues that AdTrader has not alleged "independently wrongful" conduct.  Mot. at 12.  But AdTrader alleged that Google breached the implied covenant, breached the implied duty (which is a tort), and "deliberately provided false reasons to AdTrader for terminating its AdX account and withholding its accrued earnings" among other things.  AC ¶ 188.  Google tries to argue that the implied covenant claim does not suffice, but concedes this Court has rejected that argument.  Mot. at 12 n.8 (citing *Darnaa, LLC v. Google, Inc.*, No. 15-CV-3221-RMW, 2015 WL 7753406, at *7 (N.D. Cal. Dec. 2, 2015)).

### E.    AdTrader States a Claim for Declaratory Relief (Count VI).

Google's request for dismissal of this claim fails at the outset.  California law expressly bars any attempts to limit liability for intentional wrongs, such as breach of the implied covenant or intentional interference with contract.  *Darnaa*, 2015 WL 7753406, at *5 (citing Cal. Civ. Code § 1668).  Moreover, this Court and others have held that it is inappropriate to dismiss a claim of unconscionability at the pleading stage.  *See Free Range Content, Inc. v. Google Inc.*, No. 5:14-CV-02329-BLF, 2016 WL 2902332, at *7-8 (N.D. Cal. May 13, 2016) (applying Cal. Civ. Code § 1670.5(b)); *Ramos v. Citimortgage, Inc.*, No. CIV 08-02250 WBS, 2009 WL 86744, at *7 (E.D. Cal. Jan. 8, 2009) (citing cases).

In any event, AdTrader sufficiently alleges that Google's Limitation of Liability provision ("LLP") is unconscionable and unenforceable.  It is procedurally unconscionable because "it is presented as a take-it-or-leave-it provision to AdX publishers."  AC ¶ 198.  As this Court has explained, "'California law treats contracts of adhesion … as procedurally unconscionable to at least some degree.'"  *Free Range*, 2016 WL 2902332, at *7.  Moreover, this Court "expressly rejected the arguments [Google] makes [again] here" regarding the availability of market

1    alternatives to AdTrader, or the purported non-essentialness of Google's services.  *Id.*  In

2    addition, "the degree of procedural unconscionability is enhanced when a contract binds an

3    individual to later-provided terms."  *Chavarria v. Ralphs Grocery Co.*, 733 F.3d 916, 923 (9th

4    Cir. 2013) (citation omitted).  Here, Google's contract does exactly that.  Ex. 1 §§ 1.5 & 5.1.

5         AdTrader also adequately alleges substantive unconscionability, which "'focuses on the

6    actual terms of the agreement and evaluates whether they create overly harsh or one-sided results

7    as to shock the conscience.'"  *In re Yahoo! Inc. Customer Data Security Breach Litigation*

8    *("Yahoo!")*, No. 16-MD-02752-LHK, 2018 WL 1243332, at *15 (N.D. Cal. Mar. 9, 2018).

9    Contrary to Google's argument, courts do not, in fact, "routinely" rubberstamp such LLPs, as this

10   Court has recently (including two months ago) denied two motions to dismiss unconscionability

11   challenges to nearly identical LLPs for the same reasons alleged by AdTrader.  *Yahoo!*, 2018 WL

12   1243332, at **14, 16; *Silicon Valley Self Direct, LLC v. Paychex, Inc.*, No. 5:15-CV-01055-EJD,

13   2015 WL 4452373, at *6 (N.D. Cal. July 20, 2015).  After all, "California courts have similarly

14   concluded that limitations are substantively unconscionable when they 'guarantee that plaintiffs

15   could not possibly obtain anything approaching full recompense for their harm.'"  *Yahoo*, 2018

16   WL 1243332 at *16 (citing authority).  In fact, Google cites only one case upholding an LLP that

17   "limit[ed] the amount recoverable to the amount a party paid or received" under a contract,

18   *Simulados Software, Ltd. v. Photon Infotech Private, Ltd.*, 40 F. Supp. 3d 1191, 1199 (N.D. Cal.

19   2014), and that case is inapposite as there was no finding of procedural unconscionability in the

20   first instance, and there was no discussion of the specific terms of that LLP.  Moreover, the LLPs

21   at issue in *Yahoo* and *Silicon Valley* similarly did not bar "direct damages."  *Yahoo!*, 2018 WL

22   1243332, at *16; *Silicon Valley*, 2015 WL 4452373, at *6.

23        Google's next argument that the LLP applies equally to both parties fails because

24   substantive unconscionability turns not merely on whether a contract term is ***facially*** neutral, but

25   on whether it creates "overly harsh" and "one-sided ***results***."  *Yahoo!*, 2018 WL 1243332, at *15

26   (emphasis added); *Ting v. AT&T*, 319 F.3d 1126, 1149 (9th Cir. 2003) ("[C]ourts assessing

27   California law look beyond facial neutrality and examine the actual effects of the challenged

28   provision.").  The notion that "since [Google] is also limited in what [it] can recover from

1    [AdTrader], and therefore there is enough 'mutuality' to render the clause not unconscionably

2    one-sided, is specious." *Harper v. Ultimo*, 113 Cal. App. 4th 1402, 1408 (2003).  "The relevant

3    probabilities of the deal were these: The odds were far more likely that [AdX publishers] would

4    have claims in addition to just getting their money back than [Google] would have claims in

5    addition to just getting paid." *Id.*  Indeed, as AdTrader alleged, Google has never had the LLP

6    invoked against it in a lawsuit, and Google also specifically carved out from the LLP the types of

7    cases from which an AdX Publisher might benefit.  AC ¶¶ 195-96.  Google inappropriately avers

8    that it lost revenue from "reputational" harm caused by publishers displaying prohibited content

9    (Mot. at 15), but this is a classic example of a factual dispute to be resolved later.

