Randolph Gaw (S.B. #223718)
rgaw@gawpoe.com
Mark Poe (S.B. #223714)
mpoe@gawpoe.com
Victor Meng (S.B. #254102)
vmeng@gawpoe.com
Samuel Song (S.B. #245007)
ssong@gawpoe.com
GAW | POE LLP
4 Embarcadero, Suite 1400
San Francisco, CA 94111
Telephone: (415) 766-7451
Facsimile: (415) 737-0642

Attorneys for Plaintiffs AdTrader, Inc., Classic and
Food EOOD, LML CONSULT Ltd., Ad Crunch
Ltd., Fresh Break Ltd., and Specialized Collections
Bureau, Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| ADTRADER, INC., CLASSIC AND FOOD EOOD, LML CONSULT LTD., AD CRUNCH LTD., FRESH BREAK LTD., AND SPECIALIZED COLLECTIONS BUREAU, INC.<br><br>Plaintiffs,<br><br>v.<br><br>GOOGLE LLC.<br><br>Defendant. | Case No. 5:17-CV-7082-BLF<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

1

**TABLE OF CONTENTS**

2

INTRODUCTION ..................................................................................................... 1

PARTIES .................................................................................................................. 2

JURISDICTIONAL STATEMENT........................................................................... 3

INTRADISTRICT ASSIGNMENT .......................................................................... 3

FACTUAL ALLEGATIONS .................................................................................... 3

    Google's Advertising Business................................................................................ 3

    Google's DoubleClick Ad Exchange (AdX) .......................................................... 4

    Google's DoubleClick Bid Manager (DBM) ......................................................... 5

    Google's Contracts with AdX Publishers................................................................ 6

    Google's Contracts with Advertisers....................................................................... 7

    Google's Repeated Promises to Issue Refunds or Credits to Advertisers for Invalid Activity ... 8

    Background on Plaintiffs and Their Use of AdX ..................................................... 9

    Google Initiates Direct Contact with DingIt, a Key Client of AdTrader................................. 11

    Google Suddenly Terminates AdTrader's AdX Account and Withholds Its Earnings. ............ 13

    Google Refuses to Tell AdTrader Why It Terminated AdTrader's AdX Account and Withheld Its Earnings, and Summarily Denies AdTrader's Appeal. ......................................................... 14

    Google Misrepresents That All of the Activity on AdTrader's AdX Account Was Invalid, and That All of Its Earnings Were Being Refunded to Advertisers. .................................................. 16

    Google Publicly Acknowledges That Its Promises to Refund Advertisers for Invalid Traffic Were Not True with Respect to DBM. .................................................................................... 20

CLASS ACTION ALLEGATIONS ......................................................................... 21

ADTRADER'S INDIVIDUAL CLAIMS FOR RELIEF ......................................... 23

    FIRST CAUSE OF ACTION: Breach of Contract (AdX Publisher Agreement) by AdTrader Against Google (Individual Claim) ....................................................................... 23

    SECOND CAUSE OF ACTION: Breach of the Implied Covenant of Good Faith and Fair Dealing (AdX Publisher Agreement) by AdTrader against Google (Individual Claim).......... 29

    THIRD CAUSE OF ACTION: Intentional Interference with Contract by AdTrader against Google (Individual Claim)...................................................................................... 29

    FOURTH CAUSE OF ACTION: Declaratory Relief by AdTrader against Google (Individual Claim) .................................................................................................................... 33

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' CLASS ACTION CLAIMS ................................................................ 35

FIFTH CAUSE OF ACTION: Breach of Contract (DoubleClick Ad Exchange Agreement, DBM Agreement, and AdWords Agreement) by Plaintiffs against Google (Class Action Claim) ................................................................................................................ 35

SIXTH CAUSE OF ACTION: Breach of the Implied Covenant of Good Faith and Fair Dealing (DoubleClick Ad Exchange Agreement, DBM Agreement, and AdWords Agreement) by Plaintiffs against Google (Class Action Claim)............................................................ 46

SEVENTH CAUSE OF ACTION: Breach of Implied Duty to Perform with Reasonable Care (DoubleClick Ad Exchange Agreement and AdWords Agreement) by Plaintiffs against Google (Class Action Claim) .................................................................................... 48

EIGHTH CAUSE OF ACTION: False Advertising Law by Plaintiffs against Google (Class Action Claim) ........................................................................................................ 50

NINTH CAUSE OF ACTION: Unfair Competition Law by Plaintiffs against Google (Class Action Claim) ........................................................................................................ 55

PRAYER .................................................................................................................. 58

JURY DEMAND ...................................................................................................... 59

Plaintiffs AdTrader, Inc. ("AdTrader"), Classic and Food EOOD ("Classic"), LML CONSULT Ltd. ("LML"), Ad Crunch Ltd. ("Ad Crunch"), Fresh Break Ltd. ("Fresh Break"), and Specialized Collections Bureau, Inc. ("SCB") (collectively, "Plaintiffs") hereby make the following allegations against defendant Google LLC ("Google"):

**INTRODUCTION**

1.     This action involves an advertising service controlled by Google called the DoubleClick Ad Exchange ("AdX").  There are two sides to this exchange:  (1) the buyer-side where advertisers agree to pay Google to deliver ads on websites across the Internet, and (2) the seller-side where web publishers agree to display ads on their websites in exchange for a portion of the revenues Google receives from advertisers.  Google sits in the middle, and is entrusted to pay publishers their share of the billions of dollars per year it receives from advertisers for the service those publishers provide in displaying ads on their websites.

2.     As Plaintiffs have discovered, however, Google takes advantage of its central position in this exchange.  Plaintiff AdTrader, for example, used AdX to display ads for years without incident until Google suddenly terminated its AdX account and withheld nearly $500,000 in accrued revenues from it.  Google claimed that all of the activity associated with AdTrader's AdX account violated Google's policies (without specifying those violations), and that all of the revenues withheld from AdTrader would be returned to advertisers.

3.     As it turns out, neither claim was true.  In fact, in binding judicial admissions, "Google admits that it did not affirmatively determine prior to AdTrader's termination that every single ad impression AdTrader served [in the relevant period] was invalid."  Google also "admits that it did not credit back to advertisers the entirety of amounts withheld from AdTrader." Instead, the money that Google withheld from AdTrader and did not return to advertisers went into Google's pocket, despite its repeated promises over the years (and its contractual obligation) to provide refunds to advertisers in that situation.

4.     This action also involves a Google-controlled demand-side platform ("DSP") called DoubleClick Bid Manager ("DBM").  Advertisers used DBM (and thus, paid Google) to

buy ad space on AdX, as well as other advertising exchanges and services around the world (including another Google-controlled website monetization platform called AdSense).

5.    Advertisers using DBM similarly had the expectation, and more importantly, the contractual right, to automatically receive refunds if any of their paid-for ad impressions or clicks turned out to be invalid. But until recently, Google apparently did not provide any refunds at all for invalid traffic, even when the ad buys were made on platforms entirely controlled by Google – AdX or AdSense. Late last year, it publicly admitted that "Google has a longstanding policy of refunding advertisers for invalid traffic," but that this policy was only "currently being expanded to include ads purchased via DoubleClick Bid Manager."

6.    Thus, this action seeks redress for Google's wrongful conduct on both sides of the exchange, as well as its wrongful conduct as a DSP. First, this is an individual action brought by AdTrader to recover the ad revenue that Google improperly withheld from it and damages for related tortious conduct. Second, this is a class action brought by Plaintiffs on behalf of advertisers to recover the money they paid to Google for impressions and clicks generated on their advertisements, which Google subsequently determined were invalid, but for which Google subsequently did not provide any refunds.

**PARTIES**

7.    Plaintiff AdTrader, Inc. is a Nevada corporation that has its principal place of business in New Jersey. AdTrader, Inc. was formerly known as AdTradr Corporation, and had contracted with Google under that name.

8.    Plaintiff Classic and Food EOOD is a Bulgarian company that has its principal place of business in Bulgaria.

9.    Plaintiff LML CONSULT Ltd. is a Bulgarian company that has its principal place of business in Bulgaria.

10.    Plaintiff Ad Crunch Ltd. is a Bulgarian company that has its principal place of business in Bulgaria.

11.    Plaintiff Fresh Break Ltd. is a Bulgarian company that has its principal place of business in Bulgaria.

12.     Plaintiff Specialized Collections Bureau, Inc. is a California corporation that has its principal place of business in Los Angeles, California.

13.     Defendant Google LLC is a Delaware limited liability company that has its principal place of business in California.  Google LLC was formerly known as Google, Inc. at the time the parties first contracted with each other, but was subsequently converted to its current business form.

## JURISDICTIONAL STATEMENT

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2).  If a class is certified in this action, the amount in controversy will exceed $5,000,000.00, exclusive of interest and costs, and this is a class action in which at least one member of the class is a citizen of a state different from any defendant.

15.     The Court has personal jurisdiction over Google because it transacts business in California and because in the parties' contracts, it expressly consents to personal jurisdiction in this Court.

16.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Google resides and regularly conducts business in this district, and because the contracts with Google at issue in this lawsuit have forum selection clauses requiring that litigation of all disputes is handled in the state or federal courts of Santa Clara County, California.

## INTRADISTRICT ASSIGNMENT

17.     Google's headquarters is located in Mountain View, California, and therefore assignment to the San Jose division of this Court is appropriate.

## FACTUAL ALLEGATIONS

### Google's Advertising Business

18.     Google is the largest online advertising business in the world.  It generates advertising revenues by delivering ads on (1) its own "properties" such as Google.com, Gmail, and YouTube and (2) what it calls "Google Network Members' properties."  This action concerns the second category.

19.     Google Network Members are third-party website publishers who have agreed to display ads that Google delivers on their websites.  In exchange for displaying those ads, Google agrees to pay those publishers a portion of the revenues it receives from advertisers.

20.     Advertisers pay Google on a "cost-per-click" basis, meaning that an advertiser pays Google only when an Internet user clicks on an ad.  Google also offers advertising on a "cost-per-impression" basis, meaning that an advertiser pays Google based on the number of times its ads are displayed.

21.     Google tracks and recognizes revenue for each click or impression on an ad displayed on Google Network Members' websites and is entrusted to pay those publishers their share of the advertising revenues for the service they provide in displaying the ads.

22.     In 2017 alone, Google received over $17 billion from advertisers for clicks and impressions on ads displayed on Google Network Members' properties.

### Google's DoubleClick Ad Exchange (AdX)

23.     Google offers several services through which: (a) advertisers can pay Google to have their ads displayed on third-party websites, and (b) publishers can agree to display ads in exchange for a share of the revenues advertisers pay Google for each click or impression on their ads.  Google's DoubleClick Ad Exchange[1] is one of those services and is the main one at issue in this case, but it overlaps with Google's other advertising services, as discussed below.

24.     Google has described AdX as "a real-time marketplace to buy and sell display advertising space."  As an ad exchange, AdX consolidates the supply of, and demand for, ad space from multiple sources.

25.     On the seller-side, publishers can sell ad space on their websites directly through the AdX interface.  In addition, smaller and individual publishers can sell ad space on AdX through intermediaries called "Network Partner Managers" ("NPMs"), who sell ad space on behalf of those publishers using AdX accounts belonging to the NPMs.

---

[1] AdX was renamed to Google Ad Manager on or around June 27, 2018.

26.     On the buyer-side, advertisers can buy ad space directly on AdX.  In addition, smaller and individual advertisers can buy ad space on AdX through intermediaries called "advertising agencies" or "advertising networks."

27.     Advertisers using Google's AdWords program can also buy ad space on AdX through their AdWords interface (in addition to buying space on AdSense – another Google-controlled website monetization platform).  In fact, AdWords advertisers can end up buying ad space on AdX without their knowledge.  Under the default settings for an advertiser's AdWords campaign, Google's algorithms may automatically display an AdWords advertiser's ads on AdX publishers' websites.

28.     In fact, one research firm estimated in 2015 that Google had 4 million unique advertisers at that point.  Given that the vast majority of AdWords advertisers are small businesses, the fact that they are automatically opted into AdX means that millions of the participants in AdX are small businesses.

### Google's DoubleClick Bid Manager (DBM)

29.     Advertisers can also buy ad space on AdX through a demand-side platform.

30.     A DSP is a computer-based platform that provides media buyers (such as advertisers, agencies, trading desks, etc.) with centralized access to multiple ad exchanges (not just AdX) and multiple advertising platforms where they can bid for their desired inventory.

31.     The largest DSP in the world is a Google product formerly called DoubleClick Bid Manager ("DBM").[2]  Using DBM, Google matches advertisers with publishers from various ad exchanges.  At the end of every billing period, Google sends those advertisers an invoice reflecting the impressions or clicks that their advertisements received.  The advertisers remit payment to Google, and Google keeps a portion of that payment as its platform fee.  Google sends the rest of that payment to the ad exchange(s) in which the publishers were participating in, with the ad exchanges remitting payment to those publishers after keeping some share of the revenue for themselves.

---

[2] DBM was renamed to Display & Video 360 on or around June 27, 2018.

32.     Ad buys using DBM can end up getting matched to an AdX or AdSense publisher. In fact, most ad buys made through DBM end up going to AdX.  Indeed, it is well known throughout the advertising industry that Google uses DBM to funnel advertisers to AdX instead of other advertising exchanges, and it is a topic that is openly discussed between executives of major advertisers, advertising agencies, advertising networks, and other advertising exchanges. As one example, in a November 9, 2017 interview with a media publication, the CEO of AppNexus (one of the largest DSP rivals to DBM) commented that most DBM users that spoke to AppNexus confirmed that more than half of their advertising spend goes to AdX when they used DBM.

33.     When an ad buy made through DBM is matched with an AdX publisher or an AdSense publisher, then Google has ultimate control of both sides of that transaction.  Google takes payment from the advertiser and, through AdX or AdSense, remits payment directly to the publisher.

## Google's Contracts with AdX Publishers

34.     Website publishers and NPMs who sell ad space directly on AdX are required to sign the Google Services Agreement ("AdX Publisher Agreement").  A true and correct copy of the Google Services Agreement entered into by AdTrader on June 19, 2014 is attached hereto as Exhibit 1.

35.     Section 8.2 of the AdX Publisher Agreement sets forth:  (a) Google's obligation to pay an AdX publisher or NPM a portion of the revenues that Google receives from advertisers for clicks or impressions on that publisher's or NPM's websites, and (b) the conditions under which Google may withhold payment:

**8.2  Google Payments.**

(a)   For the Services, Google will pay Company an amount equal to the Revenue Share Percentage (listed on the front page of this Agreement) of Ad Revenues attributable to a calendar month.  This payment will be made in the month following the calendar month in which the applicable Ads were displayed….

