UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ADTRADER, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GOOGLE LLC,<br><br>Defendant. | Case No. 17-cv-07082-BLF<br><br>**ORDER GRANTING WITHOUT LEAVE TO AMEND IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS SAC**<br><br>[Re: ECF 76] |

This action involves purported unlawful conduct by Defendant Google LLC ("Google") in relation to its online advertisement marketplace services. Before the Court is Google's motion to dismiss certain claims in Plaintiffs' second amended complaint for failure to state a claim. Motion, ECF 76. Plaintiffs oppose the motion. Opp'n, ECF 79. The Court heard oral argument on Google's motion to dismiss on March 7, 2019 ("the Hearing"). For the reasons stated below, Google's motion to dismiss is GRANTED WITHOUT LEAVE TO AMEND IN PART and DENIED IN PART.

**I. BACKGROUND**

**A. General Background**

Google offers online advertisement services for advertisers and website publishers. This action involves Google's advertising service called the DoubleClick Ad Exchange ("AdX"). *See* Second Am. Compl. ("SAC") ¶ 1, ECF 72. There are two sides to this exchange. On the buyer-side, advertisers pay Google to deliver ads on websites across the Internet. *See id.* On the seller-side, website publishers agree to display ads on their websites in exchange for a portion of the revenues Google receives from advertisers on the buyer-side. *See id.*

Advertisers buy advertisement space on AdX through DoubleClick Ad Exchange Buyer ("AdX Buyer") and DoubleClick Bid Manager ("DBM"). *See* SAC ¶¶ 4, 38. Advertisers may

also buy ad space using Google's AdWords or AdSense platforms. *Id.* ¶ 27. Advertisers pay Google on a "cost-per-click" basis, where the advertiser pays Google only when an Internet user clicks on an ad, or on a "cost-per-impression" basis, where the advertiser pays Google based on the number of times an ad is displayed. *Id.* ¶ 20. Meanwhile, website publishers use AdX to sell advertisement space on their websites. *Id.* ¶ 25. Businesses may participate on the seller-side as managers of websites belonging to others even if those businesses do not have their own websites. *See id.* Such businesses are called Network Partner Managers ("NPM"). *Id.*

Advertisers who buy ad space on AdX are required to sign the DoubleClick Ad Exchange Master Service Agreement (the "DoubleClick Ad Exchange Agreement"). SAC ¶ 38. Likewise, advertisers who use DBM are required to sign the DoubleClick Advertising Platform Agreement (the "DBM Agreement"), *id.* ¶ 39, and advertisers who buy ad space through AdWords are required to sign the Google Inc. Advertising Program Terms (the "AdWords Agreement"), *id.* ¶ 40. Website publishers and NPMs who sell ad space directly on AdX are required to sign the Google Services Agreement ("AdX Publisher Agreement"). *Id.* ¶ 34. At the end of every billing period, Google sends advertisers who use DBM an invoice reflecting the clicks or impressions that their ads received. *Id.* ¶ 31. The advertisers remit payment to Google; Google keeps a portion of the payment as its platform fee and sends the remainder of the payment to the ad exchange in which the publishers were participating. *Id.* The ad exchange then pays the publishers after keeping a share of the revenue for itself. *Id.*

Plaintiff AdTrader, Inc. ("AdTrader") participates on both sides of the online advertising industry. SAC ¶ 46. AdTrader is an advertising network on the buyer-side and an NPM on the seller-side. *Id.* AdTrader's business includes managing online advertising for both advertisers and website publishers and placing advertising bids on AdX through DBM on behalf of advertisers. *See id.* ¶¶ 46–51. AdTrader entered into the DoubleClick Ad Exchange Agreement (*id.* ¶ 38), DBM Agreement (*id.* ¶ 39), AdWords Agreement (*id.* ¶ 40), and AdX Publisher Agreement (*id.* ¶ 34). According to the SAC, Plaintiffs Classic and Food EOOD, LML Consult Ltd., Ad Crunch Ltd., and Fresh Break Ltd. engaged AdTrader to advertise their businesses on the Internet. *Id.* ¶¶ 53–56. Plaintiff Specialized Collections Bureau, Inc. ("SCB") used AdWords to

2

advertise its business on the Internet and some of its advertisement impressions came from AdX publisher websites. *Id.* ¶ 57.

On May 19, 2017, a few days before Google was due to pay AdTrader its accrued AdX earnings, AdTrader received an email from Google stating that AdTrader's AdX account was terminated due to violation of Google's policies. SAC ¶ 63. However, Google has not terminated the individual accounts of AdTrader's publisher clients. *Id.* ¶ 110. In addition, AdTrader believes that Google contacted one of AdTrader's publisher clients, DingIt.tv ("DingIt"), "to begin a direct relationship." *Id.* ¶ 72. At the time of termination, AdTrader had a balance of $476,622.69 in its AdX account, which Google withheld. *Id.* ¶ 80.

Plaintiffs assert that Google employs at least three different systems and processes to protect advertisers from invalid clicks or impressions. First, automated "proactive filters" that filter and discard invalid clicks/impressions in real time, before those clicks/impressions are charged to an advertiser's account. *See* SAC ¶ 172. Second, "offline analysis," a detection scheme utilizing automated algorithms and manual analysis to identify invalid activity. *See id.* Third, "reactive investigation," a manual review performed in response to an advertiser inquiry about invalid clicks/impressions. *See id.* Individually, AdTrader alleges that Google improperly withheld ad revenue from it and seeks to recover that revenue. *Id.* ¶ 6. On behalf of a putative class of advertisers, Plaintiffs allege that Google did not properly refund or credit advertisers for payments made for clicks or impressions that Google subsequently determined were invalid. *See id.* ¶¶ 6, 41–45.