10   **II.    PLAINTIFFS STATE THEIR CLASS CLAIMS AGAINST GOOGLE.**

11          **A.    Plaintiffs State a Claim for Fraud (Count VII).**

12          Google assured advertisers that: they "don't have to pay" for invalid activity (AC ¶ 103),

13   it conducted "offline analysis" to detect invalid activity (*id.* ¶¶ 100-102), and it would "issue

14   credits to any advertisers affected by this activity." *Id.* ¶¶ 102, 105.  It promised that when "[w]e

15   suspend or disable invalid accounts" and "withhold payments to the publisher," "that money is

16   credited back to the advertisers." *Id.* ¶ 104.  These statements were fraudulent. *Id.* ¶ 199-218.

17   And Google continues to make these misrepresentations to this very day. *Id.* ¶ 209.

18          Plaintiffs start by noting what Google has ***not*** challenged.  Google does not challenge

19   anything pertaining to its misrepresentation about performing "offline analysis" to ascertain the

20   existence of fraudulent or invalid activity, and thus that class-wide fraud claim will continue on

21   no matter what.  AC ¶¶ 201-04.  Google also appears to concede that Plaintiffs have extensively

22   pled the falsity of Google's statements in connection with DBM.[1]  Mot. at 16.  DBM, of course, is

23   the program where the vast majority of ad space for AdX is purchased.  AC ¶ 33.

24                 **1.    Plaintiffs adequately alleged the falsity of Google's statements.**

25          First, Google focuses on the supposed lack of allegations pertaining to AdWords or AdX

26

---

27   [1] Google's request to compare the AC with the complaint "is not proper … in connection with a
     motion to dismiss." *Broomfield v. Craft Brew All., Inc.*, No. 17-CV-01027-BLF, 2017 WL
28   3838453, at *4 (N.D. Cal. Sept. 1, 2017).

Buyer. Plaintiffs, however, alleged that AdTrader's "**AdWords** invoices … showed that Google had not issued" the refunds Google said it would give to advertisers affected by invalid activity on AdTrader's publishers' sites. AC ¶ 95 (emphasis added); *see also id.* ¶ 92 (no refunds given to individual AdWords advertisers). Google argues that AdTrader admits that it received some credits in its AdWords account (Mot. at 16), but ignores that those credits were "always in miniscule amounts" and provided without "any detail" as to why they were being provided, let alone that they were for invalid activity on AdX. AC ¶ 94. Based on these facts, and given Google's lack of transparency with respect to refunds it did give, Plaintiffs reasonably alleged on information and belief that SCB "never received **full** refunds" for invalid activity on its AdWords ads placed on an AdX publisher's website. *Id.* ¶ 208 (emphasis added). This allegation is sufficient. *See Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1439-40 (9th Cir. 1987) (as to "'matters peculiarly within the opposing party's knowledge,'" allegations based on information and belief may satisfy Rule 9(b) "in cases of corporate fraud" where "the plaintiffs cannot be expected to have personal knowledge of the facts constituting the wrongdoing"); *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993) (explaining that a party may take advantage of relaxed pleading under *Wool* if it states the factual basis for its information and belief allegations).[2]

### 2.    Google's statements were false when made.

Second, Google argues that Plaintiffs have insufficiently alleged that its statements about DBM were false when made. Mot. at 16-17. Beyond the fact that Google continues to make these representations (i.e., after their falsity has been revealed), Plaintiffs plainly alleged that a Google representative admitted that its refund policy was only then (as of December 13, 2017) "being expanded" to encompass DBM.[3] AC ¶¶ 124, 206. Obviously, if Google had only recently

---

[2] Regarding AdX Buyer, Google forces advertisers to sign up for it in order to use DBM. AC ¶ 43. Therefore, the DBM allegations suffice to state a fraud claim pertaining to AdX Buyer.

[3] Plaintiffs request that the Court take judicial notice of a printout of the December 13, 2017 article from the Register that is referenced in paragraph 124 of the AC and attached to Exhibit A of the concurrently-filed Declaration of Randolph Gaw. Courts routinely take judicial notice of website contents pursuant to Federal Rule of Evidence 201. *Frances Kenny Family Tr. v. World Savs. Bank FSB*, No. 04-3724, 2005 WL 106792, at *1 n.1 (N.D. Cal. Jan. 19, 2005). And extrinsic documents can be considered on a motion to dismiss if referred to in the complaint and its authenticity is not questioned. *Solis v. Webb*, 931 F. Supp. 2d 936, 943 (N.D. Cal. 2012).

1   started providing refunds to DBM users, then its representations about having always provided

2   refunds to its advertisers were untrue at the time Plaintiffs signed up for DBM.  *See Nordstrom v.*

3   *Ryan*, 762 F.3d 903, 906 (9th Cir. 2014) ("In reviewing an order dismissing a case for failure to

4   state a claim, we… 'draw all reasonable inferences in the plaintiff's favor.'") (citation omitted).