(b)   Google's payments for the Services under this Agreement will be based on Google's accounting which may be filtered to exclude (i) invalid queries, impressions, conversions, or clicks, and (ii) any amounts refunded to advertisers in connection with Company's failure to comply with this Agreement, as reasonably determined by Google.

36.   Section 13.2 of the AdX Publisher Agreement sets forth the terms under which the agreement itself may be terminated (subsections (a), (b), and (d)), or an AdX publisher's use of the AdX service may be suspended or terminated (subsection (c)):

**13.2.   Termination.**

(a)  Either party may terminate this Agreement with notice if the other party is in material breach of this Agreement:

(i)   where the breach is incapable of remedy;

(ii)   where the breach is capable of remedy and the party in breach fails to remedy that breach within 30 days after receiving notice from the other party; or

(iii)  more than twice even if the previous breaches were remedied.

(b)  Either party may terminate this Agreement for any or no reason upon 30 days prior notice to the other party.

(c)  Google reserves the right to suspend or terminate Company's use of any Services that are alleged or reasonably believed by Google to infringe or violate a third party right.  If any suspension of a Service under this subsection 13.2(c) continues for more than 6 months, Company may immediately terminate this Agreement upon notice to Google.

(d)  Google may terminate this Agreement immediately with notice if pornographic content that is illegal under U.S. law is displayed on any Site.

37.   The AdX Publisher Agreement contains no language permitting Google to withhold payment from a publisher solely because Google terminated that publisher's use of AdX.  Rather, Google could withhold payment only if the conditions set forth in Section 8.2(b) were met.

### Google's Contracts with Advertisers

38.   <u>DoubleClick Ad Exchange Agreement</u>:  Advertisers who buy ad space on AdX are required to sign the DoubleClick Ad Exchange Master Service Agreement (the "DoubleClick Ad Exchange Agreement").  A true and correct copy of the DoubleClick Ad Exchange Agreement entered into by AdTrader on or around April 1, 2016, together with its incorporated terms and

conditions, is attached hereto as Exhibit 2.  After signing this contract, advertisers are given access to the default Google product used to make ad buys on AdX, called AdX Buyer.

39.     <u>DBM Agreement</u>:  Advertisers who use DBM are required to sign the DoubleClick Advertising Platform Agreement (the "DBM Agreement").  A true and correct copy of the DBM Agreement entered into by AdTrader on March 1, 2016 is attached hereto as Exhibit 3.  An advertiser using DBM is not allowed to buy ad space on AdX until that advertiser has first executed the DoubleClick Ad Exchange Agreement.  And in the case of AdTrader, even when it made ad buys using DBM on an AdX publisher's website, Google would sometimes send AdTrader a separate invoice generated through AdX Buyer reflecting the AdX-specific ad buys that AdTrader had made.  Among other things, this demonstrated that all of Google's systems were deeply interconnected with each other, with AdX Buyer having full access to data residing on DBM, and presumably vice versa.

40.     <u>AdWords Agreement</u>:  Finally, advertisers who buy ad space through AdWords are required to sign the Google Inc. Advertising Program Terms ("AdWords Agreement").  A true and correct copy of the AdWords Agreement entered into by AdTrader on February 21, 2013 is attached hereto as Exhibit 4.

**Google's Repeated Promises to Issue Refunds or Credits to Advertisers for Invalid Activity**

41.     On its various webpages, Google repeatedly promises advertisers that it monitors activity on their ads, and will issue credits or refunds to advertisers for invalid activity on their ads.

42.     For instance, in an article posted in its "Ad Traffic Quality Resource Center" titled "Google's Protection against Invalid Clicks," Google states:  "When invalid activity is found through offline analysis and reactive investigation, we mark those clicks as invalid and issue credits to any advertisers affected by this activity."  A true and correct copy of this article is attached as Exhibit 7.

43.     As another example, in an AdWords Help article titled "Understanding credits and adjustments to your account" (a true and correct copy of which is attached as Exhibit 8), Google represents to advertisers that it "prohibits" "invalid clicks and impressions," and "that's why you

don't have to pay for these unfair clicks and impressions."  A true and correct copy of this article is attached as Exhibit 8.

44.     In another article posted on "Google Ads Traffic Quality" page titled "How does Google prevent invalid activity?" Google states:

> When we find something wrong, we try to make it right as soon as possible.  We suspend or disable invalid accounts, and may withhold payments to the publisher.  When appropriate and possible, that money is credited back to the advertisers – not only for the month where we found the invalid activity, but often for the previous month, as well.

A true and correct copy of this article is attached as Exhibit 6.

45.     Importantly, Google's repeated promises to issue credits or refunds for invalid activity are not limited to any particular ad platform or exchange.  They appear on webpages addressing topics applicable to all of Google's advertising services.  Indeed, Google has publicly stated that the Ad Traffic Quality Resource Center—where it promises credits—"serve[s] as the single source for all click fraud and ad traffic quality related information."

**Background on Plaintiffs and Their Use of AdX**

46.     AdTrader:  AdTrader was unique because its business dealt with both the buy-side and the sell-side of the online advertising industry.  On the buy-side, AdTrader is an advertising network.  On the sell-side, AdTrader was an NPM.

47.     As an advertising network, AdTrader primarily uses DBM to place advertising bids on behalf of its advertising clients, handles implementation of their advertisements, and monitors advertising campaigns to ensure they are reaching their intended targets at the intended prices.  Most of AdTrader's ad buys end up going to AdX.  Indeed, using analytics data provided by Google itself, AdTrader determined that for all of 2017, over 70% of all of its advertising clients' ad impressions acquired through DBM had originated from AdX as opposed to other advertising exchanges.

48.     When Google charges AdTrader for clicks or impressions on its advertising clients' ads, AdTrader advances those costs and later seeks reimbursement from its clients.  On many occasions, however, AdTrader was not reimbursed by a client or was not reimbursed in full.

1   Thus, to the extent that Google overcharged its advertising clients, AdTrader sometimes bore the

2   brunt of those overcharges and had to absorb those costs itself.

3        49.    AdTrader also paid to engage in online advertising of its own services, and used

4   DBM and AdWords to display its own advertisements on the websites of AdX publishers.

5        50.    As an NPM, AdTrader sold ad space on behalf of its publisher clients, who were

6   predominantly small and mid-sized publishers.  AdTrader ensured that its publisher clients were

7   complying with the requirements of the online advertising exchanges they participated in

8   (including AdX), ranging from actions such as making sure that advertisements are placed in the

9   proper positions on the websites to vetting out objectionable content from those websites.

10        51.    AdTrader has worked extensively with Google for the last three years as an NPM

11   and an advertising network.  In these roles, AdTrader has heavily utilized Google's various

12   DoubleClick products, and its employees are extremely knowledgeable about how to use them

13   properly in accordance with Google's guidelines.

14        52.    Google employees regularly communicated with AdTrader employees (in phone

15   calls, e-mails, on-line chats, and live meetings) about how to properly utilize the various

16   DoubleClick products.  Those Google employees included Balint Torok (an account manager),

17   Anthony Nakache (the Director of Online Partnerships), and Rachad Saddi (a Channel Partner

18   Manager).  In these discussions, Google reassured AdTrader that AdTrader and its publishers

19   were complying with all of Google's policies, and would continue to be in compliance if they

20   followed the implementation and optimization measures suggested by those employees, which

21   AdTrader did.  In fact, Mr. Torok considered AdTrader to be such a well-managed account that

22   he referred other AdX publishers to AdTrader for help and advice.

23        53.    <u>Classic</u>:  Plaintiff Classic runs a restaurant.  Classic engaged AdTrader to use

24   DBM to advertise its business on the Internet, with the majority of all ad impressions coming

25   from AdX publisher websites.  Any advertising expenditures charged by Google for such ad

26   impressions were passed on by AdTrader to Classic and paid in full by Classic.  Any refunds or

27   credits given by Google for such advertising expenditures would have also been passed on by

28   AdTrader to Classic.

SECOND AMENDED COMPLAINT
CASE NO. 5:17-CV-7082-BLF

54.     <u>LML</u>:  Plaintiff LML runs a restaurant.  LML engaged AdTrader to use DBM to advertise its business on the Internet, with the majority of all ad impressions coming from AdX publisher websites.  Any advertising expenditures charged by Google for such ad impressions were passed on by AdTrader to LML and paid in full by LML.  Any refunds or credits given by Google for such advertising expenditures would have also been passed on by AdTrader to LML.

55.     <u>Ad Crunch</u>.  Plaintiff Ad Crunch formerly operated a digital advertising agency.  Ad Crunch engaged AdTrader to use DBM to advertise its business on the Internet, with the majority of all ad impressions coming from AdX publisher websites.  Any advertising expenditures charged by Google for such ad impressions were passed on by AdTrader to Ad Crunch and paid in full by Ad Crunch.  Any refunds or credits given by Google for such advertising expenditures would have also been passed on by AdTrader to Ad Crunch.

56.     <u>Fresh Break</u>.  Plaintiff Fresh Break runs a restaurant.  Fresh Break engaged AdTrader to use DBM to advertise its business on the Internet, with the majority of all ad impressions coming from AdX publisher websites.  Any advertising expenditures charged by Google for such ad impressions were passed on by AdTrader to Fresh Break and paid in full by Fresh Break.  Any refunds or credits given by Google for such advertising expenditures would have also been passed on by AdTrader to Fresh Break.

57.     <u>SCB</u>.  Plaintiff SCB is a collections agency.  It used AdWords to advertise its business on the Internet.  As SCB did not opt out of the Google Display Network, some of its ad impressions came from AdX publisher websites.

**Google Initiates Direct Contact with DingIt, a Key Client of AdTrader.**

58.     In early 2017, AdTrader began a contractual relationship with DingIt.tv ("DingIt") in its capacity as an NPM.  DingIt, and its parent company Level Up Media, is one of the leading video hosting services for e-sports.  DingIt engaged AdTrader to optimize the monetization of its content, including the bidding and placement of advertisements on DingIt web properties through AdX.

1       59.    DingIt was pleased with the quality of AdTrader's work.  On April 26, 2017,

2    DingIt executives had a call with AdTrader's executives, and DingIt offered an exclusive

3    partnership to AdTrader worth millions of dollars in added annual revenue.  AdTrader accepted.

4       60.    Google was well aware of the contractual relationship between AdTrader and

5    DingIt.  As an NPM, AdTrader needed Google's approval to add any new publisher to its stable,

6    and DingIt was no exception.  Furthermore, in March and April 2017, AdTrader employees had

7    specific discussions with Google employees Pavel Pimshin (then AdTrader's account manager)

8    and Mr. Torok about AdTrader working with DingIt.

9       61.    On May 12, 2017, Mr. Pimshin contacted AdTrader asking it to have DingIt

10    contact Google directly, and to send Google AdTrader's contract with DingIt.  These requests

11    were unusual and concerning for AdTrader, as Google typically works directly with major

12    website publishers like DingIt to monetize their properties on AdX—the same type of service that

13    NPMs like AdTrader provide to publishers.  Indeed, Mr. Torok had previously (and privately)

14    warned AdTrader employees that in his observation, NPMs would start getting into trouble with

15    Google once they reached an annual revenue run-rate of $4-5 million.  At that revenue level, the

16    NPM's publisher clients were likely generating enough revenue that Google (or a preferred AdX

17    partner typically owned by ex-Google employees) would be interested in working directly with

18    those publishers.

19       62.    Despite its concerns, AdTrader complied with Google's requests because it had no

20    choice in the matter, as Google had given an ultimatum.  On May 15, 2017, AdTrader introduced

21    Mr. Pimshin and other Google employees to Adam Simmons, an executive of Level Up Media, as

22    requested by Google.  Mr. Simmons then directly communicated with those Google employees by

23    e-mail.  AdTrader also gave Mr. Pimshim a copy of its contract with DingIt.  As a result, Google

24    became fully knowledgeable about AdTrader's contractual relationship with DingIt, as well as the

25    terms of AdTrader's supply-side agreements, including when and how AdTrader remitted funds

26    received from Google to its publisher clients.

27

28

**Google Suddenly Terminates AdTrader's AdX Account and Withholds Its Earnings.**

63.     On May 19, 2017—four days after Google initiated direct contact with DingIt and just a few days before Google was due to pay AdTrader its accrued AdX earnings—Google abruptly terminated AdTrader's AdX account and withheld all of its accrued earnings, claiming that unspecified sites managed by AdTrader violated AdX program policies.  AdTrader received this shocking news in a generic form e-mail from Google stating, in part:

> Hello,
>
> This e-mail is to alert you that your DoubleClick Ad Exchange account was found to be non-compliant with our Ad Exchange program policies and as a result, your **Ad Exchange account has been disabled.**
>
> **Current account status:** Disabled
>
> **Action required:** None
>
> **Violation explanation**
>
> As stated in our program policies, sites displaying Google ads should provide substantial and useful information to the user.  Users should be able to easily navigate through the site to find what products, goods, or services are promised.  Examples of misguided navigation include, but are not limited to:
>
> False claims of downloadable or streaming content
>
> Linking to content that does not exist
>
> Redirecting users to irrelevant and/or misleading webpages
>
> Text on a page unrelated to the topic and/or business model of the website.
>
> **Payment**
>
> As your account has been permanently disabled, we will withhold payment of your account balance.  As stated in the terms governing your Ad Exchange account, Google reserves the right to withhold from its payments to publishers any amounts refunded to advertisers in connection with the publisher's failure to comply with their Ad Exchange agreement, as reasonably determined by Google.  Please note that this step was taken in an effort to maintain the quality of the Ad Exchange program and to protect the interests of our advertisers.  The earnings on your account will be returned to the affected advertisers.
>
> **No further accounts**
>
> Please note that publishers disabled for invalid activity on Ad Exchange are not allowed any further participation in Ad Exchange, AdSense or our other ad monetization products.

SECOND AMENDED COMPLAINT
CASE NO. 5:17-CV-7082-BLF

64.     AdTrader's employees were utterly baffled by this e-mail.  None of AdTrader's publisher clients engaged in the kind of hypothetical, prohibited activities listed by Google. Indeed, Google employees had repeatedly confirmed that the websites AdTrader managed were in compliance with Google's policies, and had held AdTrader out as a model and resource for other AdX publishers.