Based on the above allegations, the SAC pleads nine claims. Claims 1 to 4 are brought by AdTrader individually against Google. Claims 5 to 9 are class action claims.

**B.      AdTrader's Claims and Plaintiffs' Class Claims Relevant to the Instant Motion**

Plaintiffs filed this action on December 13, 2017. Compl., ECF 1. On March 20, 2018, Plaintiffs filed a first amended complaint pleading fifteen claims—claims 1 to 6 were brought by AdTrader individually against Google and claims 7 to 15 were class action claims. *See generally* First Am. Compl. ("FAC"), ECF 29. Google subsequently moved to dismiss claims 2 to 15 of the FAC for failure to state a claim. *See* Motion to Dismiss FAC ("MTD"), ECF 36. On July 13,

3

2018, the Court denied Google's MTD claim 6; granted Google's MTD claim 9 without leave to amend; granted Google's MTD claims 2, 4–5, 7–8, 10–11, and 13–15 with leave to amend; and granted Google's MTD claims 3 and 12 with leave to amend in part and without leave to amend in part. *See* FAC Order at 21–22, ECF 63.

On August 13, 2018, Plaintiffs filed the operative SAC pleading nine claims. Google's instant motion to dismiss targets the following six claims in Plaintiffs' SAC:

Count II (individual) for breach of the implied covenant of good faith and fair dealing;

Count V (class) for breach of contract;

Count VI (class) for breach of the implied covenant of good faith and fair dealing;

Count VII (class) for breach of implied duty to perform with reasonable care;

Count VIII (class) for false advertising; and

Count IX (class) for violation of unfair competition law.

*See generally* SAC, ECF 72; Motion, ECF 76. Plaintiffs' FAC included these same causes of action.[1] All six challenged causes of action were previously dismissed with leave to amend[2] (Count VII, which was FAC Count 12, was also dismissed in part without leave to amend). *See* FAC Order at 21–22.

## II. LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When considering such a motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

---

[1] Except the SAC's false advertising claim which appears to have replaced the FAC's claims for fraud and negligent misrepresentation.
[2] Count II was FAC Count 2; Count V was FAC Count 10; Count VI was FAC Count 11; Count VII was FAC Count 12; Count VIII was FAC Counts 7 and 8; Count IX was FAC Count 14.

4

## III. DISCUSSION

Google moves to dismiss claim 2 which is brought by AdTrader as an individual claim. Google also seeks to dismiss claims 5 to 9 which are class action claims. As an initial matter, and as discussed at the Hearing, arguments raised by the parties in footnotes or argued only in footnotes are not properly briefed and are denied. The Court discusses each challenged claim in turn. For the reasons that follow, Google's motion to dismiss is GRANTED WITHOUT LEAVE TO AMEND IN PART and DENIED IN PART.

### A. Second Cause of Action: Breach of the Implied Covenant of Good Faith and Fair Dealing (AdX Publisher Agreement)

Under the SAC's second claim, AdTrader asserts that Google breached the implied covenant of good faith and fair dealing present in the AdX Publisher Agreement between AdTrader and Google. *See* SAC ¶¶ 122–23. The Court previously dismissed this claim in the FAC but granted AdTrader leave to allege an implied covenant claim in the alternative "to the extent that the parties' contract is not deemed to impose an objective standard." *See* FAC Order at 6, ECF 63. The SAC "pleads this claim in the alternative to its breach of contract claim, should it be determined that Google had subjective discretion to withhold payments to AdX publishers under . . . the AdX Publisher Agreement." SAC ¶ 121.

However, this alternative claim is rendered moot by Google's representation that the AdX Publisher Agreement "imposes an objective standard of reasonableness on Google, rendering this claim wholly duplicative of AdTrader's breach of contract claim [claim 1 of the SAC]." *See* Motion at 7, ECF 76. In other words, Google admits that the AdX Publisher Agreement does not give Google the subjective discretion to withhold payments. Google is bound by this admission and will be judicially estopped from arguing otherwise in this action. Because Plaintiffs' alternative claim for breach of the implied covenant of good faith and fair dealing requires a "determin[ation] that Google had subjective discretion" under the AdX Publisher Agreement, *see* SAC ¶ 121, this alternative claim is moot. And to the extent this claim relies on an objective standard, application of the objective standard means this claim is subsumed by Plaintiffs' breach of contract claim (Count I of the SAC, which is not challenged at present). *See Integrated Storage*

5

*Consulting Servs., Inc. v. NetApp, Inc.*, 2013 WL 3974537, at *7–8 (N.D. Cal. July 31, 2013). Accordingly, the Court GRANTS Google's motion to dismiss the second cause of action WITHOUT LEAVE TO AMEND.

### B. Fifth Cause of Action: Breach of Contract (DoubleClick Ad Exchange Agreement, DBM Agreement, and AdWords Agreement)

The SAC's fifth claim is a class action claim for breach of contract. Plaintiffs allege breach of three separate contracts. First, Plaintiffs (except SCB) allege Google breached Section 6 of the DoubleClick Ad Exchange Agreement by failing to provide refunds or credits for amounts Plaintiffs paid Google for clicks or impressions on an AdX publisher's website that Google subsequently flagged as invalid. *See* SAC ¶¶ 158, 178, 193. Second, Plaintiffs allege Google breached Section 7 of the AdWords Agreement for similar conduct. *See id.* ¶¶ 159, 179. Third, Plaintiffs (except SCB) allege Google breached Section 2(a) of the DBM Agreement by failing to provide refunds or credits for funds spent by Plaintiffs on clicks or impressions bought using DBM that Google subsequently flagged as invalid. *See id.* ¶¶ 181, 190.