5   Similarly, AdTrader learned from Google employee Paschal Pradeep that there was no way for

6   Google to even determine whether there was invalid activity on DBM (*viz.,* the promised "offline

7   analysis"), which meant it also could not credit advertisers for such activity.  AC ¶¶ 112-114.

8       Moreover, Google's view that Plaintiffs must point to some event "before they signed up

9   for DBM" to show its statements were false when made is incorrect as a matter of law.  *See In re*

10  *Read-Rite Corp.*, 335 F.3d 843, 846 (9th Cir. 2003) ("A later statement may suggest that a

11  defendant had contemporaneous knowledge of the falsity of his statement, if the later statement

12  directly contradicts or is inconsistent with the earlier statement."), *abrogated on other grounds by*

13  *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008).  Indeed, as Google's own

14  authority recognizes, "'circumstantial evidence'—including "later discovered" evidence—"that

15  explains why the statement was misleading when made' can be adequate to plead falseness."

16  *Heredia v. Intuitive Surgical, Inc.*, No. 5:15-CV-02662-EJD, 2016 WL 6947590, at *7 (N.D. Cal.

17  Nov. 28, 2016).  Here, for example, AdTrader discovered that Google had ***never*** given any

18  refunds or credits to AdTrader or its advertising clients for DBM, let alone after Google disabled

19  AdTrader's AdX account and withheld the entire amount of its earnings.  AC ¶¶ 91-95, 104, 205.

20  AdTrader also found out that other AdX advertisers had never received any refunds, thereby

21  precluding the explanation that this was a phenomenon isolated to AdTrader.  *Id.* ¶¶ 96-97.  Then

22  came the WSJ Article detailing how Google did not credit DBM advertisers for invalid activity in

23  2Q 2017, instead returning a pittance of what they paid.  *Id.* ¶¶ 116-20.  These allegations are a

24  far-cry from the conclusory "'contradicted by later-discovered facts'" refrain rejected in cases

25  Google cites.  Mot. at 17.  Google's insinuation that somehow there's a benign explanation for all

26  of these separately-occurring events is simply ***im***plausible.  *Cf. Starr*, 652 F.3d at 1216.

27      And, of course, the fact that Google suddenly changed the terms of its AdWords

28  Agreement to impose a retroactive arbitration clause and class action waiver only six days after

- 14 -

1    publication of the WSJ Article cannot be ignored.  AC ¶¶ 121-23.  In fact, Google has since

2    admitted that the last time it had updated that agreement was back in February 2013.  *See* ECF

3    No. 37 at 2:27-28; *Gospel Missions of America v. City of Los Angeles*, 328 F.3d 548, 557 (9th

4    Cir. 2003) ("We have discretion to consider a statement made in briefs to be a judicial

5    admission[.]").  Google's sudden rush to protect itself from lawsuits after years of inactivity (and,

6    further, in breaking their contractual promise that no modifications would have retroactive effect)

7    is evidence that its prior statements were false when made.  *Cf. Welgus v. TriNet Grp., Inc.*, No.

8    15-CV-03625-BLF, 2017 WL 6466264, at *18 (N.D. Cal. Dec. 18, 2017) ("Insider trading may

9    suffice as circumstantial evidence that a statement was false when made" depending on context,

10   such as when such trades are "'dramatically out of line with prior trading practices[.]'").

11                    **3.     Plaintiffs adequately allege reliance.**

12          Third, Google argues that Plaintiffs have not alleged reliance because AdTrader continued

13   to use DBM for a few months after the WSJ Article was published.  Mot. at 17-18.  As an initial

14   matter, this contention ignores Plaintiffs' allegations that as for Classic, LML, Ad Crunch, Fresh

15   Break, and SCB, "none of them had any idea as to how credits or refunds were handled by

16   Google."  AC ¶ 216.  Moreover, even with respect to AdTrader, this argument fails because it

17   wrongfully assumes that AdTrader must demonstrate that the sole reason it signed up for DBM

18   was to get refunds or credits for invalid activity.  *See Sangster v. Paetkau*, 68 Cal. App. 4th 151,

19   170 (1998) ("In establishing the reliance element of a cause of action for fraud, it is settled that

20   the alleged fraud need not be the sole cause of a party's reliance."); *Glen Holly Entertainment,*

21   *Inc. v. Tektronix, Inc.*, 352 F.3d 367, 380 (9th Cir. 2003) (quoting *Sangster*); *Tropical Sails Corp.*

22   *v. Yext, Inc.*, No. 14 Civ. 7582, 2017 WL 1048086, at *6 (S.D.N.Y. March 17, 2017) ("a

23   misrepresentation need be only a substantial factor or an inducing cause of the plaintiff's loss").