65.     Moreover, Google's termination notice did not even assert that AdTrader or any of its publisher clients had "infringe[d] or violate[d] a third party right"—the only basis upon which Google was permitted to "terminate [AdTrader's] use" of AdX.  Nor did it assert any of the bases upon which Google was permitted to terminate the AdX Publisher Agreement with AdTrader.

66.     The effects of Google's sudden decision to terminate AdTrader's AdX account and to withhold all of its earnings were immediate and devastating.  All of the more than 200 publishers who had contracted with AdTrader to display ads on their websites through AdTrader's AdX account were immediately shut out of AdX.  Those publishers who had validly displayed AdX ads on their websites and generated revenues for Google were owed money, all of which Google withheld from AdTrader.  Nonetheless, rather than treat its clients as Google did AdTrader, AdTrader paid most of its publishers the money they were owed out of its own pocket to the tune of hundreds of thousands of dollars, crippling its small business.

**Google Refuses to Tell AdTrader Why It Terminated AdTrader's AdX Account and Withheld Its Earnings, and Summarily Denies AdTrader's Appeal.**

67.     Desperate for answers, AdTrader's employees reached out to Google's employees for clarification, but received none.  After ignoring or brushing off AdTrader for six days, Google employees would say only that AdTrader's account was permanently disabled because it was found to be in violation of some unspecified AdX guidelines.  Google would not tell AdTrader, for example, which of AdTrader's hundreds of publishers had committed violations, much less what those violations were.  AdTrader was apparently not alone in this experience, as Google, as a matter of policy, refuses to provide publishers whose accounts are disabled "any information about their account activity, including any web pages, users, or third-party services that might

have been involved." Google's statement is found on one of its DoubleClick Ad Exchange Seller Help webpages, a true and correct copy of which is attached as Exhibit 5.

68. AdTrader submitted an internal appeal to Google, pursuant to Google's procedures. Google's appeal form, however, is a pro forma document that asks only general, standardized questions without permitting the user to elaborate on the reasons why Google's termination and withholding decisions might be wrong. Further, because Google refused to explain which of its clients had engaged in violations or what those violations were (instead offering only hypothetical "[e]xamples"), AdTrader had no way of knowing what facts to provide Google to get it to reconsider its decision.

69. Not surprisingly, Google summarily rejected AdTrader's internal appeal by means of an auto-generated e-mail that was sent a short time later. On information and belief, nobody at Google closely reviewed AdTrader's appeal, as the appeal form was designed to convey minimal information to Google and give publishers the illusion that Google might reconsider its decision.

70. AdTrader's employees again asked Google representatives to provide further information as to what policy AdTrader had violated, and explained that AdTrader could not effectively appeal Google's decision if it did not know what it did that was wrong. Google's employees were unmoved and refused to provide any additional information.

71. Google's employees certainly had a motive to gin up a pretextual reason to terminate AdTrader's AdX account and to conceal the real reason. As Mr. Torok had previously warned AdTrader, a publisher generating as much revenue as DingIt would catch Google's eye and spell trouble for the NPM.

72. On information and belief, after Google terminated AdTrader's account on May 19, 2017, Google contacted DingIt to begin a direct relationship. Indeed, months after Google terminated AdTrader's account, reports showed that Google was still selling huge volumes of DingIt traffic to advertisers (e.g., 10 billion impressions over a 30-day period) through DBM.

**Google Misrepresents That All of the Activity on AdTrader's AdX Account Was Invalid, and That All of Its Earnings Were Being Refunded to Advertisers.**

73.     On May 24, 2017, AdTrader employees finally managed to get Mr. Nakache (Google's Director of Online Partnerships) on the phone to inquire about the reasons for its termination and the withholding of its earnings.

74.     On that recorded May 24, 2017 call, Mr. Nakache represented to AdTrader's employees that all of the activity in AdTrader's AdX account was in violation of Google's policy, and that every single advertiser who paid for an impression on any of AdTrader's publisher clients' sites would get their money back:

> AdTrader:  All of the money is going to be refunded to advertisers?
>
> Nakache:  Yes.
>
> AdTrader:  Does that mean that every single impression and every single click for all of our publishers has been…
>
> Nakache:  Exactly.  Everything in the account, the account is in violation of our policy, advertisers have been impacted, and as a result we have made the decision to refund all the advertisers and all the revshare from Google.
>
> ***
>
> AdTrader:  So, every single advertisers [sic] who has bought a single impression for the past two months from any of our publishers will get their money back?  Is that correct?
>
> Nakache:  Yes.
>
> ***
>
> AdTrader:  I see. OK, so we are not going to receive anything unless the appeal is successful we will not be paid anything.
>
> Nakache: No, the money is going to be paid back to the advertisers.
>
> AdTrader: So, whether the appeal is successful or not, we will still not receive the payment, is that correct?
>
> Nakache: Yes.[3]

75.     Mr. Nakache's statements were false.  It was not true that "every single impression and every single click" on AdTrader's publisher clients' ads were "in violation of [Google's]

---

[3] Mr. Nakache is located in Ireland and AdTrader's employee was also located out of the United States at the time.  Therefore, California's two-party consent law does not apply.

policy."  In fact, Google has made the following judicial admission in this action: "Google admits that it did not affirmatively determine prior to AdTrader's termination that every single ad impression AdTrader served in [April or May 2017] was invalid."  (Google's Responses to AdTrader's Requests for Admission ("RFAs") Nos. 13, 15.)

76.     Nor, as Mr. Nakache represented, did Google "refund all the advertisers and all the revshare from Google," or issue refunds to "every single advertiser[]" who paid for an impression on an AdTrader publisher site.  Again, Google has judicially admitted this: "Google admits it did not credit back to advertisers the entirety of amounts withheld from AdTrader."  (Google's Response to RFA No. 5.)  Indeed, of the $476,622.69 of accrued AdX earnings that Google withheld from AdTrader, Google now contends that it "refunded or credited $335,362.79 to advertisers who had purchased advertising space from AdTrader in connection with AdTrader's termination."  (Google's Response to Interrogatory No. 4.)[4]

77.     Even before filing this action, AdTrader had independent proof that Google did not refund all of the revenue it withheld from AdTrader to advertisers, as Google had claimed it would do.  During the last earnings period prior to AdTrader's account termination, AdTrader had used DBM to display a number of its advertising clients' ads (and its own ads) on the websites of its AdX publisher clients.  A small sampling of such examples includes:

a.     Citroen, Daza, Ivet.bg, Mackeeper, Mytime.mk, Refan, and Tehnomix advertised on the website of an AdTrader publisher named athletic.net.

b.     Allianz.bg, Gosport.bg, Mytime.mk and VIP Watches advertised on the website of an AdTrader publisher named bgbasket.com.

c.     Citroen, Daza, Delimano, Diamonds Club, Dormeo, Gosport.bg, Happy Bulgaria, Ivet.bg, MaistorPlus, Markiiza, Max Credit, Nestle, Sportex, Topcho, and VIP Watches advertised on the website of an AdTrader publisher named blitz.bg.  (AdTrader also put up its own advertisements on that website as well.)

---

[4] Plaintiffs are **not** alleging that the contents of Google's interrogatory response are true. Plaintiffs are merely reciting the contents of the response itself to show that, even if one believes Google (and Plaintiffs certainly do not), Google's own admission materially undercuts its own defense.

d.      Allianz.bg, Citroen, Daza, Diamonds Club, Dormeo, Gosport.bg, Happy Bulgaria, Ivet.bg, Mackeeper, Refan, Tehnomix, and VIP Watches advertised on the website of an AdTrader publisher named cheezburger.com.  (AdTrader also put up its own advertisements on that website as well.)

e.      Citroen, Daza, Delimano, Diamonds Club, Dormeo, Gosport.bg, Happy Bulgaria, Ivet.bg, Max Credit, Nestle, Refan, Sportex, Tehnomix, and VIP Watches advertised on the website of an AdTrader publisher named dir.bg.  (AdTrader also put up its own advertisements on that website as well.)

f.      Citroen, Daza, Dormeo, Gosport.bg, Happy Bulgaria, Ivet.bg, Mackeeper, Nestle, Refan, Sportex, Tehnomix, and VIP Watches advertised on various websites published by the International Business Times, which was also an AdTrader publisher.  (AdTrader also put up its own advertisements on these websites as well.)

g.      Citroen, Daza, Delimano, Diamonds Club, Dormeo, Gosport.bg, Happy Bulgaria, Ivet.bg, Mackeeper, Max Credit, Nestle, Refan, Tehnomix, and VIP Watches advertised on the popular video-gaming website IGN, which was also an AdTrader publisher.  (AdTrader also put up its own advertisements on that website as well.)

h.      Citroen, Mytime.mk, Sportex, and VIP Watches advertised on the website of an AdTrader publisher named investor.bg.

78.    AdTrader never got any refunds or credits from Google through DBM despite having run those aforementioned advertisements and notwithstanding Mr. Nakache's emphatic statements to the contrary.  And for AdTrader's advertising clients that also run advertisements on AdTrader's publisher's websites using their individual AdWords accounts, none of them received any refunds or credits on their individual accounts for these specific advertisements.

79.    AdTrader checked with one of its channel partners, a well-known DoubleClick certified marketing partner, who handled many of AdTrader's ad buys through DBM.  That channel partner confirmed that AdTrader had not received any refunds from Google for advertising it had made through DBM on AdX publisher websites.

80.     But, just to be sure, AdTrader checked its AdWords invoices to see if the refunds Mr. Nakache claimed Google had made could have been reflected there instead of a DBM invoice.  Those AdWords invoices, however, showed that Google had not issued Mr. Nakache's claimed refunds.

81.     Alerted to this inconsistency, AdTrader reviewed its earlier records to see whether it had ever previously received a refund or credit from Google for ad buys made on AdX through DBM or AdWords.  (Google gives separate monthly invoices for ad buys made through DBM and for advertising done via AdWords.)  As for AdTrader's DBM account, Google gave no refunds or credits even though, every single month, Google withheld a small amount of accrued earnings from AdTrader on its publishing activities for what it deemed to be invalid activity.  During some of these same months, however, AdTrader and its advertising clients had bought traffic from some of those same websites through DBM, so if Google's explanation was true, then AdTrader and its advertising clients should have received some refunds or credits almost every month.

82.     As for AdTrader's AdWords' account, that account did reflect some credits from Google over the years, but always in miniscule amounts and, furthermore, Google does not provide any detail as to why those refunds are being provided.  For example, an AdWords advertiser has no way of knowing whether a refund or credit is coming for an ad impression placed on an AdX publisher's website, or a Youtube video, or an AdSense publisher's website, or from Google Search.  Only Google knows that information and it does not share such information with any AdWords advertisers.  On information and belief, Google has not, in fact, been issuing any refunds or credits for AdWords advertisements displayed on an AdX publisher's website after it subsequently determines that the impressions or clicks for those advertisements were invalid.

83.     AdTrader also discovered that other advertisers had not received credits or refunds from Google.  Following the filing of this lawsuit, representatives from Criteo – a publicly traded marketing company that engages in substantial amounts of online advertising – contacted employees of AdTrader.  Criteo's representatives informed AdTrader that the company's records

1    did not show any evidence of it having received refunds from Google for advertising expenditures

2    it made via AdX Buyer.

3         84.    In addition, a prominent journalist who has investigated Google in the past

4    informed AdTrader that, over the years, his advertiser sources also confirmed that they had never

5    received any refunds from Google, contrary to Google's representations.  But since advertisers

6    had no visibility into what Google did with its publishers, no one ever raised any challenges to

7    Google.

8    **Google Publicly Acknowledges That Its Promises to Refund Advertisers for Invalid Traffic**
**Were Not True with Respect to DBM.**
9

10        85.    Public statements made by Google further confirm that, in many cases, Google did

11   not issue credits or refunds to advertisers for invalid activity detected by Google, as it promised it

12   would do.

13        86.    On August 25, 2017, an article published in the Wall Street Journal explained that

14   Google had detected a surge of ad fraud during the second quarter of 2017 affecting advertisers

15   who purchased advertising using DBM.  But rather than offer full refunds or credits to those

16   advertisers, Google was offering only a modest reimbursement – about 7-10% of the total

17   amounts spent by those advertisers (with some advertisers apparently getting much less).  These

18   amounts represent only the "platform fee" that advertisers pay to Google, not the amounts the

19   advertisers paid to Google for the invalid activity.

20        87.    Google's proffered defense in this article was that it could not offer more in

21   refunds "because it doesn't control the rest of the money spent."  But that statement was itself

22   untrue, as previously alleged in greater detail, the vast majority of advertisements purchased on

23   DBM go to AdX publisher websites (or AdSense publisher websites), and Google routinely

24   deducts or withholds payments to those publishers (like it did for AdTrader) on the grounds that

25   some or all of the clicks or impressions generated on that website were somehow invalid.

26        88.    Apparently, some executive at Google read the August 25, 2017 Wall Street

27   Journal article and realized that it publicly exposed that Google was not giving full refunds or

28   credits as Google had promised.  Thus, on or around September 1, 2017, Google suddenly

1    changed the terms of the contract governing its relationship with AdWords advertisers – the

2    AdWords Agreement – to require that they arbitrate their disputes with Google and precluding

3    them from bringing any class actions against Google.  It is plainly obvious that Google made such

4    changes directly in response to the August 25, 2017 Wall Street Journal article to prevent

5    advertisers (especially smaller advertisers) from suing Google and obtaining redress.  This sudden

6    change to the contract terms was particularly egregious because it purported to require advertisers

7    to arbitrate any claim they had against Google arising prior to the date of the contract

8    modification.  But in all prior iterations of the AdWords Agreement, Google specifically

9    represented to everyone that any future "changes to the Terms **will not apply retroactively**[.]"

10   89.    Furthermore, after AdTrader filed this lawsuit on December 13, 2017, Google

11   publicly acknowledged that it had not been providing the promised refund or credits to advertisers

12   for invalid activity.  In response to media attention surrounding this lawsuit, Google's authorized

13   spokesperson informed Thomas Claburn, a journalist for a UK publication called The Register,

14   that "Google has a longstanding policy of refunding advertisers for invalid traffic," but that this

15   policy was only "currently being expanded to include ads purchased via DoubleClick Bid

16   Manager."  That is, Google itself has acknowledged that, prior to the filing of this lawsuit, its

17   repeated promises that it would issue refunds to advertisers for invalid traffic were not true with

18   respect to ads bought through DBM.  A true and correct copy of The Register article where

19   Google's statements were published is attached as Exhibit 10.  Google has since judicially

20   admitted that its spokesperson had indeed made these statements.  (Google's Response to RFA

21   No. 1.)

## CLASS ACTION ALLEGATIONS

23   90.    AdTrader, Classic, LML, Ad Crunch, and Fresh Break bring this action on behalf

24   of themselves and an AdX Advertiser Class, defined as:

25   All persons and entities that, at any time during the applicable limitations period,
     were charged by Google through AdX Buyer for clicks or impressions on
26   advertisements displayed on the website of a third-party publisher participating in
     the DoubleClick Ad Exchange, and did not receive refunds or credits for
27   advertising expenditures spent by them on that publisher website after Google
     withheld any amount of payment to that publisher for what Google claimed to be
28   invalid activity or non-compliance with a Google policy.