As a preliminary matter, Google argues that "Plaintiffs previously admitted that none of the three contracts at issue actually requires Google to refund advertisers for invalid activity." *See* Motion at 8 (citing to Plaintiffs' statement at FAC ¶ 253 that "[t]he DoubleClick Advertising Agreement does not have any express language relating to the parties' obligations when Google discovers that its advertisers had spent money on websites Google determined to have had fraudulent or invalid traffic"). Google contends that therefore Plaintiffs should be bound by their "admission that there are no refund terms in the contracts." *See* Reply at 2, ECF 88. Plaintiffs counter that the FAC simply described what the advertising contracts did not "literally state." *See* Opp'n at 3, ECF 79. Google's argument is unconvincing. To the extent Plaintiffs' "admission" was to a legal question—such as contract interpretation—that admission is not binding on Plaintiffs. And "[f]actual assertions in pleadings and pretrial orders, **unless amended**, are considered judicial admissions conclusively binding on the party who made them." *See American Title Ins. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988) (emphasis added). Here, Plaintiffs have amended. Indeed, in dismissing Plaintiffs' breach of contract claim in the FAC, the Court

6

specifically granted Plaintiffs leave to allege which terms of the agreements at issue have been breached. *See* FAC Order at 17. In sum, Google's "admission" argument fails.

Turning to the contracts at issue, the relevant portions of the DoubleClick Ad Exchange Agreement and the AdWords Agreement (Section 6 and Section 7, respectively) are essentially the same. Meanwhile, Section 2(a) of the DBM Agreement contains quite different language. Accordingly, the Court first addresses in unison the DoubleClick Ad Exchange Agreement and AdWords Agreement, followed by the DBM Agreement.

**1. DoubleClick Ad Exchange Agreement and AdWords Agreement**

Section 6 of the DoubleClick Ad Exchange Agreement provides:

> **6. Payment.** Customer will pay all charges incurred in connection with the Program, . . . **[c]harges are solely based on Google's measurements for the Programs and the applicable billing metrics (e.g., clicks or impressions)** . . . . Any portion of a charge not disputed in good faith must be paid in full. . . . If Google does not deliver Ads to the selected Targets, then Customer's sole remedy is to make a claim for advertising credits within 60 days after the invoice date ("Claim Period"), after which Google will issue the credits following claim validation. **Customer understands that third parties may generate impressions or clicks on Customer's Ads for prohibited or improper purposes and that its sole remedy is to make a claim for advertising credits within the Claim Period**, after which Google will issue the credits following claim validation. TO THE FULLEST EXTENT PERMITTED BY LAW, (A) **CUSTOMER WAIVES ALL CLAIMS RELATING TO ANY PROGRAM CHARGES UNLESS A CLAIM IS MADE WITHIN THE CLAIM PERIOD** AND (B) THE ISSUANCE OF ADVERTISING CREDITS (IF ANY) IS AT GOOGLE'S REASONABLE DISCRETION.

Ex. 2 to SAC, ECF 72-2 (emphasis added and removed). Section 7 of the AdWords Agreement provides essentially the same language. *See* Ex. 4 to SAC, ECF 72-4. Both agreements are governed by California law. *See* DoubleClick Ad Exchange Agreement § 12, Ex. 2 to SAC; AdWords Agreement § 12, Ex. 4 to SAC. In this section, the Court jointly refers to the DoubleClick Ad Exchange Agreement and AdWords Agreement as "the DoubleClick Agreement."

Discussion at the Hearing focused in part on the timing of the alleged breach. There are at least three scenarios. First, where Google invoices advertisers for clicks or impressions that Google believes to be valid, but advertisers question validity by making a claim for credits within

7

60 days of invoicing, and Google investigates as provided by the contract. Second, as raised by Plaintiffs at the Hearing, where Google knows the clicks or impressions to be invalid at the time of invoicing but nonetheless charges advertisers for those clicks or impressions as though valid. Third, where Google believes the clicks or impressions to be valid at the time of invoicing and the advertiser makes no claim for credits within 60 days of invoicing, but Google discovers the clicks or impressions to be invalid sometime after invoicing and does not provide the advertiser with a credit. The first scenario is not in meaningful dispute and shall not go forward. The Court discusses in turn the second scenario ("before invoicing") and third scenario ("after invoicing").

### a. Clicks or impressions Google allegedly knew invalid before invoicing

At the Hearing, Plaintiffs argued that their theory of breach includes improper invoicing by Google for clicks or impressions Google knew to be invalid at the time of invoicing—"Google billed for traffic that it knew at the time was invalid or highly suspected to be invalid" and "Google manipulated the timing of the invoices . . . knowing that invalid traffic would come in." *See* Hr. Transcript at 17:18–25. However, these allegations simply do not appear in the SAC. Instead, the SAC pertains to clicks or impressions Google initially deemed valid but discovered were invalid sometime after the invoice date. *See, e.g.*, SAC ¶ 165 (alleging Plaintiffs understood that "if Google initially charged [Plaintiffs] for invalid clicks or impressions, then Google would provide a refund or credit if it **subsequently determined** that they were invalid") (emphasis added). Notwithstanding Plaintiffs' argument at the Hearing, Plaintiffs have not presented facts or pleadings to support Plaintiffs' theory that Google knew clicks or impressions were invalid *before* invoicing but nonetheless invoiced Plaintiffs for those same clicks or impressions and failed to provide a refund or credit as required by contract. The Court simply finds this theory implausible based on the multiple rounds of pleadings and is not convinced Plaintiffs could adequately plead breach of contract on such a basis in this action.