24          Furthermore, Google's argument is not meritorious because California and New York law

25   are clear that except in "'rare case[s]… the question of whether a plaintiff's reliance is reasonable

26   is a question of fact.'"  *City Solutions, Inc. v. Clear Channel Communications*, 365 F.3d 835, 840

27   (9th Cir. 2004) (quoting *Alliance Mortgage Co. v. Rothwell*, 10 Cal. 4th 1226, 1239 (1995));

28   *Nagelberg v. Meli*, __ F. Supp. 3d __, 2017 WL 5201446, at *5 (S.D.N.Y. Oct. 27, 2017)

(whether "reliance… is justified generally raises an issue of fact.").  Perhaps Google can eventually persuade a jury that AdTrader should have immediately discontinued using DBM after reading the article instead of (i) doing its own independent research, or (ii) taking time to find appropriate legal advice about the situation, or (iii) deciding that the harm to its business from abruptly disentangling itself from DBM was too great to make any sudden moves, or (iv) deciding that there was nothing inconsistent about wanting to continue using DBM and also wanting to force Google to pay the refunds and credits it promised.  But that is not an issue that is appropriate for resolution at the pleading stage.  *See Sustainable Ranching Partners, Inc. v. Bering Pac. Ranches Ltd.*, No. 17-CV-02323-JST, 2018 WL 1696805, at *1 (N.D. Cal. Apr. 6, 2018) ("Bering Pacific does not dispute that Sustainable has alleged ***actual*** reliance, but argues that the alleged reliance was not ***reasonable***.  This question cannot be decided on a motion to dismiss[.]") (emphasis in original); *Stationary Engineers Local 39 Health & Welfare Tr. Fund v. Philip Morris, Inc.*, No. C-97-01519 DLJ, 1998 WL 476265, at *11 (N.D. Cal. Apr. 30, 1998) (finding justifiable reliance on defendants' misrepresentations about health risks of smoking despite existence of public studies regarding smoking, because plaintiffs alleged that defendants had superior knowledge of the facts and limited public access to those facts).

Finally, Google's arguments fail because Plaintiffs consistently alleged that even after the August 25, 2017 article, they still had difficulty piecing things together because "Google's lack of transparency ***kept Plaintiffs in the dark*** about how the internal mechanics of AdX worked."  AC ¶ 216 (emphasis added).  Indeed, AdTrader did not even know how Google's credits worked until December 2017—when this lawsuit was filed—when it finally received a DBM credit of $2.00 having nothing to do with the earnings Google confiscated from its AdX account.  *Id.* ¶¶ 98, 216.[4]

---

[4] Google's cases are not comparable.  Mot. at 18.  In *Frank Lloyd Wright Found. v. Kroeter*, 697 F. Supp. 2d 1118, 1127 (D. Ariz. 2010), the court found no reliance (on summary judgment) because the plaintiff continued doing business with defendants for "over the next decade" (not mere months).  In *Xcellence, Inc. v. Arkin Kaplan Rice LLP*, No. 10 Civ. 3304 (HB), 2011 WL 1002419, at *5 (S.D.N.Y. Mar. 15, 2011), the plaintiff failed to plead materiality, not reliance.  In *Schaffer v. SunTrust Mortg., Inc.*, No. 4:16-CV-518, 2017 WL 3033398, at *2 (E.D. Tex. July 18, 2017), the Texas court found no reliance (again on summary judgment) because the plaintiff continued doing the very thing she claimed the defendant fraudulently told her not to do.

**B.**      **Plaintiffs State a Claim for Negligent Misrepresentation (Count VIII).**

Like the fraud claim, Google doesn't challenge Plaintiffs' negligent misrepresentation claim with respect to the "offline analysis" claim.  And each of Google's arguments against Plaintiffs' negligent misrepresentation claim are recycled from its fraud arguments and thus similarly fail for the reasons discussed above.  Mot. at 19.

**C.**      **Plaintiffs State a Claim Under Cal. Penal Code § 496(c) (Count IX).**

Google argues this claim fails with the fraud claim.  Mot. at 19.  Not so.  *See supra* § II.A.

**D.**      **Plaintiffs State a Claim for Breach of Contract (Count X).**

Google contends that because its contracts do not expressly state that it will refund advertisers when *it* (as opposed to the advertiser) detects invalid activity, it cannot have breached those contracts.  Mot. at 19-21.  Google is incorrect as Plaintiffs have stated a claim under theories of implied terms or contract modification despite the lack of such express language.

**1.**      **Google has breached the implied terms of its contracts.**

The DoubleClick Ad Exchange Agreement provides that Google will place Plaintiffs' advertising on AdX publisher websites according to Plaintiffs' "Ad trafficking decisions and targeting decisions[.]"  AC ¶ 43 & Ex. 2 § 1.  Google charges Plaintiffs per Google's "measurements for the Programs and the applicable billing metrics (e.g., clicks or impressions)[.]"  Ex. 2 § 6.

The DoubleClick Advertising Agreement provides that Google will "deliver Ads according to the trafficking criteria selected by [them.]"  AC ¶ 44 & Ex. 3 § 2(a).  In turn, Plaintiffs pay Google for those related services.  Ex. 3 § 3.

The AdWords Agreement provides that Google will place Plaintiffs' advertising on Google's websites or its third-party partner websites according to Plaintiffs' "Ad trafficking or targeting decisions[.]"  AC ¶ 45 & Ex. 4 § 1.  Google charges Plaintiffs per Google's "measurements for the Programs and the applicable billing metrics (e.g., clicks or impressions)[.]"  Ex. 4 § 7.