91.     Plaintiffs also bring this action on behalf of themselves and an AdWords Advertiser Class, defined as:

> All persons and entities that, at any time during the applicable limitations period, were charged by Google through AdWords for clicks or impressions on advertisements displayed on the website of a third-party publisher participating in the DoubleClick Ad Exchange, and did not receive refunds or credits for advertising expenditures spent by them on that publisher website after Google withheld any amount of payment to that publisher for what Google claimed to be invalid activity or non-compliance with a Google policy.

92.     AdTrader, Classic, LML, Ad Crunch, and Fresh Break additionally bring this action on behalf of themselves and a DBM Advertiser Class, defined as:

> All persons and entities that, at any time during the applicable limitations period, were charged by Google through DoubleClick Bid Manager for advertising space on the website of a third-party publisher, and did not receive refunds or credits for advertising expenditures spent by them on that publisher website after Google withheld any amount of payment to that publisher for any reason.

93.     AdTrader, Classic, LML, Ad Crunch, and Fresh Break additionally bring this action on behalf of themselves and a DBM-AdX Advertiser Sub-Class, defined as:

> All persons and entities that, at any time during the applicable limitations period, were charged by Google through DoubleClick Bid Manager for advertising space on the website of a third-party publisher participating in the DoubleClick Ad Exchange, and did not receive refunds or credits for advertising expenditures spent by them on that publisher website after Google withheld any amount of payment to that publisher for what Google claimed to be invalid activity or non-compliance with a Google policy.

94.     Through the process of seeking and obtaining class certification, Plaintiffs reserve the right to amend the definitions of the proposed classes, as appropriate.

95.     Excluded from the Class and Sub-Class are the officers, directors, and employees of Google, any judicial officer presiding over this action, and the members of his or her immediate family and judicial staff.

96.     This action is brought and may properly be maintained as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3).

97.     The Classes and Sub-Class are so numerous that joinder of all members is impracticable.  There are tens of thousands, if not hundreds of thousands, of persons and entities that have done online advertising on an AdX publisher website.  The precise number and identity of the members of the Classes and Sub-Class can be obtained from the records of Google.

98.     There are numerous questions of law and fact common to the members of the Classes and Sub-Class which predominate over any questions affecting only individual members including: (i) whether Google breached its contracts with its advertising clients by failing to provide them refunds or credits for clicks or impressions that Google deemed to be invalid, (ii) whether Google breached the implied covenant of good faith and fair dealing to its advertising clients by failing to provide them refunds or credits for clicks or impressions that Google deemed to be invalid, (iii) whether Google breached the implied duty to perform with reasonable care to its advertising clients by failing to provide them with correct analytics to allow them to determine whether the clicks or impressions on their advertisements were invalid, (iv) whether Google violated California's False Advertising Law by falsely promising advertisers that it would provide them refunds or credits for clicks or impressions that Google deemed to be invalid, (v) whether Google violated California's Unfair Competition Law by failing to provide its advertising clients refunds or credits for clicks or impressions that Google deemed to be invalid, and (vi) whether Plaintiffs and the members of the Class are entitled to damages, restitution, and injunctive relief for Google's conduct.

## ADTRADER'S INDIVIDUAL CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION:
**Breach of Contract (AdX Publisher Agreement)
by AdTrader Against Google
(Individual Claim)**

99.     Plaintiffs hereby re-incorporate and re-allege all the preceding paragraphs as if fully set forth herein.

100.     AdTrader entered into the AdX Publisher Agreement with Google.  The primary obligations of an AdX publisher are set forth in Section 2.3 of the agreement, which requires that the publisher adhere to Google's published AdX Guidelines and Google's technical protocols.

101.     AdTrader substantially performed all of its obligations under the AdX Publisher Agreement.  AdTrader's publisher clients displayed advertisements on their websites delivered by Google, and thereby generated advertising revenue for Google.  AdTrader ensured that its publisher clients adhered to Google's guidelines when displaying advertisements through AdX on

their websites, including displaying only content that adhered to Google's policies.  Furthermore, as previously alleged, Google employees confirmed on multiple occasions (in-person, by phone calls, by Internet chat, and by e-mail) that AdTrader's publisher websites were in compliance with Google's policies.

**Google Breaches By Withholding AdTrader's Accrued Earnings**

102.    In breach of the AdX Publisher Agreement, Google failed to pay AdTrader for all of the valid clicks or impressions on advertisements displayed on its publisher clients' websites using Google's AdX program.

103.    Under Section 8.2(a) of the AdX Publisher Agreement, Google agreed that it "will pay [AdTrader] an amount equal to the Revenue Share Percentage [specified in the agreement] of Ad Revenues attributable to a calendar month."

104.    Under Section 8.2(b), Google could withhold AdTrader's revenues only for "(i) invalid queries, impressions, conversions, or clicks, **and** (ii) any amounts refunded to advertisers in connection with Company's failure to comply with this Agreement, as reasonably determined by Google."  In other words, both conditions precedent must be satisfied before Google is permitted to withhold accrued AdX earnings from a publisher – i.e., Google cannot withhold accrued earnings for invalid activity on an AdX publisher's website alone; Google could withhold those earnings only if it had ***also*** issued refunds to advertisers that had displayed advertisements on those publishers' websites.

105.    Google invoked only the second condition in Section 8.2(b), claiming that all of the earnings withheld from AdTrader would be returned to affected advertisers.  But Google has judicially admitted in this action that "it did not credit back to advertisers the entirety of amounts withheld from AdTrader," and thus, at the very least, was not permitted to withhold from AdTrader those amounts that were not returned to advertisers.  Thus, Google's actions in withholding payment from AdTrader breached the AdX Publisher Agreement.

106.    Google also breached the AdX Publisher Agreement because it did not "reasonably determine[]" either (i) the "invalid queries, impressions, conversions, or clicks" that

they claim AdTrader had, or that AdTrader had "fail[ed] to comply with the [AdX Publisher] Agreement[,]" as required by Section 8.2(b).

107.     Google's May 19, 2017 termination notice did not even claim that there were "invalid queries, impressions, conversions, or clicks" on advertisements displayed by AdTrader's publisher clients.  Nor would there have been any basis for Google to make such a claim, as the websites that AdTrader managed had, at most, a negligible amount of such activity.  In fact, Google account manager Balint Torok previously told AdTrader employees the percentage of invalid impressions that AdTrader's publishers had for each billing period, and based on those representations, only 0.15% - 0.2% of AdTrader's estimated revenue for the average billing period was the product of invalid activity (and accordingly deducted).  Mr. Torok informed AdTrader that this was an exceptionally low number compared to the vast majority of other AdX publishers, as the average amount of invalid activity on an AdX publisher website was usually several percentage points.

108.     Also, at all relevant times, AdTrader ensured that its publisher clients adhered to Google's policies and guidelines, and was previously and repeatedly informed by Google that its publisher clients were in compliance with Google's policies.

109.     Moreover, because AdTrader published ads only on its publisher clients' sites, the only way that AdTrader could have violated a Google policy was if one or more of its clients had done so.  But to AdTrader's knowledge, none of its publisher clients have had their individual AdX or AdSense accounts terminated or suspended by Google, despite the fact that AdTrader's earnings were withheld for some of those same publishers' supposed violations.  Indeed, Google maintains files available to DBM users that identify the active participants in AdX, and as of the filing of this pleading, these files show that multiple AdTrader publisher clients such as dubizzle.com, IGN, ytn.co.kr, OLX, mydotcomrade.com, seoul.com.kr., dir.bg, standartnews.com, khan.co.kr all continue to monetize their content through AdX.

110.     AdTrader's publisher clients remain active on AdX despite the fact that Google's termination e-mail stated that "publishers[5] disabled for invalid activity on Ad Exchange are not allowed any further participation in Ad Exchange, AdSense or our other ads monetization products."  Therefore, if AdTrader had, in fact, violated an AdX policy, then at least some of its publisher clients necessarily would also have had their individual accounts disabled, because AdTrader (as an NPM) only worked on the websites of its publisher clients.  The fact that none of AdTrader's publisher clients suffered a similar fate is proof that AdTrader did not, in fact, violate any Google policies.

111.     Further, Google did not report any policy violations on the "Policy Violations" page of AdTrader's DoubleClick for Publishers account (which was tied to its AdX account).  Google also did not give AdTrader any prior notice that AdTrader had breached the AdX Publisher Agreement.

112.     As previously alleged in greater detail, Google's refusal to communicate with AdTrader regarding its withholding and termination decision meant that it did not "reasonably determine" what amount of accrued earnings to withhold from AdTrader—among other things, AdTrader was not given any meaningful opportunity to point out any potential errors Google made, or that the overwhelming majority of its 200 publisher client websites could not have possibly been violating any Google rules.  Nor would Google pay any heed to AdTrader's arguments or supporting data.

113.     As a proximate result of Google's breaches of contract, AdTrader has been damaged by $476,622.69 – the amount of the accrued AdX earnings that Google withheld from AdTrader.

114.     In addition, Google's breach of contract has resulted in lost profits to AdTrader's business as a whole.  AdTrader's monetization operation for publishers has disintegrated, and AdTrader has thus lost out on all future business from its clients.  AdTrader has also lost out on

---

[5] Google uses the term "publisher" to refer to anyone operating on the sell-side of AdX, including NPMs.

future business from other publishing clients that had reached out to the company for its products and services.

115.    Google was fully aware that its breach of contract could result in lost future profits for AdTrader.  The AdX program specifically contemplates that participants would include businesses that manage monetization of on-line advertising for web publishers.  It therefore is foreseeable that a failure by Google to pay an NPM the amounts owed to it and its publishers under the AdX program would result in a loss of future business to that NPM.

**Google Breaches By Improperly Terminating the AdX Account**

116.    In addition to the aforementioned breaches, Google also breached the AdX Publisher Agreement by improperly terminating AdTrader's AdX account.

117.    Google's May 19, 2017 violation notice to AdTrader stated that AdTrader's AdX account had been "permanently disabled," and that "publishers disabled for invalid activity on Ad Exchange are not allowed any further participation in Ad Exchange, AdSense or [Google's] other monetization products."  But under Section 13.2(c) of the AdX Publisher Agreement, there is only one basis upon which Google was permitted to "terminate" AdTrader's "use of the Services"—when a publisher's use of those services "are alleged or reasonably believed by Google to infringe or violate a third party right."  Google's notice of violation, however, did not accuse AdTrader of "infring[ing] or violat[ing]" any "third party right."

118.    Furthermore, Section 13.2 of the AdX Publisher Agreement also sets forth the conditions under which either party may terminate "this Agreement."  But Google's May 19, 2017 violation notice did not purport to terminate the AdX Publisher Agreement with AdTrader.  And, even if Google's violation notice were construed as an attempt to terminate that agreement, none of the conditions under which Google could terminate the agreement were met:

      a.    Section 13.2(a) of the AdX Publisher Agreement states that: "Either party may terminate this Agreement with notice if the other party is in material breach of this Agreement: (i) where the breach is incapable of remedy; (ii) where the breach is capable of remedy and the party in breach fails to remedy that breach within 30 days after receiving notice from the other party; or (iii) more than twice even if the previous breaches were remedied."  But

1   there was no indication that AdTrader's purported "breach [was] incapable of remedy."  Indeed,

2   AdTrader could have easily remedied the alleged violations, for example, by instructing any of its

3   publisher engaged in any violations to stop, or by ceasing to work with that particular

4   publisher.  Second, Google never even gave AdTrader an opportunity "to remedy [any purported]

5   breach within 30 days after receiving notice" of the alleged violation from Google; Google

6   terminated AdTrader's AdX account immediately.  Third, Google's violation notice gave no

7   indication that AdTrader was in material breach "more than twice."

8           b.      Section 13.2(b) of the AdX Publisher Agreement states that: "Either party

9   may terminate this Agreement for any or no reason upon 30 days prior notice to the other

10   party."  Google, however, did not provide AdTrader with any prior notice of termination, let

11   alone the 30 days' notice required by Section 13.2(b).  Had Google provided the required notice,

12   AdTrader would have had an opportunity to correct any alleged violations, or at the very least, to

13   make alternative arrangements with its many publisher clients before Google pulled the

14   plug.  Moreover, during those 30 days prior to termination, AdTrader would have continued to

15   earn revenues for the valid activity on its AdX publishers' websites.

16           c.      Lastly, Section 13.2(d) states that: "Google may terminate this Agreement

17   immediately with notice if pornographic content that is illegal under U.S. law is displayed on any

18   Site."  There has never been any suggestion by Google that any of AdTrader's publisher clients

19   ever displayed such content.

20       119.    As a proximate result of Google's breach in improperly terminating AdTrader's

21   AdX account, AdTrader suffered damages because it could no longer monetize its existing

22   publisher clients' websites using AdX.  AdTrader would have earned substantial revenue between

23   May 19, 2017 to whatever date that would have followed 30 days after Google properly gave a

24   notice of termination pursuant to section 13.2(a)(ii).  As Google has yet to give such a proper

25   notice of termination, at a minimum, the Court should construe this date to be no earlier than the

26   date of this filing.

27       120.    Google was fully aware that its breach of contract could result in such damages for

28   AdTrader.  The AdX program specifically contemplates that participants would include

businesses that manage monetization of on-line advertising for web publishers.  It therefore is foreseeable that the termination of an NPM's AdX account would result in a loss of revenue to that NPM.

### SECOND CAUSE OF ACTION:
**Breach of the Implied Covenant of Good Faith and Fair Dealing**
**(AdX Publisher Agreement)**
**by AdTrader against Google**
**(Individual Claim)**

121.    Plaintiffs hereby re-incorporate and re-allege all the preceding paragraphs as if fully set forth herein.  AdTrader expressly pleads this claim in the alternative to its breach of contract claim, should it be determined that Google had subjective discretion to withhold payments to AdX publishers under section 8.2(b) of the AdX Publisher Agreement.