Accordingly, the Court GRANTS Google's motion to dismiss the fifth cause of action with respect to the DoubleClick Ad Exchange Agreement and AdWords Agreement to the extent the allegations concern clicks or impressions Google knew to be invalid *before invoicing*, WITHOUT LEAVE TO AMEND.

8

### b. Clicks or impressions Google allegedly determined invalid after invoicing

The Court next addresses Plaintiffs' allegations that Google failed to refund or credit Plaintiffs for clicks or impressions Google initially deemed valid but discovered were invalid sometime after the invoice date. *See, e.g.*, SAC ¶¶ 165, 166. Under this scenario, Plaintiffs allege that "Google itself claims or determines there was invalid activity, refuses to pay the publisher for that invalid activity, and then keeps the money for itself instead of returning it to the advertiser, as promised." *Id.* ¶ 198. As a simplistic and generic example, Plaintiffs' theory is that if the advertiser is invoiced $10 for clicks or impressions that are actually valid, $3 should go to Google and $7 to the publisher, but that in this scenario Google later discovers that the clicks are invalid and does not pay the publisher $7 and does not credit the advertiser, thus improperly generating a windfall for itself.

Google contends that the DoubleClick Agreement is fully integrated and that Section 6 "expressly disclaim[s] any possibility of refunds" under Plaintiffs' theory of breach. *See* Motion at 9. Google further contends that "Plaintiffs' attempt to rely on various pieces of extra-contractual evidence to support their 'understanding' [of the contract] is equally futile because parol evidence cannot be used to interpret an unambiguous integrated agreement." *Id.* Plaintiffs counter that Section 6 provides that charges would be based *solely* on Google's "measurements" and the "applicable billing metrics" and that the parties mutually understood that those terms would *not* include clicks or impressions that Google later determined to be invalid. *See* Opp'n at 4–5; SAC ¶¶ 165–66. In other words, Plaintiffs allege that "measurements" and "applicable billing metrics" as used in Section 6 do not permit Google to charge advertisers for clicks or impressions that Google "**subsequently determined**" to be invalid. *See* SAC ¶ 166 (emphasis added). For the reasons discussed below, the Court finds that the DoubleClick Agreement is ambiguous as to whether the terms "measurements" and "applicable billing metrics" include clicks or impressions that Google later discovers to be invalid.

The DoubleClick Agreement is governed by California law. Under California law, a contract must be interpreted to give effect to the mutual intention of the parties at the time the contract was formed. Cal. Civ. Code § 1636. The parties' intent is determined from the

9

language of the contract, "if the language is clear and explicit, and does not involve an absurdity." Cal. Civ. Code § 1638. However, "[t]he proper interpretation of a contract is disputable if the contract is susceptible of more than one reasonable interpretation, that is, if the contract is ambiguous." *Fremont Indem. Co. v. Fremont Gen. Corp.*, 148 Cal. App. 4th 97, 114 (2007). "Extrinsic evidence may be admitted if it serves to prove a meaning to which the contract is reasonably susceptible." *Shum v. Intel Corp.*, 2008 WL 4414722, at *6 (N.D. Cal. Sept. 26, 2008) (citing *Powers v. Dickson, Carlson & Campillo*, 54 Cal. App. 4th 1102, 1111 (1997)). Moreover, extrinsic evidence may be offered "to resolve an ambiguity," even when the contract is an integrated agreement. *See Lennar Mare Island LLC v. Steadfast Ins. Co.*, 176 F. Supp. 3d 949, 963 (E.D. Cal. 2016) (citing California law).

Indeed, under California law, "[e]ven if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible." *First Nat'l Mortgage Co. v. Federal Realty Inv. Trust*, 631 F.3d 1058, 1067 (9th Cir. 2011) (internal citation omitted). Such is the case here. In support of its favored interpretation of Section 6, Plaintiffs provide extrinsic evidence of Google's "repeated representations" that it would credit advertisers for "invalid activity [] found through offline analysis and reactive investigation." *See, e.g.*, Opp'n at 9; SAC ¶ 171. For example, Plaintiffs point to extrinsic evidence that Google represented to its advertisers that "[w]hen invalid activity is found through offline analysis and reactive investigation, we mark those clicks as invalid and issue credits to any advertisers affected by this activity." SAC ¶ 171 (citing and quoting Google Ads Traffic Quality webpage, Ex. 7 to SAC, ECF 72-7). Accordingly, the extrinsic evidence reveals that Google's advertising charges—which under Section 6 are based solely on "measurements" and "applicable billing metrics" for the program—are not necessarily limited to what Google believed at the time of invoicing. Instead, the terms are reasonably susceptible to an interpretation that would require Google to update its "measurements" and "applicable billing metrics" based on later-discovered invalid activity and provide credits accordingly. Because the terms are reasonably susceptible of more than one interpretation, the contract is ambiguous. *Fremont Indem.*, 148 Cal. App. 4th at 114.

10

Google's counterarguments are unavailing. Although the contract's plain language anticipates that advertisers may be invoiced for clicks or impressions that are in fact invalid, and provides a specific, sole remedy (to make a claim for advertising credits within the Claim Period), the scope and/or limitations of the contract terms are ambiguous, as discussed above. Put simply, even though the contract appears unambiguous at first blush, Plaintiffs' extrinsic evidence reveals a latent ambiguity.