Google argues that the language of these contracts unambiguously forecloses any right for Plaintiffs to receive advertising refunds or credits under the circumstances that are the heart of

this lawsuit.  Mot. at 20.  Of course, if that were true, one would expect Google to highlight the express terms in question in its opening brief for all to see, but Google does nothing of the sort.[5]  Indeed, the obvious elephant in the room that Google pretends not to see is that none of its contracts define terms like "trafficking criteria," "measurements," or "applicable billing metrics."  As such, these contracts are ambiguous and the Court is required to determine "all such implied provisions as are indispensable to effectuate the intention of the parties."  *Frankel v. Board of Dental Examiners*, 46 Cal. App. 4th 534, 544 (1996).  And to facilitate its determination as to the meaning of these contracts, the Court is permitted to consider parol evidence.  *Salehi v. Surfside III Condominium Owners' Assn.*, 200 Cal. App. 4th 1146, 1159 (2011); *Impala Partners v. Bloom*, 133 A.D.3d 498, 499 (N.Y. App. 2015).  *See also Topps Co., Inc. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 69 (2d Cir. 2008) ("Even though a document may be fully integrated … it is proper to consider extrinsic evidence in interpreting [] ambiguous terms").

In fact, even if the DoubleClick Ad Exchange or AdWords Agreements appear to be unambiguous**,** California law permits consideration of extrinsic evidence anyway.  *Foad Consulting Group v. Musil Govan Azzalino*, 270 F.3d 821, 826 (9th Cir. 2001).  This is the case "even when the contract is an integrated agreement."  *Lennar Mare Island, LLC v. Steadfast Ins. Co.*, 176 F. Supp. 3d 949, 963 (E.D. Cal. 2016).  This is because "'a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible.'"  *Tesoro Refining & Marketing Co. LLC v. Pacific Gas and Electric Co.*, 146 F. Supp. 3d 1170, 1182 (N.D. Cal. 2015) (citation omitted).  And here, the extrinsic evidence overwhelmingly establishes that Plaintiffs reasonably expected that as part of their "trafficking criteria" or Google's "measurements" and "billing metrics," they

---

[5] Google claims that the DoubleClick Ad Exchange Agreement and the AdWords Agreement provides that an advertiser's "sole remedy" is to make a claim for advertising credits.  Mot. at 20 (citing Ex. 2 § 6 & Ex. 4 § 7.)  Plainly, this clause applies only when advertisers (not Google) discover invalid activity.  Otherwise, how could an advertiser make a claim for credit when it has no awareness of any invalid activity in the first place?  Google itself makes that point clear when it characterized "advertiser inquiries about invalid clicks" as its "Reactive Investigations" prong for the three different systems it uses to detect invalid clicks.  Ex. 7 (ECF No. 29-7).  By contrast, ad fraud or invalid activity that Google detects on its own is classified as "offline analysis" and, as Google expressly states, the advertiser is also entitled to credits in that situation.  *Id.*

1    would not be charged for ad clicks or impressions that Google had internally flagged as

2    fraudulent or invalid.  For instance, Google promised advertisers that they "***don't have to pay***" for

3    "invalid clicks and impressions" Ex. 8 (ECF No. 29-8) at 2 (emphasis added), and that "[w]hen

4    invalid activity is found through offline analysis and reactive investigation, we mark those clicks

5    as invalid and issue credits to any advertisers affected by this activity."  Ex. 7 at 3; Ex. 9 (ECF

6    No. 29-9).  *See also* AC ¶¶ 99-106.  There can be no doubt that the contracts are reasonably

7    susceptible to Plaintiffs' interpretation, and the conflict is "a genuine dispute of material fact

8    inappropriate for resolution" on a motion to dismiss.  *Lennar*, 176 F. Supp. 3d at 964.  And if

9    there is any doubt, "the language of a contract should be interpreted most strongly against the

10   party who caused the uncertainty to exist" (i.e., Google).  *See* Cal. Civ. Code § 1654; *U.S. Fire*

11   *Ins. Co. v. Gen. Reinsurance Corp.*, 949 F.2d 569, 573-76 (2d Cir. 1991) (ambiguities are

12   construed "against the offeror" and using parol evidence to determine parties' contractual intent).

13       Furthermore, even if there is no ambiguity, Google's course of performance in providing

14   some credits for invalid activity evinces the parties' intent that the contracts required Google to

15   do so.  AC ¶¶ 98, 116; *Lennar*, 176 F. Supp. 3d at 966 ("course of performance evidence [is]

16   admissible to explain or supplement but not to contradict the terms of an integrated agreement,

17   even when the agreement's written terms are unambiguous").  Google claims that it provided

18   refunds "as a courtesy," but "'[w]hether a transaction is a gift is a question of fact to be

19   determined from all the evidence'" and cannot be decided here.  *Letizia*, 267 F. Supp. 3d at 1252.

20       Finally, Google contends that a promise to provide credits for invalid activity cannot be

21   implied in the contracts because such a promise would not be indispensable to effectuate the

22   parties' intent.  Mot. at 21.  But that proposition defies common sense.  No advertiser in their

23   right mind could seriously expect to be charged if Google detected that 10,000 out of 10,000

24   clicks on its ads were invalid, particularly where Google repeatedly promised the opposite.  AC

25   ¶¶ 102-05.  But that would be the (il)logical conclusion of the interpretation Google advances—

26   that "[a]dvertisers agreed to bear this risk."  Mot. at 21-22.  As such, Google's reading of its

27   contractual obligations is impermissible under either California or New York law.  *English &*

28   *Sons, Inc. v. Straw Hat Restaurants, Inc.*, 176 F. Supp. 3d 904, 914 (N.D. Cal. 2016)

1    ("'Interpretation of a contract must be fair and reasonable, not leading to absurd conclusions.'")