122.    As previously alleged in greater detail, AdTrader entered into the AdX Publisher Agreement with Google, and substantially performed under that agreement.

123.    There exists in every contract, including in the AdX Publisher Agreement, an implied covenant of good faith and fair dealing, requiring that each party not do anything to unfairly interfere with the right of the other party to receive the benefits of the contract.

124.    As previously alleged in greater detail, in breach of the implied covenant, Google unfairly frustrated AdTrader's right to receive its accrued revenue by arbitrarily refusing to pay AdTrader for all of the valid clicks or impressions on advertisements displayed on its publisher clients' websites using Google's AdX program.  Google arbitrarily withheld all of AdTrader's accrued earnings, rather than just those earnings supposedly attributable to invalid activity.

125.    As a proximate result of Google's breach of the implied covenant of good faith and fair dealing, AdTrader has been damaged in the amount of the accrued AdX earnings that Google withheld from it but should have paid to it.

### THIRD CAUSE OF ACTION:
**Intentional Interference with Contract**
**by AdTrader against Google**
**(Individual Claim)**

126.    Plaintiffs hereby re-incorporate and re-allege all the preceding paragraphs as if fully set forth herein.

127.    As previously alleged in greater detail, AdTrader and DingIt had a contractual relationship, whereby AdTrader helped DingIt optimize the monetization of its content through AdX. And as previously alleged in greater detail, Google knew of the existence of AdTrader's contractual relationship with DingIt.

128.    Google's decision to withhold AdTrader's accrued AdX earnings made AdTrader's further performance under its contractual relationship with DingIt impossible, or at least extremely difficult, as DingIt ceased using AdTrader's services when AdTrader was unable to remit the full amount of earnings owed to DingIt.

129.    In addition, Google's decision to improperly terminate AdTrader's AdX account made AdTrader's further performance under its contractual relationship with DingIt impossible, as AdTrader could not perform any AdX-related services for DingIt without having access to AdX.

130.    Google knew that its actions would disrupt AdTrader's performance under its contract with DingIt. Google had extensively worked with AdTrader for nearly four years, and knew that either withholding AdTrader's AdX earnings or terminating AdTrader's AdX account would prevent AdTrader from being able to fulfill its contractual duties to DingIt. Google also had a copy of AdTrader's contract with DingIt, and thus knew that AdTrader was obligated to remit some of its accrued earnings to DingIt, and to perform AdX-related services for DingIt. Furthermore, Google has extensively worked with NPMs similar to AdTrader for years, and was familiar enough with the business model of these companies to know that either withholding accrued earnings or terminating their AdX account would cripple these businesses.

131.    On information and belief, Google intended to disrupt AdTrader's relationship with DingIt. In particular, DingIt, and its parent company Level Up Media, is one of the leading video hosting services for e-sports. Google typically has a direct relationship with major website publishers and helps those publishers monetize their properties on AdX (i.e., the same types of services that NPMs like AdTrader provide). Google thus had a clear financial incentive to cause DingIt to work directly with Google (or a preferred AdX partner that is typically owned by ex-

1    Google employees).  It is not a coincidence that Google abruptly terminated AdTrader's AdX

2    account on May 19, 2017, only a few days after Google initiated direct contact with DingIt.

3        132.    AdTrader was harmed as a result of Google's interference.  Google's actions

4    caused AdTrader to lose the DingIt account, and the revenue it represented.  Indeed, just prior to

5    AdTrader's account termination, DingIt and AdTrader had entered into an exclusive agreement

6    for AdTrader to further monetize DingIt's websites, which would have generated approximately

7    $6 million in revenue for AdTrader through the rest of 2017 alone.  And going forward, this

8    relationship would have been worth tens of millions of dollars in annual revenue for AdTrader.

9        133.    AdTrader also had a contractual relationship with Dubizzle FZ LLC ("Dubizzle"),

10   a member of OLX Group.  OLX runs online marketplaces and online classified advertisements

11   similar to Craigslist, and is largely based in emerging market economies such as the United Arab

12   Emirates, India, Brazil, Pakistan, Poland, and Portugal.  AdTrader had entered into a contract

13   with Dubizzle on or around December 17, 2015, and that contractual relationship was still extant

14   as of the date that Google withheld AdTrader's accrued AdX earnings.

15       134.    AdTrader's relationship with Dubizzle was in its capacity as an NPM, and thus

16   AdTrader's contractual duty was to help Dubizzle optimize the monetization of its content

17   through AdX.  In return, Dubizzle paid AdTrader a share of the AdX publisher revenue generated

18   from displaying advertisements on Dubizzle's websites.

19       135.    Google was aware of the existence of AdTrader's contractual relationship with

20   Dubizzle, because Google required AdTrader to register Dubizzle in AdX as part of AdTrader's

21   obligations as an NPM to register each of its publisher partners, and because Google had a copy

22   of AdTrader's supply agreement with its publishers.

23       136.    Google's decision to improperly terminate AdTrader's AdX account made

24   AdTrader's further performance under its contractual relationship with Dubizzle impossible, as

25   AdTrader could not perform any AdX-related services for Dubizzle without having access to

26   AdX.

27       137.    AdTrader also had a contractual relationship with Dir.bg Group ("Dir").  Dir is one

28   of the largest online groups in Bulgaria.  AdTrader had entered into a contract with Dir on or

1  around February 8, 2016, and that contractual relationship was still extant as of the date that

2  Google withheld AdTrader's accrued AdX earnings.

3       138.    AdTrader's relationship with Dir was in its capacity as an NPM, and thus

4  AdTrader's contractual duty was to help Dir optimize the monetization of its content through

5  AdX.  In return, Dir paid AdTrader a share of the AdX publisher revenue generated from

6  displaying advertisements on Dir's websites.

7       139.    Google was aware of the existence of AdTrader's contractual relationship with

8  Dir, because Google required AdTrader to register Dir in AdX as part of AdTrader's obligations

9  as an NPM to register each of its publisher partners, and because Google had a copy of

10 AdTrader's supply agreement with its publishers.

11      140.    Google's decision to improperly terminate AdTrader's AdX account made

12 AdTrader's further performance under its contractual relationship with Dir impossible, as

13 AdTrader could not perform any AdX-related services for Dir without having access to AdX.

14      141.    AdTrader also had a contractual relationship with Investor.bg Group ("Investor").

15 Investor is one of the largest online groups in Bulgaria.  AdTrader had entered into a contract

16 with Investor on or around April 27, 2015, and that contractual relationship was still extant as of

17 the date that Google withheld AdTrader's accrued AdX earnings.

18      142.    AdTrader's relationship with Investor was in its capacity as an NPM, and thus

19 AdTrader's contractual duty was to help helped Investor optimize the monetization of its content

20 through AdX.  In return, Investor paid AdTrader a share of the AdX publisher revenue generated

21 from displaying advertisements on Investor's websites.

22      143.    Google was aware of the existence of AdTrader's contractual relationship with

23 Investor, because Google required AdTrader to register Investor in AdX as part of AdTrader's

24 obligations as an NPM to register each of its publisher partners, and because Google had a copy

25 of AdTrader's supply agreement with its publishers.

26      144.    Google's decision to improperly terminate AdTrader's AdX account made

27 AdTrader's further performance under its contractual relationship with Investor impossible, as

28 AdTrader could not perform any AdX-related services for Investor without having access to AdX.

145.     Google knew that its actions would disrupt AdTrader's performance under its contracts with Dubizzle, Dir, and Investor.  Google had extensively worked with AdTrader for nearly four years by that point in time and knew that improperly terminating AdTrader's AdX account would prevent AdTrader from fulfilling its contractual duties to any of its publisher partners, including Dubizzle, Dir, and Investor.

146.     AdTrader was harmed as a result of Google's interference.  Google's actions caused AdTrader to lose the Dubizzle, Dir, and Investor accounts, and the revenue they represented.  At the time of AdTrader's account termination, AdTrader had earned a total of $155,299.63 in revenue from Dubizzle, $42,628.51 in revenue from Dir, and $20,313.79 in revenue from Investor.  Continuing these relationships would have been worth millions of dollars in annual revenue for AdTrader, as these clients had been steadily growing their relationships with AdTrader, and in Dubizzle's case, had been steadily growing its business operations around the world.

147.     Google's actions towards AdTrader reflect that it acted with malice, oppression, or fraud toward AdTrader.  Google's aforementioned conduct, including its refusal to substantively communicate with AdTrader regarding the supposed reasons for terminating AdTrader's account and withholding its accrued AdX earnings, reflects Google's intent to inflict a financially crippling injury upon AdTrader.  Google also engaged in fraudulent conduct when Mr. Nakache misrepresented to AdTrader that its appeal was futile because Google was already refunding all of AdTrader's accrued earnings back to Google's advertisers.

**FOURTH CAUSE OF ACTION:**
**Declaratory Relief**
**by AdTrader against Google**
**(Individual Claim)**

148.     Plaintiffs hereby re-incorporate and re-allege all the preceding paragraphs as if fully set forth herein.

149.     The AdX Publisher Agreement includes a Limitation of Liability provision that exempts Google from liability for any "lost revenues or indirect, special, incidental, consequential, exemplary, or punitive damages[.]"  The Limitation of Liability also states that

1  liability is limited to no more "than the net amount that [Google] has received and retained under

2  this Agreement during the 12 months before the claim arises."

3       150.    Google has invoked this Limitation of Liability clause in other lawsuits brought by

4  AdSense or AdX publishers to try to avoid liability.  AdTrader expects that Google will invoke

5  that provision in this lawsuit as well.

6       151.    AdTrader seeks a declaration that this Limitation of Liability clause is

7  unenforceable under principles of California contract law with respect to any tort claims brought

8  by an AdX publisher against Google.

9       152.    AdTrader also seeks a declaration that this Limitation of Liability clause is

10  substantively and procedurally unconscionable and therefore unenforceable under principles of

11  California contract law.

12       153.    The Limitation of Liability clause is substantively unconscionable because it is

13  transparently one-sided in favor of Google.  There are no instances in which an AdX publisher

14  could engage in conduct that could cause "consequential, special, indirect, exemplary or punitive"

15  damages to Google.  Indeed, Google has never even brought a claim or lawsuit against an AdX

16  publisher that could have resulted in consequential, special, indirect, exemplary or punitive

17  damages.  Nor has Google ever experienced a material loss in revenue from advertisers as a result

18  of an ad running on a publisher webpage that contained material thought by some to be

19  inappropriate or offensive.  These terms therefore operate only for Google's benefit and to the

20  detriment of AdX publishers.

21       154.    If there were any means by which an AdX publisher's conduct could conceivably

22  cause more-than-compensatory damages to Google, Google has expressly exempted such

23  examples from the Limitation of Liability clause.  For example, the AdX Publisher Agreement

24  explicitly excludes from the Limitations of Liability clause "breaches of confidentiality

25  obligations contained in this Agreement, violations of a party's Intellectual Property Rights by the

26  other party, or indemnification obligations contained in this Agreement[.]"  Each of the examples

27  inures solely to the benefit of Google.  No publisher could possibly disclose confidential

28  information to Google (as their entire business model is to publish content on the Internet),

whereas Google regards even their most banal internal e-mails to be confidential (as evidenced by the fact that in every lawsuit it is involved in, Google marks almost all of its internal documents to be "Confidential" or "Attorney's Eyes Only" regardless of the actual content of those documents).  Similarly, Google cannot conceivably violate any publisher's intellectual property rights when Google considers the various AdX platforms and their interfaces its proprietary intellectual property.

155.    The examples of indemnification provided in the agreement also make it clear that there is no likely scenario where a publisher could require Google to provide indemnification from a third-party lawsuit.  Thus, the Limitations of Liability are authored to give off the illusion of bilateralism, but in substance operate solely to prevent publishers from recovering their damages due to Google's wrongful conduct.

156.    The Limitation of Liability clause is procedurally unconscionable for many reasons, including that it is presented as a take-it-or-leave it provision to AdX publishers.  And given that Google has a virtual monopoly in the field of online advertising, anyone who wishes to monetize their websites through advertising has to use AdX (or AdSense, which has a virtually identical Limitation of Liability clause).

**PLAINTIFFS' CLASS ACTION CLAIMS**

**FIFTH CAUSE OF ACTION:**
**Breach of Contract (DoubleClick Ad Exchange Agreement,**
**DBM Agreement, and AdWords Agreement)**
**by Plaintiffs against Google**
**(Class Action Claim)**

157.    Plaintiffs hereby re-incorporate and re-allege all the preceding paragraphs as if fully set forth herein.

158.    AdTrader, Classic, LML, Ad Crunch, and Fresh Break (collectively, "ADTRADER+") bring this claim for breach of the DoubleClick Ad Exchange Agreement on behalf of themselves and all members of the AdX Advertiser Class.

159.    Plaintiffs bring this claim for breaches of the AdWords Agreement on behalf of themselves and all members of the AdWords Advertiser Class.

160.    AdTrader and the other members of the AdX Advertiser Class entered into the DoubleClick Ad Exchange Agreement.

161.    AdTrader and SCB entered into the AdWords Agreement.

162.    Classic, LML, Ad Crunch, and Fresh Break were third-party beneficiaries of the DoubleClick Ad Exchange Agreement and the AdWords Agreement entered into by AdTrader. As previously alleged in greater detail, Google is aware that advertising agencies and advertising networks like AdTrader buy ad space on behalf of their advertising clients.  Furthermore, Google knows exactly who all of AdTrader's advertising clients are, because AdTrader is required to separately register them with Google.  When Google issues invoices to AdTrader, each of AdTrader's advertising clients are identified by name and a unique ID number.

163.    ADTRADER+, and the other members of the AdX Advertiser Class, substantially performed their obligations under the DoubleClick Ad Exchange Agreement.  The key requirements of that contract were that they (i) provide advertisements that complied with Google's policies and regulations and (ii) pay Google in a timely fashion after Google invoiced them for its services.  ADTRADER+, and the other members of the Advertiser Class, met both of these obligations at all times.

164.    Plaintiffs, and the other members of the AdWords Advertiser Class, substantially performed their obligations under the AdWords Agreement.  The key requirements of that contract were that they (i) provide advertisements that complied with Google's policies and regulations and (ii) pay Google in a timely fashion after Google invoiced them for its services. Plaintiffs, and the other members of the Advertiser Class, met both of these obligations at all times.