A court may not dismiss on the pleadings where the extrinsic evidence renders the contract ambiguous. *See A. Kemp Fisheries, Inc. v. Castle & Cooke, Inc.*, 852 F.2d 493, 496 n.2 (9th Cir. 1988). Accordingly, the Court DENIES Google's motion to dismiss the fifth cause of action with respect to the DoubleClick Ad Exchange Agreement and AdWords Agreement to the extent the allegations concern clicks or impressions Google determined to be invalid *after invoicing*.

### 2. DBM Agreement

Section 2(a) of the DBM Agreement does not contain the language of the DoubleClick Ad Exchange Agreement or AdWords Agreement but rather provides:

> **2. Services and Obligations.** (a) DoubleClick will: (i) provide Services to Company, and obtain all rights necessary to provide Services hereunder; (ii) **deliver Ads according to the trafficking criteria selected by Company**; (iii) provide Company access to web-based training and support; (iv) use current Internet Ad serving industry-standard security measures in connection with its provision of Services hereunder; and (v) promptly notify Company of any breach of DoubleClick security resulting in unauthorized access to the data derived from Company's use of Services. DoubleClick hereby represents and warrants that it has all necessary rights and authority (i) to enter into this APA and each Order Form and (ii) to perform its obligations hereunder and thereunder.

Ex. 3 to SAC, ECF 72-3 (emphasis added). The DBM Agreement is governed by New York law. *See* DBM Agreement § 10.

Plaintiffs allege that Google breached Section 2(a) of the DBM Agreement because the term "deliver Ads according to the trafficking criteria selected by the Company [Advertiser]" requires Google to refund or credit Plaintiffs if Google initially charged them for clicks or impressions that Google subsequently determined were invalid. *See, e.g.*, SAC ¶ 185. Plaintiffs contend that "the DBM Agreement is ambiguous, which by itself precludes dismissal." *See* Opp'n

11

at 11. Google counters that the term cited by Plaintiffs is not ambiguous and that in any event interpreting "trafficking criteria" to mean "issue refunds for any invalid activity Google may detect after the fact" would "obliterate any normal meaning of those words." *See* Reply at 7; *see also* Motion at 12. For the reasons discussed below, the Court finds Section 2(a) ambiguous in relevant part and accordingly DENIES Google's motion to dismiss claim 5 with respect to the DBM Agreement.

Under New York law, "if a contract is straightforward and unambiguous, its interpretation presents a question of law for the court to be made without resort to extrinsic evidence." *See Spinelli v. National Football League*, 903 F.3d 185, 200 (2d Cir. 2018) (internal quotation and citation omitted). "But if the intent of the parties cannot be ascertained from the face of their agreement, the contract is ambiguous and its interpretation presents a question of fact." *Id.* (internal quotation and citation omitted). Courts must consider how the contract would be understood "by a reasonably intelligent person who has examined the context of the entire agreement and who is cognizant of the customs . . . and terminology as generally understood in the particular trade or business." *See Great Minds v. Fedex Office and Print Services, Inc.*, 886 F.3d 91, 94 (2d Cir. 2018) (internal quotation and citation omitted). If the contract language "is susceptible to two reasonable interpretations, the contract is ambiguous as a matter of law." *See id.* (internal quotation and citation omitted).

Here, the face of the DBM Agreement does not define "trafficking criteria." Indeed, unlike the DoubleClick Agreement, the DBM Agreement makes no mention of credits or improper or prohibited clicks or impressions. *See generally* DBM Agreement. Nor does the DBM Agreement include explicit language that the Company waives all claims relating to charges unless a claim is made within the claim period. *See generally id.* Plaintiffs point to evidence that Google's self-declared practices in the digital advertising industry call for credits for invalid activity. For example, Plaintiffs cite a Google Ads Traffic Quality webpage stating: "When invalid activity is found through **offline analysis and reactive investigation, we mark those clicks as invalid and issue credits** to any advertisers affected by this activity." *See* Ex. 7 to SAC at 3 (emphasis added); *see also* Ex. 6 to SAC at 2 (separate Google Ads Traffic Quality webpage

12

containing similar language). The Court finds this evidence relevant to understanding "the context of the entire agreement and . . . the customs . . . and terminology as generally understood in the [digital advertising industry]." *See Great Minds*, 886 F.3d at 94. In other words, the contract language "trafficking criteria selected by the Company" is susceptible to the reasonable interpretation that a Company's self-selected trafficking criteria would require credits for clicks or impressions the Company was charged for but Google later found to be invalid. The evidence cited by Plaintiffs at least raises a question of fact as to whether this was the industry norm.

In sum, the Court finds the term "deliver Ads according to the trafficking criteria selected by the Company" in Section 2(a) of the DBM Agreement ambiguous. Under New York law, ambiguity in contract language "precludes summary dismissal on a Rule 12(b)(6) motion." *See Oppenheimer & Co. v. Trans Energy, Inc.*, 946 F. Supp. 2d 343, 349 (S.D.N.Y. 2013). Accordingly, the Court DENIES Google's motion to dismiss Plaintiffs' fifth cause of action with respect to breach of the DBM Agreement.

### 3. Conclusions re Fifth Cause of Action for Breach of Contract

The Court's analysis of Plaintiffs' fifth cause of action for breach of contract falls into two categories: (1) the DoubleClick Ad Exchange Agreement and AdWords Agreement (referred to jointly as "the DoubleClick Agreement"); and (2) the DBM Agreement.