2    (citation omitted); *UMB Bank, Nat'l Ass'n v. Airplanes Ltd.*, 260 F. Supp. 3d 384, 393 (S.D.N.Y.

3    2017) ("Courts must reject interpretations of agreement provisions that are commercially

4    unreasonable or illogical.").[6]

5                    **2.    In the alternative, Google modified and breached its contracts.**

6            Google does not even challenge Plaintiffs' allegations that its subsequent promises to

7    provide refunds or credits modified the parties' contracts.  AC ¶¶ 253-55.  Indeed, "California law

8    recognizes that parties may impliedly waive or modify responsibilities under a contract through

9    conduct, even where the contract includes a clause requiring any modification to be in writing."

10   *MicroTechnologies, LLC v. Autonomy, Inc.*, No. 15-CV-02220-JCS, 2017 WL 1848470, at *16

11   (N.D. Cal. May 8, 2017).  *See also Global Crossing Bandwidth, Inc. v. Locus*

12   *Telecommunication, Inc.*, 632 F. Supp. 2d 224, 234-35 (W.D.N.Y. 2009) (under New York law,

13   parties may modify a written contract through course of conduct and the issue of whether such

14   modification took place is ordinarily one of fact).  The parol evidence rule does not bar

15   consideration of Plaintiffs' allegations regarding extrinsic evidence showing that such a

16   modification took place.  *See In re Ins. Installment Fee Cases*, 211 Cal. App. 4th 1395, 1413

17   (2012) ("'[T]he parol evidence rule precludes extrinsic evidence of ***prior*** or ***contemporaneous***

18   agreements that contradict, vary, or add to an integrated writing—it does not relate to ***future***

19   agreements and does not bar extrinsic evidence that proves that the parties ***subsequently*** modified

20   their integrated writing.'") (emphasis added).  *Navigant Consulting, Inc. v. Kostakis*, No. CV-07-

21   2302 CPS JMA, 2007 WL 2907330, at *8 (E.D.N.Y. Oct. 4, 2007) ("[T]he parol evidence rule

22   does not apply to subsequent agreements or modifications[.]").

23           Similarly, Google also waived any right to be paid for invalid activity, as well as any right

24   to modify the agreements only in writing, by repeatedly promising to provide credits for invalid

25   activity.  *See Wind Dancer Prod. Grp. v. Walt Disney Pictures*, 10 Cal. App. 5th 56, 78 (2017)

26

27   ───────────────
     [6] Plaintiffs premise this breach of contract theory on the existence of implied terms, but
     alternatively, the Court could simply interpret the meaning of an ambiguous term to include a
28   promise to provide refunds or credits, and Google not doing so is a breach of that express term.

PLTFS.' OPP. TO MTD AM. COMP.
                                                        CASE NO. 5:17-CV-07082-BLF

1   ("California courts will find waiver … when that party's acts are so inconsistent with an intent to

2   enforce the right as to induce a reasonable belief that such right has been relinquished."); *Hadden*

3   *v. Consolidated Edison Co. of New York, Inc.*, 45 N.Y.2d 466, 469 (1978) ("A waiver, the

4   intentional relinquishment of a known right, may be accomplished by express agreement or by

5   such conduct or failure to act as to evince an intent not to claim the purported advantage.").

6   **E.      Plaintiffs State a Claim for Breach of the Implied Covenant (Count XI).**

7   Google argues that the implied covenant cannot be used to create "additional obligations

8   that exist nowhere in the contract."  Mot. at 21.  If Google contends that Plaintiffs cannot claim a

9   breach of the implied covenant absent a breach of contract, it is wrong.  *See Marsu, B.V. v. Walt*

10  *Disney Co.*, 185 F.3d 932, 937–38 (9th Cir. 1999) ("'breach of a specific provision of the contract

11  is not a necessary prerequisite[.]'"); *Patel v. New York Life Ins. Co.*, No. 11 CIV. 4895 JPO, 2012

12  WL 1883529, at *4 (S.D.N.Y. May 21, 2012) ("Under New York law, a party may breach an

13  implied duty of good faith and fair dealing even where it has not breached its contract.").

14  And if Google is arguing that Plaintiffs' implied covenant claim somehow contradicts an

15  express contractual provision allowing it to keep advertising funds for itself even after it had

16  detected fraudulent or invalid activity for those ads, then Google has notably failed to point to

17  where such language may lie in any of the contracts at issue.  Indeed, the contracts required

18  Google to deliver ads according to advertisers' "trafficking criteria," (Ex. 3 § 2(a)(ii)), and to

19  charge them based on Google's "measurements" and "billing metrics."  Ex. 2 § 6; Ex. 4 § 7.  The

20  discretion granted to Google creates, as a matter of law, an implied covenant that Google would

21  act in good faith in exercising that discretion.  *Storek & Storek, Inc. v. Citicorp Real Estate, Inc.*,

22  100 Cal. App. 4th 44, 61-62 (2002).  By charging Plaintiffs for invalid activity Google ***already***

23  ***detected***, Google exercised that discretion in bad faith and frustrated Plaintiffs' rights to have

24  their ads displayed as directed, and to be charged only for that promised service.  *See Ladd*, 184

25  Cal. App. 4th at 1306-07 ("'The implied covenant 'finds particular application in situations where

26  one party is invested with a power affecting the rights of another.  Such power must be exercised

27  in good faith.'"") (citation omitted).