165.    Section 6 of the DoubleClick Ad Exchange Agreement (Exhibit 2) states that the "charges" that an advertiser pays to Google (in connection with AdX) are "solely based on Google's measurements" regarding that advertiser's ad buys and "the applicable billing metrics (e.g., clicks or impressions)[.]"  ADTRADER+, and the other members of the AdX Advertiser Class, understood that Google's "measurements" and "applicable billings metrics" would not include clicks or impressions that Google determined to be invalid.  After all, no reasonable

advertiser would agree to pay Google for clicks or impressions that Google determined to be invalid.  ADTRADER+ understood that under Section 6, if Google initially charged them for invalid clicks or impressions, then Google would provide a refund or credit if it subsequently determined that they were invalid.

166.    Section 7 of the AdWords Agreement (Exhibit 4) states that the "charges" that an advertiser pays to Google (in connection with AdWords) is "solely based on Google's measurements" regarding that advertiser's ad buys and "and the applicable billing metrics (e.g., clicks or impressions)[.]"  Plaintiffs, and the other members of the AdWords Advertiser Class understood that Google's "measurements" and "applicable billings metrics" would not include clicks or impressions that Google determined to be invalid.  After all, no reasonable advertiser would agree to pay Google for clicks or impressions that Google determined to be invalid.  Plaintiffs understood that under Section 7, if Google initially charged them for those clicks/impressions, then Google would provide a refund or credit if it subsequently determined that the click/impression was invalid.

167.    Plaintiffs' understanding that Section 6 of the DoubleClick Ad Exchange Agreement and Section 7 of the AdWords Agreement (collectively, the "Refund Clauses") embodies Google's promise to provide them with refunds or credits if it subsequently determined that any clicks or impressions they had already paid for were invalid, is based in part on oral statements made by Google's employees to AdTrader's employees.  From 2014 through early 2016 (before AdTrader signed the DoubleClick Ad Exchange Agreement), AdTrader's Google account managers (Marta Madarasz, Alexandru Badinici, and Balint Torok) repeatedly told AdTrader employees during phone conversations that AdTrader needed to ensure that its publisher clients were not delivering invalid traffic because, under those circumstances, Google would not pay AdTrader its accrued earnings and, more importantly, would refund those amounts back to the advertisers.  From these conversations, Google conveyed to AdTrader's employees that Google was contractually obligated to refund its advertisers for any clicks or impressions that were charged but turned out to be invalid.

168.    Moreover, following their conversations with Ms. Madarasz, Ms. Badinici, and Mr. Torok, AdTrader employees periodically reviewed Google's statements on its DoubleClick Ad Exchange Seller Help webpage (Exhibit 5).  On this webpage, which Google had authored before the start of the Class Period (and which is still being published by Google to this very day), Google wrote "Publishers disabled for invalid activity may not receive any further payment.  **The earnings on your account will be properly returned to the affected advertisers**."  (Exhibit 5 (emphasis added).)  As the title of the webpage suggests, Google wrote it to answer commonly asked questions by participants on AdX.  Plaintiffs understood this webpage to apply to any advertiser buying ad space on an AdX publisher's website, and this webpage confirmed what Google orally conveyed to AdTrader – i.e., that Google was contractually obligated to refund its advertisers for any clicks or impressions that were charged but turned out to be invalid.

169.    Plaintiffs' understanding of the meaning of the Refund Clauses is further supported by another posting on Google Ads Traffic Quality site that was authored before the start of the Class Period (and which is still being published by Google to this very day).  There, Google wrote, "When we find something wrong, we try to make it right as soon as possible.  We suspend or disable invalid accounts, and may withhold payments to the publisher.  When appropriate and possible, **that money is credited back to the advertisers** – not only for the month where we found the invalid activity, but often for the previous month as well."  (Exhibit 6 (emphasis added).)

170.    Google has repeatedly informed advertisers and potential advertisers that the Google Ads Traffic Quality webpages are an authoritative source of its policies and positions regarding invalid activity on Google's advertising platforms (including AdX).  Indeed, some of the content in these webpages expressly references AdX, making it clear that the Google Ads Traffic Quality webpages fully apply to AdX.  And Google's representatives specifically referred AdTrader during in-person conversations and telephone calls to review the Google Ads Traffic Quality webpages in response to some of AdTrader's questions about making ad buys on AdX.  Certainly, Plaintiffs understood this webpage to apply to any advertiser buying ad space on an AdX publisher's website.

171.   Plaintiffs' understanding of the meaning of the Refund Clauses is further supported by a different Google Ads Traffic Quality webpage that Google authored before the start of the Class Period (and which is still being published by Google to this very day).  There, Google represented to its advertisers that "**[w]hen invalid activity is found through offline analysis and reactive investigation, we mark those clicks as invalid and issue credits to any advertisers affected by this activity**."  (Ex. 7 (emphasis added).)  As with all of Google's Ads Traffic Quality webpages, Plaintiffs understood this webpage to apply to any advertiser buying ad space on an AdX publisher's website.

172.   On that same webpage, Google also explained that "offline analysis" was a detection scheme based upon automated algorithms and manual analysis that affected all Google sites and even those in other networks.  Google further explained that "offline analysis" would take place after a different process called "proactive filters," which involved automated algorithms that filtered and discarded out invalid clicks/impressions in real time, before those clicks/impressions were charged to an advertiser's account.  Finally, Google represented that the final process it used to detect invalid ad clicks/impressions came about through "reactive investigations" – which was essentially a manual review performed in response to an advertiser inquiry about invalid clicks/impressions.

173.   Thus, with respect to "offline analysis," Plaintiffs understood that even after Google charged an AdX ad click/impression to either their AdX Buyer, DBM, or AdWords account and presented an invoice for the same, Google was still automatically using various procedures to detect whether that ad click/impression was valid and authentic.  And if Google determined that the ad click/impression was invalid, then Google would proactively provide a refund or credit to Plaintiffs since Google had already charged Plaintiffs for that click/impression.  By contrast, the "proactive filtering" process was a way to prevent charging the advertiser for an invalid ad click/impressions in the first place.  And the "reactive investigation" pertained to an advertiser's right to raise its own challenge to Google regarding the validity of an ad click/impression for which Google charged it.

174.     Plaintiffs' understanding of the meaning of the Refund Clauses is further supported by an AdWords Help article that Google authored before the start of the Class Period (and which is still being published by Google to this very day).  There, Google states that, with respect to "invalid activity," that it "prohibit[s] this kind of bad behavior.  And **that's why you don't have to pay for these unfair clicks and impressions**."  (Ex. 8 (emphasis added).  Again, the default setting in AdWords is to have the advertisements appear on AdX publisher websites, so Plaintiffs understood that these statements applied with respect to AdWords ads that ended up being displayed on an AdX publisher's website.

175.     Plaintiffs' understanding of the meaning of the Refund Clauses is further supported by an Inside AdWords blog post that Google authored before the start of the Class Period (and which is still being published by Google to this very day).  There, Google states "**our team proactively identifies invalid activity that may not have been automatically filtered and credits advertisers accordingly**…. In the interest of transparency, all credits, past and future, for future invalid click activity are now labeled 'Adjustment – Click Quality.'"  A true and correct copy of this webpage is attached as Exhibit 9.  Again, the default setting in AdWords is to have the advertisements appear on AdX publisher websites, so Plaintiffs understood that these statements applied with respect to AdWords ads that ended up being displayed on an AdX publisher's website.

176.     Furthermore, Google's own conduct demonstrates that it too shares the understanding that, per the Refund Clauses, Google is obligated to provide its advertisers with refunds or credits for paid-for AdX impressions or clicks when Google subsequently determines that those impressions or clicks were invalid.  For example, Google's termination notices to AdX publishers are based on an auto-generated template.  As part of that template, Google tells all terminated AdX publishers, in addition to withholding payment of their accrued AdX earnings, that "[t]he earnings on [their] account will be returned to the affected advertisers."

177.     In addition, as previously alleged in greater detail, Google issued an official statement to The Register admitting that "Google has a longstanding policy of refunding advertisers for invalid traffic."

SECOND AMENDED COMPLAINT
CASE NO. 5:17-CV-7082-BLF

178.    As previously alleged in greater detail, Google breached its obligations to ADTRADER+, and the other members of the AdX Advertiser Class under Section 6 of the DoubleClick Ad Exchange Agreement, by failing to provide them refunds or credits for amounts they paid Google for clicks or impressions on an AdX publisher's website that Google subsequently flagged as invalid.  Google failed to provide refunds or credits in these situations even when Google simultaneously refused to pay its AdX publishers for those same impressions or clicks.

179.    As previously alleged in greater detail, Google breached its obligations to Plaintiffs, and the other members of the AdWords Advertiser Class under Section 7 of the AdWords Agreement, by failing to provide them refunds or credits for amounts they paid Google for clicks or impressions on an AdX publisher's website that Google subsequently flagged as invalid.  Google failed to provide refunds or credits in these situations even when Google simultaneously refused to pay its AdX publishers for those same impressions or clicks.

180.    As a proximate result of Google's breaches of the contracts, Plaintiffs, and the other members of the AdX Advertiser Class and the AdWords Advertiser Class, have been damaged by not receiving the refunds or credits owed to them by Google.

181.    ADTRADER+ also brings this claim for breach of the DBM Agreement on behalf of themselves and all members of the DBM Advertiser Class.

182.    AdTrader and the other members of the DBM Advertiser Class, entered into the DBM Agreement.

183.    Classic, LML, Ad Crunch, and Fresh Break were third-party beneficiaries of the DBM Agreement entered into by AdTrader.  As previously alleged in greater detail, Google is aware that advertising agencies and advertising networks like AdTrader buy ad space on behalf of their advertising clients.  Furthermore, Google knows exactly who all of AdTrader's advertising clients are, because AdTrader is required to separately register them in DBM.  When Google issues DBM invoices, each of AdTrader's advertising clients are identified by name and a unique ID number.

184.   ADTRADER+, and the other members of the DBM Advertiser Class, substantially performed their obligations under the DBM Agreement.  The key requirements of that contract were that ADTRADER+, and the other members of the DBM Sub-Class, (i) provide advertisements that complied with Google's policies and regulations and (ii) pay Google in a timely fashion after Google invoiced them for its services.  ADTRADER+, and the other members of the DBM Advertiser Class, met both of these obligations at all times.

185.   Section 2(a) of the DBM Agreement (Exhibit 3) states that Google will "deliver Ads according to the trafficking criteria selected by the Company," in exchange for advertisers' payments to Google under Section 3.  ADTRADER+ and the other members of the DBM Advertiser Class understood that the "trafficking criteria" they selected would not include clicks or impressions that Google determined to be invalid.  After all, no reasonable advertiser would agree to pay Google for clicks or impressions that Google determined to be invalid.  And ADTRADER+ understood that if Google initially charged them for invalid clicks or impressions, then Google would provide a refund or credit if it subsequently determined that they were invalid.

186.   Importantly, the language used in Section 2(a) of the DBM Agreement is intentionally broader than the language used in the DoubleClick Ad Exchange Agreement and the AdWords Agreement.  Part of that appears to be a legacy holdover from when DoubleClick was an independent company based in New York.  But part of that is because a DSP (such as DBM) is broader in scope than an advertising exchange like AdX.  DBM, like all DSPs, processes bids for ad buys across multiple advertising exchanges (not just AdX).  Thus, ADTRADER+ understood and expected that Google would provide refunds or credits for invalid traffic not just when that traffic originated from an AdSense publisher or an AdX publisher's website (which Google obviously controls), but also when that invalid traffic originated from a publisher that is participating in a different advertising exchange where DBM buys from.

187.   ADTRADER+'s understanding of Section 2(a) is based in part on norms and standards in the digital advertising industry.  Other major DSPs, such as DataXu, AppNexus, and OpenX, were (as of March 1, 2016) all providing refunds to advertisers for ad traffic that turned out to be fraudulent or otherwise invalid regardless of whether such traffic originated on an

SECOND AMENDED COMPLAINT
CASE NO. 5:17-CV-7082-BLF

1   advertising exchange affiliated with them.  For example, DataXu alone has been providing such

2   refunds since 2014 and it does not even operate an affiliated advertising exchange.

3        188.    DSPs have the ability to detect invalid or fraudulent traffic across all advertising

4   exchanges because all, or almost all of them, are integrated with third party verification services

5   such as DoubleVerify, Integral Ad Science, Meetrics, and MOAT.  And on information and

6   belief, Google has long used its own proprietary verification algorithms to detect invalid or

7   fraudulent traffic originating on its own and other advertising exchanges.

8        189.    Moreover, as previously alleged in greater detail, Google's representations in

9   Exhibits 5-7 also gave ADTRADER+ the understanding that Section 2(a) of the DBM Agreement

10  obligated Google to provide refunds for paid-for impressions or clicks bought on a publisher's

11  website when Google subsequently determines that those impressions or clicks were invalid.  As

12  previously alleged in greater detail, Google's website does not draw distinctions between any of

13  its various advertising services, and Google refers all potential advertisers to review its various

14  webpages.

15       190.    As previously alleged in greater detail, Google breached its obligations to

16  Plaintiffs, and the other members of the DBM Advertiser Class under Section 2(a) of the DBM

17  Agreement, by failing to provide them refunds or credits for their advertising funds that had been

18  spent on clicks or impressions bought using DBM that Google subsequently flagged as invalid.

19  Google failed to provide refunds or credits in these situations even when Google simultaneously

20  refused to pay those publishers for those same impressions or clicks.

21       191.    ADTRADER+ also brings this claim for breach of the DBM Agreement and the

22  DoubleClick Ad Exchange Agreement on behalf of themselves and all members of the DBM-

23  AdX Sub-Class.[6]

24       192.    As previously alleged in greater detail, a media buyer could not use DBM to make

25  an ad buy on AdX unless that buyer had already executed the DoubleClick Ad Exchange

26  _____

27  [6] Plaintiffs presents all the different classes and the sub-class largely for administrative
    convenience, because Google generates separate invoices for each of its different products – AdX
28  Buyer, DBM, and AdWords.  For example, an ad buy made on an AdX publisher's website
    through DBM would be reflected only in the DBM invoice, not in an AdX Buyer invoice.

1    Agreement.  Therefore, all members of the DBM-AdX Sub-Class are, by necessity, signatories of

2    both the DBM Agreement and the DoubleClick Ad Exchange Agreement.