The first category consists of two sub-categories: allegations concerning clicks or impressions Google knew to be invalid *before invoicing* Plaintiffs; and allegations concerning clicks or impressions Google discovered to be invalid *after invoicing* Plaintiffs. Google's motion to dismiss the former allegations is GRANTED WITHOUT LEAVE TO AMEND, while Google's motion to dismiss the latter allegations is DENIED. The Court notes that the DoubleClick Agreement is expressly limited to credits and does not cover refunds.

Google's motion to dismiss Plaintiffs' allegations of breach of the DBM Agreement is DENIED.

**C. Sixth Cause of Action: Breach of the Implied Covenant of Good Faith and Fair Dealing (DoubleClick Ad Exchange Agreement, DBM Agreement, and AdWords Agreement)**

The SAC's sixth claim is a class action claim for breach of the implied covenant of good

13

faith and fair dealing present in the DoubleClick Ad Exchange Agreement, AdWords Agreement, and DBM Agreement. *See* SAC ¶ 201. The parties' arguments with respect to claim 6 mirror the parties' arguments with respect to claim 2, and the Court reaches the same conclusion.

Plaintiffs plead this claim in the alternative to their class action breach of contract claim "in the event it is determined that under [the three agreements] Google's obligation to provide refund or credits to advertisers [] is a matter of Google's subjective discretion." SAC ¶ 201. However, Google tacitly admits that nothing in the agreements provides Google with subjective discretion, arguing that "Plaintiffs' attempt to bring this claim in the alternative [] fails . . . [to] show[] that the unwritten, implied terms of the agreements on which they purportedly rely could plausibly be found to impose any 'subjective discretionary' obligations." *See* Motion at 16. Google further argues that "as with their breach of contract claim, Plaintiffs have already admitted these alleged duties cannot be found in the actual language of the agreements. *Id.* at 15–16. In effect, Google admits that the agreements do not afford Google subjective discretion. Thus, Google will be judicially estopped from later flipping its position to contend that the agreements do provide Google with the *subjective* discretion to withhold credits for clicks or impressions discovered to be invalid after invoicing. Accordingly, this claim is moot and the Court GRANTS Google's motion to dismiss the sixth cause of action WITHOUT LEAVE TO AMEND.

### D. Seventh Cause of Action: Breach of Implied Duty to Perform with Reasonable Care (DoubleClick Ad Exchange Agreement and AdWords Agreement)

The SAC's seventh claim is a class action claim for breach of the implied duty to perform with reasonable care present in the DoubleClick Ad Exchange Agreement and AdWords Agreement (jointly, "the DoubleClick Agreement"). *See* SAC ¶¶ 216–17. Plaintiffs bring this claim "solely to recover contract damages and not tort damages." *Id.* ¶ 210. The Court previously dismissed this claim in the FAC but granted Plaintiffs leave to file an amended claim that "must contain sufficient factual allegations to support the elements of a claim for breach of implied duty to perform with reasonable care." *See* FAC Order at 18.

Plaintiffs allege that "Google failed to use reasonable care in performing its contractual obligations to provide Plaintiffs . . . with advertising metrics." *See* SAC ¶¶ 216, 217. According

14

to the SAC, Google provided Plaintiffs with metrics every month "showing the total number of valid, billable impressions that their AdWords advertisements received on AdX publishers' websites." *Id.* ¶ 215. Plaintiffs allege that Google failed to correct erroneous metrics or provide Plaintiffs with any kind of corrective disclosure once Google "subsequently became aware that the advertising metrics [previously] provided to Plaintiffs . . . incorrectly showed" as valid certain invalid clicks or impressions. *Id.* ¶ 216. Thus, Plaintiffs assert that Google "fail[ed] to perform its services with reasonable care." *Id.* ¶ 218.

Google contends that Plaintiffs improperly "seek to impose a duty on Google to provide specific metrics regarding invalid activity" that is not supported by "the words of the contract[s]." *See* Motion at 16. Plaintiffs counter that the parties' agreements "contemplate" Google's "duty to provide advertising metrics." *See* Opp'n at 16. Plaintiffs further argue that Google "regularly provided them with advertising metrics" and that therefore Google's "course of performance sufficiently supports Plaintiffs' implied duty claim." *See id.* For the reasons discussed below, the Court finds claim 7 may not proceed because it is subsumed in Plaintiffs' breach of contract claim.

First, to the extent Plaintiffs allege that the contract itself imposes the alleged implied duty to correct or supplement advertising metrics after the fact, the alleged implied duty does not exist because the contract already contains the purported obligation. Plaintiffs cannot assert a non-existent implied duty. The claim which Plaintiffs seek to assert would be subsumed in its breach of contract claim. Second, Plaintiffs' course of performance argument simply maps Plaintiffs' breach of contract allegations on to this different claim. Because the allegations are no different, this claim is subsumed in Plaintiffs' breach of contract claim. *See Guz v. Bechtel Nat'l Inc.*, 24 Cal. 4th 317, 327 (2000) ("[W]here breach of an actual term is alleged, a separate implied covenant claim, based on the same breach is superfluous."). Accordingly, the Court GRANTS Google's motion to dismiss the seventh cause of action WITHOUT LEAVE TO AMEND.