28  Google also contends that Plaintiffs cannot "require Google to determine that advertisers'

- 21 -

1    ads were only placed on pages with exclusively valid activity" as a "prerequisite for Google

2    retaining this fee."  Mot. at 21.  ***But that is not what this case is about***.  Plaintiffs are not

3    claiming that Google "should have" detected invalid activity.  Plaintiffs are alleging that Google

4    ***did*** detect supposedly invalid activity but arbitrarily refused to reimburse advertisers, choosing

5    instead to pocket their money.  AC ¶¶ 71, 89-97, 266.  Google's argument that advertisers

6    "agreed to bear" the risk that Google would take their money even when it determined that the

7    service it promised had not been delivered is ridiculous.  Mot. at 21-22; *Richbell Info. Servs. v.*

8    *Jupiter Partners*, 309 A.D.2d 288, 302 (N.Y. App. 2003) (implied covenant may be used to "seek

9    imposition of an entirely proper duty to eschew ... bad-faith targeted malevolence in the guise of

10    business dealings").  And the fact that certain contracts allowed advertisers to seek credits "if they

11    believe" there was invalid activity does not help Google, Mot. at 22, because Plaintiffs had no

12    reason to believe there was invalid activity—only Google did.  AC ¶¶ 94, 96-98.

13          **F.**      **Plaintiffs State a Claim for Breach of the Implied Duty of Care (Count XII).**

14          Google argues that there can be no implied duty (or breach thereof) because the contracts

15    do not expressly require it to monitor or provide refunds for invalid activity.  Mot. at 22.[7]  But the

16    duty of care "'is implied by law and need not be stated in the agreement'" so long as it

17    "contemplated" the duty.  *Holguin*, 229 Cal. App. 4th at 1324.  In *Letizia*, even though the

18    contract did not expressly require Facebook to provide advertising metrics, the court found that

19    the contract "contemplated" that duty because it referenced advertising metrics and because

20    extrinsic documents ("Facebook's Advertising Guidelines") stated that users could use

21    Facebook's advertising data.  *Letizia*, 267 F. Supp. 3d at 1252-53.  Here, the AdWords and AdX

22    Buyer Agreements state that "[c]harges are solely based on Google's measurements for the

23    Programs and the applicable billing metrics (e.g., clicks or impressions)."  Ex. 2 § 6; Ex. 4 § 7.  In

24    addition, Google repeatedly promised that it "carefully monitors all clicks and impressions on

25    ads" and that it would "issue credits to any advertisers affected by" invalid activity.  AC ¶ 273

26

---

27    [7] Google's arguments mostly rely on cases interpreting New York law.  But Plaintiffs expressly
     did not plead this claim for the sole contract governed by New York law—the DoubleClick
28    Advertising Agreement.  AC ¶ 268.

1   (quoting additional statements). The above language clearly "contemplated" a duty to properly

2   measure clicks or impressions and to not charge for those which Google determined were invalid.

3   *See also* Ex. 1 § 8.2(b) (contemplating refunds to advertisers).

4        Moreover, Google's course of performance in providing some credits (AC ¶¶ 98, 116),

5   gave rise to these implied duties. *Letizia*, 267 F. Supp. 3d at 1251. Nothing about these implied

6   duties is inconsistent with the contracts' express terms, but instead, merely explain and

7   supplement them. *Id.* at 1250. Nor does an integration clause bar a claim for breach of implied

8   duty. *Id.* at 1249-50; *Kuitems v. Covell*, 104 Cal. App. 2d 482, 485 (1951) (an integration clause

9   "cannot furnish the appellants an avenue of escape" from the implied duty). Moreover, none of

10  Google's California-law cases even address a claim for breach of the implied duty of care. Mot.

11  at 22. And Google's arguments that tort recovery is not available for this claim and that the fraud

12  claim does not state an independent tort (Mot. at 22-23), fail as shown in Sections I.B and II.A.

13       **G.**    **Plaintiffs State a Claim for Unjust Enrichment (Count XIII).**

14       Google's argument that this claim should be dismissed because there is an enforceable

15  contract between the parties (Mot. at 23), is easily disposed of. The cases it cites merely stand for

16  the proposition that an unjust enrichment claim does not lie when there is contract governing the

17  ***specific subject matter*** in dispute—not whenever there is a contract between the parties, as

18  Google suggests. Here, in contrast, Google repeatedly posits that nothing in the advertiser

19  contracts required it to provide refunds or credits for invalid activity. Mot. at 19, 21-22. In case

20  the Court should agree, Plaintiffs explicitly and permissibly allege the unjust enrichment claim in

21  the alternative. AC ¶ 278; *Rosado v. eBay Inc.*, 53 F. Supp. 3d 1256, 1267-68 (N.D. Cal. 2014)

22  (rejecting argument that "no independent cause of action exists for unjust enrichment where there

23  is an express contract" and allowing alternative pleading). *See also Vertex Const. Corp. v. T.F.J.*

24  *Fitness L.L.C.*, No. 10-CV-683 (CBA)(ALC), 2011 WL 5884209, at *4 (E.D.N.Y. Nov. 23, 2011)

25  ("'where the contract does not cover the dispute in issue, a plaintiff may proceed upon a theory of