3          193.    If it is determined that the DBM Agreement does not grant ADTRADER+ and the

4    other members of the DBM Advertiser Class a contractual right to a refund under the

5    circumstances described at length in this pleading, pursuant to Section 6 of the DoubleClick Ad

6    Exchange Agreement, the members of the DBM-AdX Sub-Class are nonetheless entitled to a

7    refund for amounts they paid Google for clicks or impressions on an AdX publisher's website that

8    Google subsequently flagged as invalid.

9          194.    As previously alleged in greater detail, Google breached its obligations to

10   AdTrader, and the other members of the DBM-AdX Sub-Class by failing to provide them refunds

11   or credits for their advertising funds that had been spent on clicks or impressions bought using

12   DBM that Google subsequently flagged as invalid.  Google failed to provide refunds or credits in

13   these situations even when Google simultaneously refused to pay those publishers for those same

14   impressions or clicks.

15         195.    Furthermore, to the extent that the DoubleClick Ad Exchange Agreement, the

16   DBM Agreement, or the AdWords Agreement permit Google to retain advertiser funds resulting

17   from ad impressions or clicks that Google subsequently determined were invalid, then Google

18   freely and knowingly waived any such right to keep those funds by publishing (and continuing to

19   publish) its statements that it proactively provides refunds or credits to advertisers for invalid

20   activity as previously discussed in greater detail in Exhibits 5-9.

21         196.    Google has contended that Section 6 of the DoubleClick Ad Exchange Agreement

22   (Exhibit 2) and Section 7 of the AdWords Agreement (Exhibit 4) limit or preclude Plaintiffs'

23   breach of contract claim here.  The relevant sections both state:

24         If Google does not deliver Ads to the selected Targets, then Customer's sole
           remedy is to make a claim for advertising credits within 60 days after the invoice
25         date ("Claim Period"), after which Google will issue the credits following claim
           validation[.] Customer understands that third parties may generate impressions or
26         clicks on Customer's Ads for prohibited or improper purposes and that its sole
           remedy is to make a claim for advertising credits within the Claim Period, after
27         which Google will issue the credits following claim validation.  TO THE
           FULLEST EXTENT PERMITTED BY LAW, (A) CUSTOMER WAIVES ALL
28         CLAIMS RELATING TO ANY PROGRAM CHARGES UNLESS A CLAIM IS

MADE WITHIN THE CLAIM PERIOD AND (B) THE ISSUANCE OF ADVERTISING CREDITS (IF ANY) IS AT GOOGLE'S REASONABLE DISCRETION.

197.    The DBM Agreement lacks any such language.  Moreover, Google's reading of Section 6 of the DoubleClick Ad Exchange Agreement and Section 7 of the AdWords Agreement is not correct, because it is clear that the language of both sections refers only to "reactive investigations."  As previously alleged in greater detail, Google explained in Exhibit 7 that "reactive investigations" refers to a review of the validity of ad impressions performed by Google in response to an advertiser inquiry.  Thus, Plaintiffs, and the other members of the Advertiser Class, understood that these two sections to govern only situations where the advertiser suspected its impressions were invalid, thereby putting the onus on the advertiser to raise the claim with Google within the allotted time.  Plaintiffs, and the other members of the AdX Advertiser Class, the AdWords Advertiser Class, and the DBM-AdX Sub-Class, did not understand these sections to refer to Google's obligation to proactively provide refunds or credits to them for ad impressions that Google independently determined on its own accord were invalid (i.e., through "offline analysis").

198.    Indeed, Plaintiffs, like all online advertisers, knew there was always some risk that their advertisements could be the subject of a fraudulent click or impression.  Section 6 of the DoubleClick Ad Exchange Agreement and Section 7 of the AdWords Agreement merely minimize Google's liability in the event it does not detect third-party fraud, as it is likely impossible to detect all cases of third-party fraud.  What these contractual provisions do not do, however, is permit Google's first-party fraud – that is, when Google itself claims or determines there was invalid activity, refuses to pay the publisher for that invalid activity, and then keeps the money for itself instead of returning it to the advertiser, as promised.

199.    More importantly, even if Google's reading of Section 6 of the DoubleClick Ad Exchange Agreement or Section 7 of the AdWords Agreement were correct, it has nevertheless freely and knowingly waived the right to enforce those sections by publishing (and continuing to publish) its statements that it **proactively** provides refunds or credits to advertisers for invalid activity as previously alleged in greater detail in Exhibits 5-9.

1    200.    Furthermore, by repeatedly telling Plaintiffs and the other members of the AdX

2    Advertiser Class, the AdWords Advertiser Class, and the DBM-AdX Sub-Class that Google

3    would automatically provide refunds or credits to them for ad impressions that Google

4    independently determined were invalid, and by having Plaintiffs and the other members of those

5    classes make ad buys on AdX in reliance on those statements, Google is now estopped from

6    arguing that either Section 6 of the DoubleClick Ad Exchange Agreement or Section 7 of the

7    AdWords Agreement eliminates its liability to Plaintiffs and the other members of those classes

8    for having failed to raise a claim within the requisite claims period.

9                               **SIXTH CAUSE OF ACTION:**
     **Breach of the Implied Covenant of Good Faith and Fair Dealing (DoubleClick Ad Exchange**
10                **Agreement, DBM Agreement, and AdWords Agreement)**
                              **by Plaintiffs against Google**
11                              **(Class Action Claim)**

12    201.    Plaintiffs hereby re-incorporate and re-allege all the preceding paragraphs as if

13    fully set forth herein.  Plaintiffs plead this claim in the alternative in the event it is determined that

14    under the DoubleClick Ad Exchange Agreement, the DBM Agreement, or the AdWords

15    Agreement, Google's obligation to provide refunds or credits to advertisers under the previously-

16    described circumstances is a matter of Google's subjective discretion.

17    202.    As previously alleged in great detail, Plaintiffs, and the other members of the AdX

18    Advertiser Class, the AdWords Advertiser Class, the DBM Advertiser Class, and the DBM-AdX

19    Sub-Class, entered into the DoubleClick Ad Exchange Agreement, the DBM Agreement, and/or

20    the AdWords Agreement (or were third-party beneficiaries of those contracts), and substantially

21    performed under these contracts.

22    203.    There exists in every contract, including the DoubleClick Ad Exchange

23    Agreement, the DBM Agreement, and the AdWords Agreement, an implied covenant of good

24    faith and fair dealing, requiring that each party not do anything to unfairly interfere with the right

25    of the other party to receive the benefits of the contract.

26    204.    Plaintiffs' purpose for entering into the DoubleClick Ad Exchange Agreement, the

27    DBM Agreement, and/or the AdWords Agreement was to maximize the success of their

28    advertising campaigns and thus pay Google only for advertisements that it had delivered to valid

traffic (and correspondingly not pay Google for advertisements that Google knew or claimed was delivered to invalid traffic).

205.    Google unfairly interfered with ADTRADER+ and the other members of the AdX Advertiser Class's right to receive the benefits of the DoubleClick Ad Exchange Agreement by failing to provide refunds or credits to them for ad impressions and clicks that Google itself claimed or determined were invalid and/or for which Google withheld payment to AdX publishers.

206.    Google unfairly interfered with Plaintiffs and the other members of the AdWords Advertiser Class's right to receive the benefits of the AdWords Agreement by failing to provide refunds or credits to them for ad impressions and clicks that Google itself claimed or determined were invalid and/or for which Google withheld payment to AdX publishers.

207.    Google unfairly interfered with ADTRADER+ and the other members of the DBM Advertiser Class's right to receive the benefits of the DBM Agreement by failing to provide refunds or credits to them for ad impressions and clicks for which Google withheld payment to publishers.

208.    Google unfairly interfered with ADTRADER+ and the other members of the DBM-AdX Advertiser Class's right to receive the benefits of the DoubleClick Ad Exchange Agreement by failing to provide refunds or credits for ad impressions and clicks that Google itself claimed or determined were invalid and/or for which Google withheld payment to AdX publishers.

209.    As a proximate result of Google's breaches of the implied covenant, Plaintiffs and the other members of the AdX Advertiser Class, the AdWords Advertiser Class, the DBM Advertiser Class, and the DBM-AdX Sub-class have been damaged by not receiving the refunds or credits owed to them by Google.

**SEVENTH CAUSE OF ACTION:**
**Breach of Implied Duty to Perform with Reasonable Care**
**(DoubleClick Ad Exchange Agreement and AdWords Agreement)**
**by Plaintiffs against Google**
**(Class Action Claim)**

210.    Plaintiffs hereby re-incorporate and re-allege all the preceding paragraphs as if fully set forth herein.  Plaintiffs bring this claim solely to recover contract damages and not tort damages.

211.    As previously alleged in greater detail, Plaintiffs and the other members of the AdX Advertiser Class, the AdWords Advertiser Class, and the DBM-AdX Sub-Class entered into the DoubleClick Ad Exchange Agreement, and/or the AdWords Agreement (or were third-party beneficiaries to those contracts), and substantially performed under these contracts.

212.    As previously alleged in greater detail, under Section 6 of the DoubleClick Ad Exchange Agreement, the amounts owed by Plaintiffs and the other members of the Advertiser Class to Google for their ad buys were based on Google's "measurements for the Programs and the applicable billing metrics (e.g., clicks or impressions)[.]"  Accordingly, every single month from the time the parties entered into the DoubleClick Ad Exchange Agreement, whenever Google presented to ADTRADER+ and the other members of the AdX Advertiser Class and the members of the DBM-AdX Sub-Class its invoice for the amounts owed by them for their ad buys made on AdX, Google also provided them various advertising metrics ostensibly meant to validate Google's "measurements" for the parties' "applicable billing metrics."  These metrics are also meant to enable advertisers to exercise their contractual right under Section 6 to request a "reactive investigation" of the impressions/clicks for which Google billed them.

213.    Google provides these metrics in various forms and the advertiser has the option of viewing these metrics at varying levels of granularity.  At the most basic level of detail, every single month from the time the parties entered into the DoubleClick Ad Exchange Agreement, Google provided ADTRADER+ and the other members of the AdX Advertiser Class and the DBM-AdX Sub-Class with advertising metrics showing the total number of valid, billable impressions that their advertisements received on AdX publisher websites.  These metrics remain

1   accessible to Plaintiffs and other members of the AdX Advertiser Class and the DBM-AdX Sub-

2   Class on their Google-provided software dashboard interface at all times.

3       214.   As previously alleged in greater detail, under Section 7 of the AdWords

4   Agreement, the amounts owed by Plaintiffs and the other members of the AdWords Advertiser

5   Class to Google for their ad buys were based on Google's "measurements for the Programs and

6   the applicable billing metrics (e.g., clicks or impressions)[.]"  Accordingly, every single month

7   from the time the parties entered into the AdWords Agreement, whenever Google presented to

8   Plaintiffs and the other members of the AdWords Advertiser Class its invoice for the amounts

9   owed by them for their ad buys (including for AdWords ads that ended up being displayed on an

10  AdX publisher's website), Google also provided them various advertising metrics ostensibly

11  meant to validate Google's "measurements" for the parties' "applicable billing metrics."  These

12  metrics are also meant to enable advertisers to exercise their contractual right under Section 7 to

13  request a "reactive investigation" of the impressions/clicks for which Google billed them.

14      215.   Google provides these metrics in various forms and the advertiser has the option of

15  viewing these metrics at varying level of granularity.  At the most basic level of detail, every

16  single month from the time the parties entered into the AdWords Agreement, Google provided

17  Plaintiffs and the other members of the AdWords Advertiser Class with advertising metrics

18  showing the total number of valid, billable impressions that their AdWords advertisements

19  received on AdX publishers' websites).  These metrics remain accessible to Plaintiffs and other

20  members of the AdWords Advertiser Class on their Google-provided software dashboard

21  interface at all times.

22      216.   Google failed to use reasonable care in performing its contractual obligation to

23  provide Plaintiffs and the other members of the AdX Advertiser Class and the DBM-AdX Sub-

24  Class with advertising metrics.  Specifically, Google subsequently became aware that the

25  advertising metrics that Google provided to Plaintiffs and the other members of the AdX

26  Advertiser Class and the DBM-AdX Sub-Class incorrectly showed that Google was deeming all

27  of the reported AdX impressions or clicks to be valid when, in reality, Google had later

28  determined some of those impressions or clicks to be invalid.  Google did not, however, correct

those erroneous metrics, or send out any kind of corrective disclosure to Plaintiffs and the other members of the AdX Advertiser Class and the DBM-AdX Sub-Class.

217.    Google failed to use reasonable care in performing its contractual obligation to provide Plaintiffs and the other members of the AdWords Advertiser Class with advertising metrics.  Specifically, Google subsequently became aware that the advertising metrics that Google provided to Plaintiffs and the other members of the AdWords Advertiser Class incorrectly showed that Google was deeming all of the reported AdX impressions or clicks to be valid when, in reality, Google had later determined some of those impressions or clicks to be invalid.  Google did not, however, correct those erroneous metrics, or send out any kind of corrective disclosure to Plaintiffs and the other members of the AdWords Advertiser Class.

218.    Plaintiffs and the other members of the AdX Advertiser Class, the AdWords Advertiser Class, and the DBM-AdX Sub-Class have been damaged by Google's failure to perform its services with reasonable care.  Put simply, if Google had provided corrected metrics (or even a corrective disclosure), then Plaintiffs and the other members of these classes would have been alerted to the fact that ad impressions or clicks they had already paid for had been subsequently determined by Google to be invalid.  With this knowledge, Plaintiffs and the other members of these classes would have requested Google to perform a reactive investigation of those invalid impressions/clicks and would have subsequently received a refund or credit from Google.

**EIGHTH CAUSE OF ACTION:**
**False Advertising Law**
**by Plaintiffs against Google**
**(Class Action Claim)**

219.    Plaintiffs hereby re-incorporate and re-allege all the preceding paragraphs as if fully set forth herein.

220.    Plaintiffs bring this claim under California's False Advertising Law (the "FAL"), California Business & Professions Code §§ 17500, et seq., on behalf of themselves and all members of the AdX Advertiser Class, the AdWords Advertiser Class, and the DBM-AdX Sub-Class.

221.    Google offered its advertising services (i.e., AdX, AdWords, and DBM) to consumers and the public on a nationwide basis, including in California.