### E. Eighth Cause of Action: Violation of California's False Advertising Law; and Ninth Cause of Action: Violation of California's Unfair Competition Law

The SAC's eighth claim is a class action claim brought under California's False Advertising Law ("FAL"), California Business & Professions Code §§ 17500, et seq. Plaintiffs

allege that Google offered its advertising services to consumers and the public on a nationwide basis and "made and broadly disseminated over the Internet [numerous] untrue or misleading statements" concerning purported refunds or credits for invalid activity discovered by Google. *See* SAC ¶¶ 221–222. Plaintiffs also bring the FAL claim in the alternative, should it be determined that an advertiser is contractually entitled to a credit for invalid traffic under the DoubleClick Ad Exchange Agreement or AdWords Agreement only if the advertiser requested that Google perform a "reactive investigation" of its ad traffic, under the theory that Google's public statements regarding credits were contradictory to such a requirement and plainly misleading. *Id.* ¶¶ 230–31.

The SAC's ninth claim is a class action claim brought under California's Unfair Competition Law ("UCL"), California Business & Professions Code §§ 17200, et seq. *See* SAC ¶¶ 238–39. Plaintiffs allege that "Google's actions and systematic conduct towards Plaintiffs" in "refus[ing] to provide credits or refunds to advertisers for invalid impressions or clicks on their ads" violates the UCL. *Id.* ¶ 243. The Court previously dismissed this claim in the FAC on the basis that Plaintiffs lacked standing, but granted Plaintiffs leave to amend. *See* FAC Order at 19–20. Specifically, the Court found that Plaintiffs' FAC contained no allegations that Plaintiffs were "small and unsophisticated entities" of the type who may have standing under the UCL. *See id.*

As an initial matter, Google argues that Plaintiffs cannot bring a FAL claim related to the DBM Agreement because that agreement is governed by New York law. *Id.* at 18–19. In response, Plaintiffs state that they "did **not** bring their FAL claim on behalf of the DBM Advertisers Class." *See* Opp'n at 17 n.8 (emphasis in original). Plaintiffs thus argue that the DBM Agreement is irrelevant to Plaintiffs' FAL claim. *See* Opp'n at 18. Google responds that Plaintiffs' FAL claim for the DBM-AdX Advertiser sub-class as defined in SAC ¶ 93 should be dismissed based on a choice-of-law provision. *See* Reply at 10–11. These issues are not sufficiently briefed. Accordingly, the Court makes no ruling as to whether Plaintiffs' FAL claim may cover advertisers who entered both the DBM Agreement and DoubleClick Ad Exchange Agreement.

The Court next addresses in turn (1) standing for Plaintiffs' FAL and UCL claims;

16

(2) remaining FAL issues; and (3) remaining UCL issues. For the reasons discussed below, Google's motion to dismiss Plaintiffs' FAL and UCL claims is DENIED.

### 1. FAL and UCL standing

Google contends that Plaintiffs lack statutory standing to bring their FAL and UCL claims. *See* Motion at 19–22, 23–24. Google argues that the FAL and UCL were enacted to protect consumers and the public and that Plaintiffs lack standing because Plaintiffs are "corporate customers." *See id.* at 22, 23. As discussed below, the Court disagrees.

The UCL and FAL apply to any "person who has suffered injury in fact and has lost money or property as a result" of the alleged wrongful conduct. *See* Cal. Bus. & Prof. Code §§ 17204, 17535. The term "person" includes "corporations." *Id.* §§ 17201, 17506. "[W]here a UCL action is based on contracts not involving either the public in general or individual consumers who are parties to the contract, a corporate plaintiff may not rely on the UCL for the relief it seeks." *Linear Tech. Corp. v. Applied Materials, Inc.*, 152 Cal. App. 4th 115, 135 (2007). However, courts have held that *Linear Tech.* does not prevent *all* corporate plaintiffs from proceeding under the UCL where the contract-at-issue does not involve either the public or individual consumers, but rather that *Linear Tech.* only precludes "sophisticated corporations" or "large corporations" from seeking such relief. *See, e.g.*, *Circle Click Media LLC v. Regus Mgmt. Group LLC*, 2015 WL 6638929, at *4–5 (N.D. Cal. Oct. 30, 2015) (applying California law); *Ewert v. eBay, Inc.*, 2010 WL 4269259, at *8–9 (N.D. Cal. Oct. 25, 2010) (same).

Here, the contracts-at-issue do not involve either the public in general or individual consumers. Thus, the dispute turns on whether Plaintiffs are sophisticated or large corporations or rather small and unsophisticated entities. Google argues that the SAC fares no better than the FAC and urges the Court to dismiss Plaintiffs' UCL claim for lack of standing. *See* Motion at 23–24. Plaintiffs counter that the SAC newly alleges that all Plaintiffs are small, unsophisticated businesses each employing between 3 and 25 people. *See* Opp'n at 23. Indeed, the SAC alleges that Plaintiffs are all "small businesses [and] not sophisticated corporate entities," and lists the number of people employed by each company. *See* SAC ¶ 236. Three named plaintiffs are restaurants—Classic, Fresh Break, and LML, each with approximately 25 or fewer employees. *Id.*

17

Plaintiff Ad Crunch is no longer in business and has no employees. *Id.* Plaintiff SCB is a small collections agency with 3 employees, while AdTrader currently has a total of 12 employees. *Id.* In addition, the SAC alleges that "the vast majority of AdWords advertisers are small businesses" and that "millions of the participants in AdX are small businesses." *Id.* ¶ 28. Taking Plaintiffs' allegations as true, as it must at the pleading stage, the Court finds that Plaintiffs are similar to the small entities in *Circle Click* and unlike the "large corporations" in *Linear Tech.* Moreover, the relative level of sophistication may be a question of fact. *See In re Yahoo! Litigation*, 251 F.R.D. 459, 475 (C.D. Cal. 2008). Accordingly, Google's argument that Plaintiffs lack FAL and UCL standing because this case does not involve individual consumers or the public fails.