26  quantum meruit as well as contract"). Because "it is difficult to determine the validity or scope

27  of the contract at the pleading stage, courts routinely reject arguments like [Google's] as

28  premature." *Id.*

1    **H.    Plaintiffs State a Claim Under the UCL (Count XIV).**

2    Google is wrong that Plaintiffs lack statutory standing.  Mot. at 24.  Google's practice of

3    refusing to provide credits for invalid activity was based on contrary representations distributed

4    widely to individual and business consumers seeking to advertise online.  AC ¶ 289.  Google's

5    acts also deprived advertisers of massive amounts of credits they would have spent on ads

6    targeting end consumers interested in their products or services, leading to a decrease in ad

7    spending and a resulting decrease in publishers offering free online content for consumers.  *Id.*

8    This Court found similar harm to consumers sufficient to plead standing in *Free Range*, 2016 WL

9    2902332, at *17.  Moreover, courts have rejected the argument that businesses cannot have

10    standing, where the action "deals with form contracts, not individual negotiated contracts between

11    sophisticated entities."  *Circle Click Media LLC v. Regus Management Group LLC*, No. 3:12-

12    CV-04000-SC, 2015 WL 6638929, at *4-5 (N.D. Cal. 2015); *Ewert v. eBay, Inc*., Nos. C-07-

13    02198 RMW, C-07-04487 RMW, 2010 WL 4269259, at *9 (N.D. Cal. Oct. 25, 2010); *In re

14    Yahoo! Litig.*, 251 F.R.D. 459, 475 (C.D. Cal. 2008).  Here, as shown by the fact that Google

15    allows "smaller" advertisers to use DBM through advertising agencies/networks like AdTrader,

16    AC ¶¶ 37-38, "the proposed class of plaintiffs is not so uniformly sophisticated and capable of

17    seeking relief against [Google]."  *Circle Click*, 2015 WL 6638929, at *5.

18    Google's arguments that Plaintiffs have not pled unlawful or fraudulent activity fail as

19    Plaintiffs have adequately pleaded their other claims, as discussed above.  The Court should also

20    reject the contention that Plaintiffs have not alleged unfair conduct.  Google promised it would

21    give advertisers credits for invalid activity, but when it claimed there was invalid activity (to AdX

22    publishers), it pocketed the money instead.  That conduct is by definition "immoral, unethical,

23    oppressive, [and] unscrupulous."  *Free Range*, 2016 WL 2902332, at *18 n.8; *Carma Developers

24    (Cal.), Inc. v. Marathon Dev. California, Inc.*, 2 Cal. 4th 342, 373 (1992) ("Dishonesty

25    presupposes subjective immorality.").  *See also Blakemore v. Superior Court*, 129 Cal. App. 4th

26    36, 49 (2005) (business-to-business practice of failing to provide promised credits for unordered

27    products stated "unfair" claim under UCL); *Arce v. Kaiser Foundation Health Plan*, 181 Cal.

28    App. 4th 471, 489-90 (2010) ("With respect to the unfairness ... appellate courts have recognized

- 24 -

1   that 'a systematic breach of certain types of contracts (e.g., breaches of standard consumer or

2   producer contracts involved in a class action) can constitute an unfair business practice under the

3   UCL.'").  The conduct is also "substantially injurious to consumers" as shown above.

4       **I.      Plaintiffs State a Claim Under N.Y. GBL § 349 (Count XV).**

5           Google's contention that selling ads is not a consumer-oriented act (Mot. at 25), cannot be

6   squared with *Verizon Directories Corp. v. Yellow Book USA, Inc.*, 338 F. Supp. 2d 422, 428-29

7   (E.D.N.Y. 2004).  There, the Yellow Book's false claim of greater usage over another phone book

8   was found "consumer-oriented" because (1) it was based on a "national advertising campaign

9   directed at millions of users of yellow pages and tens of thousands of potential advertisers,

10  distributed in a wide array of media on a large scale," and (2) the false claim "may have had an

11  impact on at least a few businesses misled as to the value of the advertisements they purchased, as

12  well as on some members of the general public probably denied in at least some cases a more

13  extensive listing of businesses in the yellow pages directories they used." *Id.*  Plaintiffs allege

14  nearly the same thing about Google's deceptive practices, AC ¶ 298, and a § 349 claim "need

15  only meet the bare-bones notice-pleading requirements of Rule 8(a)." *City of New York v.*

16  *Smokes-Spirits.com, Inc.*, 541 F.3d 425, 455 (2d Cir. 2008).  Further, New York's high court has

17  recognized that businesses can bring § 349 claims, as "the statute's plain language permit[s]

18  recovery by any person injured 'by reason of' any violation." *Blue Cross and Blue Shield of N.J.,*

19  *Inc. v. Philip Morris USA Inc.*, 3 N.Y.3d 200, 206-07 (2004); *Securitron Magnalock Corp. v.*

20  *Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995) ("critical question … is whether the matter affects the

21  public interest …, not whether the suit is brought by a consumer or a competitor.").

22                                      **CONCLUSION**

23          Google's motion should be denied in its entirety, but if necessary, leave to amend should

24  be granted. *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

25          Dated:  May 15, 2018                    GAW | POE LLP

26

27                                          By: _____

28                                              Randolph Gaw
                                                Attorneys for Plaintiffs AdTrader, Inc.,
                                                et al.