222.    With the intent to perform those advertising services, Google made and broadly disseminated over the Internet the following untrue or misleading statements (the "Refund Promises") to consumers and the public, including Plaintiffs:

      a.    On its DoubleClick Ad Exchange Seller Help webpage (Exhibit 5), which Google authored before the start of the Class Period (and which is still being published by Google to this day), Google stated:  "Publishers disabled for invalid activity may not receive any further payment.  **The earnings on your account will be properly returned to the affected advertisers**."  (Ex. 5 (emphasis added).)

      b.    On one of its Google Ads Traffic Quality webpages (Exhibit 6), which Google authored before the start of the Class Period (and which is still being published by Google to this day), Google stated:  "When we find something wrong, we try to make it right as soon as possible.  We suspend or disable invalid accounts, and may withhold payments to the publisher.  When appropriate and possible, **that money is credited back to the advertisers** – not only for the month where we found the invalid activity, but often for the previous month as well."  (Ex. 6 (emphasis added).)

      c.    In another Google Ads Traffic Quality webpage (Exhibit 7), which Google authored before the start of the Class Period (and which is still being published by Google to this day), Google stated:  "When invalid activity is found through offline analysis and reactive investigation, we mark those clicks as invalid and **issue credits to any advertisers affected by this activity**."  (Ex. 7 (emphasis added).)

      d.    In an AdWords Help article (Exhibit 8), which Google authored before the start of the Class Period (and which is still being published by Google to this day), Google stated that, with respect to "invalid activity," it "prohibit[s] this kind of bad behavior.  And **that's why you don't have to pay for these unfair clicks and impressions**."  (Ex. 8 (emphasis added).)

      e.    In an Inside AdWords blog post (Exhibit 9), which Google authored before the start of the Class Period (and which is still being published by Google to this day), Google

stated:  "**[O]ur team proactively identifies invalid activity that may not have been**

**automatically filtered and credits advertisers accordingly**."  (Ex. 9 (emphasis added).)

223.    Google's Refund Promises were untrue or misleading when made, as a reasonable

consumer was likely to be misled or deceived by them.  Indeed, the only reasonable interpretation

of Google's Refund Promises was that it would issue credits to advertisers when it found invalid

activity.  Yet, as previously alleged in greater detail, in many instances throughout the entire

Class Period up until around November 2017, after Google withheld revenues from AdX

publishers claiming that it found invalid activity or policy violations, Google did not return that

money to affected advertisers, as promised.

224.    In addition, on December 13, 2017, Google gave an official statement to The

Register (Exhibit 10) in response to this lawsuit: "Google has a longstanding policy of refunding

advertisers for invalid traffic.  As we recently announced, this is currently being expanded to

include ads purchased via DoubleClick Bid Manager."  Thus, prior to December 2017, even

though AdX is fully owned and operated by Google (and Google required advertisers to enter into

the DoubleClick Ad Exchange Agreement in order to make an ad buy on AdX), Google was not

providing any refunds for any ad buys that an advertiser made through DBM for an AdX

publisher's inventory, even when Google subsequently determined that some of those already

paid-for ad impressions or clicks were invalid.

225.    Furthermore, as previously alleged in greater detail, Google's conduct in

unilaterally imposing a retroactive arbitration clause in response to the August 25, 2017 Wall

Street Journal article reflects its hurried attempt to minimize liability to its advertisers after it was

publicly revealed that Google was not refunding its advertisers as promised.  If Google had

legitimately understood that it had not been making any promises to provide refunds to

advertisers, it would not have acted in this manner.

226.    Plaintiffs have statutory standing to sue under the FAL because they suffered

injury in fact and lost money or property as a result of Google's untrue or misleading Refund

Promises.

227.    AdTrader reviewed Google's Refund Promises on or around March 1, 2016, prior to entering into the DoubleClick Ad Exchange Agreement and the DBM Agreement.  Classic, LML, Ad Crunch and Fresh Break also reviewed those same representations at that same time through their agent, AdTrader.  In reliance on Google's Refund Promises, these Plaintiffs expended money to purchase advertising through AdX and DBM that they would not have otherwise spent.  That is, they would not have purchased this advertising if Google had disclosed that it would not give them refunds or credits when it found invalid activity or policy violations associated with their advertising and withheld payment to the relevant publisher on that basis. When Google failed to issue such refunds or credits as promised, Plaintiffs suffered injury in fact and lost money as a result.

228.    SCB reviewed Google's Refund Promises on or shortly before it entered into the AdWords Agreement during the spring of 2015.  In reliance on Google's Refund Promises, SCB expended money to purchase advertising through AdWords that it would not have otherwise spent.  That is, SCB would not have purchased this advertising if Google had disclosed that it would not give SCB refunds or credits when it found invalid activity or policy violations associated with SCB's advertising and withheld payment to the relevant publisher on that basis. When Google failed to issue such refunds or credits as promised, SCB suffered injury in fact and lost money as a result.

229.    Google should have known, through the exercise of reasonable care, that the Refund Promises were untrue or misleading back in 2015 and back on March 1, 2016.  By then, Google had fully owned, controlled, and operated each of the AdWords, AdX, and DBM software for many years (with DBM being the most recent, as it was acquired by Google on June 3, 2010). Having controlled these programs for all that time and having annually handled billions of dollars in transactions through those programs, Google should have known that it was not providing refunds (whether deliberately or inadvertently) for already paid-for ad impressions or clicks on an AdX publisher's website that Google subsequently determined to be invalid.

230.    Plaintiffs also bring this FAL claim in the alternative, should it be determined that, pursuant to Section 6 of the DoubleClick Ad Exchange Agreement (Exhibit 2) or Section 7 of the

1   AdWords Agreement (Exhibit 4), an advertiser is contractually entitled to a refund or credits for

2   invalid traffic only if that advertiser had previously requested that Google perform a "reactive

3   investigation" of its ad traffic.

4        231.   As previously alleged in greater detail, in the Refund Promises, Google

5   represented to Plaintiffs that it would **proactively** offer refunds or credits for already paid-for ad

6   impressions or clicks on an AdX publisher's website that Google subsequently determined to be

7   invalid.  Should it be determined that the DoubleClick Ad Exchange Agreement or the AdWords

8   Agreement create no such duty whatsoever, and that an advertiser is entitled to a refund or credits

9   for invalid traffic only if that advertiser had previously requested that Google perform a "reactive

10  investigation" of its ad traffic, then the Refund Promises were plainly misleading at the time they

11  were made to Plaintiffs in 2015 and March 1, 2016.

12       232.   Google should have known, through the exercise of reasonable care, that the

13  Refund Promises were untrue or misleading back in 2015 and back on March 1, 2016.  Google

14  authored the DoubleClick Ad Exchange Agreement or the AdWords Agreement and thus was

15  fully aware as how it interpreted the provisions of those contracts, and that its interpretation was

16  at odds with what it expressed in the Refund Promises.

17       233.   Plaintiffs have suffered injury in fact as they have lost money due to Google's

18  actions.  As previously alleged in greater detail, based in large measure upon Google's promise to

19  **proactively** provide refunds or credits for invalid traffic, Plaintiffs participated in AdX and paid

20  money to Google for ad impressions or clicks generated by their advertisements displayed on an

21  AdX publisher's website.  Google then failed to provide refunds or credits to Plaintiffs for those

22  ad impressions or clicks that Google subsequently determined were invalid, on the purported

23  grounds that Google was never going to do anything proactively, but that it was Plaintiffs'

24  obligation to affirmatively raise with Google a request for refunds or credits for invalid activity.

25       234.   Google's acts and practices implicate the public in general and individual

26  consumers in that they were based on misrepresentations that were distributed widely on the

27  Internet and directed at millions of individuals and small businesses looking to engage in online

28  advertising.  (Indeed, one research firm estimated in 2015 that Google had 4 million unique

advertisers at that point.)  Google's statements misled these individuals and small businesses as to the value of advertisements they purchased through Google.

235.    In addition, Google's acts and practices have deprived its advertisers of money or credits – totaling hundreds of millions, or even billions, of dollars – that they would have spent on ads targeting end consumers interested in their products or services.  Thus, the interests of individual consumers are also implicated because end consumers and Internet users were deprived of ads that cater to their interests.  The decrease in advertising expenditures also, in turn, leads to a decrease in the number of publishers offering free content for consumers on the Internet.

236.    Plaintiffs are small businesses—not sophisticated corporate entities—and precisely the type of consumers that the FAL was designed to protect.  AdTrader currently has a total of 12 employees.  Classic is a small restaurant that currently has approximately 25 employees.  LML is also a restaurant that employs approximately 25 people.  Ad Crunch is no longer in business and does not have any employees.  Fresh Break is also a restaurant that currently employs between 5-10 people.  And SCB is a small collections agency that currently has 3 employees.

237.    Plaintiffs and the other members of these classes are accordingly entitled to restitution and injunctive relief as a remedy for Google's violations of the FAL.

### NINTH CAUSE OF ACTION:
**Unfair Competition Law**
**by Plaintiffs against Google**
**(Class Action Claim)**

238.    Plaintiffs hereby re-incorporate and re-allege all the preceding paragraphs as if fully set forth herein.

239.    Plaintiffs bring this claim under California's Unfair Competition Law ("UCL"), California Business & Professions Code §§ 17200, et seq., on behalf of themselves and all members of the AdX Advertiser Class, the AdWords Advertiser Class, and the DBM-AdX Sub-Class.

240.    As previously alleged in greater detail, Plaintiffs are small businesses, not sophisticated corporate entities.

241.   Google's actions and systematic conduct towards Plaintiffs and the other members of these classes constitute unlawful business practices within the meaning of California Business & Professions Code § 17200.  As previously alleged in greater detail, Google engaged in systemic breaches of the DoubleClick Ad Exchange Agreement and the AdWords Agreement, systemic breaches of the implied covenant of good faith and fair dealing arising from those contracts, and violations of the FAL.

242.   Google has engaged, and continues to engage in, unlawful, fraudulent, and unfair business acts and practices prohibited by the UCL.  As previously alleged in greater detail, despite promising to do so, Google repeatedly and systematically refused to provide full credits or refunds to advertisers for invalid impressions or clicks on their ads, while simultaneously withholding payments to the publishers who displayed those ads.  Google instead simply kept all of the money for itself.

243.   Google's actions and systematic conduct towards Plaintiffs and the other members of these classes constitute unfair business practices within the meaning of California Business & Professions Code § 17200.  As previously alleged in greater detail, despite promising to do so, Google repeatedly and systematically refuses to provide credits or refunds to advertisers for invalid impressions or clicks on their ads, while simultaneously withholding payments to the publishers who displayed those ads.  Google instead simply pockets the money.  Such practices are deemed unfair under the UCL.  In addition, Google's conduct is immoral, unethical, oppressive, and unscrupulous in that Google wrongfully confiscates money that it promised to return to advertisers.  Google's conduct is also deceptive, because it repeatedly represented to Plaintiffs that it would proactively provide refunds or credits to them for their paid-for ad impressions or clicks that Google subsequently determined were invalid.  Google's conduct is also deemed unfair within the meaning of California Business & Professions Code § 17200 because its practices harm the public interest while creating zero utility in the process.

244.   Google's actions and systematic conduct towards Plaintiffs and the other members of these classes constitute fraudulent business practices within the meaning of California Business & Professions Code § 17200.  As previously alleged in greater detail, Google repeatedly and

1    fraudulently represented that it would issue full refunds or credits to advertisers for impressions

2    or clicks on their ads that were determined to be fraudulent or invalid.  Google's representations

3    were likely to deceive a reasonable consumer.  In addition, as previously alleged in greater detail,

4    Plaintiffs actually relied on Google's misrepresentations.

5    245.    Plaintiffs also bring this fraudulent business practices claim in the alternative

6    should it be determined that, pursuant to Section 6 of the DoubleClick Ad Exchange Agreement

7    (Exhibit 2) or Section 7 of the AdWords Agreement (Exhibit 4), an advertiser is entitled to a

8    refund or credits for invalid traffic only if that advertiser had previously requested that Google

9    perform a "reactive investigation" of its ad traffic.  As previously alleged in greater detail, Google

10   repeatedly represented to Plaintiffs it would **proactively** offer refunds or credits for already paid-

11   for ad impressions or clicks on an AdX publisher's website that Google subsequently determined

12   to be invalid.  In addition, as previously alleged in greater detail, Plaintiffs actually relied on

13   Google's misrepresentations.  As previously alleged in greater detail, Google's actions also

14   constitute "unfair, deceptive, untrue, or misleading advertising" within the meaning of California

15   Business & Professions Code § 17200.

16   246.    As previously alleged in greater detail, Plaintiffs have suffered injury in fact as

17   they have lost money due to Google's actions.

18   247.    As previously alleged in greater detail, Google's acts and practices implicate the

19   public in general as well as individual consumers.

20   248.    Plaintiffs, and the members of these classes are accordingly entitled to restitution

21   and injunctive relief as a remedy for Google's violations of the UCL.

22   //

23   //

24   //

25

26

27

28

SECOND AMENDED COMPLAINT
CASE NO. 5:17-CV-7082-BLF

1

**PRAYER**

2       **WHEREFORE**, Plaintiffs AdTrader, Inc., Classic and Food EOOD, LML CONSULT

3   Ltd., Ad Crunch Ltd., Fresh Break Ltd., and Specialized Collections Bureau, Inc. pray for

4   judgment as follows:

5           1.      For judgment against defendant Google, LLC;

6           2.      For compensatory and special damages;

7           3.      For punitive damages;

8           4.      For declaratory relief;

9           5.      For restitution;

10          6.      For a permanent injunction;

11          7.      For pre-judgment interest;

12          8.      For attorney's fees and costs; and

13          9.      For such other and further relief as the Court deems just and proper.

14

15      Dated:  August 13, 2018                    GAW | POE LLP

16

17                                                 By:

18                                                 Randolph Gaw
                                                   Attorneys for Plaintiffs AdTrader, Inc.,
19                                                 Classic and Food EOOD, LML
                                                   CONSULT Ltd., Ad Crunch Ltd., Fresh
20                                                 Break Ltd., and Specialized Collections
                                                   Bureau, Inc.

21

22

23

24

25

26

27

28

SECOND AMENDED COMPLAINT
CASE NO. 5:17-CV-7082-BLF

1

**JURY DEMAND**

2          Plaintiffs AdTrader, Inc., Classic and Food EOOD, LML CONSULT Ltd., Ad Crunch

3   Ltd., Fresh Break Ltd., and Specialized Collections Bureau, Inc. hereby demand a jury trial for

4   their claims against defendant Google, LLC.

5

6          Dated:  August 13, 2018                      GAW | POE LLP

7

8                                                       By:

9                                                          Randolph Gaw
                                                           Attorneys for Plaintiffs AdTrader, Inc.,
                                                           Classic and Food EOOD, LML
10                                                         CONSULT Ltd., Ad Crunch Ltd., Fresh
                                                           Break Ltd., and Specialized Collections
11                                                         Bureau, Inc.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED COMPLAINT
CASE NO. 5:17-CV-7082-BLF