Google additionally argues that Plaintiffs have not sufficiently alleged reliance. Indeed, "[t]o establish standing as a class representative for a misrepresentation claim under the UCL or FAL, a plaintiff must show he personally lost money or property because of his own **actual and reasonable reliance** on the allegedly untrue or misleading statements." *See Woods v. Google Inc.*, 2011 WL 3501403, at *8 (N.D. Cal. Aug. 10, 2011) (citing California law) (emphasis added). In other words, UCL and FAL claims require reliance. *See In re Tobacco II Cases*, 46 Cal. 4th 298, 326 (2009) (class representatives must establish reliance under the UCL and FAL to have standing). Here, the Court finds that Plaintiffs have adequately alleged that they relied on Google's public statements to "expend[] money to purchase advertising through AdX and DBM that they would not have otherwise spent." *See* SAC ¶¶ 227, 228. For example, Plaintiffs allege they relied on Google's statement that "[w]hen invalid activity is found through **offline analysis and reactive investigation, we mark those clicks as invalid and issue credits** to any advertisers affected by this activity" in deciding to enter the agreements. *See* Ex. 7 to SAC at 3 (emphasis added); SAC ¶¶ 222.c, 227.

In sum, the Court finds that Plaintiffs have adequately alleged FAL and UCL standing.

### 2. Remaining FAL issues

Google contends that Plaintiffs fail to plead the "untrue or misleading" statements with the requisite particularity under Rule 9(b) and that Plaintiffs reliance allegations are conclusory. *See* Motion at 17–18. In addition, Google contends that the SAC inadequately pleads how its public

18

statements were "untrue or misleading" to users of AdX Buyer or AdWords. *See id.* at 23.

Plaintiffs counter that the SAC "more than adequately give[s] Google notice of what misconduct it engaged in so that it can defend itself against Plaintiffs' [FAL] claim." *See* Opp'n at 18. Plaintiffs further argue that the SAC plausibly alleges statutory standing and a link between Google's public statements and advertisers using either AdX Buyer or AdWords. *See* Opp'n at 19–22.

The Court agrees with Plaintiffs. Here, Plaintiffs' factual allegations, accepted as true, provide that Google's alleged misrepresentations occurred before the agreements were entered, that Google's statements materially concerned the agreements, and how Plaintiffs relied on the statements. *See, e.g.*, SAC ¶¶ 168, 171, 222, 227–28. Thus, by a thin margin, Plaintiffs have done just enough to "nudge[] their claim[] across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

### 3. Remaining UCL issues

Finally, Google argues that the SAC does not sufficiently allege that Google engaged in "unlawful, unfair or fraudulent business act or practice" as required by the UCL. Cal. Bus. & Prof. Code § 17200; *see also* Motion at 25. The Court disagrees. Plaintiffs adequately state a UCL claim under the "unlawful" and "fraudulent" prongs based on the reasons discussed above in denying Google's motion to dismiss Plaintiffs' FAL claim. *See Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 950 (2002) ("[A]ny violation of the false advertising law . . . necessarily violates the UCL.") (internal quotation and citation omitted). And Plaintiffs have plausibly alleged that Google's practices are "unfair" within the meaning of the UCL because, for example, "[Google's] practices harm the public interest while creating zero utility in the process." *See* SAC ¶ 243; *see also Backus v. General Mills, Inc.*, 122 F. Supp. 3d 909, 929 (N.D. Cal. 2015) (under the "balancing test," a plaintiff states a claim under the "unfair" prong if he alleges that the harm to the public from the business practice is greater than the utility of the practice). Accordingly, Google's argument fails.

### 4. Conclusion re Eighth and Ninth Causes of Action (FAL and UCL)

In sum, the Court DENIES Google's motion to dismiss the eighth and ninth causes of action.

## IV. ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that:

(1) Google's motion to dismiss the second cause of action for breach of the implied covenant of good faith & fair dealing is GRANTED WITHOUT LEAVE TO AMEND.

(2a) Google's motion to dismiss the fifth cause of action based on breach of the DoubleClick Ad Exchange Agreement and AdWords Agreement concerning clicks or impressions Google knew to be invalid *before invoicing* is GRANTED WITHOUT LEAVE TO AMEND.

(2b) Google's motion to dismiss the fifth cause of action based on breach of the DoubleClick Ad Exchange Agreement and AdWords Agreement concerning clicks or impressions Google determined to be invalid *after invoicing* is DENIED.

(2c) Google's motion to dismiss the fifth cause of action based on breach of the DBM Agreement is DENIED.

(3) Google's motion to dismiss the sixth cause of action based on breach of the implied covenant of good faith & fair dealing is GRANTED WITHOUT LEAVE TO AMEND.

(4) Google's motion to dismiss the seventh cause of action based on breach of the implied duty to perform with reasonable care is GRANTED WITHOUT LEAVE TO AMEND.

(5) Google's motion to dismiss the eighth cause of action based on violation of California's False Advertising Law is DENIED.

(6) Google's motion to dismiss the ninth cause of action based on violation of California's Unfair Competition Law is DENIED.

Plaintiffs may not add claims or parties without prior leave of the Court. All discovery matters are referred to the assigned magistrate judge.

**IT IS SO ORDERED.**

Dated: April 22, 2019

_____
BETH LABSON FREEMAN
United States District Judge